Nos. 25-8013, 26-88, 26-497, 26-525

_____

# In the United States Court of Appeals For the Ninth Circuit

_____

**STATE OF CALIFORNIA, ET AL.,**
*Plaintiffs-Appellees,*

**v.**

**UNITED STATES OF AMERICA, ET AL.,**
*Defendants,*

**WESTERN STATES TRUCKING ASSOCIATION, ET AL.,**
*Movant-Intervenor Defendants-Appellants*

_____

On Appeal from the U.S. District Court
for the Northern District of California
4:25-cv-04966-HSG; Hon. Haywood S. Gilliam, Jr.

_____

**APPELLANTS' IN CASE NOS. 26-88, 26-497, 26-525
EXCERPTS OF RECORD VOLUME 3 of 4**

_____

Raymond B. Ludwiszewski
Rachel Levick
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
Tel.: (202) 955-8500

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
 Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620

*Additional counsel listed inside*

3-ER-292

Sean Howell
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
 Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8355

Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Tel.: (512) 693-8350

Steven P. Lehotsky
Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
 Suite 700
Washington, DC 20001
Tel.: (512) 693-8350

*Counsel for Appellants*

# Exhibit B

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice* forthcoming)
Rachel Levick (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER
1700 M Street, N.W.
Washington, DC 20036
Tel.: 202-955-8500ludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-*
*Intervenors The Alliance for Automotive*
*Innovation and The National Automobile*
*Dealers Association*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 4:25-cv-04966-HSG |
| Plaintiffs, | **PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION** |
| vs. | |
| UNITED STATES OF AMERICA, et al., | Administrative Procedure Act Case |
| Defendants. | Action Filed:  June 12, 2025 |

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG                **3-ER-295**

Defendant-Intervenors the Alliance for Automotive Innovation and the National Automobile Dealers Association, by and through their undersigned attorneys, answer Plaintiffs' June 12, 2025, Complaint as follows:

## **INTRODUCTION**

1.      Defendant-Intervenors admit that 42 U.S.C. § 7521(a) provides that the Administrator of the United States Environmental Protection Agency (EPA) shall prescribe standards applicable to the emission of any air pollutant from new motor vehicles, that 42 U.S.C. § 7543(a) provides that no State shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles, and that 42 U.S.C. § 7543(b)(1) allows EPA to waive application of 42 U.S.C. § 7543(a) if certain enumerated conditions are satisfied.  Otherwise, the allegations in Paragraph 1 state legal arguments and conclusions to which no response is required.

2.      The allegations in Paragraph 2 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties.  The judicial opinions cited speak for themselves.

3.      Defendant-Intervenors admit that 42 U.S.C. § 7543(b)(1) was enacted in 1967. Otherwise, the allegations in Paragraph 3 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties.  The judicial opinion cited speaks for itself.

4.      Defendant-Intervenors admit that EPA published the Federal Register notices listed in Paragraph 4 on the dates cited therein.  Otherwise, the allegations in Paragraph 4 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties.  The Federal Register notices cited speak for themselves.

5.      Defendant-Intervenors admit that, on May 22, 2025, the Senate adopted H.J. Res.

Gibson, Dunn & Crutcher LLP

1

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

**3-ER-296**

87, 88, 89, 119th Cong. (2025), and the President signed those resolutions on June 12, 2025. The remaining allegations in Paragraph 5 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties. The Congressional resolutions cited speak for themselves.

6. The allegations in Paragraph 6 state legal arguments and conclusions to which no response is required. The statutory provisions cited speak for themselves.

7. The allegations in Paragraph 7 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties. The judicial decision cited speaks for itself.

8. The allegations in Paragraph 8 state legal arguments and conclusions to which no response is required. The judicial decisions cited speak for themselves.

9. The allegations in Paragraph 9 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief about the truth of the allegations concerning other parties. The regulation cited speaks for itself.

10. The allegations in Paragraph 10 state legal arguments and conclusions to which no response is required.

11. The allegations in Paragraph 11 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The articles cited speak for themselves.

12. The allegations in Paragraph 12 state legal arguments and conclusions to which no response is required. The judicial decisions cited speak for themselves.

13. The allegations in Paragraph 13 consist of Plaintiffs' characterization of the relief Plaintiffs seek in this lawsuit to which no response is required. To the extent a response is required,

Gibson, Dunn &
Crutcher LLP

2

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-297

Defendant-Intervenors specifically deny that Plaintiffs are entitled to the relief sought, or any other relief.

### PARTIES

14. The allegations in Paragraph 14 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors admit that California is a state in the United States of America. Defendant-Intervenors otherwise deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The regulations cited speak for themselves.

15. The allegations in Paragraph 15 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

16. The allegations in Paragraph 16 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

17. The allegations in Paragraph 17 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

18. The allegations in Paragraph 18 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for

Gibson, Dunn & Crutcher LLP

3

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-298

themselves.

19. The allegations in Paragraph 19 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

20. The allegations in Paragraph 20 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

21. The allegations in Paragraph 21 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

22. The allegations in Paragraph 22 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

23. The allegations in Paragraph 23 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

24. The allegations in Paragraph 24 state legal arguments and conclusions to which no

Gibson, Dunn & Crutcher LLP

4

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-299

response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The state statutory and regulatory provisions cited speak for themselves.

25.    Admitted.

26.    Admitted.

27.    Defendant-Intervenors admit that Lee Zeldin is EPA Administrator. The remaining allegations in Paragraph 27 state legal arguments, conclusions, and characterizations of Plaintiffs' complaint to which no response is required.

28.    Defendant-Intervenors admit that Donald J. Trump is the President of the United States. The remaining allegations in Paragraph 28 state legal arguments, conclusions, and characterizations of Plaintiffs' complaint to which no response is required.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

29.    The allegations in Paragraph 29 state legal arguments and conclusions to which no response is required. The statutory provisions cited speak for themselves.

30.    The allegations in Paragraph 30 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations. The statutory provision and judicial decision cited speak for themselves.

31.    The allegations in Paragraph 31 state legal arguments and conclusions to which no response is required. The statutory provision cited speaks for itself.

32.    The allegations in Paragraph 32 state legal arguments and conclusions to which no response is required. The civil local rules cited speak for themselves.

## FACTUAL BACKGROUND

33.    The allegations contained in Paragraph 33 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provisions and judicial provisions cited

Gibson, Dunn &
Crutcher LLP

5

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-300

speak for themselves.

34.     The allegations contained in Paragraph 34 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.  The statutory provisions and judicial provisions cited speak for themselves.

35.     The allegations contained in Paragraph 35 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.  The statutory provisions and judicial provisions cited speak for themselves.

36.     The allegations contained in Paragraph 36 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.  The statutory provisions and judicial provisions cited speak for themselves.

37.     The allegations contained in Paragraph 37 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.  The statutory provisions and judicial provisions cited speak for themselves.

38.     The allegations contained in Paragraph 38 state legal arguments and conclusions to which no response is required.  To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.  The statutory provisions and judicial provisions cited speak for themselves.

39.     The allegations contained in Paragraph 39 state legal arguments and conclusions to

Gibson, Dunn & Crutcher LLP

6

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-301

which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provisions and judicial provisions cited speak for themselves.

40. The allegations contained in Paragraph 40 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provision cited speaks for itself.

41. The allegations contained in Paragraph 41 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provision and agency document cited speak for themselves.

42. The allegations contained in Paragraph 42 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The regulatory provisions cited speak for themselves.

43. The allegations contained in Paragraph 43 state legal arguments and conclusions to which no response is required. The regulatory provisions cited speak for themselves.

44. The allegations contained in Paragraph 44 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The regulatory provisions and agency documents cited speak for themselves.

45. The allegations contained in Paragraph 45 state legal arguments and conclusions to which no response is required. The regulatory provision cited speaks for itself.

46. Defendant-Intervenors lack sufficient knowledge and information to form a belief

Gibson, Dunn &
Crutcher LLP

7

about the truth of Plaintiffs' factual allegations in Paragraph 46 and, on that basis, deny the allegations. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required.

47. The allegations contained in Paragraph 47 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.

48. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 48 and, on that basis, deny the allegations. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required.

49. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 49 and, on that basis, deny the allegations. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required.

50. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 50 and, on that basis, deny the allegations. To the extent a response is required, Defendant-Intervenors deny the allegations for

Gibson, Dunn & Crutcher LLP

8

lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required.

51. The allegations contained in Paragraph 51 state legal arguments and conclusions to which no response is required. The statutory provision cited speaks for itself.

52. The allegations contained in Paragraph 52 state legal arguments and conclusions to which no response is required. The statutory provisions cited speak for themselves.

53. The allegations contained in Paragraph 53 state legal arguments and conclusions to which no response is required. The statutory provisions and congressional resolution cited speak for themselves.

54. The allegations contained in Paragraph 54 state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

55. The allegations contained in Paragraph 55 state legal arguments and conclusions to which no response is required. The statutory provisions cited speak for themselves.

56. Defendant-Intervenors admit that the CRA provides that "no determination, finding, action, or omission under [it] shall be subject to judicial review."

57. The allegations contained in Paragraph 57 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provisions cited speak for themselves.

58. The allegations contained in Paragraph 58 state legal arguments and conclusions to which no response is required. The judicial decision cited speaks for itself.

59. The allegations contained in Paragraph 59 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The judicial decision cited speaks for itself.

Gibson, Dunn & Crutcher LLP

9

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

60. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 60 and, on that basis, deny the allegations. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required.

61. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 61 and, on that basis, deny the allegations. To the extent the remaining allegations are legal conclusions or seek to characterize publicly available documents, the documents speak for themselves and no further response is required. The judicial decision cited speaks for itself.

62. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 62 and, on that basis, deny the allegations. The remaining allegations are legal conclusions for which no response is required.

63. The allegations contained in Paragraph 63 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provisions and judicial decision cited speak for themselves.

64. The allegations contained in Paragraph 64 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provision cited speaks for itself.

65. The allegations contained in Paragraph 65 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory and regulatory provisions cited speak for themselves.

Gibson, Dunn & Crutcher LLP

10

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-305

66.    The allegations contained in Paragraph 66 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provisions and public documents cited speak for themselves.

67.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 67 and, on that basis, deny the allegations. The remaining allegations are legal conclusions for which no response is required. The statutory provisions and public documents cited speak for themselves.

68.    The allegations contained in Paragraph 68 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The regulatory provision cited speaks for itself.

69.    The allegations contained in Paragraph 69 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The regulatory provision cited speaks for itself.

70.    The allegations contained in Paragraph 70 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.

71.    The allegations contained in Paragraph 71 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The executive order cited speaks for itself.

72.    The allegations contained in Paragraph 72 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny

Gibson, Dunn &
Crutcher LLP

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG                3-ER-306

the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The executive order cited speaks for itself.

73. The allegations contained in Paragraph 73 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The public document cited speaks for itself.

74. The allegations contained in Paragraph 74 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The public document cited speaks for itself.

75. The allegations contained in Paragraph 75 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The statutory provision cited speaks for itself.

76. The allegations contained in Paragraph 76 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The public document cited speaks for itself.

77. Defendant-Intervenors admit that the EPA submitted the three waivers at issue to the GAO and Congress on February 19, 2025. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' remaining factual allegations in Paragraph 77 and, on that basis, deny the allegations. The public documents cited speak for themselves.

78. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 78 and, on that basis, deny the allegations. The remaining allegations contained in Paragraph 78 state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

Gibson, Dunn &
Crutcher LLP

12

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-307

79. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 79 and, on that basis, deny the allegations. The public document cited speaks for itself.

80. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 80 and, on that basis, deny the allegations. The public document cited speaks for itself.

81. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 81 and, on that basis, deny the allegations. The public document cited speaks for itself.

82. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 82 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required.

83. Defendant-Intervenors admit that GAO published a letter entitled "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act" on March 6, 2025. *See* U.S. Gov't Accountability Off., B-337179 (Mar. 6, 2025). The remaining allegations in Paragraph 83 state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

84. The allegations contained in Paragraph 84 state legal arguments and conclusions to which no response is required. To the extent a further response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The public document cited speaks for itself.

85. Defendant-Intervenors admit that on April 2, 2025, the House introduced joint resolutions 87, 88, and 89. *See* H.J. Res. 87–89. The remaining allegations in Paragraph 85 state legal arguments and conclusions to which no response is required. To the extent a further response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information

Gibson, Dunn & Crutcher LLP

sufficient to form a belief as to the truth of the allegations concerning other parties. The resolution cited speaks for itself.

86. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 86 and, on that basis, deny the allegations. The public document cited speaks for itself.

87. The allegations contained in Paragraph 87 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties.

88. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 88 and, on that basis, deny the allegations. The public document cited speaks for itself.

89. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 89 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public documents cited speak for themselves.

90. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 90 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

91. The allegations contained in Paragraph 91 state legal arguments and conclusions to which no response is required. To the extent a response is required, Defendant-Intervenors deny the allegations for lack of knowledge and information sufficient to form a belief as to the truth of the allegations concerning other parties. The public documents cited speak for themselves.

92. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 92 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response

Gibson, Dunn & Crutcher LLP

14

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-309

is required.  The public documents cited speak for themselves.

93.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 93 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response is required.  The statutory provision and public document cited speak for themselves.

94.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 94 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response is required.  The public documents cited speak for themselves.

95.    Defendant-Intervenors admit that the House voted to adopt H.J. Res. 87–89 on April 30, 2025.  The remaining allegations in Paragraph 95 state legal arguments and conclusions to which no response is required.  The public document cited speaks for itself.

96.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 96 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response is required.  The public document cited speaks for itself.

97.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 97 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response is required.  The public document cited speaks for itself.

98.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 98 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response is required.  The public document cited speaks for itself.

99.    Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 99 and, on that basis, deny the allegations.  The remaining allegations state legal arguments and conclusions to which no response

Gibson, Dunn & Crutcher LLP

15

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-310

is required. The public document cited speaks for itself.

100. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 100 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

101. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 101 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

102. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 102 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The statutory provision cited speaks for itself.

103. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 103 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

104. Defendant-Intervenors lack sufficient knowledge and information to form a belief about  the truth of Plaintiffs' factual allegations in Paragraph 104 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

105. Defendant-Intervenors lack sufficient knowledge and information to form a belief about  the truth of Plaintiffs' factual allegations in Paragraph 105 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

106. Defendant-Intervenors lack sufficient knowledge and information to form a belief about  the truth of Plaintiffs' factual allegations in Paragraph 106 and, on that basis, deny the

Gibson, Dunn &
Crutcher LLP

16

allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

107. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 107 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

108. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 108 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

109. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 109 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

110. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 110 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

111. Admitted.

112. Defendant-Intervenors lack sufficient knowledge and information to form a belief about the truth of Plaintiffs' factual allegations in Paragraph 112 and, on that basis, deny the allegations. The remaining allegations state legal arguments and conclusions to which no response is required. The public document cited speaks for itself.

113. Admitted.

Gibson, Dunn &
Crutcher LLP

17

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-312

## CLAIMS FOR RELIEF

### COUNT I

### *Ultra Vires* – Conduct in Excess of Statutory Authority

### (Against All Defendants)

114. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

115. The allegations contained in Paragraph 115 state Plaintiff's characterizations and legal conclusions to which no response is required.

116. The allegations contained in Paragraph 116 state Plaintiff's characterizations and legal conclusions to which no response is required.

117. The allegations contained in Paragraph 117 state Plaintiff's characterizations and legal conclusions to which no response is required.

118. The allegations contained in Paragraph 118 state Plaintiff's characterizations and legal conclusions to which no response is required.

119. The allegations contained in Paragraph 119 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

120. The allegations contained in Paragraph 120 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision speaks for itself.

121. The allegations contained in Paragraph 121 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions speak for themselves.

### COUNT II

### Violation of the Administrative Procedure Act

### (Against the United States, EPA, and Its Administrator)

122. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

123. The allegations contained in Paragraph 123 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-313

Gibson, Dunn &
Crutcher LLP

124.    The allegations contained in Paragraph 124 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

125.    The allegations contained in Paragraph 125 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

126.    The allegations contained in Paragraph 126 state Plaintiff's characterizations and legal conclusions to which no response is required.

127.    The allegations contained in Paragraph 127 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

128.    The allegations contained in Paragraph 128 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

129.    The allegations contained in Paragraph 129 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

130.    The allegations contained in Paragraph 130 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision and statutory provision cited speak for themselves.

131.    The allegations contained in Paragraph 131 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

132.    The allegations contained in Paragraph 132 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

133.    The allegations contained in Paragraph 133 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

134.    The allegations contained in Paragraph 134 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

135.    The allegations contained in Paragraph 135 state Plaintiff's characterizations and

Gibson, Dunn &
Crutcher LLP

19

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-314

legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

## COUNT III

### Violation of the Congressional Review Act

### (Against All Defendants)

136. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

137. The allegations contained in Paragraph 137 state Plaintiff's characterizations and legal conclusions to which no response is required.

138. The allegations contained in Paragraph 138 state Plaintiff's characterizations and legal conclusions to which no response is required.

139. The allegations contained in Paragraph 139 state Plaintiff's characterizations and legal conclusions to which no response is required.

140. The allegations contained in Paragraph 140 state Plaintiff's characterizations and legal conclusions to which no response is required.

141. The allegations contained in Paragraph 141 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

142. The allegations contained in Paragraph 142 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

143. The allegations contained in Paragraph 143 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory decisions cited speak for themselves.

## COUNT IV

### Violation of the Take Care Clause

### (Against President Trump, EPA, and Its Administrator)

144. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

Gibson, Dunn &
Crutcher LLP

20

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-315

145. The allegations contained in Paragraph 145 state Plaintiff's characterizations and legal conclusions to which no response is required. The constitutional provision cited speaks for itself.

146. The allegations contained in Paragraph 146 state Plaintiff's characterizations and legal conclusions to which no response is required.

147. The allegations contained in Paragraph 147 state Plaintiff's characterizations and legal conclusions to which no response is required.

148. The allegations contained in Paragraph 148 state Plaintiff's characterizations and legal conclusions to which no response is required.

149. The allegations contained in Paragraph 149 state Plaintiff's characterizations and legal conclusions to which no response is required.

150. The allegations contained in Paragraph 150 state Plaintiff's characterizations and legal conclusions to which no response is required.

151. The allegations contained in Paragraph 151 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself..

152. The allegations contained in Paragraph 152 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

## COUNT V

## Violation of Separation of Powers

## (Against All Defendants)

153. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

154. The allegations contained in Paragraph 154 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision and constitutional provision cited speak for themselves.

155. The allegations contained in Paragraph 155 state Plaintiff's characterizations and

Gibson, Dunn &
Crutcher LLP

21

**3-ER-316**

legal conclusions to which no response is required. The judicial decision cited speaks for itself.

156. The allegations contained in Paragraph 156 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

157. The allegations contained in Paragraph 157 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

158. The allegations contained in Paragraph 158 state Plaintiff's characterizations and legal conclusions to which no response is required. The constitutional provision cited speaks for itself.

159. The allegations contained in Paragraph 159 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

160. The allegations contained in Paragraph 160 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision and public document cited speak for themselves.

161. The allegations contained in Paragraph 161 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

162. The allegations contained in Paragraph 162 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

163. The allegations contained in Paragraph 163 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision and constitutional provision cited speak for themselves.

164. The allegations contained in Paragraph 164 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

165. The allegations contained in Paragraph 165 state Plaintiff's characterizations and

Gibson, Dunn & Crutcher LLP

22

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-317

legal conclusions to which no response is required. The judicial decision cited speaks for itself.

166. The allegations contained in Paragraph 166 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

167. The allegations contained in Paragraph 167 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decision cited speaks for itself.

168. The allegations contained in Paragraph 168 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

169. The allegations contained in Paragraph 169 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

## COUNT VI

### Violation of Tenth Amendment and Structural Principles of Federalism

### (Against All Defendants)

170. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

171. The allegations contained in Paragraph 171 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

172. The allegations contained in Paragraph 172 state Plaintiff's characterizations and legal conclusions to which no response is required.

173. The allegations contained in Paragraph 173 state Plaintiff's characterizations and legal conclusions to which no response is required.

174. The allegations contained in Paragraph 174 state Plaintiff's characterizations and legal conclusions to which no response is required.

175. The allegations contained in Paragraph 175 state Plaintiff's characterizations and legal conclusions to which no response is required.

176. The allegations contained in Paragraph 176 state Plaintiff's characterizations and

Gibson, Dunn &
Crutcher LLP

23

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-318

legal conclusions to which no response is required. The judicial decisions and public document cited speak for themselves.

177. The allegations contained in Paragraph 177 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

178. The allegations contained in Paragraph 178 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provisions cited speak for themselves.

## COUNT VII

## Nonstatutory Review: Violation of Federal Law by Federal Officials

## (Against All Defendants)

179. Defendant-Intervenors incorporate their responses to Paragraphs 1 through 113 herein as if separately pleaded.

180. The allegations contained in Paragraph 180 state Plaintiff's characterizations and legal conclusions to which no response is required. The judicial decisions cited speak for themselves.

181. The allegations contained in Paragraph 181 state Plaintiff's characterizations and legal conclusions to which no response is required.

182. The allegations contained in Paragraph 182 state Plaintiff's characterizations and legal conclusions to which no response is required.

183. The allegations contained in Paragraph 183 state Plaintiff's characterizations and legal conclusions to which no response is required.

184. The allegations contained in Paragraph 184 state Plaintiff's characterizations and legal conclusions to which no response is required. The statutory provision cited speaks for itself.

185. The allegations contained in Paragraph 185 state Plaintiff's characterizations and legal conclusions to which no response is required.

186. The allegations contained in Paragraph 186 state Plaintiff's characterizations and legal conclusions to which no response is required.

Gibson, Dunn & Crutcher LLP

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-319

187.   The allegations contained in Paragraph 187 state Plaintiff's characterizations and legal conclusions to which no response is required.  The statutory provision cited speaks for itself.

188.   The allegations contained in Paragraph 188 state Plaintiff's characterizations and legal conclusions to which no response is required.  The statutory provisions cited speak for themselves.

## PRAYER FOR RELIEF

The allegations set forth in Plaintiffs "Prayer for Relief" are conclusions of law for which no responsive pleading is required and which are therefore denied.  To the extent the allegations in this paragraph are deemed in whole or in part to be factual, Defendant-Intervenors deny each and every allegation.  Defendant-Intervenors further deny that Plaintiffs are entitled to any relief sought on any of their claims, or any other relief.

## AFFIRMATIVE AND OTHER DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), Defendant-Intervenors assert the following affirmative and other defenses.  Assertion of a defense is not a concession that Defendant-Intervenors have the burden of proving the matter asserted.  In addition to the defenses described below, Defendant-Intervenors expressly reserve the right to allege additional defenses as they become known.

### FIRST AFFIRMATIVE DEFENSE

### (Lack of Subject Matter Jurisdiction)

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that this Court lacks jurisdiction over some or all of Plaintiffs' claims.

### SECOND AFFIRMATIVE DEFENSE

### (Lack of Standing)

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that Plaintiffs lack standing to pursue some or all of their claims.

Gibson, Dunn & Crutcher LLP

25

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-320

**THIRD AFFIRMATIVE DEFENSE**

**(Lack of Justiciability)**

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that some or all of Plaintiffs' claims are not justiciable.

**FOURTH AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that Plaintiffs fail to state a claim upon which relief can be granted for some or all of their claims.

**FIFTH AFFIRMATIVE DEFENSE**

**(Sovereign Immunity)**

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that some or all of Plaintiffs' claims are barred by the doctrine of sovereign immunity.

**SIXTH AFFIRMATIVE DEFENSE**

**(Preemption)**

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that the regulations upon which Plaintiffs' base some or all of their claims are preempted by Section 209 of the Clean Air Act.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Dormant Commerce Clause)**

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors are informed and believe, and on that basis allege, that some or all of Plaintiffs' claims are barred by the Dormant Commerce Clause doctrine derived from

Gibson, Dunn & Crutcher LLP

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

**3-ER-321**

the Commerce Clause of the U.S. Constitution.

## EIGHTH AFFIRMATIVE DEFENSE

### (Incorporation of All Applicable Defenses)

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Defendant-Intervenors assert all applicable defenses pled by all other defendants to this Action, and hereby incorporates the same herein by reference

## NINTH AFFIRMATIVE DEFENSE

### (Reservation of Right to Assert Additional Defenses)

As a separate and distinct affirmative defense to the complaint and to each claim for relief contained therein, Plaintiffs have failed to particularize its claims, or that Defendant-Intervenors' lack of knowledge of the circumstances surrounding Plaintiffs' claims prevents them from asserting all applicable defenses at this time.  Upon further particularization of the claims by Plaintiffs or upon discovery of further information concerning their claims, Defendant-Intervenors reserve the right to assert additional defenses.

## PRAYER

WHEREFORE, Defendant-Intervenors respectfully request:

A.    That judgment be entered in favor of Defendant-Intervenors and the Federal Defendants and against Plaintiffs with respect to each claim pleaded in the complaint and that this action be dismissed in its entirety with prejudice;

B.    That Plaintiffs takes nothing by way of their complaint;

C.    That Defendant-Intervenors be granted his reasonable attorneys' fees, costs, and expenses; and

D.    That the Court award such other and further relief as it deems just and proper.

Gibson, Dunn &
Crutcher LLP

27

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

3-ER-322

DATED:  September 5, 2025               Respectfully submitted,

                                       */s/ Sean Howell*

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

Raymond B. Ludwiszewski (*pro hac vice* forthcoming)
Rachel Levick (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

*Attorneys for Proposed Defendant-Intervenors*
*The Alliance for Automotive Innovation and*
*The National Automobile Dealers Association*

Gibson, Dunn &
Crutcher LLP

28

PROPOSED ANSWER OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL
AUTOMOBILE DEALERS ASSOCIATION
CASE No. 4:25-cv-04966-HSG

**3-ER-323**

Steven P. Lehotsky** (DC 992765)
Michael B. Schon* (DC 989893)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW, Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Email: steve@lkcfirm.com
Email: mike@lkcfirm.com

Katherine C. Yarger* (CO 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Telephone: (512) 693-8350
Email: katie@lkcfirm.com

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
Email: brad@benbrooklawgroup.com

*Attorneys for Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores*

Michael Buschbacher* (IN 31251-71)
James R. Conde* (DC 1031694)
James R. Wedeking* (DC 500033)
Laura B. Ruppalt* (VA 97202)
BOYDEN GRAY PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 955-0620
Email: mbuschbacher@boydengray.com

John B. Thomas (SBN 269538)
HICKS THOMAS LLP
701 University Avenue, Suite 106
Sacramento, California 95825
Telephone: (916) 447-4900
Email: jthomas@hicks-thomas.com

*Attorneys for Proposed Intervenors American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association*

** Motion for admission *pro hac vice* pending.
* Admitted *pro hac vice*.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA, et al.,

        Plaintiffs,

      v.

UNITED STATES OF AMERICA; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; and DONALD J. TRUMP, in his official capacity as President of the United States,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:25-cv-04966-HSG

**JOINT REPLY OF AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, THE NATIONAL ASSOCIATION OF CONVENIENCE STORES, AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, ILLINOIS CORN GROWERS ASSOCIATION, INDIANA CORN GROWERS ASSOCIATION, IOWA CORN GROWERS ASSOCIATION, KANSAS CORN GROWERS ASSOCIATION, KENTUCKY CORN GROWERS ASSOCIATION, MICHIGAN CORN GROWERS ASSOCIATION, MISSOURI CORN GROWERS ASSOCIATION, NEBRASKA CORN GROWERS ASSOCIATION, TENNESSEE CORN GROWERS ASSOCIATION, TEXAS CORN PRODUCERS, WISCONSIN CORN GROWERS ASSOCIATION, AND NATIONAL CORN GROWERS ASSOCIATION IN SUPPORT OF THEIR MOTIONS TO INTERVENE**

Date: October 23, 2025
Time: 2:00pm PST
Courtroom: 2, 4th Floor Oakland Courthouse
Judge: Hon. Haywood S. Gilliam, Jr.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION.............................................................................................................1

ISSUES TO BE DECIDED..............................................................................................3

STATEMENT OF FACTS................................................................................................3

ARGUMENT ...................................................................................................................4

    I.    Movants are entitled to intervene under Rule 24(a)(2)..........................................4

       A.  Movants' motions are timely and will not cause delay or prejudice. ...................5

       B.  Movants have significantly protectable interests that this litigation may impair. ...............6

       C.  Federal Defendants do not adequately represent Movant's interests................................11

    II.    Alternatively, the Court should grant Movants permissive intervention.........................13

    III.    Movants are amenable to reasonable case management conditions................................14

CONCLUSION ................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*,
No. CV 14-09603-AB (SSX), 2015 WL 12745805 (C.D. Cal. Mar. 25, 2015)...................... 13

*Am. Rivers v. Wheeler*,
No. C 20-04636 WHA, 2020 WL 5993229 (N.D. Cal. Oct. 9, 2020) ................................... 13

*Barke v. Banks*,
No. 8:20-cv-00358-JLS-ADS, 2020 WL 2315857 (C.D. Cal. May 7, 2020) ........................ 12

*Cal. Chamber of Com. v. Becerra*,
529 F. Supp. 3d 1099 (E.D. Cal. 2021) ............................................................................. 12

*Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*,
54 F.4th 1078 (9th Cir. 2022)......................................................................................... 6, 8

*California v. Bureau of Land Mgmt.*,
Nos. 18-CV-00521-HSG & 18-CV-00524-HSG, 2018 WL 3439453 (N.D. Cal.
July 17, 2018) .................................................................................................................. 5

*California v. EPA*,
No. 18-CV-03237-HSG, 2018 WL 6069943 (N.D. Cal. Nov. 20, 2018) ............................... 5

*California v. Health & Hum. Servs.*,
330 F.R.D. 248 (N.D. Cal. 2019) ...................................................................................... 9

*California v. Health & Hum. Servs.*,
No. 17-CV-05783-HSG, 2018 WL 574882 (N.D. Cal. Jan. 26, 2018)................................... 5

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011)...................................................................................... 5, 7, 12

*Cooper v. Newsom*,
26 F.4th 1104 (9th Cir. 2022)............................................................................................ 8

*Diamond Alt. Energy, LLC v. EPA*,
145 S. Ct. 2121 (2025) .......................................................................... 2, 3, 6, 8, 10, 11, 12

*Finjan, Inc. v. Symantec Corp.*,
No. 14-cv-02998-HSG, 2017 WL 6610081 (N.D. Cal. Sept. 29, 2017).................................. 5

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995)........................................................................................ 5, 10

iii

*Juliana v. United States*,
No. 6:15-cv-1517-TC, 2016 WL 183903 (D. Or. Jan. 14, 2016).............................................. 9

*League of United Latin Am. Citizens v. Wilson*,
131 F.3d 1297 (9th Cir. 1997).......................................................................................... 5

*California ex rel. Lockyer v. United States*,
450 F.3d 436 (9th Cir. 2006)..................................................................................... 5, 11, 12

*S. Cal. Healthcare Sys., Inc. v. City of Culver City*,
No. 2:21-cv-05052-MCS-RAO, 2021 WL 4817846 (C.D. Cal. July 26, 2021) ..................... 12

*Sagebrush Rebellion, Inc. v. Watt*,
713 F.2d 525 (9th Cir. 1983)........................................................................................ 11, 12

*Sierra Club v. EPA*,
995 F.2d 1478 (9th Cir. 1993).......................................................................................... 5

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001)........................................................................................ 11, 12

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972) ................................................................................................... 12

*United States v. Alisal Water Corp.*,
370 F.3d 915 (9th Cir. 2004)............................................................................................ 5

*United States v. Carpenter*,
526 F.3d 1237 (9th Cir. 2008).......................................................................................... 9

*United States v. City of Los Angeles*,
288 F.3d 391 (9th Cir. 2002)............................................................................................ 8

*United States v. Oregon*,
839 F.2d 635 (9th Cir. 1988).......................................................................................... 11

*United States v. Stringfellow*,
783 F.2d 821 (9th Cir. 1986).......................................................................................... 11

*Venegas v. Skaggs*,
867 F.2d 527 (9th Cir. 1989).......................................................................................... 13

*W. Watersheds Project v. Haaland*,
22 F.4th 828 (9th Cir. 2022)......................................................................................... 5, 8

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
834 F.3d 562 (5th Cir. 2016)........................................................................................ 8, 9

*Wilderness Soc'y v. U.S. Forest Serv.*,
630 F.3d 1173 (9th Cir. 2011).............................................................................. 2, 5, 6, 7, 12

**Movants' Joint Reply in Support of Motions to Intervene, No. 4:25-cv-04966-HSG**

**3-ER-328**

*Yniguez v. Arizona*,
939 F.2d 727 (9th Cir. 1991) ............................................................................ 13

**Statutes**

42 U.S.C. § 7543(a) ...................................................................................... 2, 3

42 U.S.C. § 7543(b) .......................................................................................... 2

Congressional Review Act, 5 U.S.C. §§ 801–08 ............................................. 3

**Federal Rules**

Fed. R. Civ. P. 24(a) ........................................................................ 3, 4, 6, 8, 11

Fed. R. Civ. P. 24(b) .......................................................................... 3, 4, 13, 14

**Other Authorities**

AmFree, *AmFree Heralds Trump's EV Mandate Repeal, Vows to Fight
California's Legal Challenge* (June 13, 2025), https://perma.cc/PE6V-C9K2 ...................... 10

Cal. Air Res. Bd., *Response to Comments on the Draft Environmental Analysis
Prepared for the Advanced Clean Cars II Program* (Aug. 24, 2022),
https://perma.cc/SF59-TC9X ....................................................................... 1, 7

Ellen Robo et al., Env't Rsch. Mgmt. Grp., *California Clean Trucks Program*
(2022), https://perma.cc/3RK8-WPP8 ......................................................... 1, 7

Ill. Corn Growers Ass'n, *California EV Mandates, Clean Air Act, and a
Congressional Review Act Vote* (May 20, 2025), https://perma.cc/8YAS-6QZD ................. 10

Petition for Review, *California v. Wheeler*, No. 19-1239 (D.C. Cir. Nov. 15, 2019),
ECF 2 ........................................................................................................... 12

## INTRODUCTION

Movants seek intervention to defend their significantly protectable interests that would be harmed by the sweeping and unprecedented relief Plaintiffs request in their Complaint. The Complaint filed by California and 10 other states asks this Court to void duly enacted legislation that revoked three Clean Air Act waivers. California used those waivers to enact and enforce otherwise preempted vehicle emission standards designed to drive down the sale of liquid fuels and, over time, eliminate the sale of vehicles that use liquid fuels altogether. California cannot dispute that the standards it seeks to revive through this litigation impose enormous and concrete economic injury on Movants' members because its own calculations show that the standards would significantly reduce liquid fuel sales. *See* Cal. Air Res. Bd., *Response to Comments on the Draft Environmental Analysis Prepared for the Advanced Clean Cars II Program* 55 & n.54 (Aug. 24, 2022), https://perma.cc/SF59-TC9X (addressing the ultimate ban on the sale of gasoline-powered cars and estimating the reduction of fuel sales); *see also* Ellen Robo et al., Env't Rsch. Mgmt. Grp., *California Clean Trucks Program* 11 (2022), https://perma.cc/3RK8-WPP8 (study of the "Advanced Clean Trucks" program, estimating fuel sales to drop by over 40% by 2050). California's standards also increase the purchase, operation, and maintenance costs of the cars and trucks that members of Movant American Free Enterprise Chamber of Commerce rely on to operate their businesses, imposing yet another form of economic harm. *See* ECF No. 49-1, at 4–5, ¶¶ 11–14 (Collins declaration).

Plaintiffs' objections to intervention attempt to raise barriers that Federal Rule of Civil Procedure 24 ("Rule 24") does not impose. Plaintiffs concede that Movants timely sought intervention and are seriously harmed by the preempted regulations that Plaintiffs seek to resuscitate in this case. Plaintiffs' only real arguments are that this harm is somehow insufficient to give Movants an interest here because there is no statutory source for those interests and some Movants are already involved in ongoing litigation challenging the preempted regulations under the Clean Air Act. No statutory source is required. And the other Clean Air Act litigation is inapposite: Movants' harm here stems from Plaintiffs' attempt to resuscitate waivers that Congress invalidated—actions and issues that were not at issue in the Clean Air Act litigation.

**Movants' Joint Reply in Support of Motions to Intervene, No. 4:25-cv-04966-HSG**

**3-ER-330**

As necessary background, the Clean Air Act prohibits any state from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). However, Congress authorized the Environmental Protection Agency ("EPA") to waive this prohibition for California alone among the states if California can meet certain requirements. *Id.* § 7543(b). The legislation that Plaintiffs ask this Court to overturn revoked three such waivers that EPA had issued. The legislation's effect is to prohibit California from foisting on the public and Movants' members harms flowing from California's regulations. Movants' separate challenges to the waivers under the Clean Air Act do not change that. Successfully defending the duly enacted federal legislation at issue here will indisputably eliminate harm to Movants' members.

This is not the first time in recent years that California has tried to block the liquid fuels industry from reaching court to challenge California's emissions programs. Just a few months ago, the U.S. Supreme Court, in a 7-2 decision, resoundingly rejected California's argument that members of the liquid fuels industry (including many seeking to intervene here) lacked standing to challenge an earlier version of California's rules—"Advanced Clean Cars I." *See Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025). Although the standards for intervention and for standing are not identical, there is significant overlap, with standing being harder, not easier, to satisfy. Like Article III standing, Rule 24 is designed to ensure that legally protected interests are heard, and the Ninth Circuit has repeatedly held that Rule 24 must be applied "liberal[ly]" in favor of potential intervenors with a focus on "practical … considerations." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc).

Because Movants meet the Ninth Circuit's standard for intervention as of right and have also shown that this Court should exercise its discretion to grant permissive intervention, the Court should allow Movants to participate fully in this case.

///

///

///

///

2

3-ER-331

**ISSUES TO BE DECIDED**

1.    Whether Movants are entitled to intervene as Defendants in this action as of right under Fed. R. Civ. P. 24(a).

2.    In the alternative, whether Movants should be granted leave to intervene permissively under Fed. R. Civ. P. 24(b).

**STATEMENT OF FACTS**

Movants fully set forth the relevant facts in their motions to intervene. ECF Nos. 49 at 3–8 (American Free Enterprise Chamber of Commerce and Corn Grower Movants, hereafter "AmFree" and "Corn Growers"); 61 at 3–5 (American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores (the "AFPM Movants")). This case arose after Congress passed and the President signed legislation pursuant to the Congressional Review Act ("CRA"), 5 U.S.C. §§ 801–08, repealing three waivers of Clean Air Act preemption granted by EPA. California required these waivers to effectuate stringent emissions standards for new motor vehicle emissions—"Advanced Clean Cars II" ("ACC II"), "Advanced Clean Trucks" ("ACT"), and "Omnibus Low $NO_x$ Program" ("Omnibus"). *See* 42 U.S.C. § 7543(a) (preempting states from adopting or attempting to enforce emissions standards other than those promulgated by EPA), (b) (allowing California to request a waiver of this preemption). As the Supreme Court recently noted, Congress passed and the President signed "legislation to block … [those] California regulations." *Diamond Alt. Energy*, 145 S. Ct. at 2131 n.1.

Nevertheless, within hours of the President signing the CRA Resolutions on June 12, 2025, Plaintiffs filed this suit, raising an array of statutory and constitutional claims seeking to invalidate the legislation. *See* Complaint at 27–39, ¶¶ 114–88 (ECF No. 1). These claims allege (1) that EPA's letters sending the waivers to Congress were illegal; (2) that Congress violated its internal procedures by accepting the waivers for review and by allowing the votes to proceed with the approval of a simple majority of Senators, rather than the three-fifths (60 votes when all 100 Senators are present) that Senate filibuster rules sometimes require; and (3) that the President acted unconstitutionally in signing the legislation. *Id.* Plaintiffs ultimately ask this Court, among other things, to declare the Resolutions unlawful, to declare the waivers "valid and in effect," and to enjoin

EPA "from interfering with Plaintiffs' enforcement" of the ACC II, ACT, and Omnibus standards. *Id.* at 39–40.

Movants moved to intervene as Defendants to represent the distinct interests of fuel producers and other private parties not represented by the Federal Government Defendants, who necessarily represent the public interest. Those motions were filed on August 4 (AmFree and Corn Growers) and August 6 (AFPM Movants), 2025. ECF Nos. 49 at 5–8, 10–13; 61 at 6–9. In addition, the "Zero Emissions Transportation Association" ("ZETA"), a trade organization that represents electric-vehicle manufacturers such as Tesla, moved to intervene on behalf of Plaintiffs on July 25, 2025. ECF No. 43. Texas has also moved to intervene. ECF No. 86. Although Plaintiffs have opposed intervention by AmFree and the Corn Growers and the AFPM Movants, ECF Nos. 84 (Opp. to AmFree and Corn Growers); 85 (Opp. to AFPM Movants), Plaintiffs did not oppose intervention by ZETA. *See* ECF No. 43 at 2 n.2. Plaintiffs make no attempt to explain why intervention by ZETA should be permitted but intervention by Movants should be denied. The Federal Defendants did not oppose intervention by any party. Movants now file this Joint Reply.

## ARGUMENT

The Court should grant the motions to intervene because Movants are entitled to intervene as of right under Rule 24(a)(2) and also because Movants meet the requirements for permissive intervention under Rule 24(b)(1)(B).

### I.    Movants are entitled to intervene under Rule 24(a)(2).

Movants have easily satisfied all four requirements to intervene *as of right*, and accordingly, are entitled to intervene in this case. Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, a non-party has the right to intervene in a proceeding where it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Court must grant intervention under that provision if (1) the motion is "timely," (2) the applicant has a "significantly protectable interest relating to the property or transaction which is the subject of the action," (3) the "disposition of the action may as a practical matter impair or impede its ability to protect that

interest," and (4) the applicant's interest may be "inadequately represented by the parties to the action." *Wilderness Soc'y*, 630 F.3d at 1177 (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993) (internal quotation marks omitted)).

Courts apply Rule 24 "liberally in favor of potential intervenors," *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006), guided "primarily by practical considerations," *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022); *see also, e.g.*, *California v. Bureau of Land Mgmt.*, Nos. 18-CV-00521-HSG & 18-CV-00524-HSG, 2018 WL 3439453, at *8 (N.D. Cal. July 17, 2018) (Gilliam, J., granting motion to intervene); *Finjan, Inc. v. Symantec Corp.*, No. 14-CV-02998-HSG, 2017 WL 6610081, at *3 (N.D. Cal. Sept. 29, 2017) (same); *California v. Health & Hum. Servs.*, No. 17-CV-05783-HSG, 2018 WL 574882, at *5 (N.D. Cal. Jan. 26, 2018) (same); *California v. EPA*, No. 18-CV-03237-HSG, 2018 WL 6069943, at *1 (N.D. Cal. Nov. 20, 2018) (same).

Plaintiffs directly dispute only elements (2) through (4). *See* ECF Nos. 84 at 4–7: 85 at 4–7. But Movants address each requirement for intervention as of right below.

**A. Movants' motions are timely and will not cause delay or prejudice.**

The motion is timely. Timeliness is a "flexible concept" committed to the district court's discretion, *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004), and is readily satisfied where intervention is sought at the outset of litigation. *Sierra Club*, 995 F.2d at 1481, *abrogated on other grounds by*, *Wilderness Soc'y*, 630 F.3d 1173. Courts consider the stage of the proceedings, prejudice to existing parties, and the length and reason for any delay. *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997). All three factors confirm timeliness here. Movants have sought intervention at the earliest stage of proceedings: Defendants have not yet answered or moved to dismiss, there have been no substantive rulings, and the initial case management conference is still weeks away. This is well within the timeframe the Ninth Circuit has previously held appropriate for intervention. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995); *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). Because intervention will not disrupt any proceedings, prejudice any party, or delay the case, this factor strongly supports intervention.

3-ER-334

**B. Movants have significantly protectable interests that this litigation may impair.**

Movants together represent virtually all of the American liquid fuels industry—including upstream producers, midstream transportation companies, refiners, fuel retailers, renewable fuel manufacturers, and the farmers who grow the corn used to manufacture the ethanol used in most automobile fuels. Movant AmFree also represents businesses across the nation that rely on gasoline- and diesel-powered cars and trucks to profitably operate. Each identified multiple protectable interests sufficient to support intervention as of right. As the Supreme Court recently noted in a case that found standing met for many of the same entities seeking intervention here, "the fuel producers persuasively contend that invalidating California's regulations would likely mean more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers." *Diamond Alt. Energy*, 145 S. Ct. at 2137. For similar reasons, ensuring California's programs remain unenforceable protects businesses and consumers from the vehicle cost increases that would inevitably result from California's standards. Those conclusions control here and confirm Movants' significantly protectable interests in this litigation.

Plaintiffs make two misplaced arguments to avoid this conclusion, neither of which is persuasive. Plaintiffs first attack Movants' economic injuries, arguing primarily that they do not count because they lack a "statutory source." *See* ECF Nos. 85 at 1 (asserting without citation that a "statutory source" is required); 84 at 4–6. Second, Plaintiffs claim that Movants should be barred from intervening here because they pursued separate Clean Air Act challenges to the waivers. Neither claim has any support in Rule 24(a) or in precedent. Plaintiffs are specifically asking this Court to reinstate California's programs that would slash fuel sales by billions of dollars and drive up vehicle costs. To suggest that the parties most directly injured by that relief have no right to be heard defies both law and common sense.

An interest satisfies the requirements of Rule 24(a)(2) if it is "protectable under some law," and there exists "a relationship between th[at] legally protected interest and the claims at issue." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1088 (9th Cir. 2022) (quoting *Wilderness Soc'y*, 630 F.3d at 1179). This is a "practical, threshold inquiry," and contrary to Plaintiffs suggestion, "[n]o specific legal or equitable interest need be established." *Citizens for*

6

*Balanced Use*, 647 F.3d at 897 (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996)) (alteration in original). Moreover, exacting review is not required since the whole point of intervention is to provide "both efficient resolution of issues and broadened access to the courts." *Wilderness Soc'y*, 630 F.3d at 1179.

**First – economic injuries and other interests:** Here, Movants established a significantly protectable interest in shielding their members from the economic harm that would result if Plaintiffs were to prevail. The relief Plaintiffs seek would allow all three of California's preempted programs to take effect, each of which would harm Movants' members economically by, among other things, reducing demand for gasoline and thus ethanol and corn and increasing vehicle costs. ECF Nos. 49 at 5–7; 61 at 7–8; *see also, e.g.*, ECF Nos. 49-2 (Couser declaration explaining how the preempted programs harm ethanol producer); 49-3 (DeMartini declaration explaining how ACT and Omnibus harm RV retailer); 49-4 (Weinzierl declaration explaining how programs harm Corn Growers); 61-3 (Kantor declaration explaining how ACC II, ACT, and Omnibus programs harm convenience retailers, including problems with selling electric-vehicle charging, reduced fuel sales, and other regulatory burdens); 61-4 (Martini declaration explaining how the programs harm Chevron, a member of AFPM and API, including by disincentivizing other lower-carbon technologies).

Ignoring Movants' motions, including declaratory support, and ignoring Plaintiffs' own statements about the impact of California's preempted rules, Plaintiffs suggest that Movants' claimed harms are nonexistent. But causing these economic harms to Movants' members is the goal of the standards Plaintiffs' are trying to revive. *See* Cal. Air Res. Bd., *Response to Comments on the Draft Environmental Analysis*, *supra*, at 55 & n.54 (addressing the ultimate ban on the sale of gasoline-powered cars and estimating the reduction of fuel sales); *see also* Robo et al., *supra*, at 11 (study of the Advanced Clean Trucks program, estimating fuel sales to drop by over 40% by 2050).

Plaintiffs next argue that there is no "relationship" between Movants' harms and interests and the litigation because "the lawfulness of EPA's waiver actions is not implicated by Plaintiffs' claims." ECF Nos. 84 at 4; 85 at 4. But Movants are not asserting an abstract interest in the question of whether the waivers were lawful in the first place. They are asserting their concrete interest in avoiding the economic harm they will suffer if Plaintiffs succeed in persuading this Court to

3-ER-336

resuscitate California's emissions programs. That harm is no less real because Plaintiffs here seek to re-inflict it by nullifying the CRA Resolutions, rather than by applying for Clean Air Act waivers, which Plaintiffs used to inflict the harm initially. Resolution of this case in Plaintiffs' favor will harm the economic interests of Movants' members, which remain if California's emissions regulations are in effect. *See Diamond Alt. Energy*, 145 S. Ct. at 2135, 2136–37. Indeed, ZETA moved to intervene in this case in support of Plaintiffs by asserting the exact opposite economic interests ECF No. 43 at 6, and Plaintiffs do not oppose ZETA's intervention, *id.* at 2 n.2.[1]

Plaintiffs do not dispute that AFPM Movants have standing, *i.e.*, that they face concrete injury from the relief that Plaintiffs' seek, *see* ECF No. 85 at 4, and the standing inquiry is at least as stringent as the inquiry into whether a movant has an interest sufficient to support intervention. For example, the Fifth Circuit has explained that an interest, for the purpose of intervention, "is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016). And the Ninth Circuit has repeatedly allowed intervention for less concrete interests that are "significant[ly] protectable" even in the absence of a "specific legal or equitable interest." *United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002); *see also, e.g.*, *Cooper v. Newsom*, 26 F.4th 1104, 1112 (9th Cir. 2022) (Bumatay, J., dissenting from the denial of rehearing en banc) (collecting cases where the Ninth Circuit allowed movants to intervene that had "less concrete interests").

Plaintiffs' argument that AFPM Movants' standing somehow calls into question their ability to intervene is exactly backwards. *See* ECF No. 85 at 4. Rule 24(a) merely asks whether the legal interest is protectable "under some law" and whether there is a practical relationship between that interest and the claims at issue. *See Jim Dobbas, Inc.*, 54 F.4th at 1088. "[R]eview is guided primarily by practical considerations, not technical distinctions." *W. Watersheds Project*, 22 F.4th at 835 (cleaned up). Contrary to Plaintiffs' assertions, there is no requirement that intervenors like

---

[1] Plaintiffs, in contrast, do seek adjudication of the underlying lawfulness of the waivers, asking this Court to declare them "valid and in effect." ECF No. 1 at 39.

the Movants here must have a statutory source for their claimed injuries. *See United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008) (holding that environmental group had sufficient interest for Article III standing and to intervene on behalf of its members, which was to ensure that members were not harmed by development on wilderness area); *California v. Health & Hum. Servs.*, 330 F.R.D. 248, 253 (N.D. Cal. 2019) (noting that Oregon had a "significant protectable interest" where California's claims were "related to" its finances and other interests); *Juliana v. United States*, No. 6:15-cv-1517-TC, 2016 WL 183903, at *3 (D. Or. Jan. 14, 2016) (granting motion to intervene by API, AFPM, and others and finding a protectable interest "[b]ecause this action will directly change the nature of many of the members' business or how they carry out their business"); *see also Wal-Mart Stores, Inc.*, 834 F.3d at 567 (explaining "that associations representing licensed business owners have a right to intervene in lawsuits challenging the regulatory scheme that governs the profession").

Plaintiffs further attempt to cabin Movants' economic interests to just two of California's programs at issue (excluding the Omnibus regulations). ECF Nos. 84 at 5–6, 85 at 6. Even if true, Movants' interests in defending any one of the Resolutions at issue is sufficient for intervention. But in any event, Plaintiffs mischaracterize what the Omnibus regulations would do and the nature of the Movants' arguments. Movants specifically noted the harm their liquid fuel producing members would suffer from California's attempt to reinstate the Omnibus regulations (among the others) through this lawsuit. *See, e.g.*, ECF Nos. 49-1, at 3, ¶ 8 (Collins declaration explaining that Omnibus regulations harm fuel producers by forcing manufacturers to sell more electric vehicles and engines to comply); 61-1 at 3, ¶ 9 (Moody declaration noting that the electric-vehicle requirements along with stricter emissions standard "restrict market access for liquid fuel-powered vehicles, distort national fuel markets, and undermine efforts to maintain consumer choice and fuel availability"); 61-4 at 2–3, ¶¶ 8–9 (Martini declaration explaining that "increasingly stringent NOx requirements and mandates for zero-emission vehicle sales" "would have significantly decreased the demand for fuel sales, as the State recognizes"). It is "an odd argument" for California to advance that the regulations would not affect fuel producers and sellers when the "whole point" of all three programs is to "increase the number of electric vehicles in the new automobile market beyond what

**Movants Joint Reply in Support of Motions to Intervene, No. 4:25-cv-04966-HSG**

consumers would otherwise demand and what automakers would otherwise manufacture and sell" and to reduce liquid fuel consumption. *Diamond Alt. Energy*, 145 S. Ct. at 2137 (rejecting a near-identical argument). Moreover, Movants AmFree and the National Association of Convenience Stores explained how the Omnibus regulations harm the economic interests of other business members—including truck retailers, fleet owners, lessors, and owner-operators—by reducing availability of and increasing costs of the trucks they rely on to operate. *See, e.g.*, ECF Nos. 49-1, at 4–5, ¶¶ 11–14 (Collins declaration), 49-3, at 2, 5–7, ¶¶ 5, 12–19 (DeMartini declaration explaining that Omnibus regulations harm RV retailer); 61-3 ¶ 5 (Kantor declaration noting that convenience retailers operate fleets of trucks and will suffer increased operational costs under the California standards, including the Omnibus regulations). Movants' economic interests are harmed by all three of California's programs.

AmFree and the Corn Growers additionally identified non-economic interests that support their intervention as of right, namely because Plaintiffs' suit "challeng[es] the legality of a measure [they] have supported." *Idaho Farm Bureau Fed'n*, 58 F.3d at 1397. They supported the CRA Resolutions (including before they were enacted into law);[2] some Corn Growers "participated in the administrative process" leading to the ACC II waiver by submitting detailed comments explaining why that waiver is unlawful, *id.*, and AmFree "even filed a suit" to invalidate the ACC II and Omnibus waivers, *id.* at 1398. Plaintiffs cannot waive off this engagement because it "relates to the waivers." ECF No. 84 at 6. All that matters is that their support relates to the preempted California emissions programs that Plaintiffs brought this lawsuit to reimpose. *See* ECF No. 1 at 40 (Prayer for Relief Paragraphs 5 and 6 (asking Court to enjoin EPA from preventing California from enforcing the standards that require the waivers)). And, in any event, Movants *did* support the Resolutions, and Plaintiffs' unsupported claim of a heightened engagement standard, *see* ECF No. 84 at 6 (suggesting Movants must show "deeper engagement"), is directly at odds with the "liberal

---

[2] *See, e.g.*, Ill. Corn Growers Ass'n, *California EV Mandates, Clean Air Act, and a Congressional Review Act Vote* (May 20, 2025), https://perma.cc/8YAS-6QZD; AmFree, *AmFree Heralds Trump's EV Mandate Repeal, Vows to Fight California's Legal Challenge* (June 13, 2025), https://perma.cc/PE6V-C9K2.

construction in favor of applications for intervention" that the Ninth Circuit has consistently held applies, *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983).

Again, "the whole point of the regulations" is to "decrease in purchases of gasoline and other liquid fuels for automobiles." *Diamond Alt. Energy*, 145 S. Ct. at 2135. Plaintiffs' argument that "the targets of its regulation should be locked out of court as unaffected bystanders," *id.* at 2142, should hence be rejected.

***Second – separate challenges to the waivers granted under the Clean Air Act***: Plaintiffs claim that Movants should be barred from intervening here because some Movants pursued separate Clean Air Act challenges to California's preempted rules, ECF Nos. 84 at 4, 85 at 5–6, 9, is mistaken. If anything, Movants' pre-existing challenges reinforce Movants' significantly protectable interest in this case, since resolution here could affect the outcome of those challenges and vice versa. *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) ("[F]actual and legal determinations . . . when upheld by an appellate ruling will have a persuasive *stare decisis* effect in any parallel or subsequent litigation" and "[are] an important consideration in determining the extent to which an applicant's interest may be impaired"); *see also United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir. 1986) ("The prospect of stare decisis may … supply the requisite practical impairment warranting intervention as of right."), *vacated on other grounds*, 480 U.S. 370 (1987).

In short, Movants easily meet the Ninth Circuit's standard for showing an adequate interest to intervene as of right under Rule 24(a).

### C.  Federal Defendants do not adequately represent Movants' interests.

Where a private-sector movant seeks to join government defendants, "the presumption of adequacy … is rebutted" if the movant shows that the "interests of government and the private sector *may* diverge" during litigation. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001) (emphasis added). The Ninth Circuit recognizes that governmental defendants represent the broad public interest, which may diverge from the "more narrow, parochial interests" of private intervenors. *California ex rel. Lockyer*, 450 F.3d at 445 (citing *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995), *abrogated on other grounds by*, *Wilderness Soc'y*, 630 F.3d 1173).

11

3-ER-340

Movants have shown that their interests may diverge from the Federal Defendants' here. *First*, although Movants are committed to defend the CRA Resolutions to the last, the government's history of changing position in cases regarding EPA waivers[3] suggests that the Federal Defendants might—for example, after a change in presidential administration—decline to appeal (or dismiss an appeal of) an adverse decision. *See* ECF No. 49 at 14. *Second*, Movants' and Federal Defendants' interests may already diverge. Movants' ultimate interest is ensuring that Plaintiffs' challenges to the Resolution fail, whatever the grounds of decision. In contrast, the Federal Defendants' strongest interest is likely to persuade the Court that the challenged actions are not justiciable, which would set a powerful precedent for future litigation by making similar government actions more difficult to challenge. These different objectives may cause Defendants to forgo meritorious arguments that Movants would vigorously pursue, for example, arguing affirmatively that the waivers are "rules" properly subject to the CRA. *See id.* at 14–15.

That showing is more than enough. The Supreme Court has made clear that private parties need not prove an actual conflict with the government; it is sufficient that the government's representation "'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Sagebrush Rebellion, Inc.*, 713 F.2d at 528 ("This court has consistently followed *Trbovich*."). Indeed, the Ninth Circuit, and district courts within it, regularly admit private parties to intervene of right on the side of governmental defendants. *E.g.*, *Citizens for Balanced Use*, 647 F.3d at 899; *California ex rel. Lockyer*, 450 F.3d at 444; *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823–24; *Cal. Chamber of Com. v. Becerra*, 529 F. Supp. 3d 1099, 1110 (E.D. Cal. 2021); *S. Cal. Healthcare Sys., Inc. v. City of Culver City*, No. 2:21-cv-05052-MCS-RAO, 2021 WL 4817846, at *1 (C.D. Cal. July 26, 2021); *Barke v. Banks*, No. 8:20-cv-00358-JLS-ADS, 2020 WL 2315857, at *3 (C.D. Cal. May 7, 2020); *Am. Rivers v. Wheeler*, No. C 20-04636 WHA, 2020 WL 5993229, at *1 (N.D. Cal. Oct. 9, 2020); *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, No. CV 14-

---

[3] *See, e.g.*, Petition for Review, *California v. Wheeler*, No. 19-1239 (D.C. Cir. Nov. 15, 2019), ECF 2 (challenge to withdrawal of ACC I waiver); *see also Diamond Alt. Energy*, 145 S. Ct. at 2130–31 (explaining that the Bush EPA denied the ACC I waiver in 2008, the Obama EPA granted it in 2013, the Trump EPA rescinded it in 2019, and the Biden EPA reinstated it in 2022).

09603-AB (SSX), 2015 WL 12745805, at *1, *5 (C.D. Cal. Mar. 25, 2015); *see also Yniguez v. Arizona*, 939 F.2d 727, 738 (9th Cir. 1991).

**II. Alternatively, the Court should grant Movants permissive intervention.**

Movants also easily satisfy the requirements for permissive intervention under Rule 24(b), as explained in their motions. *See* ECF Nos. 49 at 15–17; 61 at 9–10. The motions are timely, *see supra* Part I.A; ECF Nos. 49 at 10; 61 at 7; and Movants' defenses share common questions of law and fact with the main action, *see* ECF Nos. 49 at 16; 61 at 9–10. Discretionary considerations also support permissive intervention here. *See Venegas v. Skaggs*, 867 F.2d 527, 530, 534 (9th Cir. 1989) (reversing and remanding district court, granting permissive intervention, and noting that district courts have discretion to determine whether permissive intervention is proper, guided by efficiency and fairness to movants and parties). In contrast, denying intervention risks prejudice to Movants by leaving their interests to be defended only by amici status, which, among other disadvantages, provides no right to participate in appeals.

Plaintiffs do not dispute that Movants satisfy Rule 24(b)'s minimum requirements. Instead, they argue that Movants' interests are better "vindicated through existing lawsuits" challenging the California waivers and speculate that Movants will attempt to improperly expand the scope of this action to encompass those claims. ECF Nos. 84 at 7; 85 at 7. But such speculation is unfounded and contradicted by Movants' proposed motions to dismiss, which hew closely to Plaintiffs' claims and do not raise extraneous arguments or counterclaims. *See* ECF Nos. 49-9 at 10–25; 61-5 at 6–25. There is thus no risk that permissive intervention will inject collateral issues.

Intervention here also will not "prejudice" Plaintiffs "by introducing duplication and delay." ECF Nos. 84 at 8, 85 at 8. Indeed, courts repeatedly reject the notion that participation by trade associations with economic stakes "expands" a case just because they add industry-specific perspectives. *See Venegas*, 867 F.2d at 530. Moreover, any concerns of potential duplication can be managed through reasonable case-management orders, such as coordinated briefing. *See infra* Part III. And Plaintiffs cannot invoke the difficulties of responding "on behalf of 11 States, each with its own internal approval process" to motions "involving complex legal questions," ECF Nos. 84 at 8, when they made the choice to sue together on those precise legal issues. What Plaintiffs describe as

"prejudice" is instead the natural result of hearing from the very industries that California is seeking to destroy—precisely the type of participation Rule 24(b) is designed to allow.

For these reasons, even if the Court declines to grant intervention as of right, it should permit Movants to intervene under Rule 24(b).

### III.    Movants are amenable to reasonable case management conditions.

Plaintiffs conclude by requesting that the Court impose a list of conditions on Movants' participation if granted intervention. ECF Nos. 84 at 9; 85 at 9–10. As an initial matter, Movants submit that any such conditions are appropriately addressed at a future Case Management Conference. Nonetheless, Movants remain open to reasonable conditions on all parties and intervenors that would promote efficiency and conserve judicial resources, and so Movants respond below to Plaintiffs' proposed limitations.

Plaintiffs first ask the Court to prohibit Movants from initiating discovery. ECF Nos. 84 at 9; 85 at 9. Movants believe that discovery is unnecessary for *all parties* because this case presents only pure questions of law and would therefore consent to a mutual waiver of discovery for the entire litigation. Movants, however, strongly oppose any condition that prohibits Movants from conducting discovery while allowing Plaintiffs to direct discovery at them, which could invite abuse.

Plaintiffs also ask that Movants' "arguments and defenses shall be limited to those claims and issues raised in any operative complaints." ECF Nos. 84 at 9; 85 at 9. Movants understand this as a request barring counterclaims or crossclaims by intervenors. At this time, Movants do not intend to bring any such claims.

Movants are also open to consolidated briefing. The parties that signed this brief—AmFree and the Corn Growers, and the AFPM Movants—will take efforts to avoid duplication and unnecessary briefing, and indeed are voluntarily submitting this brief jointly in the interest of conserving judicial resources. *See* ECF Nos. 84 at 9; 85 at 9. Movants are therefore open to joint briefing where appropriate. However, at this stage in the proceeding, adopting such conditions would be premature. Among other reasons, limits on the number of pages and briefs for dispositive motions must account for the full scope of parties and intervenors (even future intervenors) on both

sides. This can be better addressed, and informed, through the meet-and-confer and case management processes.

Last, Movants oppose Plaintiffs' additional proposed "procedural conditions" relating to meet-and-confer requirements, joint briefing schedules, and restricted page limits for intervenors.[4] *See* ECF Nos. 84 at 9; 85 at 9–10. Movants submit that those requirements are unnecessary and, in any event, premature, since, again, they can be determined, if necessary, after the Court grants intervention. Movants would request that these conditions be discussed at a future case management conference if the Court is nonetheless inclined to impose any of them.

**CONCLUSION**

The Court should grant the motions to intervene. The Court should also wait to consider any conditions on Movants' participation until a future case management conference.

---

[4] Movants ask that any page limits the Court places on Movants beyond those prescribed by the Federal Rules of Civil Procedure and Local Rules also apply to Plaintiffs' filings directed at Movants.

15

3-ER-344

Dated: August 27, 2025                Respectfully submitted,


                                      /s/ Katherine C. Yarger
                                      Katherine C. Yarger* (CO 40387)
                                      Steven P. Lehotsky** (DC 992765)
                                      Michael B. Schon* (DC 989893)
                                      LEHOTSKY KELLER COHN LLP

                                      Bradley A. Benbrook (SBN 177786)
                                      Stephen M. Duvernay (SBN 250957)
                                      BENBROOK LAW GROUP, PC

                                      *Attorneys for Proposed Intervenors American
                                      Fuel & Petrochemical Manufacturers,
                                      American Petroleum Institute, and the
                                      National Association of Convenience Stores*

                                      Michael Buschbacher* (IN 31251-71)
                                      James R. Conde* (DC 1031694)
                                      James R. Wedeking* (DC 500033)
                                      Laura B. Ruppalt* (VA 97202)
                                      BOYDEN GRAY PLLC

                                      John B. Thomas (SBN 269538)
                                      HICKS THOMAS LLP

                                      *Attorneys for Proposed Intervenors
                                      American Free Enterprise Chamber of
                                      Commerce, Illinois Corn Growers
                                      Association, Indiana Corn Growers
                                      Association, Iowa Corn Growers Association,
                                      Kansas Corn Growers Association, Kentucky
                                      Corn Growers Association, Michigan Corn
                                      Growers Association, Missouri Corn Growers
                                      Association, Nebraska Corn Growers
                                      Association, Tennessee Corn Growers
                                      Association, Texas Corn Producers,
                                      Wisconsin Corn Growers Association, and
                                      National Corn Growers Association*

                                      ** Motion for admission *pro hac vice*
                                      pending.
                                      * Admitted *pro hac vice*.

Movants Joint Reply in Support of Motions to Intervene, No. 4:25-cv-04966-HSG

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
EMMANUELLE S. SOICHET, State Bar No. 290754
CECILIA D. SEGAL, State Bar No. 310935
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone:  (510) 879-0299
Fax:  (510) 622-2270
E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE BY AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS ET AL.**<br><br>(Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 5 U.S.C. § 801 et seq.)<br><br>**Date:        October 23, 2025**<br>**Time:        2:00pm**<br>**Judge:      Hon. Haywood S. Gilliam, Jr.** |

**3-ER-346**

## STATEMENT OF ISSUES TO BE DECIDED

Should the Court deny the motion filed by American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores (collectively, AFPM) to intervene either as of right or permissively in the above-captioned matter? If the Court grants the motion, should it nonetheless place reasonable conditions on AFPM's participation and on this litigation to ensure Plaintiffs are not prejudiced and the case proceeds efficiently?

## INTRODUCTION

AFPM's motion to intervene rests on conclusory arguments and incomplete facts and should be denied for that reason alone. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001) (courts need not accept as true conclusory allegations in a motion to intervene and supporting papers). Among other things, AFPM does not identify the statutory source for its alleged protectable interest; does not acknowledge the presumption of adequate representation that applies; and does not explain what specialized expertise it might contribute that would be relevant to this case.

But even putting those issues aside, AFPM's grounds for intervention are deficient for substantially the same reasons as the grounds raised by American Free Enterprise Chamber of Commerce et al. (AmFree) to support its own motion to intervene. *See* AmFree Mot., ECF No. 49; Pls.' Opp'n to AmFree Mot., ECF 84. As with AmFree, AFPM's asserted protectable interest lies in the lawfulness of the U.S. Environmental Protection Agency's (EPA) decision to grant California's requests for Clean Air Act preemption waivers that authorize enforcement of three sets of state vehicle emissions standards. That legal question is not relevant to this suit, and is better protected via petitions for review under the Clean Air Act challenging the waivers themselves—such as the petitions these associations have already filed (which they do not cite in their papers). AFPM thus cannot show that its interest would be impaired by the Court's resolution of Plaintiffs' claims here. Nor can AFPM overcome the presumption that the federal government will adequately represent its interests. Intervention as of right is not warranted.

Furthermore, and again as with AmFree, AFPM's intervention threatens to expand the scope of the litigation to encompass extraneous issues and facts, prejudicing Plaintiffs. That

**3-ER-347**

AmFree has also moved to intervene defensively, and that other groups might still file, adds to the risk of prejudice from undue duplication and delay. The Court should therefore deny AFPM permissive intervention and instead allow AFPM to air its views in an amicus brief.

Alternatively, if the Court is inclined to grant intervention, Plaintiffs respectfully request that the Court place reasonable limitations on AFPM's participation along with certain procedural conditions on all parties to ensure the case proceeds efficiently.

## BACKGROUND

Earlier this year, Congress took the unprecedented and unlawful step of targeting, with resolutions of "rule" disapproval (Resolutions), three Clean Air Act orders that waived preemption of certain emissions standards set by California for new motor vehicles sold in the State. Compl. (ECF 1) ¶¶ 5-7. California has been setting such standards for more than half a century. *Id.* ¶ 33. Since 1967, when Congress generally preempted States from setting new motor vehicle standards, California has done so pursuant to the preemption waivers that EPA must grant, subject to certain limited conditions. *See* 42 U.S.C. § 7543(b)(1).

Each of the three waivers targeted by the Resolutions permits California to enforce specific amendments to its regulatory program, adopted to reduce harmful pollution and protect public health and welfare. These waivers similarly allow other States to adopt and enforce California's regulations as their own. *Id.* § 7507. The first waiver, published in April 2023 (88 Fed. Reg. 20,688 (Apr. 6, 2023)), authorizes the Advanced Clean Trucks (ACT) regulation which requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles in California beginning with model year 2024. Compl. ¶ 44. The second and third waivers, published in early January 2025, authorize the Advanced Clean Cars II (ACCII) and Omnibus regulations, respectively. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). ACCII gradually strengthens California's longstanding emission standards for light-duty vehicles (passenger cars and light trucks), including the State's zero-emission-vehicle sales requirements and the exhaust emission standards for criteria pollutants, requiring reductions in smog-forming oxides of nitrogen (NOx) and particulate matter. Compl. ¶ 43. The Omnibus regulation likewise strengthens longstanding state emission standards, requiring substantial reductions in NOx exhaust emissions

**3-ER-348**

from new medium- and heavy-duty vehicles. *Id.* ¶ 45. All three of these regulations are crucial parts of California's comprehensive plan to improve the air Californians breathe and meet state and federal air quality standards. *Id.* ¶ 46 (noting tens of millions of Californians are affected by some of the worst air quality in the Nation).

The unlawful targeting of these waivers began months (or, in the case of ACT, years) after the waivers were granted. EPA reversed the view it had consistently held for decades—shared by the Government Accountability Office—and suddenly declared, without any explanation, that waivers were "rules" within the meaning of the Congressional Review Act (CRA). *Id.* ¶¶ 65, 68-70, 73-77. Relying on EPA's misinterpretation, Congress enacted the Resolutions that purport to invalidate the three waivers. *Id.* ¶¶ 94, 103, 108. The President signed the Resolutions on June 12, 2025. *Id.* ¶ 113. Plaintiff States sued the United States the same day. Plaintiffs seek, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles. *Id.* ¶¶ 153-178.

## LEGAL STANDARD

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), a movant must show that: (1) the motion is timely; (2) the movant has a "significantly protectable interest" in the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) the movant's interest is inadequately represented by the existing parties. *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024). "Failure to satisfy any one of the requirements is fatal to the application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011).

To intervene permissively under Federal Rule of Civil Procedure 24(b)(1), a movant must show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the movant's claim or defense shares a common question of law or fact with the main action. *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002). In exercising its discretion on this issue, a court must consider whether the intervention would "unduly delay or prejudice" the existing parties. Fed. R. Civ. P. 24(b)(3).

**3-ER-349**

Though courts construe Rule 24 broadly in favor of intervention, the movant bears the burden of establishing that the Rule's requirements are met. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1001 & n.2. Conclusory allegations will not suffice. *See Berg*, 268 F.3d at 820.

## ARGUMENT

### I.    AFPM DOES NOT MEET THE STANDARD FOR INTERVENTION AS OF RIGHT

#### A.    AFPM lacks a protectable interest that could be impeded by disposition of this case

AFPM begins by asserting Article III standing. Mot. 6-7. But an intervenor of right need not demonstrate Article III standing unless it "seeks additional relief beyond that which the plaintiff requests." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *accord Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022). AFPM does not indicate an intent to do so here, and so the standing inquiry is inapposite. *See* Mot. 9:25-26. To the extent AFPM's standing argument is meant to satisfy Rule 24(a)'s requirement that a proposed intervenor demonstrate a sufficient interest in the litigation, it fails to do so. Unlike standing, Rule 24(a) demands that the interest be protectable "under *some* law." *Berg*, 268 F.3d at 818 (emphasis added); *see also Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1087-88 & n.8 (interpreting Rule 24(a)(2) as requiring a *legal* interest). AFPM makes no effort to identify what that law might be here. Its reliance on *Berg* thus does not "go a long way" toward Rule 24(a)'s requirement, much less satisfy it, as AFPM must. Mot. 8:22-25.

Filling in the blanks, it appears that, as with AmFree, AFPM relies on the Clean Air Act's judicial review provision as the requisite legal protection for AFPM's asserted interests in the case. That is presumably why AFPM repeatedly cites *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025), in which petitioners challenged an EPA waiver action under the Clean Air Act. *See, e.g.*, Mot. 6:11-20, 8:8-25. But the lawfulness of EPA's waiver actions under that Act is not at issue here. *See* Compl. ¶¶ 114-188 (raising no Clean Air Act questions). As with AmFree, then, AFPM's failure to demonstrate a "relationship between [its] legally protected interest and the claims at issue" is fatal to its intervention as of right. *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1088 (cleaned up).

**3-ER-350**

AFPM also appears to evoke the protection of the Clean Air Act when it asserts an interest in preserving what AFPM describes as the Act's "uniform national framework" for motor vehicle emission regulation. *See* Mot. 2:15-16; *see also, e.g.*, Mot. 8:6. But the Clean Air Act establishes no such framework and thus protects no such interest. To the contrary, the effect of the Clean Air Act is that new "motor vehicles must be either 'federal cars' designed to meet EPA's standards *or* 'California cars' designed to meet California's standards." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 453 (D.C. Cir. 1998) (citation omitted) (emphasis added). AFPM's preferred uniform national framework for vehicle emission regulation did not exist before the Clean Air Act, and Congress expressly opted *not* to create such a framework in the statute. 42 U.S.C. § 7543(b)(1). Indeed, California has been regulating these emissions since the 1950s— pursuant solely to state law authority until enactment of the Clean Air Act preemption provision in 1967, and pursuant to preemption waivers ever since. *See Am. Trucking Ass'ns, Inc. v. EPA*, 600 F.3d 624, 626 (D.C. Cir. 2010) ("As to regulating emissions from *mobile* pollution sources like automobile engines, EPA and the States . . . share responsibility . . . .").[1]

AFPM also fails to demonstrate how the disposition of this case will impair its interest in the lawfulness of the EPA waivers. "Th[is] litigation does not prevent any individual from initiating suit" to challenge a particular waiver. *City of Los Angeles*, 288 F.3d at 402. Indeed, each of these associations has done just that and collectively filed cases challenging the three waivers targeted by the Resolutions—though AFPM makes no reference to that fact in its papers. *See Am. Fuel & Petrochemical Mfrs., Nat'l Ass'n of Conv. Stores, et al. v. EPA*, No. 25-1085 (D.C. Cir.) (petition for review of ACCII waiver); *Am. Petroleum Inst. v. EPA*, No. 25-1478 (9th Cir.)

---

[1] AFPM hails the need for "national uniformity" (Mot. 1:24), yet also complains that the California standards amount to "a de facto national vehicle standard" (Mot. 2:1-2). AFPM cannot have it both ways. In any event, as AFPM elsewhere acknowledges (Mot. 3:15-18), EPA's standards, not California's, apply in all States unless and until a State chooses to adopt a California standard instead. Plaintiff States have done so, but those independent choices by separate sovereigns do not make California a national vehicle regulator. Indeed, the States that have adopted the ACCII, ACT, and Omnibus standards represent a minority of the national vehicle market. *See Section 177 States Regulation Dashboard*, CARB, https://perma.cc/4AZ7-94F8 (last updated Apr. 2025) (showing that States that have adopted ACCII account for 30.1% of new light-duty vehicle registrations; States that have adopted ACT account for 25.4% of new heavy-duty vehicle registrations; and States that have adopted Omnibus account for 23.8% of new heavy-duty vehicle registrations).

**3-ER-351**

(petition for review of ACCII waiver); *Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 23-1146 (D.C. Cir.) (petition for review of ACT waiver by all three associations); *Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 25-1083 (D.C. Cir.) (petition for review of Omnibus waiver). Because those petitions involve claims under the Clean Air Act, disposition of Plaintiffs' distinct claims in this case will not affect them. *See supra* 4:24-28.[2]

Finally, even accepting *arguendo* that AFPM's interest in the lawfulness of certain waivers is at issue here, AFPM establishes no such interest in at least one of the Resolutions. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1002 (alleged interest must be concrete). Whatever interest AFPM has in "EV mandates" (Mot. 2:9) is not implicated by the Resolution purporting to disapprove the Omnibus waiver. The Omnibus regulation reduces emissions of particulate and smog-forming pollutants from vehicles with exhaust emissions. AFPM concedes its alleged interest is not implicated by that regulation, much less the Resolution targeting its waiver. Mot. 7:26-8:5 (alleging interest only in ACCII and ACT).[3]

### B.    AFPM's interests are adequately represented by Federal Defendants

AFPM fails to show that Federal Defendants will not adequately represent its interests. AFPM attempts to stake out its influence by claiming to "speak[] for the workers, consumers, and communities that rely" on the fuel supply industry. Mot. 2:13-14. That claim is unsubstantiated. These trade associations represent companies—fuel producers, refiners, distributors, and retailers—not individual employees and customers or the broader public. *See id.*, Ex. A ¶¶ 3, 5; Ex. B ¶¶ 3-4; Ex. C ¶¶ 3, 5-6; Ex. D ¶¶ 1-2.

In any event, AFPM does not acknowledge, let alone try to overcome, the presumption of adequacy that arises when, as here, a proposed intervenor and an existing party "have the same ultimate objective." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). AFPM's

---

[2] AFPM may point out on reply that EPA has moved to dismiss the petitions for review of the ACCII and Omnibus waivers. That does not support intervention. The associations could request their cases be held in abeyance pending the resolution of this matter, to protect their interests should Plaintiffs prevail here. If the associations concede to dismissal, that only increases the likelihood that AFPM will attempt to inject arguments concerning the legality of the waivers into this suit, improperly expanding its scope. *See infra* 7:19-8:6.

[3] In fact, none of these California regulations is an "EV mandate." Some of the provisions of ACCII and ACT require the sale of *zero-emission* vehicles, but those vehicles need not be EVs. *E.g.*, Cal. Code Regs., tit. 13, § 1962.4(b).

**3-ER-352**

argument that these objectives "may diverge" (Mot. 9:11) is "long on generalizations and short on specifics." *Or. Nat. Res. Council v. Allen*, No. CV 03-888-PA, 2003 WL 27386127, at *1 (D. Or. Nov. 4, 2003). Unlike the proposed intervenors in *California ex rel. Lockyer v. United States*, AFPM fails to present "direct evidence" of any conflict that could affect litigation strategy. 450 F.3d 436, 444-45 (9th Cir. 2006). AFPM's cited legal authority is thus distinguishable and in fact underscores that the presumption of adequacy applies here, requiring a "very compelling showing" to rebut it. *Id.* at 443; *see also id.* at 444 ("Arguably, this [presumption] is nowhere more applicable than in a case where the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment.").

Even assuming AFPM is correct that no *current* party represents fuel producers' interests (Mot. 2:13, 9:9), AmFree has already moved to intervene to fill that purported gap. *Compare id.* 7-8 (alleging economic harms to fuel producers and others), *with* AmFree Mot. 6-7 (same); *compare also* Mot., Ex. E at 6-15 (proposed motion to dismiss making arguments under Section 805 of the CRA, standing doctrine, and the political question doctrine), *with* AmFree Mot., Ex. I at 11-14, 16-18 (same). Intervention by neither is warranted, and certainly not by both.

## II.    AFPM DOES NOT MEET THE STANDARD FOR PERMISSIVE INTERVENTION

AFPM does not qualify for permissive intervention under Rule 24(b). As described above, its interests focus on the lawfulness of EPA's waivers. Those interests are more properly vindicated through existing lawsuits under the Clean Air Act. AFPM may nonetheless attempt to litigate those issues here, even though they are irrelevant to Plaintiffs' claims. For example, AFPM's papers suggest it wants to assert a kind of conflict preemption argument as to federal emission standards. Mot. 1:18 ("California's regulations would have . . . conflicted with uniform federal rules"). AFPM accordingly seeks to impose a "uniform national framework" for new motor vehicle emissions. *Id.* at 2:15-16; *see also id.* at 8:6 (objecting to "divergent . . . regulatory regimes"). But this case—which concerns the lawfulness of three specific congressional resolutions targeted at three specific waivers—provides no such opportunity. Nor should the Court expand the case to do so. Similarly, AFPM's interest in the lawfulness of these waivers, *see supra* 4:24-28, is simply not germane to Plaintiffs' challenges to the lawfulness of the actions the

federal government took *after* EPA granted the waivers. Underscoring the point, AFPM misleadingly states—as though it were a fact—that the "statutory criteria" for a waiver include that the "regulations aim to address local air quality concerns." Mot. 3:20-21. Far from a fact, this is AFPM's *interpretation* of the Clean Air Act—one they are litigating on petitions for review of multiple waivers. *E.g.*, *Ohio v. EPA*, 98 F.4th 288, 299 (D.C. Cir.), *rev'd and remanded sub nom. Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025). "Intervention cannot be used as a means to inject collateral issues into an existing action." *Apple Inc. v. Iancu*, No. 5:20-cv-06128-EJD, 2021 WL 411157, at *5 (N.D. Cal. Feb. 5, 2021). AFPM threatens to do just that, to Plaintiffs' prejudice. At a minimum, AFPM's intervention is likely to lead to unnecessary disputes about the case's scope, wasting judicial and party resources.[4]

AFPM's intervention is also likely to lead to duplication and delay. As noted, AmFree's pending motion to intervene—which Plaintiffs oppose—alleges similar interests in the case and proposes to make similar legal arguments. *Supra* 7:11-15. Additional motions to intervene on the side of Federal Defendants may follow. Plaintiffs thus face the prospect of having to respond—on behalf of 11 States, each with its own internal approval process—to multiple motions involving complex legal questions from several sets of adverse parties, all of which could significantly slow down the case (or require Plaintiffs to respond on untenable deadlines). This Court should exercise its discretion and decline to permit AFPM's intervention to avoid that prejudicial result. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987) ("[I]n a complex case . . . a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference.").

AFPM's conclusory assertions to the contrary are unpersuasive. AFPM states that its participation here would "avoid future duplicative litigation." Mot. 10:8-9. But AFPM seeks to intervene as defendants, not plaintiffs; it does not contend that there is a "separate action that [it] may bring" that could instead be "part of this action," creating judicial efficiency. *In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*, No. 22-cv-05173-TLT, 2023 WL 4536883, at *4

---

[4] *California v. Health and Human Services*, 330 F.R.D. 248, 255 (N.D. Cal. 2019) (cited at Mot. 9:27-10:1) involved no such risk that the proposed intervenor would expand the scope of the case, rendering it inapposite.

(N.D. Cal. July 13, 2023). To the extent AFPM is referring to its petitions for review of the waivers—which are not mentioned anywhere in AFPM's motion—those petitions raise distinct legal issues in a distinct forum. *See supra* at 5:17-6:5; 42 U.S.C. § 7607(b) (petition for review must be filed in appropriate U.S. Court of Appeals). AFPM also states that it would contribute particular economic and technical expertise to the case. Mot. 10:9-10. But it "has not identified anything 'more' it would contribute" to the issues relevant here—the illegality of the Resolutions—"let alone enough to justify the complications that can arise from having additional parties." *Allen*, 2003 WL 27386127, at *2.

In short, AFPM fails to satisfy the test for permissive intervention. Its participation in the case would be more appropriate, if at all, in an amicus brief. *See id.* at *3 (denying permissive intervention but allowing movant to participate as amicus curiae); *United States v. De Leon Guerrero*, 4 F.3d 749, 756 (9th Cir. 1993) (affirming district court's authority to so order).

## III.  IF THE COURT GRANTS INTERVENTION, IT SHOULD IMPOSE REASONABLE CASE MANAGEMENT CONDITIONS

If the Court nonetheless intends to grant AFPM intervention, and in light of the concerns identified above, Plaintiffs respectfully request that the Court impose the following reasonable limitations on AFPM's participation:

(1) AFPM shall not initiate discovery;

(2) AFPM's arguments and defenses shall be limited to those claims and issues raised in any operative complaints; and

(3) if AFPM and AmFree are both granted intervention, they should be required to jointly brief and argue all dispositive motions.[5]

In addition, Plaintiffs respectfully request that the Court impose the following procedural conditions on all parties, including all intervenors:

---

[5] This should not pose any practical difficulty, as the counsel who signed AFPM's papers also works at a firm representing AmFree. *See Bradley A. Benbrook*, Hicks Thomas, https://perma.cc/LNP5-MVY4 (last visited Aug. 19, 2025).

**3-ER-355**

(1) the parties must meet and confer at least two weeks before the filing of any dispositive motion and submit a joint proposed briefing schedule to the Court at least one week before the motion's filing; and

(2) the combined total page limit of any intervenor briefs on any dispositive motion must be limited to two-thirds of the page limit allowed to the original parties that the intervenor is supporting. In other words, defendant-intervenors would, collectively, be limited to two-thirds the pages available to Federal Defendants, and plaintiff-intervenors would, collectively, be limited to two-thirds the pages available to Plaintiff States.

Such conditions are authorized under Federal Rule of Procedure 24(a) and 24(b), are routinely applied, and will help promote judicial efficiency. *See Stringfellow*, 480 U.S. at 382-83 & n.2 (Brennan, J., concurring in part and concurring in the judgment) (confirming district courts have discretion to limit intervention as of right and even more discretion to limit permissive intervention (citing Advisory Committee Notes, Fed. R. Civ. P. 24)); *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, Nos. 21, 26, 17, 2021 WL 4552144, at *3 (N.D. Cal. May 3, 2021) (barring defendant-intervenors from initiating discovery and directing parties to meet and confer on case schedule allowing for efficient adjudication of anticipated motion to dismiss and motions for summary judgment); *California v. Health & Human Servs.*, No. 17-cv-05738-HSG, 2017 WL 6731640, at *9 (N.D. Cal. Dec. 29, 2017) (limiting issues in the case to those raised by the original parties).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motion to intervene. In the alternative, Plaintiffs respectfully request that the Court impose the case management conditions described above to avoid prejudice to Plaintiffs.

Dated:  August 20, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
Telephone:  (415) 510-3545
Fax:  (510) 622-2270
E-mail: Cecilia.Segal@doj.ca.gov
*Attorneys for Plaintiff State of California*


**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov


**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov


**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov


**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov


**3-ER-357**

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

 */s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
 (505) 717-3520
wgrantham@nmdoj.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

*Admitted pro hac vice

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

*/s/ Cecilia D. Segal*
Cecilia D. Segal
Counsel for Plaintiff State of California

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
EMMANUELLE S. SOICHET, State Bar No. 290754
CECILIA D. SEGAL, State Bar No. 310935
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone:  (510) 879-0299
Fax:  (510) 622-2270
E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE BY AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE ET AL.**<br><br>(Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 5 U.S.C. § 801 et seq.)<br><br>**Date:**     **October 23, 2025**<br>**Time:**     **2:00pm**<br>**Judge:**    **Hon. Haywood S. Gilliam, Jr.** |

**3-ER-359**

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Court deny the motion filed by American Free Enterprise Chamber of Commerce (AmFree) and several Corn Growers Associations (collectively, Movants) to intervene either as of right or permissively in the above-captioned matter? If the Court grants the motion, should it nonetheless place reasonable conditions on Movants' participation and on this litigation to ensure Plaintiffs are not prejudiced and the case proceeds efficiently?

**INTRODUCTION**

This litigation concerns the legality of Congress's unprecedented attempt, absent administrative or judicial process, to retroactively annul three waivers of Clean Air Act preemption that the U.S. Environmental Protection Agency (EPA) issued to California. Intervention should be denied because Movants' grievances against the EPA waivers are different than this case's dispute over the validity of later-enacted congressional resolutions. Under the Clean Air Act, EPA's waivers can be reviewed in the appropriate court of appeals on petitions filed within 60 days of a waiver's publication in the Federal Register. 42 U.S.C. § 7607(b)(1). Movant AmFree and others filed such petitions seeking review of the three waivers implicated here, and the time to file further challenges to those waivers expired months ago. Movants' request to intervene in this suit to safeguard the same interests that animate their waiver litigation should be rejected.

Movants may not intervene as of right, for two reasons. First, they fail to demonstrate a protectable interest in the congressional resolutions—as opposed to the lawfulness of the EPA waivers—that would be impeded by the disposition in this litigation. Indeed, as to one of the resolutions at issue (the Omnibus resolution), Movants proffer no cognizable interest at all. Second, the United States adequately represents all of Movants' interests.

Movants should not be granted permissive intervention, either. Their intervention risks injecting extraneous issues into the litigation, to Plaintiffs' prejudice. That a second group of similarly situated trade associations has moved to intervene—with the possibility that more might still file—only heightens this risk. To avoid prejudicing Plaintiffs, the Court should deny permissive intervention and allow Movants to present their views as amici curiae instead.

**3-ER-360**

Alternatively, if the Court is inclined to grant intervention, Plaintiffs respectfully request that the Court place reasonable limitations on Movants' participation along with certain procedural conditions on all parties to ensure the case proceeds efficiently.

## BACKGROUND

Earlier this year, Congress took the unprecedented and unlawful step of targeting, with resolutions of "rule" disapproval (Resolutions), three Clean Air Act orders that waived preemption of certain emissions standards set by California for new motor vehicles sold in the State. Compl. (ECF 1) ¶¶ 5-7. California has been setting such standards for more than half a century. *Id.* ¶ 33. Since 1967, when Congress generally preempted States from setting new motor vehicle standards, California has done so pursuant to the preemption waivers that EPA must grant, subject to certain limited conditions. *See* 42 U.S.C. § 7543(b)(1).

Each of the three waivers targeted by the Resolutions permits California to enforce specific amendments to its regulatory program, adopted to reduce harmful pollution and protect public health and welfare. These waivers similarly allow other States to adopt and enforce California's regulations as their own. *Id.* § 7507. The first waiver, published in April 2023 (88 Fed. Reg. 20,688 (Apr. 6, 2023)), authorizes the Advanced Clean Trucks (ACT) regulation which requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles in California beginning with model year 2024. Compl. ¶ 44. The second and third waivers, published in early January 2025, authorize the Advanced Clean Cars II (ACCII) and Omnibus regulations, respectively. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). ACCII gradually strengthens California's longstanding emission standards for light-duty vehicles (passenger cars and light trucks), including the State's zero-emission-vehicle sales requirements and the exhaust emission standards for criteria pollutants, requiring reductions in smog-forming oxides of nitrogen (NOx) and particulate matter. Compl. ¶ 43. The Omnibus regulation likewise strengthens longstanding state emission standards, requiring substantial reductions in NOx exhaust emissions from new medium- and heavy-duty vehicles. *Id.* ¶ 45. All three of these regulations are crucial parts of California's comprehensive plan to improve the air Californians breathe and meet state and federal air quality standards. *Id.* ¶ 46 (noting tens of millions of Californians are affected by

**3-ER-361**

some of the worst air quality in the Nation).

The unlawful targeting of these waivers began months (or, in the case of ACT, years) after the waivers were granted. EPA reversed the view it had consistently held for decades—shared by the Government Accountability Office—and suddenly declared, without any explanation, that waivers were "rules" within the meaning of the Congressional Review Act (CRA). *Id.* ¶¶ 65, 68-70, 73-77. Relying on EPA's misinterpretation, Congress enacted the Resolutions that purport to invalidate the three waivers. *Id.* ¶¶ 94, 103, 108. The President signed the Resolutions on June 12, 2025. *Id.* ¶ 113. Plaintiff States sued the United States the same day. Plaintiffs seek, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles. *Id.* ¶¶ 153-178.

## LEGAL STANDARD

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), a movant must show that: (1) the motion is timely; (2) the movant has a "significantly protectable interest" in the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) the movant's interest is inadequately represented by the existing parties. *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024). "Failure to satisfy any one of the requirements is fatal to the application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011).

To intervene permissively under Federal Rule of Civil Procedure 24(b)(1), a movant must show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the movant's claim or defense shares a common question of law or fact with the main action. *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002). In exercising its discretion on this issue, a court must consider whether the intervention would "unduly delay or prejudice" the existing parties. Fed. R. Civ. P. 24(b)(3).

Though courts construe Rule 24 broadly in favor of intervention, the movant bears the burden of establishing that the Rule's requirements are met. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1001 & n.2. Conclusory allegations will not suffice. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

**3-ER-362**

# ARGUMENT

## I.  MOVANTS DO NOT MEET THE STANDARD FOR INTERVENTION AS OF RIGHT

### A.  Movants lack a protectable interest that could be impeded by disposition of this case

Movants assert multiple interests in an effort to identify a protectable one that could be impeded here. None suffices.

Movants claim their "members have a legally protectable right not to suffer the effects of unlawful EPA actions." Mot. 11:21-22; *see also Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1087-88 & n.8 (9th Cir. 2022) (interpreting Rule 24(a)(2) as requiring a *legal* interest). In support, they cite 42 U.S.C. § 7607(b)—the Clean Air Act's judicial review provision—which protects interests in the legality of Clean Air Act actions. But Movants' claimed interest lacks "a relationship" with "the claims at issue" in this litigation because the lawfulness of EPA's waiver actions is not implicated by Plaintiffs' claims. *Cal. Dep't of Toxic Substances Control*, 54 F.4th at 1088 (cleaned up). To illustrate, Movants appear to believe that EPA's waiver decisions were unlawful because, in their view, the relevant California standards are "commercially unfeasible." Mot. 1:26. That claim could be appropriately raised in a petition for review of a waiver pursuant to 42 U.S.C. § 7607(b). *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998) ("technological feasibility" at issue "in the waiver context"). But whether the waiver decisions complied with the Clean Air Act is irrelevant in this suit, where Plaintiffs challenge *other* actions by EPA. *Compare* Mot. 1:22-23 (claiming California's "standards are prohibited by the Clean Air Act"), *with* Compl. ¶¶ 114-188 (raising no Clean Air Act questions).

Nor will any interest in the lawfulness of the waivers be impaired by the disposition of this case. This "litigation does not prevent any individual from initiating suit against" any EPA waiver. *City of Los Angeles*, 288 F.3d at 402. Indeed, AmFree has protected its interests in the lawfulness of EPA's waiver actions by opting to challenge two of them through petitions for review. Mot. 7:25-8:1 & n.8. Contrary to AmFree's conclusory assertions, this litigation will not impede those pending waiver lawsuits. Mot. 12-13. A victory for Plaintiffs here—*e.g.*, a

**3-ER-363**

determination that the Resolutions were not constitutionally enacted—will not alter AmFree's legal claims against EPA's waiver decisions. It is hard to imagine how, for example, disposition of Plaintiffs' separation-of-powers challenge to the Resolutions would "creat[e] Ninth Circuit precedent" relevant to AmFree's arguments challenging the waivers under the Clean Air Act. Mot. 13:4-5. Nowhere do Movants address that analytical gap.[1]

AmFree's reference to its lawsuit challenging an agreement between the California Air Resources Board (CARB) and truck manufacturers (Mot. 13:12-23) fares no better. AmFree filed that case six months before the Resolutions at issue here were signed. Compl., *Am. Free Enter. Chamber of Com. v. Engine Mfrs. Ass'n*, No. 3:24-cv-50504 (N.D. Ill. filed Dec. 16, 2024), ECF 1. True, a ruling in Plaintiffs' favor might require AmFree to revert to the complaint it originally filed (*see* Mot. 13:17-18 (citing amended complaint filed on June 30, 2025 (ECF 103))), unless the case is dismissed (*see* Def. Steven S. Cliff's Mot. to Dismiss Pl.'s Compl., *Am. Free Enter. Chamber of Com. v. Engine Mfrs. Ass'n*, No. 3:24-cv-50504 (N.D. Ill. filed Aug. 14, 2025), ECF 125). But AmFree cites no authority for the proposition that it has a protected interest in avoiding that result.

Even assuming an interest in the lawfulness of the EPA waivers were sufficient to support intervention here, Movants have not met their burden to establish a concrete interest in all three targeted waivers. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1002 (alleged interest must be concrete). No Movant other than AmFree petitioned for review of any of these waivers (Mot. 12:10-13), and AmFree itself declined to seek judicial review of the waiver for ACT (Mot. 12:12-13). Thus, Movants seek to intervene as of right based on interests they opted not to protect through the established means for doing so under the Clean Air Act. In addition, the motion does not establish that *any* of the Movants has an interest in the lawfulness of the Omnibus waiver, much less the Omnibus Resolution. Movants claim such an interest based on a

---

[1] Movants may point out on reply that EPA has moved to dismiss AmFree's petitions for review of the ACCII and Omnibus waivers. That does not support intervention. AmFree could request its cases be held in abeyance pending the resolution of this matter, to protect its interests should Plaintiffs prevail here. If AmFree concedes to dismissal, that only increases the likelihood that AmFree will attempt to inject its arguments concerning the legality of the waivers into this suit, improperly expanding its scope. *See infra* 7:17-8:3.

mischaracterization of the Omnibus regulation as setting NOx emissions standards "so low that, in practice, manufacturers are incentivized to sell electric vehicles and engines to comply." Mot. 4:4-5; *see also id.*, Ex. C ¶ 14 (incorrectly describing Omnibus regulation as requiring increases in "share of electric powertrains sold in California"). But the single sentence from California's rulemaking documents on which that claim is based is not even about the stringency of the NOx emission standards.[2] Rather, it refers to credits that manufacturers could choose to earn as an alternate means of compliance, primarily in early model years that have already ended.[3] Nothing in that sentence establishes that Movants have any ongoing interest in the Omnibus regulation.

Finally, Movants assert an interest in defending the legality of measures they supported. Mot. 12:7-8. But the only support for the Resolutions identified are two website posts applauding Congress's actions *after the fact*. *See* Mot. 8:1 & n.9. To the extent Movants cite deeper engagement similar to that undertaken by the intervenors in *Idaho Farm Bureau Federation v. Babbitt*, *Sagebrush Rebellion, Inc. v. Watt*, and *Idaho v. Freeman* (cited at Mot. 12), that engagement once again relates to the waivers—and then, only one of them—not the post-waiver actions and Resolutions at issue here. *See* Mot. 7:20-25.

### B.    Movants' interests are adequately represented by Federal Defendants

A "presumption of adequacy of representation" arises when a proposed intervenor and an existing party share the "same ultimate objective," or when "the government is acting on behalf of a constituency that it represents." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). "This presumption of adequacy is nowhere more applicable than in a case where the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment." *Freedom from Religion Found., Inc.*, 644 F.3d at 841.

Movants make no mention of this presumption. Instead, they seek to avoid it by arguing that their objectives "may diverge" from those of the federal government at some point, citing the

---

[2] CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (discussing "proposed revisions to the ABT [averaging, banking, and trading] program").

[3] *Id.* at I-36 (cross-referencing "Chapter III, Section A.7"); *id.* at III-73 (proposing to allow transfer of "credits generated from 2010 through 2021 MY engines"); *id.* at III-76 (describing incentives "especially" for "years before" model year 2024).

government's history of reversing course on two (out of more than 75) earlier waivers. Mot. 14:11-17; Compl. ¶ 41.[4] But changing course on an administrative action is not the same as changing course on a statute. Most relevant here, should the U.S. Department of Justice later wish to refrain from defending the constitutionality of the Resolutions at issue, it would have to submit a report to Congress divulging and explaining that decision pursuant to 28 U.S.C. § 530D(a)(1)(B)(ii), at which point Movants may renew their motion to intervene, *see Or. Nat. Res. Council v. Allen*, No. CV 03-888-PA, 2003 WL 27386127, at *3 (D. Or. Nov. 4, 2003). Put simply, Movants' reliance on a limited history of non-analogous actions by the federal government fails to render the presumption of adequacy inapplicable. And the possibility of "divergent litigation choices" (Mot. 14:25), without more, cannot overcome it. *See Arakaki*, 324 F.3d at 1086 ("Where parties share the same ultimate objective, differences in litigation strategy do not normally justify intervention.").

## II.    MOVANTS DO NOT MEET THE STANDARD FOR PERMISSIVE INTERVENTION

Movants likewise fail to establish that permissive intervention is warranted. As described above, Movants' interests center on the lawfulness of the waivers, which are more properly vindicated through existing lawsuits under the Clean Air Act (to the extent Movants opted to do so to protect their interests). While Movants represent that they will pursue defenses that hew to Plaintiffs' claims, their intervention motion provides strong indications that they are likely to raise certain facts or issues that stray beyond them, prejudicing Plaintiffs. For example, Movants seem to want to litigate the lawfulness of EPA's waiver decisions, which is not at issue here. *E.g.*, Mot. 1:22-23 (claiming California's "standards are prohibited by the Clean Air Act"); *id.* at 1:26-28 (asserting standards are "commercially unfeasible" and have had various adverse effects); *id.* at 14:18-19 (complaining courts have not "reached the merits of the underlying statutory question whether [certain waivers] comply with the Clean Air Act"). Movants also offer argumentative and incorrect characterizations of myriad other issues that are unrelated to this litigation, including the legality of an agreement AmFree is challenging elsewhere (*id.* at 8:2-9), the costs

---

[4] Movants incorrectly assert that "the Bush EPA denied the ACC I waiver in 2008" and "the Obama EPA granted it in 2013." Mot. 14:15-16. The 2008 denial involved a different waiver request that was granted in 2009. 74 Fed. Reg. 32,744 (July 8, 2009).

**3-ER-366**

and benefits of electric vehicles (*id.* at 4:8-5:1; *id.* at 6:10-28), and the operation of California regulations (*supra* 5:22-6:8 (discussing Movants' mischaracterization of Omnibus NOx standards)). But "[i]ntervention cannot be used as a means to inject collateral issues into an existing action." *Apple Inc. v. Iancu*, No. 5:20-cv-06128-EJD, 2021 WL 411157, at *5 (N.D. Cal. Feb. 5, 2021); *accord Arakaki*, 324 F.3d at 1086. To allow otherwise would unduly prejudice the adjudication of Plaintiffs' case. *See* Fed. R. Civ. P. 24(b)(3).

Movants' participation as intervenors may further prejudice Plaintiffs by introducing duplication and delay. Already, a second group of industry trade associations representing similar interests, and proposing to make similar legal arguments, has moved to intervene defensively. *Compare* Mot. 6-7 (alleging economic harms to fuel producers and others), *with* Am. Fuel & Petrochemical Mfrs. et al. (AFPM) Mot. to Intervene (ECF 61) 7-8 (same); *compare also* Mot., Ex. I at 11-14, 16-18 (proposed motion to dismiss making arguments under Section 805 of the CRA, standing doctrine, and the political question doctrine), *with* AFPM Mot., Ex. E at 6-15 (same). More putative intervenors may follow. Plaintiffs thus face the prospect of having to respond—on behalf of 11 States, each with its own internal approval process—to multiple motions involving complex legal questions from several sets of adverse parties. To prevent this already complex case from becoming unmanageable, the Court should exercise its discretion and decline to permit these Movants intervention. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987) ("[I]n a complex case . . . a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference."). The Court could instead allow these Movants to present their views in an amicus brief. *See United States v. De Leon Guerrero*, 4 F.3d 749, 756 (9th Cir. 1993) (affirming district court decision to deny permissive intervention but allow movant to participate as amicus curiae). Certainly, *both* sets of entities seeking to intervene as defendants should not be allowed to do so. As noted, the two groups of movant-intervenors assert similar interests and intend to present similar arguments (which almost certainly overlap with the arguments Federal Defendants will make).

**3-ER-367**

III.  **IF THE COURT GRANTS INTERVENTION, IT SHOULD IMPOSE REASONABLE CASE MANAGEMENT CONDITIONS**

If the Court nonetheless intends to grant these Movants intervention, and in light of the concerns identified above, Plaintiffs respectfully request that it impose the following reasonable limitations on their participation:

(1) Movants shall not initiate discovery;

(2) Movants' arguments and defenses shall be limited to those claims and issues raised in any operative complaints; and

(3) if Movants and AFPM are both granted intervention, they should be required to jointly brief and argue all dispositive motions.[5]

In addition, Plaintiffs respectfully request that the Court impose the following procedural conditions on all parties, including all intervenors:

(1) the parties must meet and confer at least two weeks before the filing of any dispositive motion and submit a joint proposed briefing schedule to the Court at least one week before the motion's filing; and

(2) the combined total page limit of any intervenor briefs on any dispositive motion must be limited to two-thirds of the page limit allowed to the original parties that the intervenor is supporting. In other words, defendant-intervenors would, collectively, be limited to two-thirds the pages available to Federal Defendants, and plaintiff-intervenors would, collectively, be limited to two-thirds the pages available to Plaintiff States.

Such conditions are authorized under Federal Rule of Procedure 24(a) and 24(b), are routinely applied, and will help promote judicial efficiency. *See Stringfellow*, 480 U.S. at 382-83 & n.2 (Brennan, J., concurring in part and concurring in the judgment) (confirming district courts have discretion to limit intervention as of right and even more discretion to limit permissive intervention (citing Advisory Committee Notes, Fed. R. Civ. P. 24)); *Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, Nos. 21, 26, 17, 2021 WL 4552144, at *3 (N.D. Cal. May 3, 2021) (barring

---

[5] This should not pose any practical difficulty, as the counsel who signed AFPM's papers also works at a firm representing Movants. *See Bradley A. Benbrook*, Hicks Thomas, https://perma.cc/LNP5-MVY4 (last visited Aug. 19, 2025).

**3-ER-368**

defendant-intervenors from initiating discovery and directing parties to meet and confer on case schedule allowing for efficient adjudication of anticipated motion to dismiss and motions for summary judgment); *California v. Health & Human Servs.*, No. 17-cv-05738-HSG, 2017 WL 6731640, at *9 (N.D. Cal. Dec. 29, 2017) (limiting issues in the case to those raised by the original parties).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motion to intervene. In the alternative, Plaintiffs respectfully request that the Court impose the case management conditions described above to avoid prejudice to Plaintiffs.

Dated:  August 20, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
Telephone:  (415) 510-3545
Fax:  (510) 622-2270
E-mail: Cecilia.Segal@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
Carrie.noteboom@coag.gov

By: */s/ Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**3-ER-369**

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

/s/ *Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

/s/ *Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

/s/ *Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

/s/ *William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

/s/ *Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

*Admitted pro hac vice

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.

*/s/ Cecilia D. Segal*
Cecilia D. Segal
Counsel for Plaintiff State of California

OK2025401237
85303750.docx

**3-ER-371**

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
Email: brad@benbrooklawgroup.com

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW, Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Email: steve@lkcfirm.com
Email: mike@lkcfirm.com

Katherine C. Yarger* (CO 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lkcfirm.com
Telephone: (512) 693-8350

*Attorneys for Proposed Intervenors American Fuel*
*& Petrochemical Manufacturers, American*
*Petroleum Institute, the National Association of*
*Convenience Stores*

* Motion for admission *pro hac vice* forthcoming.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 4:25-cv-04966 |
| | ) |
| v. | ) **NOTICE OF MOTION AND MOTION TO** |
| | ) **INTERVENE; MEMORANDUM OF** |
| UNITED STATES OF AMERICA; U.S. | ) **POINTS AND AUTHORITIES IN SUPPORT** |
| ENVIRONMENTAL PROTECTION | ) |
| AGENCY; LEE ZELDIN, in his official | ) Date: October 23, 2025 |
| capacity as Administrator of the U.S. | ) Time: 2:00 p.m. PST |
| Environmental Protection Agency; and | ) Judge: Hon. Haywood S. Gilliam, Jr. |
| DONALD J. TRUMP, in his official capacity as | ) |
| President of the United States, | ) |
| | ) |
| Defendants. | ) |
| | ) |

MOTION TO INTERVENE, NO. 4:25-cv-04966        **3-ER-372**

# TABLE OF CONTENTS

NOTICE ............................................................................................................. 1

INTRODUCTION ............................................................................................. 1

ISSUES TO BE DECIDED .............................................................................. 3

STATEMENT OF THE FACTS ....................................................................... 3

LEGAL STANDARD........................................................................................ 5

ARGUMENT ..................................................................................................... 6

    A.     Proposed Intervenors have standing.........................................................6

    B.     Proposed Intervenors are entitled to intervene as of right........................7

    C.     In the alternative, Proposed Intervenors should be granted permissive intervention ...............................................................................9

CONCLUSION ................................................................................................. 10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AFPM v. O'Keeffe,*
 903 F.3d 903 (9th Cir. 2018) ................................................................................................ 7

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,*
 712 F.3d 1349 (9th Cir. 2013) ............................................................................................. 7

*Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.,*
 54 F.4th 1078 (9th Cir. 2022) .............................................................................................. 2

*California v. Health & Hum. Servs.,*
 330 F.R.D. 248 (N.D. Cal. 2019) ..................................................................................... 9–10

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
 647 F.3d 893 (9th Cir. 2011) ............................................................................................... 5

*Diamond Alternative Energy, LLC v. EPA,*
 606 U.S. __, 145 S. Ct. 2121 (2025) ....................................................................... 6, 7, 8, 9

*Forest Conservation Council v. U.S. Forest Serv.,*
 66 F.3d 1489 (9th Cir. 1995) ............................................................................................... 9

*Freedom from Religion Found., Inc. v. Geithner,*
 644 F.3d 836 (9th Cir. 2011) ............................................................................................. 10

*Hunt v. Wash. State Apple Advert. Comm'n,*
 432 U.S. 333 (1977) ............................................................................................................ 6

*Cal. ex rel. Lockyer v. United States,*
 450 F.3d 436 (9th Cir. 2006) ............................................................................................... 9

*McDonald v. E. J. Lavino Co.,*
 430 F.2d 1065 (5th Cir. 1970) ........................................................................................... 10

*S.W. Ctr. for Biological Diversity v. Berg,*
 268 F.3d 810 (9th Cir. 2001) ............................................................................................... 8

*Sierra Club v. EPA,*
 995 F.2d 1478 (9th Cir. 1993) ............................................................................................. 7

*United States v. Alisal Water Corp.,*
 370 F.3d 915 (9th Cir. 2004) ............................................................................................... 7

*Venegas v. Skaggs,*
 867 F.2d 527 (9th Cir. 1989) ............................................................................................. 10

*W. Watersheds Project v. Haaland,*
 22 F.4th 828 (9th Cir. 2022) ............................................................................................... 5

*Westchester Fire Ins. Co v. Mendez,*
 585 F.3d 1183 (9th Cir. 2009) ............................................................................................. 2

*Wilderness Soc'y v. U.S. Forest Serv.*,
  630 F.3d 1173 (9th Cir. 2011)............................................................................ 7, 9

**Statutes, Regulations and Rules**

88 Fed. Reg. 20,688 (Apr. 6, 2023)........................................................................ 1, 3

90 Fed. Reg. 642 (Jan. 6, 2025) ............................................................................ 1, 3

90 Fed. Reg. 643 (Jan. 6, 2025) ............................................................................ 1, 3

42 U.S.C. § 7543(a)...................................................................................................... 3

5 U.S.C. §§ 801–808 ................................................................................................ 1, 4

5 U.S.C. § 801 ................................................................................................................ 4

5 U.S.C. § 804(3) .......................................................................................................... 4

Fed. R. Civ. P. 12(b)..................................................................................................... 2

Fed. R. Civ. P. 24(a)....................................................................................... 2, 3, 5, 7, 8

Fed. R. Civ. P. 24(b)........................................................................................ 2, 3, 5, 9

Fed. R. Civ. P. 24(c).................................................................................................... 2

Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025)................................................. 4

Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025)................................................. 4

Pub. L. No. 119-17, 139 Stat. 67 (June 12, 2025)................................................. 4

**Other Authorities**

California Air Resources Board, *Response to Comments on the Draft
  Environmental Analysis Prepared for the Advanced Clean Cars II Program*
  (Aug. 24, 2022), https://perma.cc/BJS4-RSRV ................................................. 7–8

*The Congressional Review Act (CRA): A Brief Overview* 1, CRS Report IF10023
  (Aug. 29, 2024) ................................................................................................. 4

Ellen Robo et al., *California Clean Trucks Program,* Env't Rsch. Mgmt. Grp.
  (2022), https://perma.cc/7BNU-XRKS ............................................................... 8

Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ ................ 4

## NOTICE

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 23, 2025, at 2:00 p.m. PST, or as soon thereafter as this matter may be heard in the United States District Court for the Northern District of California, 1301 Clay Street, Courtroom 2 (4th Floor), Oakland, CA 94612, Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores will appear and present their motion to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure.

Proposed Intervenors' Motion is based on this Notice of Motion and Motion and accompanying Memorandum of Points and Authorities, all other papers and pleadings filed in this action, and such other matters as may be presented to the Court before or at the time of the hearing.

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

On May 22, 2025, Congress passed three resolutions disapproving EPA waivers that would have allowed California to enforce state regulations requiring the rapid transition to electric vehicles (EVs) by mandating EV sales and restricting the sale of traditional, internal combustion engine vehicles. California's regulations would have banned the sale of gasoline powered vehicles, conflicted with uniform federal rules, and enabled other states to adopt California's approach, thus impacting the nation's automobile and fuel markets.

The EPA rules that Congress voided would have had sweeping economic consequences. The California regulations would decrease nationwide fuel sales, harming fuel producers, refiners, distributors, and retailers. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (Advanced Clean Trucks); 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II); 90 Fed. Reg. 643 (Jan. 6, 2025) ("Omnibus" Low NOx). Recognizing these consequences and the threat to national uniformity, Congress exercised its oversight authority under the Congressional Review Act (CRA), 5 U.S.C. §§ 801–808. President Trump signed the disapproval resolutions into law on June 12, 2025.

California and several allied states have filed this lawsuit in response. They ask this Court to overturn Congress's lawfully enacted disapproval resolutions and restore state-level regulations.

1

In essence, California seeks to turn its own policy preferences into a de facto national vehicle standard, effectively making California the decisionmaker on vehicle emissions policy for the entire country.

Proposed Intervenors, American Fuel & Petrochemical Manufacturers (AFPM), American Petroleum Institute (API), and the National Association of Convenience Stores (NACS) have a direct interest in this case. Their members include fuel producers, refiners, distributors, and retailers operating throughout the United States. These companies rely on clear, consistent federal emissions standards when planning investments, designing and developing products, and managing nationwide supply chains. California's attempt to revive its EV mandates threatens to reduce liquid fuel sales, create conflicting regulatory requirements, force costly operational changes, undermine settled business expectations nationwide, disrupt investment planning, and introduce uncertainty into fuel markets.

No current party before this Court represents the fuel producers' interests or speaks for the workers, consumers, and communities that rely on these industries. Proposed Intervenors seek to intervene to defend Congress's resolutions and preserve the uniform national framework established by the Clean Air Act (CAA). [1]

This Court should grant intervention because all requirements under Federal Rule of Civil Procedure 24(a) are easily met. The motion is timely. Proposed Intervenors have significantly protectable interests, and the disposition of this case threatens to impair those interests. Moreover, the existing parties do not adequately represent the fuel producers' distinct economic and operational concerns. Finally, the requirements of 24(b) are also satisfied and serve as an additional ground to grant this motion. Accordingly, Proposed Intervenors respectfully request that the court grant their motion to intervene. [2]

---

[1] Plaintiffs have reserved their right to file an opposition or otherwise respond to the motion to intervene once it is filed. Defendants take no position on the motion.

[2] Proposed Intervenors have attached to this motion to intervene a motion to dismiss, which the Federal Rules of Civil Procedure treat as a responsive pleading. *See* Fed. R. Civ. P. 12(b), 24(c); *see also Westchester Fire Ins. Co v. Mendez*, 585 F.3d 1183, 1188 (9th Cir. 2009); *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086 n.7 (9th Cir. 2022) (citing *Westchester*). Ex. E.

2

**MOTION TO INTERVENE, NO. 4:25-cv-04966**          **3-ER-377**

## ISSUES TO BE DECIDED

1.      Whether Proposed Intervenors are entitled to intervene as defendants in this action as of right under Fed. R. Civ. P. 24(a).

2.      In the alternative, whether Proposed Intervenors should be granted leave to intervene permissively under Fed. R. Civ. P. 24(b).

## STATEMENT OF FACTS

Decades ago, Congress established a uniform federal framework for regulating motor vehicle emissions under the CAA, reserving authority over new motor vehicle standards to the federal government. *See* 42 U.S.C. § 7543(a). The CAA is the nation's primary law for controlling air pollution. It charges EPA with setting national air quality standards to protect public health and welfare, *see id.* § 7409, and directs EPA to regulate emissions of pollutants from both stationary sources, like power plants and factories, and mobile sources, like cars and trucks. *See id.* §§ 7411, 7521. Congress explicitly directed EPA to set the standards for new vehicles and engines and prohibited states from creating their own, with one narrow exception. *See id.* §§ 7410, 7543(a). Congress allowed California, the only state with vehicle emissions standards that predated the CAA, to apply for a waiver to enforce its standards if certain conditions are met. *See id.* § 7543(b). And if California receives a waiver for its standards, other states may adopt the California standards in lieu of EPA's, but they may not create independent requirements. *Id.* § 7507.

Although California can request a waiver of this federal preemption, such waivers remain exceptions to the statutory rule and must be explicitly approved by EPA only when strict statutory criteria are met, such as when the regulations aim to address local air quality concerns. *Id.* § 7543(b). Between April 2023 and January 2025, EPA issued multiple waivers exempting California from federal preemption and permitting it to enforce sweeping new regulatory programs, including the Advanced Clean Trucks, Advanced Clean Cars II, and "Omnibus" Low NOx rules. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

These waivers, and the state regulations they authorize, establish de facto national standards. Several other states have adopted California's waivers, exporting California's policies beyond its

borders and coercing nationwide compliance in the absence of federal legislation or uniform federal rulemaking. *See* Dkt. 1, Compl. ¶ 4.

On May 22, 2025, Congress exercised its oversight authority under the CRA, 5 U.S.C. §§ 801–808. Congress enacted the CRA in 1996 to strengthen its control over federal agency rulemaking. The CRA empowers Congress to swiftly review and overturn new federal regulations by passing a joint resolution of disapproval. Once Congress passes such a resolution and the President signs it, the rule has no legal effect and cannot be "reissued in substantially the same form" without new statutory authority. *See id.* § 801(b)(2).

The CRA process is simple. Before new rules[3] can take effect, federal agencies must submit them to both Congress and the Government Accountability Office (GAO), creating a formal window for review. *See id.* § 801(a). Congress then has 60 days to pass a "joint resolution of disapproval" for the President's signature. *Id.* §§ 801(a)(3), (d), 802(a). This allows Congress to act swiftly to check regulations it views as inconsistent with public policy. If Congress takes no action, the rule goes into effect. *See id.* §§ 801(a)(3), (b)(1) (conditioning disapproval on affirmative action by Congress). But if it passes as a joint resolution and the President signs that resolution, then the rule "shall not take effect (or continue)," and "may not be reissued in substantially the same form . . . unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(1)–(2).

Both chambers adopted joint resolutions disapproving EPA's waiver decisions. The President signed the resolutions on June 12, 2025. *See* Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025); Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025); Pub. L. No. 119-17, 139 Stat 67 (June 12, 2025); *see also* Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ. These resolutions thus reflect Congress's duly enacted determination to disallow EPA's actions in this instance.

---

[3] The CRA "applies to final rules, including major rules, non-major rules, and interim final rules." Congressional Research Service (CRS), *The Congressional Review Act (CRA): A Brief Overview* 1, CRS Report IF10023 (Aug. 29, 2024); *see* 5 U.S.C. § 804(3).

Plaintiffs, a group of states led by California, filed this lawsuit and now seek to enjoin the federal government from giving effect to these fully enacted resolutions. *See* Compl. *passim*. Plaintiffs allege that EPA, Congress, and the President acted in excess or contravention of their authority and violated several statutes and constitutional provisions—EPA in submitting the waiver rules to Congress under the CRA; Congress in treating the waivers as rules and applying expedited procedures; and the President in signing the duly passed resolution. *See generally id.*

AFPM, API, and NACS move to intervene in this case to protect their and their members' unique business interests.

## LEGAL STANDARD

Federal Rule of Civil Procedure 24 allows for both intervention as of right and permissive intervention. To intervene as of right under Rule 24(a), proposed intervenors must show: (1) a significantly protectable interest in the subject of the action; (2) that the action's outcome may, as a practical matter, impair the applicant's ability to protect that interest; (3) that the motion is timely; and (4) that the existing parties may not adequately represent the applicant's interest. *See W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022). These factors are not applied rigidly. Courts favor intervention when practical and equitable considerations support it, and the Ninth Circuit has instructed that the rule should be "broadly interpreted in favor of intervention." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

Rule 24(b), which governs permissive intervention, also allows intervention where the applicant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). To obtain permissive intervention, a party must show: (1) an independent basis for jurisdiction; (2) that the motion is timely; and (3) that its claim or defense shares a legal or factual question with the main action. Once those elements are satisfied, the district court may also consider factors such as the nature and extent of the applicant's interest and whether the applicant's interests are already represented. The court must also assess whether intervention would "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

**ARGUMENT**

**A.     Proposed Intervenors have standing.**

As the Supreme Court recently explained, Proposed Intervenors have Article III standing because the outcome of this litigation will directly affect their members' economic interests. The CRA disapprovals at issue prevent California and other states from enforcing vehicle emissions rules that would reduce fuel demand nationwide. *See* Exs. A-D (declarations of Geoffrey Moody (AFPM), Will Hupman (API), Douglas Kantor (NACS), and John Martini (Chevron), respectively). These regulatory programs—Advanced Clean Cars II, Advanced Clean Trucks, and the "Omnibus" Low NOx—would force automakers to phase out liquid-fuel-powered vehicles, harming refiners, fuel producers, distributors, and retailers across the country.

This is precisely the kind of economic harm that the Supreme Court recently held sufficient to confer standing. In *Diamond Alternative Energy, LLC v. EPA*, the Court held that liquid fuel producers challenging federal policies designed to reduce the market for their products had demonstrated "classic monetary injury" and thus satisfied the requirements of Article III. *See* 606 U.S. __, __, 145 S. Ct. 2121, 2137–38 (2025) ("In short, the commonsense economic inferences about the operation of the automobile market—combined with the statements of the fuel producers, California, EPA, and the vehicle manufacturers—make it sufficiently 'predictable' that invalidating California's regulations would likely redress the fuel producers' injury."). Here, just as in *Diamond Alternative Energy*, Proposed Intervenors face a direct economic threat due to California's efforts to enforce disapproved rules through this litigation.

Because, as explained above, at least one of Proposed Intervenors' members would have standing in its own right, Proposed Intervenors have associational standing. An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Each of those elements is met here. As shown above, individual members of all three Proposed Intervenors—who produce, refine, distribute, and sell fuel nationwide—would have standing in their own right because

6

this litigation threatens their concrete economic interests. *See Diamond Alternative Energy*, 145 S. Ct. at 2137–38. Protecting members from unlawful and harmful regulatory mandates falls squarely within the core missions of Proposed Intervenors. *See* Exs. A-D (declarations). And the claims asserted here raise legal questions that do not require individualized proof from particular members.

Accordingly, Proposed Intervenors meet the requirements for Article III standing. *See, e.g.*, *AFPM v. O'Keeffe*, 903 F.3d 903, 909–10 (9th Cir. 2018) (recognizing AFPM's ability to challenge state fuel regulations on behalf of its members, refineries and fuel producers impacted by compliance costs, and implicitly confirming standing by reaching the merits).

**B.    Proposed Intervenors are entitled to intervene as of right.**

Proposed Intervenors easily satisfy all four requirements under Rule 24(a). Proposed Intervenors have a sufficient interest in this litigation, would be directly impaired if excluded, have timely sought intervention, and cannot rely on existing parties to adequately represent their distinct economic and regulatory interests.

First, the motion is timely. "Timeliness is a flexible concept; its determination is left to the district court's discretion." *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004); *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013) (finding a motion to intervene timely when filed years after the litigation began). When intervention is sought "at the outset of the litigation," it is well within a court's discretion to allow it. *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Such is the case here. This motion comes just a few weeks after the complaint was filed, at an early stage of the case before any substantive proceedings have occurred, and no party will be prejudiced. In fact, Defendants have not even filed their responsive pleading yet.

Second, Proposed Intervenors have a significantly protectable interest. The outcome of this lawsuit directly affects Proposed Intervenors' members, who manufacture fuels, operate refineries, and distribute and sell fuel nationwide. The waiver rules that Congress disapproved would significantly reduce liquid fuel sales over the next couple decades. *See* California Air Resources Board, *Response to Comments on the Draft Environmental Analysis Prepared for the Advanced*

7

*Clean Cars II Program* (Aug. 24, 2022) at 55 n.54, https://perma.cc/BJS4-RSRV (addressing the ultimate ban on the sale of gasoline-powered cars and estimating the reduction of fuel sales); *see also* Ellen Robo et al., *California Clean Trucks Program,* Env't Rsch. Mgmt. Grp. (2022) at 11, https://perma.cc/7BNU-XRKS (study of the Advanced Clean Trucks program, estimating fuel sales to drop by over 40% by 2036). Any judicial invalidation of the CRA resolutions would, among other things, subject Proposed Intervenors' members to divergent and burdensome regulatory regimes, jeopardizing or limiting their ability to produce, distribute, and sell fuels.

The Supreme Court's recent decision in *Diamond Alternative Energy* confirms that fuel producers like Proposed Intervenors' members have a significantly protectable interest here—a "classic monetary injury" that the Court held was sufficient to support Article III standing. 145 S. Ct. at 2137 ("[T]he fuel producers persuasively contend that invalidating California's regulations would likely mean more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers."). The Court further recognized that these types of regulatory schemes are designed precisely to reduce liquid fuel sales, creating a direct and concrete economic injury to fuel producers. *See id.* at 2137 (noting that it was "an odd argument" for California to advance that the regulations would not affect fuel producers and observing that the "whole point of the regulations is to increase the number of electric vehicles in the new automobile market beyond what consumers would otherwise demand and what automakers would otherwise manufacture and sell"). And the regulatory scheme at issue in *Diamond Alternative Energy*— Advanced Clean Cars I—was far less onerous than one of the programs at issue here—Advanced Clean Cars II, which requires that 100% of new vehicles sold in California by 2035 must be "zero emissions." These classic monetary injuries, sufficient to satisfy standing, also go a long way to show satisfaction of Rule 24(a)'s protectable interest requirement. *See, e.g.*, *S.W. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 821 n.3 (9th Cir. 2001) (indicating that interests sufficient to satisfy Rule 24(a)'s protectable interest requirement are also sufficient to satisfy standing).

Third, the outcome of this litigation threatens to impair Proposed Intervenors' interests. If the plaintiff States succeed in invalidating the CRA disapprovals, Proposed Intervenors will suffer immediate and concrete injuries in the form of lost sales volume and revenue. As the Court made

8

MOTION TO INTERVENE, NO. 4:25-cv-04966    **3-ER-383**

clear in *Diamond Alternative Energy*, the EV mandates in the rules that Congress voided are explicitly designed to suppress demand for gasoline and diesel fuel by requiring automakers to produce and sell more EVs. 145 S. Ct. at 2137. Invalidating Congress's disapprovals would thus directly reinstate regulatory mandates that reduce liquid fuel consumption and injure Proposed Intervenors' members. The Supreme Court held that these types of harms are not speculative but rather "predictable" consequences of California's regulations, which have a demonstrated and acknowledged market effect. *Id.* at 2138. Thus, Proposed Intervenors' interests would be impaired if this lawsuit succeeds.

Fourth, the current defendants do not adequately represent Proposed Intervenors' narrow and concrete business interests. Courts in this Circuit recognize that governmental defendants represent the broad public interest, which may diverge from the "more narrow, parochial interests" of private intervenors. *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 445 (9th Cir. 2006) (citing *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)). Here, federal defendants are charged with representing the public at large and will not fully protect the economic and operational interests of Proposed Intervenors' members.

**C.  In the alternative, Proposed Intervenors should be granted permissive intervention.**

Alternatively, Proposed Intervenors qualify for permissive intervention under Rule 24(b).

First, the requirement for an independent ground for jurisdiction "does not apply to proposed intervenors in federal-question cases," like this one, where "the proposed intervenor[s] [are] not raising new claims." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).

Second, Proposed Intervenors have a claim or defense that shares with the main action a common question of law or fact. Proposed Intervenors seek to assert defenses directly aligned with the government defendants regarding the validity of the CRA resolutions and the legal scope of state authority to regulate emissions. *See, e.g.*, *California v. Health & Hum. Servs.*, 330 F.R.D. 248, 255

(N.D. Cal. 2019) (explaining that proposed intervenor's claim involved common question "whether the Final Rules violate the Administrative Procedure Act or the Constitution").

Third, the motion here is timely for the reasons explained above.

Finally, all relevant discretionary considerations strongly support permissive intervention. *See Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989) (reversing and remanding district court and granting permissive intervention and noting that the district court has discretion to determine whether permissive intervention is proper and is guided by the principles of efficiency and fairness to the movant and parties). Granting intervention here will promote fairness, avoid future duplicative litigation, and ensure that Proposed Intervenors' specialized economic and technical expertise is presented to the Court. Moreover, Proposed Intervenors' prompt application ensures that intervention will not delay the proceedings or prejudice any party. *See McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970) (permissive intervention should be granted "where no one would be hurt and greater justice would be attained" (quotation omitted)).

Thus, if the Court declines to grant intervention as of right, it should at minimum permit Proposed Intervenors to intervene permissively to defend the validity of the disapproval resolutions and to protect its members' economic and operational interests.

**CONCLUSION**

The motion to intervene should be granted.

Dated:   August 6, 2025 

Respectfully submitted,
/s/ Bradley A. Benbrook
Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
Benbrook Law Group, PC

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
Katherine C. Yarger* (CO 40387)
Lehotsky Keller Cohn LLP

*Attorneys for Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores*
* Motion for admission *pro hac vice* forthcoming

10

# EXHIBIT A
# AFPM Declaration

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 4:25-cv-04966 |
| Plaintiffs, | **DECLARATION OF GEOFFREY MOODY IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE** |
| v. | |
| UNITED STATES OF AMERICA; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; and DONALD J. TRUMP, in his official capacity as President of the United States, | |
| Defendants. | |

I, Geoffrey Moody, declare as follows:

1.      I am the Senior Vice President of Government Relations & Policy of American Fuel & Petrochemical Manufacturers (AFPM). In that capacity, I lead AFPM's work on all aspects of policy. My business address is 1800 M Street, N.W., Suite 900N, Washington, D.C. I am familiar with the activities and mission of the organization, with the views, priorities, and concerns of AFPM's membership, and with the facts stated in this Declaration.

2.      I am over 18 years old. This Declaration is based upon my personal knowledge and/or upon my review of business records of AFPM.

3.      AFPM is the leading trade association representing the makers of the fuels that keep Americans moving and the petrochemicals that are essential building blocks of modern life. AFPM's members provide critical energy and chemical products and support millions of American jobs.

4.      AFPM has a long history of engagement on issues concerning environmental and vehicle emission policy. AFPM regularly participates in federal rulemakings and has engaged in litigation related to vehicle emissions standards and Clean Air Act waivers.

DECLARATION OF GEOFFREY MOODY IN
SUPPORT OF PROPOSED INTERVENORS'
MOTION TO INTERVENE, NO. 4:25-cv-04966

**3-ER-387**

5.     AFPM's members include petroleum refiners that produce gasoline and diesel, fuel marketers that distribute refined petroleum products, and petrochemical manufacturers that rely on demand for liquid transportation fuels. AFPM's membership also includes companies that operate refineries and other energy infrastructure in California. AFPM members such as Cenovus, Chevron U.S.A., ExxonMobil, Flint Hills Resources, HF Sinclair, Marathon Petroleum, and Valero sell gasoline and diesel. Those and other members' sales will be reduced, causing monetary injury, if California's waivers are reinstated, because the reinstated waivers would allow California and Section 177 states to enforce regulations that phase out internal combustion engine vehicles, resulting in significant curtailment in the use of gasoline and diesel. These rules would suppress demand for some of the core products AFPM members manufacture and distribute, thereby reducing sales, imposing conflicting regulatory requirements, forcing costly operational changes, undermining settled business expectations nationwide, disrupting investment planning, and introducing uncertainty into fuel markets. Furthermore, reinstating the waivers will limit the choice of vehicle types available to purchase by both consumers and AFPM members, in both California and Section 177 states.

6.     I am familiar with the vehicle emissions control waivers that the United States Environmental Protection Agency (EPA) granted to California between 2023 and 2025. These waivers authorized California to enforce its Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

7.     I am also aware that Congress recently exercised its authority under the Congressional Review Act to disapprove EPA's decisions to grant these waivers. On June 12, 2025, the President signed joint resolutions of disapproval passed by both the House and the Senate. These resolutions lawfully nullified EPA's waiver grants to California, preventing the enforcement of California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations.

2

**DECLARATION OF GEOFFREY MOODY IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE, NO. 4:25-cv-04966**

**3-ER-388**

8.    EPA's decisions to grant these waivers and Congress's disapproval of them have a significant impact on the interests of most of AFPM's members.

9.    The California regulations at issue impose stringent zero-emission vehicle sales requirements and stricter emissions standards for internal combustion engines and vehicles. AFPM's members have raised concerns that these regulations will restrict market access for liquid fuel-powered vehicles, distort national fuel markets, and undermine efforts to maintain consumer choice and fuel affordability.

10.    AFPM's participation as a Defendant-Intervenor in this action is germane to its mission and purpose. AFPM seeks to protect its members from regulatory burdens that exceed federal statutory limits and from state actions that conflict with national fuel policies.

11.    AFPM's members need clarity on whether these state standards will remain enforceable to allow for investment and other planning.

12.    AFPM has maintained regular communication with its members regarding these waivers and the legal developments surrounding them. AFPM is well-positioned to represent the collective interests of its members in this litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 5th day of August 2025, in Washington, D.C.

_____
GEOFFREY MOODY,
DECLARANT

3

DECLARATION OF GEOFFREY MOODY IN
SUPPORT OF PROPOSED INTERVENORS'
MOTION TO INTERVENE, NO. 4:25-cv-04966

**3-ER-389**

# EXHIBIT B
# API Declaration

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 4:25-cv-04966 |
| Plaintiffs, | **DECLARATION OF WILL HUPMAN IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE** |
| v. | |
| UNITED STATES OF AMERICA; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; and DONALD J. TRUMP, in his official capacity as President of the United States, | |
| Defendants. | |

I, Will Hupman, declare as follows:

1.     I am the Vice President of Downstream Policy for the American Petroleum Institute (API). In that capacity, I lead API's work on all policies related to the refining, movement, and sale of finished products including gasoline, diesel, renewable diesel, natural gas, biodiesel, and renewable natural gas. I am familiar with the activities and mission of the organization, with the views, priorities, and concerns of API's membership, and with the facts stated in this Declaration.

2.     I am over 18 years old. This Declaration is based upon my personal knowledge and/or upon my review of business records of API.

3.     API is a national, not-for-profit trade association representing all segments of America's oil and natural gas industry. Our membership includes

marketing petroleum and natural gas products. API members support more than 11 million U.S. jobs and provide a majority of the nation's energy supply.

4. API's members include large integrated energy companies, independent producers, refiners, pipeline operators, marketers, and marine transporters. API has members who sell fuel, including Chevron Corporation, Exxon Mobil Corporation, and Marathon Petroleum Corporation. Those and other members' sales will be reduced, causing monetary injury, if California's waivers are reinstated because reinstatement of the waivers would allow California and Section 177 states to enforce strict electric vehicle mandates and tailpipe emissions standards. These mandates would reduce the market for liquid transportation fuels, impacting the business operations of API's fuel-producing and fuel-distributing members. The resulting patchwork of state-level rules would also fragment the national fuels market, create compliance burdens, and disrupt the supply chains on which API's members rely. In addition, consumer choice of vehicle type, including API members who purchase vehicles, will be curtailed in both California and Section 177 states should the waivers be reinstated.

5. API regularly engages in advocacy and litigation to protect its members from laws and regulations that impose unlawful or unconstitutional burdens on their operations. API's mission includes ensuring that its members can continue to provide affordable and reliable energy to U.S. consumers without undue interference or economic harm from unlawful regulatory actions.

6. I am familiar with the vehicle emissions control waivers that the United States Environmental Protection Agency (EPA) granted to California between 2023 and 2025. These waivers authorized California to enforce its Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations. *See* 88 Fed. Reg.

**DECLARATION OF WILL HUPMAN IN
SUPPORT OF PROPOSED INTERVENORS'
MOTION TO INTERVENE, NO. 4:25-cv-04966**

2

3-ER-392

20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

7.    I am also aware that Congress recently exercised its authority under the Congressional Review Act to disapprove EPA's decisions to grant these waivers. On June 12, 2025, the President signed joint resolutions of disapproval passed by both the House and the Senate. These resolutions lawfully nullified EPA's waiver grants to California, preventing the enforcement of California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations.

8.    EPA's decisions to grant these waivers and Congress's disapproval of them have an impact on the interests of API's members.

9.    API's members sell refined petroleum products throughout California and in other States that had previously adopted California's standards. API members also own and operate refining and distribution infrastructure that supplies these markets. California and allied States collectively represent a substantial share of the national market for gasoline and diesel.

10.    California standards in each of the disapproved waivers would have reduced API's members' sales and diminished asset utilization. Accordingly, the outcome of this litigation is important to API and its members.

12.    API has maintained regular communication with its members regarding these waivers and the legal developments surrounding them. API is well-positioned to represent the collective interests of its members in this litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 6th day of August, 2025, in Washington, D.C.

Will Hupman

**DECLARATION OF WILL HUPMAN IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE, NO. 4:25-cv-04966**

3-ER-393

# EXHIBIT C
# NACS Declaration

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA; U.S.<br>ENVIRONMENTAL PROTECTION<br>AGENCY; LEE ZELDIN, in his official<br>capacity as Administrator of the U.S.<br>Environmental Protection Agency; and<br>DONALD J. TRUMP, in his official<br>capacity as President of the United<br>States,<br><br>    Defendants. | Case No. 4:25-cv-04966<br><br>**DECLARATION OF DOUGLAS KANTOR IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE** |

I, Douglas Kantor, declare as follows:

1.     I am the General Counsel of the National Association of Convenience Stores (NACS). My business address is 1600 Duke Street, Alexandria, VA 22314. In that capacity, I lead NACS's work on all aspects of legal advocacy on behalf of the convenience store industry. I am familiar with the activities, mission, membership, and operations of NACS, and with the facts stated in this declaration.

2.     I am over 18 years old. This Declaration is based upon my personal knowledge and/or upon my review of business records of NACS.

3.     NACS is the leading trade association representing the convenience and fuel retailing industry. Its members include about 1,300 retail and 1,600 supplier businesses. In the United States, the industry NACS represents includes more than 150,000 convenience stores. These businesses engage in approximately 165 million transactions with customers each day and sell about 80% of the motor fuels purchased at retail across the United States.

4.     NACS has a longstanding interest in regulatory issues that affect transportation fuel markets, retail operations, and consumer access to motor fuels. NACS regularly engages in federal rulemakings and has participated in litigation involving environmental standards, fuel policy, and state-level mandates that affect national supply chains.

5.     NACS has members who buy and sell fuel at wholesale and sell fuel at retail. NACS members also operate fleets of trucks to distribute fuels and blend traditional petroleum-based motor fuels with renewable fuels such as ethanol, biodiesel and renewable diesel. NACS members operate in every state in the nation including California and all of the states that adopt rules set by California pursuant to waivers granted to California by the United States Environmental Protection Agency (EPA).

**DECLARATION OF DOUGLAS KANTOR IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE, NO. 4:25-cv-04966**

**3-ER-396**

6.    NACS members in California include fuel sellers such as Loop Neighborhood Markets and Bambury, Inc. dba Bonneau Markets. NACS members in states that have adopted California's rules include 36 Lyn Refuel Station (in Minnesota) and Reid Petroleum (in New York). Those and other members' sales will be reduced, causing monetary harm, if California's lawsuit is successful because the waiver program enables California and aligned states to enforce increasingly aggressive mandates that limit the sale of internal combustion engine vehicles. In addition, electric utilities have monopoly positions and use them in a way that makes it difficult or impossible for NACS members to profitably sell electric vehicle charging. Reinstating the waivers would force businesses to adjust to inconsistent regulatory regimes across state lines, inject uncertainty into long-term planning, and threaten the viability of fuel retail operations in markets affected by California's rules.

7.    I am familiar with the vehicle emissions control waivers that the United States Environmental Protection Agency (EPA) granted to California between 2023 and 2025. These waivers authorized California to enforce its Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

8.    I am also aware that Congress recently exercised its authority under the Congressional Review Act to disapprove EPA's decisions to grant these waivers. On June 12, 2025, the President signed joint resolutions of disapproval passed by both the House and the Senate. These resolutions lawfully nullified EPA's waiver grants to California, preventing the enforcement of California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations.

**DECLARATION OF DOUGLAS KANTOR IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE, NO. 4:25-cv-04966**

**3-ER-397**

9.    EPA's decisions to grant these waivers and Congress's disapproval of them have a significant impact on the interests of NACS's members.

10.    The California regulations at issue impose stringent zero-emission vehicle sales requirements and strict tailpipe standards for internal combustion engine vehicles. NACS's members have raised concerns that these regulations will significantly disrupt fuel retail operations and result in fewer fuel sales. Members operating in California and Section 177 states fear they will be compelled to comply with complex and evolving state-level mandates, even as consumer demand for internal combustion vehicles remains strong in many regions. These requirements also threaten to fragment the national fuel market, forcing retailers to manage different compliance regimes across state lines, complicating logistics, increasing operational costs, and undermining the efficiency of nationwide supply chains.

11.    NACS's participation as a Defendant-Intervenor in this case is consistent with its mission to represent the interests of fuel retailers and ensure a stable, consistent regulatory environment.

12.    NACS seeks clarity about whether California's standards are enforceable in light of Congress's disapproval. The stakes for its members—many of whom operate across multiple states—are significant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 4th day of August , 2025, in Alexandria, VA

Douglas Kantor

**DECLARATION OF DOUGLAS KANTOR IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO INTERVENE, NO. 4:25-cv-04966**

3-ER-398

# EXHIBIT D
# CHEVRON DECLARATION

**3-ER-399**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | ) ) ) Case No. 4:25-cv-04966 |
| Plaintiffs, | ) ) **DECLARATION OF JOHN MARTINI IN** |
| v. | ) **SUPPORT OF PROPOSED** ) **INTERVENORS' MOTION TO** ) **INTERVENE** |
| UNITED STATES OF AMERICA; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental protection Agency; and DONALD J. TRUMP, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

I, John Martini, declare as follows:

1.      I am the General Manager of Enterprise Policy for Chevron Corporation ("Chevron"), which is an energy company with subsidiaries and affiliates engaged in integrated energy operations, including oil and gas exploration, production, refining, distribution, and marketing, as well as manufacturing and marketing of refined petroleum products and renewable fuels. Chevron's subsidiary Chevron U.S.A Inc. is a major refiner of petroleum products in the United States. Chevron's subsidiary Renewable Energy Group, Inc. ("CREG") produces renewable transportation fuels and develops innovative renewable fuel technologies. Chevron's subsidiaries also market petroleum products and biofuels in the U.S. including liquid transportation fuels.

2.      Chevron is a member of the American Petroleum Institute ("API") and Chevron U.S.A. Inc. is a member of the American Fuel & Petrochemical Manufacturers ("AFPM").

3.      As part of my work for Chevron, I am familiar with Chevron's analyses of the impacts of various policies and market scenarios on Chevron's subsidiaries, including regulatory changes in the transportation fuels market.

**3-ER-400**

4. I am over 18 years old. This Declaration is based upon my personal knowledge and/or upon my review of business records of Chevron.

5. As stated in Chevron's 2024 Annual Report, Chevron believes that the future of energy is lower carbon. Chevron continues to take actions that attempt to help lower the carbon intensity of its operations while meeting the world's demand for energy. Chevron also supports well-designed climate policy. Chevron believes that policies seeking to reduce GHG emissions from products and services should do so on a lifecycle GHG intensity basis as this approach allows suppliers to differentiate themselves based on their carbon performance. In the transportation sector, specifically, Chevron supports technology neutral policies that cost-effectively drive GHG emission reductions, rather than policies that artificially pick winners and losers among various technology options to the detriment of consumers and effective climate policy.

6. Relevant to Chevron's business, Congress recently exercised its authority under the Congressional Review Act ("CRA") to disapprove the Environmental Protection Agency's ("EPA") decisions to grant several waivers to California between 2023 and 2025. These waivers authorized California to enforce its Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

7. On June 12, 2025, the President signed joint resolutions of disapproval passed by both the House and the Senate disapproving of the waiver decisions. These resolutions lawfully nullified EPA's waiver grants to California, preventing the enforcement of California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations.

8. California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low NOx regulations—had they not been nullified by Congress—would have empowered California and states that follow its lead to enforce rules that suppress the manufacture and sale of internal combustion engine vehicles, including through increasingly stringent NOx requirements and mandates for zero-emission vehicle sales.

**3-ER-401**

9.      California's regulations would have significantly decreased the demand for fuel sales, as the State recognizes,[1] and would have caused automakers to produce and sell more vehicles (than they otherwise would) that use no liquid fuel at all.

10.      California's lawsuit seeks to resurrect those regulations. Chevron's interests would be harmed if that effort succeeded. By reducing demand for liquid transportation fuels, California's regulations would have a direct financial impact on Chevron by artificially skewing the market and reducing the sales that Chevron's subsidiaries would otherwise have made.

11.      For example, Chevron's subsidiary Chevron U.S.A. Inc. operates five wholly owned refineries in the United States and has a total crude refining capacity in the U.S. of over one million barrels per day.[2] California's regulations would have directly impacted these operations by significantly reducing demand for this subsidiary's products.

12.      CREG also produces and sells liquid transportation fuels, including bio-based renewable diesel and biodiesel, and operates multiple active biorefineries in the United States. CREG is one of the largest producers of biomass-based diesel by volume in the United States, as well as a producer and supplier of many other products. Bio-based renewable diesel and biodiesel can generally be used in a wide range of diesel engines and their use results in lower carbon intensity emissions on a lifecycle basis compared to petroleum diesel. California's regulations would reduce demand for these fuels as well.

13.      California's regulations would also harm Chevron's subsidiaries' efforts to develop creative and effective ways to meet the world's energy needs. By forcing the shift towards electric

---

[1] *See* California Air Resources Board, *Response to Comments on the Draft Environmental Analysis Prepared for the Advanced Clean Cars II Program* (Aug. 24, 2022) at 55 n.54, https://perma.cc/BJS4-RSRV (estimating the reduction of fuel sales by 15% by 2040); *see also* Ellen Robo, et al., *California Clean Trucks Program,* Env't Rsch. Mgmt. Grp. (2022) at 11, https://perma.cc/7BNU-XRKS (study of the Advance Clean Trucks program, estimating fuel sales to drop by over 40% by 2036).
[2] Chevron, Delivering Higher Returns: 2023 Supplement to the Annual Report 21, https://www.chevron.com/-/media/shared-media/documents/2023-chevron-annual-report-supplement.pdf (noting United States-Consolidated refinery capacities of 1,059,000 barrels per day at year-end 2023).

**3-ER-402**

vehicles, despite public reports of slowing consumer demand,[3] California's regulations would have disincentivized other lower-carbon technologies that could help customers reduce GHG emission intensity. These include renewable natural gas made from dairy methane and the development of other novel catalysts to create renewable fuels, which could be used to lower the lifecycle carbon emissions of heavy-duty vehicles with internal combustion engines. California's proposed policies suppress these innovations by mandating a single technological outcome and thereby eliminating incentives to pursue alternative lower-carbon fuels.

14.    If the disapproved waivers were reinstated, Chevron and its subsidiaries would face renewed harm. They would be subject to a fragmented, state-level regulatory scheme that disrupts the national market for transportation fuels. That disruption would impede Chevron's ability to plan and invest efficiently. It would threaten Chevron's business interests and would burden its customers. A decision maintaining the validity of the CRA disapprovals would prevent that harm. It would preserve a uniform and predictable regulatory framework.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 6th day of August, 2025, in Santa Clara.

_____
JOHN MARTINI

---

[3] Jennifer Ramsay. *Behind the EV Slowdown*, IndustryWeek (Jul. 1, 2025), https://perma.cc/FEC6-UHEB.

3-ER-403

# EXHIBIT E
# PROPOSED MOTION TO DISMISS

Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
Email: brad@benbrooklawgroup.com

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW, Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Email: steve@lkcfirm.com
Email: mike@lkcfirm.com

Katherine C. Yarger* (CO 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lkcfirm.com
Telephone: (512) 693-8350

*Attorneys for Proposed Intervenors American
Fuel & Petrochemical Manufacturers,
American Petroleum Institute, and the
National Association of Convenience Stores*

* Motion for admission *pro hac vice*
forthcoming.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No. 4:25-cv-04966 |
| | ) |
| v. | ) **PROPOSED INTERVENORS' NOTICE OF** |
| | ) **MOTION AND MOTION TO DISMISS;** |
| UNITED STATES OF AMERICA; U.S. | ) **MEMORANDUM OF POINTS AND** |
| ENVIRONMENTAL PROTECTION | ) **AUTHORITIES IN SUPPORT** |
| AGENCY; LEE ZELDIN, in his official | ) |
| capacity as Administrator of the U.S. | ) Date: |
| Environmental Protection Agency; and | ) Time: 2:00 p.m. PST |
| DONALD J. TRUMP, in his official | ) Judge: Hon. Haywood S. Gilliam, Jr. |
| capacity as President of the United | ) |
| States, | ) |
| | ) |
| Defendants. | ) |

**TABLE OF CONTENTS**

NOTICE ........................................................................................................................... 1

INTRODUCTION ............................................................................................................ 1

ISSUES TO BE DECIDED ............................................................................................. 2

STATEMENT OF FACTS .............................................................................................. 2

LEGAL STANDARD...................................................................................................... 4

ARGUMENT................................................................................................................... 5

     I.      Plaintiffs' claims are not justiciable ..................................................................6

           A.      Section 805 of the CRA bars judicial review ..................................................6

           B.      Plaintiffs' challenge presents nonjusticiable political questions..................11

           C.      Plaintiffs lack standing for their statutory claims challenging EPA's actions under the CRA..............................................................................................13

           D.      The Complaint seeks relief the Court cannot grant......................................15

     II.     The Complaint fails to state a claim because the resolutions were lawfully enacted and constitutionally valid ......................................................................16

CONCLUSION.............................................................................................................. 25

**3-ER-406**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alperin v. Vatican Bank,*
410 F.3d 532 (9th Cir. 2005) .................................................................................. 11

*Arizona v. Garland,*
730 F. Supp. 3d 258 (W.D. La. 2024) ..................................................................... 20

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................................................. 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................... 5

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon,*
--- F. Supp. 3d ---, 2025 WL 1568301 (D.D.C. June 3, 2025) ............................... 20

*Baker v. Carr,*
369 U.S. 186 (1962) ............................................................................................ 11, 12

*Bank Markazi v. Peterson,*
578 U.S. 212 (2016) ............................................................................................ 22, 23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................... 5

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................ 14, 18

*Bowen v. Mich. Acad. of Fam. Physicians,*
476 U.S. 667 (1986) ................................................................................................. 10

*Ctr. for Biological Diversity v. Bernhardt,*
946 F.3d 553 (9th Cir. 2019) .................................................................. 7, 9, 15, 18

*Chenoweth v. Clinton,*
181 F.3d 112 (D.C. Cir. 1999) ................................................................................ 12

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.,*
710 F.3d 946 (9th Cir. 2013) .................................................................................... 5

*Citizens for Resp. & Ethics in Wash. v. Trump,*
302 F. Supp. 3d 127 (D.D.C. 2018) ....................................................................... 20

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................................................... 15

*Cmty. House, Inc. v. City of Boise*,
623 F.3d 945 (9th Cir. 2010) ............................................................................. 25

*Coleman v. Miller*,
307 U.S. 433 (1939) ........................................................................................... 12

*Common Cause v. Biden*,
748 F.3d 1280 (D.C. Cir. 2014) ......................................................................... 14

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
482 F.3d 1157 (9th Cir. 2007) ........................................................................... 11

*Corrie v. Caterpillar Inc.*,
503 F.3d 974 (9th Cir. 2007) ............................................................................. 11

*Dalton v. Specter*,
511 U.S. 462 (1994) .................................................................................... 19, 20

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ......................................................................... 15

*Delta Chem. Corp. v. West*,
33 F.3d 380 (4th Cir. 1994) ................................................................................. 6

*Demore v. Kim*,
538 U.S. 510 (2003) ........................................................................................... 10

*Effinger v. Ancient Organics LLC*,
657 F. Supp. 3d 1290 (N.D. Cal. 2023) .............................................................. 4

*Est. of Braude v. United States*,
38 Fed. Cl. 476 (1997) ....................................................................................... 12

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ............................................................................. 14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................... 19, 24

*Gest v. Bradbury*,
443 F.3d 1177 (9th Cir. 2006) ............................................................................. 5

*Grossman v. City of Portland*,
33 F.3d 1200 (9th Cir. 1994) ............................................................................. 25

*INS v. Chadha*,
462 U.S. 919 (1983) ........................................................................................... 21

*Kan. Nat. Res. Coal. v. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020) ....................................................................... 7, 9

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................................................... 4

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................................................ 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................................ 14

*Made in the USA Found. v. United States*,
    242 F.3d 1300 (11th Cir. 2001) ......................................................................................... 12

*Mendoza-Linares v. Garland*,
    51 F.4th 1146 (9th Cir. 2022) .............................................................................................. 9

*Metzenbaum v. Fed. Energy Reg. Comm'n*,
    675 F.2d 1282 (D.C. Cir. 1982) .................................................................................... 12, 13

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .............................................................................................. 20

*Montanans for Multiple Use v. Barbouletos*,
    568 F.3d 225 (D.C. Cir. 2009) .................................................................................... 7, 8, 15

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ............................................................................................ 20

*Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*,
    651 F.3d 1066 (9th Cir. 2011) .............................................................................................. 5

*Nixon v. United States*,
    506 U.S. 224 (1993) ............................................................................................................ 13

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. __, 145 S. Ct. 1762 (2025) .............................................................................. 16, 17

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................................................ 15

*Patchak v. Zinke*,
    583 U.S. 244 (2018) ............................................................................................................ 22

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .............................................................................................................. 17

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*,
    128 F.4th 1089 (9th Cir. 2025) ........................................................................................... 17

*Robertson v. Seattle Audubon Society*,
    503 U.S. 429 (1992) ............................................................................................................ 22

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ........................................................................................................ 14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................................... 14

*State of Nev. v. Watkins*,
    914 F.2d 1545 (9th Cir. 1990) ...................................................................................... 12

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................................................ 15

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*,
    1998 WL 842181 (W.D. Tex. June 25, 1998) ............................................................ 7–8

*The Centech Grp., Inc. v. United States*,
    78 Fed. Cl. 496 (2007) .................................................................................................... 6

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................................................ 5

*United States v. Am. Elec. Power Serv. Corp.*,
    218 F. Supp. 2d 931 (S.D. Ohio 2002) .......................................................................... 8

*United States v. Ballin*,
    144 U.S. 1 (1892) .......................................................................................................... 12

*United States v. Klein*,
    80 U.S. (13 Wall.) 128 (1872) ...................................................................................... 23

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ........................................................................................ 7

*United States v. Or. State Med. Sch.*,
    343 U.S. 326 (1952) ...................................................................................................... 15

*United States v. Orr Water Ditch Co.*,
    600 F.3d 1152 (9th Cir. 2010) .................................................................................... 4–5

*United States v. Padelford*,
    76 U.S. (9 Wall.) 531 (1870) ........................................................................................ 23

*United States v. S. Ind. Gas & Elec. Co.*,
    2002 WL 31427523 (S.D. Ind. Oct. 24, 2002) .............................................................. 8

*Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*,
    509 F.3d 1259 (10th Cir. 2007) ................................................................................... 7, 9

*Warren v. Fox Fam. Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ........................................................................................ 5

*Wash. All. of Tech. Workers v. DHS*,
   892 F.3d 332 (D.C. Cir. 2018) ................................................................. 8, 15

*Webster v. Doe*,
   486 U.S. 592 (1988) .................................................................................. 9, 10

*Yesler Terrace Cmty. Council v. Cisneros*,
   37 F.3d 442 (9th Cir. 1994) .................................................................. 3–4, 17

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ........................................................................................ 13

**Statutes, Regulations and Rules**

88 Fed. Reg. 20,688 (Apr. 6, 2023) ................................................................... 3

90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................................ 3

90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................................ 3

5 U.S.C. § 551(4) .................................................................................... 3, 6, 16

5 U.S.C. § 551(6), (8) .......................................................................................... 3

5 U.S.C. § 704 .................................................................................................... 18

5 U.S.C. § 801(a)(1) ........................................................................................ 3, 6

5 U.S.C. § 801(b)(1) .................................................................................. 4, 7, 22

5 U.S.C. § 802(g) ............................................................................................... 11

5 U.S.C. § 804(3) ...................................................................................... 3, 16, 21

5 U.S.C. § 805 ................................. 1, 2, 4, 5, 6, 7, 8, 9, 10, 15, 18, 20

8 U.S.C. § 1252(a)(2) ....................................................................................... 10

42 U.S.C. § 7401 ................................................................................................. 2

42 U.S.C. § 7507 ................................................................................................. 3

42 U.S.C. § 7543(a) ....................................................................................... 3, 24

42 U.S.C. § 7543(b) .................................................................................. 3, 10, 24

Fed. R. Civ. P. 12(b) ........................................................................................... 1

Fed. R. Civ. P. 12(b)(1) ................................................................................... 1, 4

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1, 5

Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025) ................................................................. 4, 7

Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025) ................................................................. 4, 7

Pub. L. No. 119-17, 139 Stat. 67 (June 12, 2025) ................................................................. 4, 7

**Other Authorities**

Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE)*
    *Vehicles Rule Part One: One National Program*, FRL010000-45,
    https://www.gao.gov/fedrules/196015 ...................................................................... 7

*In re Environmental Protection Agency*,
    B-334309, 2023 WL 8353888 (Comp. Gen. Nov. 30, 2023)....................................... 3

Library of Congress, *Introduction to the Legislative Process in the U.S. Congress*,
    Congress.gov (Mar. 10, 2025), https://www.congress.gov/crs-product/R42843 .................... 21

Russell T. Vought, *Post-CRA Resolutions Response to GAO's March 6, 2025*
    *"Observations Regarding the Environmental Protection Agency's Submission*
    *of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under*
    *the Congressional Review Act,"* Exec. Off. Of the Pres. (June 18, 2025),
    https://perma.cc/DR9Z-CHWX............................................................................. 7

Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ ................................. 4

*Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and*
    *Nat. Res. And H. Comm. on Res.*, 105th Cong. 20 (1997) ......................................... 6

U.S. Const. art. I, § 1 ................................................................................................ 7, 13

Valerie C. Brannon & Maeve P. Carey, *The Congressional Review Act:*
    *Determining Which "Rules" Must Be Submitted to Congress*, Congress.gov
    (Oct. 22, 2024), https://www.congress.gov/crs-product/R45248.............................. 6

William T. Egar, *Congressionally Mandated Reports: Overview and*
    *Considerations for Congress*, CRS Report (May 14, 2020),
    https://www.congress.gov/crs-product/R46357 .............................................. 21–22

**NOTICE**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on _____, 2025 at 2:00 p.m. PST, or as soon thereafter as this matter may be heard in the United States District Court for the Northern District of California, 1301 Clay Street, Courtroom 2 (4th Floor), Oakland, CA 94612, Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores will move to dismiss this case pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

**RELIEF SOUGHT BY THE MOVANTS**

The Proposed Intervenors seek an order dismissing this case for lack of subject matter jurisdiction under Rule 12(b)(1) and/or for failure to state a claim under Rule 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs' Complaint must be dismissed for lack of jurisdiction. It challenges congressional and executive actions taken under the Congressional Review Act (CRA). But the CRA squarely bars judicial review: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That prohibition forecloses review of the actions at issue here. Additionally, this Court lacks the ability to review Plaintiffs' claims because Plaintiffs ask this Court to determine nonjusticiable political questions, Plaintiffs lack standing to challenge EPA's actions, and the relief requested is unavailable.

Even if this Court had jurisdiction, which it does not, Plaintiffs' claims should be dismissed. The waivers that Congress disapproved qualify as rules under the Administrative Procedure Act (APA) and CRA; EPA lawfully submitted them for review; and Congress and the President acted within their constitutional authority to disapprove them through duly enacted legislation.

Earlier this year, Congress exercised its oversight authority under the CRA to disapprove three EPA waivers that had exempted California from federal preemption under the Clean Air Act (CAA). These waivers had authorized California to enforce aggressive vehicle emission regulatory and sales mandate schemes—the Advanced Clean Trucks, Advanced Clean Cars II, and "Omnibus"

1

Low NOx rules—that together aimed to eliminate internal combustion engines and reduce demand for liquid fuels. Several states had adopted the California programs, turning what were nominally state regulations into de facto national standards. Congress responded as the Constitution permits: through bicameralism and presentment, it enacted three joint resolutions of disapproval under the CRA, and President Trump signed each into law on June 12, 2025.

Plaintiffs now seek to undo those duly enacted laws. But their claims face multiple, independent barriers to judicial review. First, Section 805 of the CRA prohibits courts from reviewing any "determination, finding, action, or omission" under the statute. 5 U.S.C. § 805. That forecloses review of both EPA's submission of the waivers as rules and Congress's disapproval resolutions. Second, the Complaint raises nonjusticiable political questions. Third, Plaintiffs lack standing for their statutory claims challenging EPA's actions. Fourth, the relief requested is unavailable. And fifth, the Complaint fails to plead viable legal claims.

Congress's resolutions are now binding law. Plaintiffs may not circumvent the Constitution's legislative process by challenging that outcome in court. The Complaint should be dismissed.

## ISSUES TO BE DECIDED

1.    Whether this Court lacks jurisdiction because:

    a.   Plaintiffs' claims are barred by the Congressional Review Act's jurisdiction-stripping provision;

    b.   Plaintiffs' claims present nonjusticiable political questions;

    c.   Plaintiffs lack standing to challenge EPA's actions; and

    d.   The relief requested is unavailable.

2.    Whether Plaintiffs fail to state any claim upon which relief can be granted because the challenged CRA resolutions were duly enacted and consistent with constitutional and statutory requirements.

## STATEMENT OF FACTS

The CAA creates a comprehensive national framework for regulating emissions from new motor vehicles. *See* 42 U.S.C. §§ 7401, *et seq.* It gives EPA exclusive authority to set standards and

2

bars states from regulating in this space. *Id.* § 7543(a). Congress included one narrow exception: California may request a federal waiver to enforce its own emissions standards if certain criteria are met. *Id.* § 7543(b) (detailing exception for California). After the federal waiver is granted, states may then adopt California's standards in place of the federal standards, if certain conditions are met, but they may not create their own. *See id.* § 7507.

As relevant here, between April 2023 and January 2025, EPA granted California three waivers—authorizing the State to implement the Advanced Clean Trucks, Advanced Clean Cars II, and the "Omnibus" Low NOx programs. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (Advanced Clean Trucks); 90 Fed. Reg. 642 (Jan. 6, 2025) (Advanced Clean Cars II); 90 Fed. Reg. 643 (Jan. 6, 2025) ("Omnibus" Low NOx). Each program imposes sweeping new restrictions on vehicle emissions and mandates increasing sales of electric vehicles. Because other states had, and still others could have, adopted California's rules before they were disapproved, *see* 42 U.S.C. § 7507 (authorizing other states to adopt California's standards), the waivers functionally authorized a prospective regulatory scheme that dictated what vehicles consumers and businesses may drive across a large swath of the American car and truck market—creating a de facto national regulatory framework.

In early 2025, EPA submitted the three waivers to Congress under the CRA.[1] The CRA requires, with certain exceptions, that agencies "submit to each House of Congress and to the Comptroller General" each rule along with a report detailing the rule before it may take effect. 5 U.S.C. § 801(a)(1)(A). By contrast, agencies need not send orders, licenses, or rules of particular applicability. 5 U.S.C. § 551(6), (8); 5 U.S.C. § 804(3). The CRA defines "rule" broadly, adopting the APA definition. *Id.* § 804(3); *see also* 5 U.S.C. § 551(4); *see, e.g.*, *Yesler Terrace Cmty. Council*

---

[1] When EPA transmitted these waivers to Congress, some Senators requested a GAO opinion on whether the submitted waivers qualified as "rules" under the CRA, and the GAO provided substantive "observations" despite the irregularity of providing guidance at that time. *See* Dkt. 1-2, Compl. Ex. B (March 2025 GAO Observations). The GAO's observations discuss an earlier 2023 GAO opinion, *see id.* (discussing *In re Environmental Protection Agency*, B-334309, 2023 WL 8353888 (Comp. Gen. Nov. 30, 2023) (hereafter "B-334309")), that is neither legally compelled nor legally binding on anyone, *see infra* p.7 n.3. There, GAO advised that EPA's March 14, 2022 Notice of Decision (waiver) for ACC I was an adjudicatory order rather than a rule under the APA, and that even if it could be considered a rule, it would fall under the CRA's exclusion for rules of particular applicability. *See* B-334309 at *6. Congress reviewed these arguments and ultimately rejected GAO's position, as Congress has the authority to do. *See infra* p.7.

3

*v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("[R]ulemaking affects the rights of broad classes of unspecified individuals" and "is prospective," "hav[ing] a definitive effect on individuals only after the rule subsequently is applied."). Once a rule is submitted, Congress may "enact[] a joint resolution of disapproval." *Id.* § 802(a). If the President signs the resolution, the rule is invalidated and "may not be reissued in substantially the same form." *Id.* § 801(b)(2). The CRA contains a jurisdictional bar that broadly precludes judicial review of actions taken under the CRA. *See* 5 U.S.C. § 805. Section 805 expressly provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review."

Congress and the President disapproved the waivers via three joint resolutions enacted through bicameralism and presentment. *See* Pub. L. No. 119-15, 139 Stat. 65 (June 12, 2025); Pub. L. No. 119-16, 139 Stat. 66 (June 12, 2025); Pub. L. No. 119-17, 139 Stat. 67 (June 12, 2025); *see also* Statement by the President (June 12, 2025), https://perma.cc/7U7Y-6EFZ. By operation of the CRA, the disapproved waivers are now without legal effect, states may not implement them, and EPA may not reissue similar rules without new authorization.

California and ten other states now seek this Court's reversal of those duly enacted laws. They sue the United States, the President, and EPA. Much of their Complaint concerns internal political process beyond this Court's jurisdiction. They nevertheless claim that the waivers are not rules under the CRA, that EPA's submission was unlawful, and that the resolutions violate the Constitution. *See generally* Dkt. 1, Compl. None of these claims can succeed.

Proposed Intervenors, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores, seek to intervene to protect their members' rights, which are independent of and not represented by Defendants. In so doing, Proposed Intervenors simultaneously submit this Motion to Dismiss Plaintiffs' Complaint.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) tests whether the Court has subject-matter jurisdiction over the claims asserted. *See Effinger v. Ancient Organics LLC*, 657 F. Supp. 3d 1290, 1295 (N.D. Cal. 2023). Plaintiffs bear the burden of establishing that jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *United States v. Orr Water Ditch Co.*,

4

600 F.3d 1152, 1157 (9th Cir. 2010). To satisfy Article III's standing requirement, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "[W]here, as here, [Plaintiffs] seek declaratory and injunctive relief, they must demonstrate that they are 'realistically threatened by a repetition of the violation.'" *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (cleaned up). When jurisdiction is lacking, the Court must dismiss the action. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1073 (9th Cir. 2011) (affirming district court dismissal for lack of jurisdiction).

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the complaint. Courts must dismiss a complaint under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or sufficient facts alleged under a cognizable legal theory. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). To survive such a motion, the complaint must also contain enough factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts will not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted).

## ARGUMENT

California's Complaint must be dismissed. The CRA affords Congress authority to pass, through expedited procedures, a resolution of disapproval of agency rules, and Section 805 of the CRA expressly prohibits judicial review of any "determination, finding, action, or omission" made under the statute. Additionally, the Complaint has numerous other jurisdictional issues: It presents quintessential political questions about how Congress exercises its legislative oversight, which are not subject to judicial review; Plaintiffs lack standing to bring their claims against the EPA because EPA's actions did not cause Plaintiffs' alleged injury; and the relief requested is unavailable. Even if the Court could reach the merits, the Complaint fails to state any claim upon which relief could be granted. The three joint resolutions at issue reflect a lawful exercise of legislative and executive power. As explained below, the Complaint should be dismissed.

## I.    Plaintiffs' claims are not justiciable.

Plaintiffs' lawsuit fails because it presents nonjusticiable claims. First, Section 805 of the CRA withdraws jurisdiction over challenges to actions taken under the statute—including efforts to nullify disapproval resolutions. Second, Plaintiffs' claims raise political questions that the Constitution commits to the elected branches and that courts may not resolve. Third, Plaintiffs lack standing. And fourth, Plaintiffs cannot receive the relief they seek. Any of these grounds independently requires dismissal.

### A.    Section 805 of the CRA bars judicial review.

Plaintiffs' claims fail because the CRA prohibits courts from reviewing actions taken "under" it. Section 805 of the CRA states: "No determination, finding, action, or omission *under this chapter* shall be subject to judicial review." 5 U.S.C. § 805 (emphasis added). This bar applies when a plaintiff challenges a law passed through the CRA's process, including the agency's submission of the rule, Congress's disapproval, and the President's signature. That is the case here.

The CRA requires agencies to "submit to each House of Congress and to the Comptroller General" each rule along with a report detailing the rule. *Id.* § 801(a)(1). A rule is broadly defined under the CRA according to the APA's definition. *Id.* § 551(4).[2] Congress, however, need not rely on agency submission. It has also developed its own internal process to determine whether agency actions are reviewable as a rule under the CRA, treating certain rules as constructively submitted and therefore subject to the CRA. Ultimately, Congress is permitted to decide for itself when to take up an agency action under the CRA and when to pass laws disapproving it.[3] After all, it is Congress,

---

[2] *See also* Valerie C. Brannon & Maeve P. Carey, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress*, Congress.gov (Oct. 22, 2024), https://www.congress.gov/crs-product/R45248.

[3] Plaintiffs have not identified any authority, and there is none, for the proposition that GAO's observations or opinions as to whether an agency action is a "rule" are legally required or legally binding rather than merely advisory. *See The Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 507 (2007) (neither agencies nor courts are bound by GAO decisions); *Delta Chem. Corp. v. West*, 33 F.3d 380, 382 (4th Cir. 1994) ("[T]he lack of consistency in . . . GAO opinions, both internally and between opinions, renders them of little value and undeserving of judicial deference."). GAO itself recognizes that it has no power "to decide what a rule is." *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. And H. Comm. on Res.*, 105th Cong. 20 (1997). In any event, GAO has previously concluded that an action revoking a preemption waiver

not the executive, that is responsible for making law. *See* U.S. Const. art. I, § 1 (granting "[a]ll legislative Powers" to Congress); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) ("It is emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." (quotation and citation omitted)).[4]

Here, EPA submitted three waivers to Congress as rules under the CRA. Both chambers passed resolutions disapproving them. The President signed each resolution. Those resolutions became law.[5] They voided the waivers and barred EPA from "reissu[ing] [new rules] in substantially the same form." § 801(b)(2).

Plaintiffs now seek to undo that result. They attack EPA's treatment of the waiver decisions as rules, and its decision to send the rules to Congress; Congress's decision to take up the rules; the procedures by which Congress did so; Congress's adoption of the resolutions; and the President's signing of the Resolutions.

What California attempts to have this Court review are precisely the types of actions Section 805 forecloses courts from reviewing because, at their core, each claim challenges a "determination, finding, action, or omission" under the statute.[6] In *Center for Biological Diversity v. Bernhardt*, 946

is a "final rule." *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, FRL010000-45, https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a final rule).

[4] *See also* Russell T. Vought, *Post-CRA Resolutions Response to GAO's March 6, 2025 "Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act*," Exec. Off. Of the Pres. (June 18, 2025), https://perma.cc/DR9Z-CHWX.

[5] Pub. L. No. 119-15, 139 Stat. 65; Pub. L. No. 119-16, 139 Stat. 66; Pub. L. No. 119-17, 139 Stat. 67.

[6] Courts overwhelmingly agree that Section 805's jurisdictional bar applies equally to agency acts or omissions as it does to Congressional ones. *See Kan. Nat. Res. Coal. v. Dep't of Interior*, 971 F.3d 1222, 1235–36 (10th Cir. 2020) ("[T]he CRA unambiguously prohibits judicial review of any omission by any of the specified actors," which include "agencies, the Comptroller General, the President, and Congress."); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (holding CRA precludes review of agency compliance with submission requirements); *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007) *overruled in part on other grounds by Azar v. Allina Health Servs.*, 587 U.S. 566, 572 (2019) (noting CRA precludes judicial review of failure to submit a rule); *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous.*

7

F.3d 553, 563–64 (9th Cir. 2019), the Ninth Circuit rejected a nearly identical effort to circumvent the CRA's jurisdictional bar. *See id.* (rejecting plaintiff's attempt to shirk the jurisdictional bar by describing it as something other than a "'determination, finding, action or omission' under the CRA"). There, the plaintiff argued that a joint resolution was invalid because the disapproved rule had taken effect before the agency submitted it to Congress. The plaintiff claimed the submission was untimely and the resolution was therefore improperly enacted. But the court held that Section 805 bars judicial review of any claim that challenges a "determination, finding, action, or omission" under the CRA—including procedural challenges to the validity of a joint resolution. The court explained that the plaintiff's real grievance was with Congress's act of disapproval. *See id.* at 564 (plaintiff's challenge to the agency's rescission of the rule after the CRA process was a "claim [that] necessarily involves a challenge to a congressional 'determination, finding, action or omission' under the CRA"). Because the agency acted under the CRA, and because the relief sought would nullify the resolution, Section 805 stripped the court of jurisdiction. *See id.* The court emphasized that Congress's intent to preclude judicial review was "fairly discernible" from the statutory scheme. *Id.* at 563. It does not matter if the plaintiff frames the claim as a challenge to agency action—the challenge is still covered by the plain text of the act, and the bar applies. *Id.* at 563–64.

The D.C. and Tenth Circuits have similarly enforced Section 805's bar against CRA challenges. *See Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018) (holding that § 805 forecloses review of claim that rule was invalid for taking effect fewer than 60 days after publication, where the CRA mandates a 60 day waiting period); *Montanans for Multiple Use*, 568 F.3d at 229 (holding that § 805 bars review of claim that agency violated CRA by failing to report plan amendments, because the statute "denies courts the power to void rules on the basis of agency

_____

*Fin. Bd.*, 1998 WL 842181, at *7 n.15 (W.D. Tex. June 25, 1998), *aff'd*, 201 F.3d 551 (5th Cir. 2000) (Section 805 barred judicial review of agency omission to submit rule); *United States v. Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 949 (S.D. Ohio 2002) (same); *but see United States v. S. Ind. Gas & Elec. Co.*, 2002 WL 31427523, at *4–5 (S.D. Ind. Oct. 24, 2002) (Section 805 jurisdictional bar applies only to congressional action). Even were this Court persuaded by the stand-alone, unpublished position of the Southern District of Indiana, the waivers here, unlike the action at issue in that case, have already been submitted to Congress and disapproved, making the factual circumstances inapposite.

noncompliance"); *Kan. Nat. Res. Coal.*, 971 F.3d at 1226–28, 1234–38 (discussing legislative history of CRA and dismissing case for lack of subject-matter jurisdiction under the broad jurisdictional bar in § 805); *Via Christi Reg'l Med. Ctr., Inc.*, 509 F.3d at 1271 n.11 (explaining that CRA "specifically precludes judicial review of an agency's compliance with its terms"). These decisions underscore what the text makes plain: Courts lack power to second-guess congressional and executive actions taken under the CRA.

California cannot plead around the CRA's bar. The nature of the claims and the relief that each claim seeks—effectively, restoring the disapproved rules, *see, e.g.*, Compl. ¶¶ 120, 142, 151, 168, 177, 187 (seeking a declaration that the "Resolutions are unlawful, void, and of no effect"); *id.* ¶ 134 (seeking vacatur of the submissions to Congress, which is, in effect, a challenge to the Resolutions); *id.* ¶¶ 121, 135, 143, 152, 169, 178, 188 (seeking an injunction stopping "EPA and its Administrator from giving the Resolutions any legal effect")—confirm that Section 805 blocks this suit.

Last, while the Ninth Circuit has considered a narrow exception to Section 805's broad jurisdictional bar for constitutional claims, it did not engage with the CRA's text or its legislative history and merely invoked the general canon from *Webster v. Doe*, 486 U.S. 592, 603 (1988), requiring a "clear" statement before Congress can foreclose judicial review of constitutional claims. *See Bernhardt*, 946 F.3d at 561. That conclusion is mistaken.

The CRA admits no exception. Section 805 states, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. That language is absolute. It does not differentiate between statutory and constitutional claims. Instead, it says "[t]his chapter shall apply notwithstanding any other provision of law." *Id.* § 806(a). That unmistakably indicates that Congress intended the bar to override every other source of law. If Congress wanted to exempt constitutional claims from this bar, it would have used specific language to do so. *See Mendoza-Linares v. Garland*, 51 F.4th 1146, 1161 (9th Cir. 2022) (explaining that Congress's express preservation of constitutional claims in one subsection demonstrated its deliberate intent to exclude such claims from review where no similar language appears elsewhere in the statute). In *Mendoza*, the Ninth Circuit held that Congress clearly barred judicial review of an asylum-seeker's

9

constitutional claims. *See id.* at 1148–49. The statute at issue in *Mendoza* states, in part, that "no court shall have jurisdiction to review" certain immigration decisions and claims. *See id.* at 1154 (quoting 8 U.S.C. § 1252(a)(2)). The Ninth Circuit found this language clear enough to overcome the presumption of reviewability for constitutional claims. Section 805 of the CRA uses language that is equally clear: "No determination, finding, action, or omission under [the CRA] shall be subject to judicial review." 5 U.S.C. § 805.

Moreover, *Webster* and its progeny's principle that courts should presume constitutional claims remain reviewable absent a clear statement to the contrary arose in cases involving individual rights, such as liberty, due process, and access to habeas relief.[7] The concern animating those decisions was that Congress cannot, consistent with separation of powers, deny all judicial review when a citizen-claimant asserts a fundamental personal right. That concern does not apply here. This case does not involve liberty or individual rights. It involves institutional power. California asks the courts to prioritize its policy preferences—to preserve its power—over the prerogatives of Congress, which legislates for the entire nation. But California is only permitted to implement its desired regulatory regime if the executive (via the EPA) concludes that certain statutory conditions are met. 42 U.S.C. § 7543(b). California has no independent authority and cannot impose its will on the nation. The CRA reflects a constitutional judgment about internal legislative procedure. That judgment is not subject to judicial oversight—even when framed as a constitutional challenge, barring implication of individual rights.

This Court has no authority to review or reverse the outcome of the legislative process Congress used here. Section 805 requires dismissal of all of Plaintiffs' claims.

---

[7] *See Webster*, 486 U.S. at 596, 603 (individual raising, among others, due process and equal protection claims) (citing *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (individuals raising equal protection and due process claims)); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003) (noting that particularly clear statement is needed to bar review of habeas claims and indicating that the underlying constitutional concern for inability to review constitutional claims lies with particular liberty interests).

### B.    Plaintiffs' challenge presents nonjusticiable political questions.

Plaintiffs ask this Court to pass judgment on how Congress exercised its internal legislative procedures in enacting the joint resolutions. *See, e.g.*, Compl. ¶¶ 154–63, 171–76. But this Court cannot do what Plaintiffs ask. Plaintiffs present textbook political questions over which federal courts have no authority.

Where a case presents a nonjusticiable political question, the court lacks jurisdiction. *See Corrie v. Caterpillar Inc.*, 503 F.3d 974, 982 (9th Cir. 2007). To determine a political question's presence, this Court considers six equally sufficient factors:

> [1] a textually demonstrable commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)); *see also Corrie*, 503 F.3d at 980. If any one of these factors is "inextricable" from the case, it is nonjusticiable. *Alperin*, 410 F.3d at 544.

Here, the first factor is "inextricable" from and disposes of the challenges to Congress's internal procedures. The expedited procedures under Section § 802(d) that are challenged here— exempting a CRA resolution from the Senate filibuster, and placing limits on motions and debate, *see* Compl. ¶¶ 157, 172–75; *see also id.* ¶¶ 11, 89–92—are "an exercise of the rulemaking power of the Senate and House of Representatives, respectively," and as such are deemed "a part of the rules of each House, respectively," 5 U.S.C. § 802(g) (noting that either House may "change the rules . . . at any time"). As the Ninth Circuit has explained, a challenge "based on the asserted failure of Congress to comply with its own procedural rules" is a nonjusticiable "political question" that is "beyond [this Court's] power to review." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171–72 (9th Cir. 2007) (declining to review claim that Congress, by not holding a hearing on legislation, failed to comply with its own procedural rules).

The United States Supreme Court and numerous other courts have agreed and routinely refrained from deciding questions like those Plaintiffs ask this Court to resolve. *See, e.g.*, *United States v. Ballin*, 144 U.S. 1, 5 (1892) ("The constitution empowers each house to determine its rules of proceedings."); *Coleman v. Miller*, 307 U.S. 433, 450 (1939) (holding that Congress's treatment of state ratification of constitutional amendment as a nonjusticiable political question); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1311–12 (11th Cir. 2001) (holding that political branches' choices of how to handle an international agreement—*i.e.*, whether to have the Senate review and approve it as a "treaty"—was a nonjusticiable political question); *Est. of Braude v. United States*, 38 Fed. Cl. 476, 489 (1997) (holding that Congress's application of a statute governing its own process for reviewing compensation claims constituted "political questions for Congress, not this court, to decide"); *Metzenbaum v. Fed. Energy Reg. Comm'n*, 675 F.2d 1282, 1286–87 (D.C. Cir. 1982) (per curiam) (holding that a question that would require a court to "construe the rules of the House of Representatives [and] additionally to impose upon the House [the court's] interpretation of its rules" was "political in nature" and therefore nonjusticiable); *Consejo de Desarrollo Economico de Mexicali, A.C.*, 482 F.3d at 1171–72 ("In short, the Constitution textually commits the question of legislative procedural rules to Congress. Thus, whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review."); *Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999) (holding that plaintiffs lacked standing to challenge a President's decision implementing a legislative program because their injury was inherently political); *State of Nev. v. Watkins*, 914 F.2d 1545, 1556–57 (9th Cir. 1990) (holding challenge to composition of conference committee and resulting legislation as violating Tenth Amendment was nonjusticiable to the extent it sought to require Nevada representation on the Congressional committee).

This overwhelming case law confirms that Plaintiffs' claims challenging Congress's internal procedures in enacting the joint resolutions lie beyond the Court's jurisdiction and must be dismissed.

Factors two and three of *Baker* also support dismissal. Plaintiffs ask the Court to decide when and how Congress must apply the Congressional Review Act. That question lacks judicially

12

manageable standards and requires policy judgments about legislative procedure that the Constitution assigns to Congress alone. *See* U.S. Const. art. I, § 1 (granting "[a]ll legislative Powers" to Congress); *see also Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (finding that there are no judicially manageable standard for assessing the Senates conducting of an impeachment trial because the Constitution commits impeachment trials to the Senate). Courts may interpret statutory terms like "rule" under the APA, but Plaintiffs' challenge goes further. It raises institutional concerns about how Congress exercises its own oversight powers under the CRA. Compl. ¶¶ 138, 156–57, 159, 161–64. Plaintiffs do not seek review of agency action. They ask the Court to second-guess Congress's internal decision about whether and when to invoke its disapproval process. That request implicates both the absence of judicial standards and the danger of disrespecting a coordinate branch. The CRA commits review of agency rules to Congress alone.[8]

### C.    Plaintiffs lack standing for their statutory claims challenging EPA's actions under the CRA.

Plaintiffs lack standing to challenge EPA's submission of the waivers as rules or to claim that submission tainted the final resolutions of disapproval. *See id.* ¶¶ 116–20, 126–33, 139. Plaintiffs' alleged injury flows from Congress's resolutions, not EPA's actions. No relief directed at the EPA would redress Plaintiffs' injury. This is because Congress's independent determinations and actions break the causal chain. The legal force and operative effect of Plaintiffs' claimed

---

[8] The other factors also support dismissal. Factor four supports dismissal because resolving Plaintiffs' claims would require the Court to second-guess how Congress exercised its internal procedures, effectively inviting judicial oversight of the legislative process and expressing a clear lack of respect for a coequal branch. *See Metzenbaum*, 675 F.2d at 1287–88 (Courts have declined to resolve questions about internal Congressional proceedings because it is "impossibl[e]" for them to "undertake independent resolution" in situations such as this "without expressing lack of the respect due to coordinate branches of government." (cleaned up)). Finally, factors five and six support dismissal because second-guessing Congress's procedure in enacting of the joint resolutions would undermine the need for finality in legislative decisions and create a serious risk of conflicting pronouncements from the branches on a live policy issue, generating the very interbranch friction and political embarrassment the political question doctrine is meant to prevent. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 205–06 (2012) (Sotomayor, J., concurring in part) (noting that "courts properly resist calls to question the good faith with which another branch attests to the authenticity of its internal acts"). Prudential considerations should also foreclose review. *See Metzenbaum*, 675 F.2d at 1287–88.

injury—the invalidation of the waiver decisions—result directly and solely from the actions of Congress.

EPA's transmission of the waivers is neither a legal cause of the injury nor a source of redress. No remedy directed at EPA could alter the fact that Congress permissibly reviewed the waivers and enacted binding statutes that nullified them. Those statutes have the full force of law. They reflect the independent and constitutionally grounded decisions of both Houses of Congress and were presented to and signed by the President under Article I procedures. That chain of lawful legislative action breaks any causal connection between EPA's earlier transmission and Plaintiffs' alleged injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (injury must be "fairly traceable to the challenged conduct of the defendant").

Plaintiffs cannot overcome this traceability problem by labeling EPA's submission as the cause of their harm. As the Supreme Court made clear in *Bennett v. Spear*, 520 U.S. 154 (1997), "it does not suffice if the injury complained of is 'the result of the independent action of some third party not before the court.'" 520 U.S. at 169 (cleaned up). Here, that third party is Congress itself. EPA's transmission of the waivers did not dictate or compel Congress's disapproval votes. Congress remained entirely free to act or not act. Its independent legislative choice is what triggered the legal consequences at issue here.

These interrelated causation and traceability defects are fatal to standing. *See Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014) ("[T]he causation element requires that a proper defendant be sued."). Plaintiffs cannot hold the EPA responsible for an injury caused by Congress. No act of this Court directed at EPA could compel the restoration of waivers invalidated by statute. As in *Common Cause*, Plaintiffs' "alleged injury was caused not by any of the defendants, but by an 'absent third party'"—namely, Congress. *See id.* (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).

Nor could a court order directed at EPA redress Plaintiffs' asserted injury. The disapproval resolutions are valid acts of Congress. They remain binding regardless of the manner in which EPA transmitted the waivers. A declaration that EPA's submissions were improper would not undo Congress's enactments, nor would it reinstate the waivers. The requested declaration would offer no practical benefit. It would serve only to express judicial disapproval of a completed executive act that has no ongoing effect. Article III forbids such advisory opinions. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (holding that a court cannot grant relief for a past violation when the relief would not redress the plaintiff's injury and would serve only to declare a violation of law).

Because the injury is not caused by or fairly traceable to EPA and cannot be redressed by relief against EPA, Plaintiffs lack standing to assert their statutory CRA claims.

**D.    The Complaint seeks relief the Court cannot grant.**

As already explained, Plaintiffs seek relief that this Court cannot grant. Section 805's judicial-review prohibition "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Montanans for Multiple Use*, 568 F.3d at 229. As such, whether or not EPA correctly submitted the rule to Congress, there is no relief this Court can grant. *See Wash. All. of Tech. Workers*, 892 F.3d at 346 (motion to dismiss may be granted if plaintiff "would not have a claim upon which relief could be granted even with [sufficiently pled] facts" (alteration in original) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998))).

Further, equitable relief may not be used to undo past completed acts. Injunctions prevent future harm, not past conduct. *See United States v. Or. State Med. Sch.*, 343 U.S. 326, 333 (1952); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Here, EPA has completed the submission of the waiver decisions, and the legislative process is complete. Plaintiffs do not credibly allege any imminent agency action or future resolution under the CRA that presents a real and immediate threat of harm. The possibility that similar waivers might be submitted to, or disapproved by, Congress in the future is speculative and too contingent to support equitable relief. *See Bernhardt*, 946 F.3d at 560. The lack of concrete, ongoing harm forecloses any viable remedy.

15

Each of these independent grounds requires dismissal.

**II.    The Complaint fails to state a claim because the resolutions were lawfully enacted and constitutionally valid.**

Even if the Court could reach the merits, Plaintiffs' claims still fail as a matter of law.

***Ultra Vires and CRA.*** The gravamen of Plaintiffs' *ultra vires* and CRA claims is that EPA's waivers are not rules and are therefore not subject to the CRA. Compl. ¶¶ 114–21, 136–43. Plaintiffs argue that EPA and the President acted beyond their authority by classifying the waivers as "rules" subject to the CRA. *Id.* ¶¶ 115–19. They contend that these waivers are adjudicatory orders (akin to a license) or individualized determinations rather than rules, and thus not properly submitted to Congress or subject to disapproval. *See id.* Plaintiffs further assert that the CRA does not authorize their disapproval because they are not rules. *Id.* ¶¶ 137–41.

But Plaintiffs cannot show that EPA violated any "clear and mandatory" duty. *See Leedom v. Kyne*, 358 U.S. 184, 188 (1958); *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. __, 145 S. Ct. 1762, 1775–76 (2025). To sustain an *ultra vires* challenge against a federal agency, a plaintiff must demonstrate that the agency acted in plain contravention of an unambiguous statutory command. This is a high bar. As the Supreme Court explained in *Leedom v. Kyne*, *ultra vires* jurisdiction exists only when an agency acts "in excess of its delegated powers and contrary to a specific prohibition." 358 U.S. at 188.

Here, EPA acted within, rather than in contravention of, a statutory command. The CRA assigns EPA with the task of determining how to classify its actions. 5 U.S.C. § 801 (explaining that the federal agency submits rules under the CRA, implying that federal agencies determine whether to classify their decisions as rules). Plaintiffs identify no statutory provisions (there are none) that forbid EPA from treating waiver decisions like this one as rules. Although Plaintiffs disagree with EPA's determination and ask this Court to override EPA's judgment, EPA's decision is supported by the plain text of the APA and ample caselaw.

As noted above, the CRA adopts the APA's broad definition of "rule." 5 U.S.C. § 804(3). A "rule" includes "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *See* 5 U.S.C. § 551(4).

16

Courts have construed this definition broadly. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015) (noting the "broad" scope of the rule definition); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1107 (9th Cir. 2025) (same). In contrast, adjudicatory orders "resolve disputes among specific individuals in specific cases" and "have an immediate effect on specific individuals (those involved in the dispute)." *Yesler Terrace*, 37 F.3d at 448.

For example, in *Yesler Terrace*, the Ninth Circuit explained that even decisions addressing particular parties can qualify as rules when they establish standards of general applicability that affect the rights of others. *See* 37 F.3d at 448. There, the United States Department of Housing and Urban Development (HUD) authorized a state housing authority to use its eviction procedures in place of federally required grievance hearings. HUD argued this was an "order," not a rule. *Id.* at 445. But the Ninth Circuit held that HUD's determination bore all the characteristics of a rule because it had a prospective effect, applied broadly, and altered the rights of a class of individuals not yet identified. "HUD's determination had no immediate, concrete effect on anyone, but merely permitted [the housing authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

So too here. EPA's waivers let California (and other states that have adopted them under Section 177 of the CAA) use those standards in place of federally required emissions standards. It thereby prospectively altered the rights of automakers, constrained consumer choice, and reduced the market for gasoline, diesel, and other liquid fuels.

Put simply, Plaintiffs cannot use an *ultra vires* theory to relabel an ordinary interpretive action as unlawful conduct. The doctrine of *ultra vires* review exists to police clear departures from the law. *See, e.g.*, *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775–76. Plaintiffs' failure to identify a "clear and mandatory" duty forecloses this claim.

***APA.*** The APA claim fails for a similar reason. As discussed above, the waivers are rules under the CRA/APA definition of "rule." *See supra* pp. 16–17. The APA claims are unreviewable for two additional reasons. First, Plaintiffs cannot avoid the CRA's jurisdictional bar by strategic pleading. Their APA theory is that EPA violated the APA by categorizing the waivers as rules. *See*

17

Compl. ¶¶ 126–29 (alleging that "[a]ll of the EPA's actions were predicated on a new (albeit implicit) interpretation of the APA term "rule"). At bottom, Plaintiffs challenge EPA's determination under the CRA. The claim is thus barred by § 805, which strips jurisdiction over any "determination, finding, action, or omission under this chapter."

As *Bernhardt* explains, procedural attacks cannot circumvent the CRA's jurisdictional bar when the ultimate goal is to challenge Congress's final disapproval. *See* 946 F.3d at 564. Even when framed as procedural objections, such claims are impermissible if they functionally seek to undo Congress's legislative decision. *See* 5 U.S.C. § 805. In *Bernhardt*, the plaintiff challenged the agency's rescission of a rule as not in accord with the procedures set out in the CRA. The court held that even if that argument targeted agency conduct, it was in substance a challenge to congressional action and was barred by § 805. 946 F.3d at 563–64. Here, although Plaintiffs frame their claim as one challenging an underlying procedural issue (the EPA's "interpretation"), the requested relief would invalidate Congress's resolution, *see* Compl. ¶ 135 ("Plaintiffs are entitled to injunctive relief, enjoining EPA and its Administrator from giving the Resolutions any legal effect"), which means this claim is similarly unreviewable.

Second, the APA claims are unreviewable because EPA's decision to submit the waivers to Congress under the CRA is not "final agency action" reviewable under the APA. The APA provides for judicial review only of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In *Bennett v. Spear*, the Supreme Court explained that to be reviewable under the APA, an agency action must satisfy two conditions. It must mark the "consummation" of the agency's decision-making process rather than be merely tentative or interlocutory. 520 U.S. at 178. And it must be one by which "rights or obligations have been determined or from which legal consequences will flow." *Id.* (cleaned up).

EPA's determination to submit waivers to Congress under the CRA does not meet *Bennett*'s second requirement. While the submission is a procedural step required by statute, it does not itself determine rights or obligations nor create binding legal consequences. Instead, legal consequences flow only if Congress disapproves the rule (which then becomes final legislative action). The decision to submit is merely a conduit step. *Contra* Compl. ¶ 132 (alleging that "the Resolutions

18

would not have been enacted" but for EPA's actions). After all, the waivers remained in effect even after EPA submitted them and were not disapproved until the resolutions were passed and signed into law. The only final agency action was EPA's issuance of the waivers themselves, but the later transmittal by EPA to Congress was procedural—it altered no rights and imposed no obligations.

Thus, the EPA's submission decision is more like the non-final agency submissions discussed in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), and *Dalton v. Specter*, 511 U.S. 462 (1994). In *Franklin*, the Court held that the Secretary of Commerce's report to the President on the results of the census was not final agency action. Although the Secretary played a significant role in the apportionment process, the court reasoned that legal consequences flowed only from the President's subsequent decision to submit the final apportionment to Congress. Because the President—not the agency—made the dispositive legal determination, the agency's report was advisory and nonfinal. *See Franklin*, 505 U.S. at 796–801. Similarly, in *Dalton*, the court held that the Defense Secretary's recommendations under the Base Closure and Realignment Act were not final because they required presidential approval to take effect. Again, legal consequences attached only after the President acted. The agencies' submissions in both cases were essential procedural steps, but neither marked the end of decision-making nor carried legal force on their own. *See Dalton*, 511 U.S. at 468–76.

Same with EPA's submission here. It was a statutory step that triggered congressional *consideration* under the CRA. It did not create binding rights or obligations and did not determine any legal outcome. The legal consequences—the disapproval of the waiver rules and the resulting prohibition on their reissuance—were achieved by Congress and the President through duly enacted legislation. Like the agency actions in *Franklin* and *Dalton*, EPA's decision to submit the waivers functioned as part of a larger decision-making framework in which final legal authority rested elsewhere. Accordingly, Plaintiffs' APA claims should be dismissed.

Moreover, Plaintiffs' theory—that EPA's submission of the waiver decisions to Congress was arbitrary and capricious and did not follow the procedures required by law—would lead to an untenable result: Any time an agency submits a rule to Congress under the CRA, it would have to conduct full notice-and-comment rulemaking just to determine whether the underlying action

19

qualifies as a "rule." That would convert a ministerial statutory step authorized by Congress into a separate, reviewable agency rulemaking—expressly contrary to the CRA's text, purpose, and structure. Plaintiffs' reading would gut § 805's bar and create the very judicial review process that Congress specifically foreclosed.

*Take Care Clause.* Plaintiffs argue that the President, EPA, and EPA Administrator knew that the waiver decisions were not rules but acted as if they were, thereby failing to honor their constitutional duties to ensure the laws of this Nation were "faithfully execute[d]." *See* Compl. ¶¶ 144–50.

This claim is nothing more than a repackaged statutory claim reflecting disagreement over the meaning of "rule" under the CRA. Alleged statutory violations cannot be converted into Take Care Clause violations. In *Association for Education Finance and Policy, Inc v. McMahon*, --- F. Supp. 3d ---, 2025 WL 1568301, at *12 (D.D.C. June 3, 2025), the court explained that statutory compliance issues do not automatically trigger concerns under the Take Care Clause. *Id.* at *12 (citing *Dalton*, 511 U.S. at 472 (rejecting a similar statutory challenge framed as constitutional)). Similarly, in *Arizona v. Garland*, 730 F. Supp. 3d 258, 283–84 (W.D. La. 2024), the court dismissed a Take Care Clause claim that merely restated APA claims, finding no independent constitutional allegations under the clause.

Furthermore, courts have long held that attempts to challenge executive action under the "Take Care Clause" are nonjusticiable. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]he duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and is therefore not an appropriate subject for judicial intervention.); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 614 (D.C. Cir. 1974) (Take Care Clause claims present "political question[s]"); *Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018) ("Whether claims brought directly under the Take Care Clause are even justiciable is open to debate."). They raise political questions.

Here, the President executed his duty by signing the joint resolutions into law. The agencies must now carry them out. That is the very essence of faithful execution.

As for Plaintiffs' Take Care Clause claim against EPA, (that it violated the Take Care Clause by enabling Congress's use of the CRA to disapprove these waivers), *see* Compl. ¶ 150), because these waivers were rules, *see supra* pp. 16–17, and for all the reasons discussed here, these claims also fail.

***Separation of Powers.*** Plaintiffs argue that the CRA resolutions violate foundational separation-of-powers principles. *See* Compl. ¶¶ 153–67. They advance three related theories. First, they claim that Congress unlawfully delegated to the Executive Branch the authority to determine whether the CRA applies at all, by relying on EPA's classification of the waivers as "rules" under 5 U.S.C. § 804(3). *See id.* ¶ 157. They contend this violated Article I, Section 5, which vests each chamber with power to determine its own rules of proceeding. *See id.* ¶¶ 157–62. Second, they argue that Congress's acceptance of EPA's characterization intruded on judicial power under Article III by allowing the Executive to dictate the meaning of statutory terms—an interpretive function reserved to the courts. *See id.* ¶ 163. Third, they assert that because EPA's waiver decisions reflected the application of existing legal standards to a specific factual record, Congress's disapproval amounted to a retroactive override of an adjudicatory decision, rather than the enactment of new law. *See id.* ¶¶ 164–67.

These theories are wrong at each turn. Congress did not delegate any power to the Executive Branch. When Congress acts through the full legislative process, it acts squarely within its constitutional role. *INS v. Chadha*, 462 U.S. 919, 954–55 (1983). That is what happened here. Congress enacted laws under Article I; the President signed those laws. Nothing in the Constitution forbids Congress from legislating in response to agency action or considering agency submissions. It is basic knowledge that Congress routinely relies on agency submissions, committee reports, and outside information when determining how and when to legislate. *See, e.g.*, Library of Congress, *Introduction to the Legislative Process in the U.S. Congress*, Congress.gov (Mar. 10, 2025), https://www.congress.gov/crs-product/R42843 (summarizing the basics of the legislative process and noting that Congressional committees consider, for example, agencies' opinions on bill's strengths and weaknesses when drafting and considering legislation); William T. Egar, *Congressionally Mandated Reports: Overview and Considerations for Congress*, CRS Report (May

21

14, 2020), https://www.congress.gov/crs-product/R46357 (explaining that "Congress frequently requires the President, departments, agencies, and other entities of the federal government to transmit reports, notifications, studies, and other information" for a variety of purposes, such as to inform congressional decisionmaking"). Doing so does not delegate power or violate structural boundaries. Plaintiffs' suggestion that the CRA required each chamber to independently adjudicate the definitional scope of "rule" before proceeding to a vote, *see* Compl. ¶¶ 157–59, 163, also finds no support in law or logic.

Nor did Congress intrude on Article III. Congress did not accept EPA's view blindly. It decided for itself that the waiver decisions were rules under the CRA. And in any event, courts do not have jurisdiction to review Congress's application of the CRA. *See* 5 U.S.C. § 805. Limiting judicial review in this context is not a constitutional flaw. Article III does not guarantee review of every congressional action. *See Patchak v. Zinke*, 583 U.S. 244, 254 (2018) (noting that Congress's power to restrain the courts from acting is an essential ingredient in separation of powers). And the CRA leaves untouched the courts' authority to interpret the APA in cases that do not implicate determinations, acts, or omissions under the CRA.

Last, it does not matter that the resolutions had consequences for pending regulatory and judicial proceedings. *See* Compl. ¶¶ 164–67. Congress has full authority to override agency actions by statute. When it enacts a resolution under the CRA, it replaces the agency's decision with new law, and the action disapproved "shall not take effect (or continue)." 5 U.S.C. § 801(b)(1).

The Supreme Court has long held that Congress may enact legislation that affects the outcome of pending cases so long as it changes the law itself, rather than dictating results under preexisting law. For example, in *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 438–41 (1992) Congress replaced environmental protections with new statutory provisions that permitted certain logging operations, even though those changes affected ongoing litigation. The court upheld the statute because it amended the governing law rather than ordering courts to reach a particular result under the old regime. The Court reaffirmed this distinction in *Bank Markazi v. Peterson*, 578 U.S. 212, 225–26 & n.17 (2016), explaining that Congress may "amend [] applicable law" even in ways that affect pending litigation, so long as it does not "prescribe [a] rule of decision" in a specific case.

That is exactly what happened here. Congress enacted a new law of general applicability through the CRA, withdrawing EPA's waivers and preempting the underlying state law. The fact that the law effects pending litigation does not make it unconstitutional. To the contrary, that is a core feature of Article I lawmaking.

*United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872), where the court held that Congress acted impermissibly, and which was cited in *Bank Markazi*, makes the result here even clearer. *Klein* involved post-Civil War legislation under which persons whose property had been seized during the war could recover funds if they proved they had not aided the rebellion. *Id.* at 131, 139. After the statute was enacted, the President pardoned rebels, and the court held that a presidential pardon operated as a substitute for the proof of loyalty required by the statute. *See United States v. Padelford*, 76 U.S. (9 Wall.) 531 (1870). In response, Congress passed a statute forbidding courts from accepting pardons as evidence of loyalty and requiring dismissal of such claims. *Klein*, 13 Wall. at 129. The court struck down the new law because it altered the legal effect of presidential pardons—an executive power the Constitution commits solely to the President—and directed the judiciary to apply that new interpretation retroactively in pending cases. *Id.* at 147. The statute dictated outcomes under preexisting law without changing the legal rule and thereby intruded on both executive and judicial functions.

Nothing like that happened here. Congress did not redefine the legal effect of an executive act, nor did it instruct the judiciary to reach a particular result under existing law. It enacted a resolution, through constitutionally prescribed procedures, to override EPA's prior decisions and prospectively eliminate their legal effect. That is not usurpation. It is legislation. And it fits squarely within the structural design the Framers adopted to separate powers and assign legislative authority to Congress.

**Federalism.** Plaintiffs' federalism claim, in sum, asserts that Congress's disapproval of California's waivers unlawfully intrudes on state sovereignty. They allege that the Executive and Legislative Branches ignored established procedures and expert determinations to reclassify past EPA adjudications as rules, thereby triggering CRA procedures that bypassed meaningful debate and state input. This maneuver, they argue, stripped California and other states of regulatory

authority without proper process or notice, retroactively altered legal standards, and blocked judicial review. *See* Compl. ¶¶ 171–76.

This argument misunderstands the structure and text of the CAA, and with it, states' roles in these kinds of congressional procedures. While states play some role in protecting air quality, Congress retained the power to control the role of state authority, given the nationwide implications of any regulation. The CAA expressly preempts state emission standards *unless EPA grants a waiver*. *See* 42 U.S.C. § 7543(a)–(b); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) (noting that "state laws are preempted when they conflict with federal law" or when Congress expresses a clear intent to occupy a field). The waiver provision does not confer an absolute right on California to regulate emissions or mandate sales of specific types of vehicles through a compliance credit system, the costs of which are borne by vehicle consumers nationwide. Rather, it reflects a conditional permission that depends on EPA approval and, by extension, congressional oversight of EPA's decisions. Congress may change, limit, or withdraw that permission at any time through valid legislation. When Congress disapproves a waiver, it exercises its constitutional authority to regulate commerce and set national policy. The Supreme Court has held that Congress may preempt state law so long as it acts within its enumerated powers.

Plaintiffs misunderstand the nature of what Congress did here. Congress did not strike down state law or override state authority. It invalidated a federal agency action—EPA's grant of waivers—using procedures Congress itself enacted in the CRA to serve as a democratic check on executive power. The resolutions do not erase state regulations; they nullify federal decisions that had temporarily allowed those regulations to stand. That is an exercise of Congress's constitutional power to regulate commerce and supervise federal agencies.

Last, any attempt through federalism arguments to dictate to Congress its own rules cannot stand: Congress retains the right to determine its own rules, absent state interference. *See* pp.6–11.

***Violations of Federal Law by Federal Officials.*** Plaintiffs also seek to hold federal officials liable for carrying out Congress's resolutions. *See* Compl. ¶¶ 179–88. But implementing a duly enacted statute or performing the executive's duties under a statute is not unlawful. *See Franklin*, 505 U.S. at 800–01 (courts lack authority to enjoin the President in the performance of discretionary

24

duties); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010) ("[W]hen a public official acts in reliance on a duly enacted statute or ordinance, that official is entitled to qualified immunity." (citing *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994))). This count rises or falls with the others. Because the proceeding claims fail, so too does this claim.

<strong>CONCLUSION</strong>

The Proposed Intervenors' Motion to Dismiss should be granted and the Complaint should be dismissed with prejudice.

Dated:   August 6, 2025          Respectfully submitted,

*/s/* Bradley A. Benbrook
Bradley A. Benbrook (SBN 177786)
Stephen M. Duvernay (SBN 250957)
Benbrook Law Group, PC

Steven P. Lehotsky* (DC 992765)
Michael B. Schon* (DC 989893)
Katherine C. Yarger* (CO 40387)
Lehotsky Keller Cohn LLP

*Attorneys for Proposed Intervenors American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the National Association of Convenience Stores*
* Motion for admission *pro hac vice* forthcoming

Michael Buschbacher*
James R. Conde*
James R. Wedeking*
Laura B. Ruppalt*
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
*Pro hac vice applications forthcoming

Eric Grant (Bar No. 151064)
John B. Thomas (Bar No. 269538)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 447-4900
grant@hicks-thomas.com

Counsel for Proposed Intervenor-Defendants
(complete list on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **MOTION TO INTERVENE AS DEFENDANTS OF AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, ILLINOIS CORN GROWERS ASSOCIATION, INDIANA CORN GROWERS ASSOCIATION, IOWA CORN GROWERS ASSOCIATION, KANSAS CORN GROWERS ASSOCIATION, KENTUCKY CORN GROWERS ASSOCIATION, MICHIGAN CORN GROWERS ASSOCIATION, MISSOURI CORN GROWERS ASSOCIATION, NEBRASKA CORN GROWERS ASSOCIATION, TENNESSEE CORN GROWERS ASSOCIATION, TEXAS CORN PRODUCERS, WISCONSIN CORN GROWERS ASSOCIATION, AND NATIONAL CORN GROWERS ASSOCIATION** <br><br> Date:      October 16, 2025 <br> Time:      2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:     Hon. Haywood S. Gilliam, Jr. |

**3-ER-438**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

NOTICE OF MOTION.................................................................................................... 1

MOTION TO INTERVENE.............................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

STATEMENT OF ISSUES .............................................................................................. 2

BACKGROUND ............................................................................................................. 3

I.      EPA Issues Waivers of Clean Air Act Preemption for Three California
        Programs ............................................................................................................ 3

II.     Congress Repeals the EPA Waivers of Clean Air Act Preemption..................... 4

III.    Movants Have Substantial Interests in the Validity of the Resolutions............... 5

STANDARD FOR INTERVENTION.............................................................................. 8

ARGUMENT .................................................................................................................. 9

I.      Movants Are Entitled To Intervene Under Rule 24(a)(2) ................................... 9

        A.      Intervention Is Timely ............................................................................ 10

        B.      Movants Have a Protectable Interest That May Be Practically
                Impeded.................................................................................................. 10

        C.      Federal Defendants May Not Adequately Represent Movants'
                Interests ................................................................................................. 13

II.     Alternatively, This Court Should Grant Permissive Intervention
        Under Rule 24(b)(1)(B) ...................................................................................... 15

        A.      No Independent Jurisdictional Ground Is Required and Motion
                Is Timely................................................................................................. 15

        B.      Movants' Defense Shares Common Questions of Law and Fact ........... 16

        C.      Intervention Will Not Cause Undue Delay or Prejudice Existing
                Parties ..................................................................................................... 16

CONCLUSION ............................................................................................................ 17

LIST OF EXHIBITS..................................................................................................... 19

3-ER-439

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,*
    152 F.3d 1184 (9th Cir. 1998) ..............................................................................12, 15

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
    647 F.3d 893 (9th Cir. 2011) .......................................................... 9, 10, 11, 14, 15

*Diamond Alt. Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025) .......................................................................... 2, 7, 11, 14

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011) ..................................................................... 9, 16

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ....................................................................14, 15

*Golden State Transit Corp. v. City of Los Angeles,*
    493 U.S. 103 (1989) .......................................................................................... 11

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995)..........................................................................10, 12

*Idaho v. Freeman,*
    625 F.2d 886 (9th Cir. 1980).............................................................................. 12

*Kalbers v. U.S. Dep't of Justice,*
    22 F.4th 816 (9th Cir. 2021) ............................................................................. 10

*Kootenai Tribe of Idaho v. Veneman,*
    313 F.3d 1094 (9th Cir. 2002) .......................................................................16, 17

*LULAC v. Wilson,*
    131 F.3d 1297 (9th Cir. 1997) .......................................................................10, 16

*Levin Richmond Terminal Corp. v. City of Richmond,*
    482 F. Supp. 3d 944 (N.D. Cal. 2020) ................................................................ 16

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ......................................................................................... 12

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs,*
    2019 WL 5818061 (D. Mont. Nov. 7, 2019) ....................................................... 17

*Nooksack Indian Tribe v. Zinke,*
    321 F.R.D. 377 (W.D. Wash. 2017)................................................................... 16

*Sagebrush Rebellion, Inc. v. Watt,*
    713 F.2d 525 (9th Cir. 1983)........................................................................12, 15

*Sigwart v. U.S. Bank Nat. Ass'n*,
   2014 WL 2451566 (D. Haw. May 30, 2014) .................................................. 11

*Smith v. Pangilinan*,
   651 F.2d 1320 (9th Cir. 1981) ..................................................................... 13

*Sw. Ctr. for Biological Diversity v. Berg*,
   268 F.3d 810 (9th Cir. 2001) ..........................................................9, 12, 14, 15

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) ......................................................................................14, 15

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) ....................................................................... 11

*United States v. City of Los Angeles*,
   288 F.3d 391 (9th Cir. 2002) ...................................................................... 9, 10

*United States v. Oregon*,
   839 F.2d 635 (9th Cir. 1988) ....................................................................... 13

*United States v. Stringfellow*,
   783 F.2d 821 (9th Cir. 1986) ....................................................................... 13

*United States ex rel. McGough v. Covington Technols. Co.*,
   967 F.2d 1391 (9th Cir. 1992) ..................................................................... 10

*Wilderness Soc'y v. U.S. Forest Serv.*,
   630 F.3d 1173 (9th Cir. 2011) (en banc) .................................................... 11


**Statutes**

5 U.S.C. § 801(b)(2) ......................................................................................5

5 U.S.C. §§ 801–808 .................................................................................. 2, 5

42 U.S.C. § 7507 .........................................................................................1

42 U.S.C. § 7507(1) ....................................................................................3

42 U.S.C. § 7521(a) .....................................................................................3

42 U.S.C. § 7543(a) ......................................................1, 3, 4, 5, 8, 11, 13

42 U.S.C. § 7543(b) ............................................................................1, 3, 7

42 U.S.C. § 7607(b) .................................................................................. 11

Pub. L. No. 119-15, 139 Stat. 65 (2025) ....................................................5

Pub. L. No. 119-16, 139 Stat. 66 (2025) ....................................................5

Pub. L. No. 119-17, 139 Stat. 67 (2025) ....................................................5


**3-ER-441**

## Regulations

88 Fed. Reg. 20,688 (Apr. 6, 2023) ...................................................................................3

90 Fed. Reg. 642 (Jan. 6, 2025) .......................................................................................3

90 Fed. Reg. 643 (Jan. 6, 2025).......................................................................................3

Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C).......................................................................4

Cal. Code Regs. tit. 13, § 1956.8(a)(2)(D).......................................................................4

Cal. Code Regs. tit. 13, § 1962.4 .....................................................................................3

Cal. Code Regs. tit. 13, § 1962.4(e)(1)(C) .......................................................................3

Cal. Code Regs tit. 13, § 1963.1.......................................................................................4

Cal. Code Regs tit. 13, § 1963.2 ......................................................................................4

Cal. Code Regs. tit. 13, § 1963.6(a) .................................................................................4

Cal. Code Regs. tit. 13, § 2016 ........................................................................................4

## Court Rules

Fed. R. Civ. P. 12(a)(3)...................................................................................................10

Fed. R. Civ. P. 24 .............................................................................................................1

Fed. R. Civ. P. 24(a)(2) ...........................................................................1, 2, 8, 9, 11, 12, 15

Fed. R. Civ. P. 24(b)(1)(B) ....................................................................................1, 2, 9, 15

Fed. R. Civ. P. 24(b)(3) .....................................................................................................9

Fed. R. Civ. P. 24(c)..........................................................................................................2

N. Dist. Cal. Civil Local R. 7-2  ........................................................................................1

**Other Authorities**

AmFree, *AmFree Heralds Trump's EV Mandate Repeal, Vows to Fight California's Legal Challenge* (June 13, 2025), https://perma.cc/PZD3-JNVV ............................................8

All. for Auto. Innovation, *It's Gonna Take a Miracle: California And States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ....................................4

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8..................................................................................................4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.............................................................................4

Ill. Corn Growers Ass'n et al., *Comment on Application for a Clean Air Act Waiver*, EPA-HQ-OAR-2023-0292-0185 (Feb. 27, 2024), https://perma.cc/K5KX-28KD...........................................................................................................................................7

Ill. Corn Growers Ass'n, *California EV Mandates, Clean Air Act and a Congressional Review Act Vote* (May 20, 2025), https://perma.cc/85C8-DC47 .......................8

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW...............................................................................5

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on October 16, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (4th Floor) of the above-named Court (Hon. Haywood S. Gilliam, Jr. presiding), located at 1301 Clay Street, Oakland, California 94612, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Movants") will, and hereby do, move to intervene as Defendants in this civil action, as described below.

**MOTION TO INTERVENE**

Pursuant to Federal Rule of Civil Procedure 24 ("Rule 24") and Civil Local Rule 7-2, Movants respectfully move to intervene, by right or by permission, as Defendants in this civil action. Movants are entitled to intervene under Rule 24(a)(2); alternatively, this Court should grant permissive intervention under Rule 24(b)(1)(B). This Motion is supported by the following Memorandum of Points and Authorities, the accompanying declarations, and any oral argument that may be presented to the Court. Plaintiffs reserve their rights to oppose or otherwise respond to this Motion. Defendants take no position.

**MEMORANDUM OF POINTS AND AUTHORITIES**

California and several other states have adopted emissions standards designed to phase out new internal-combustion vehicles and mandate sales of electric vehicles. These standards are prohibited by the Clean Air Act, 42 U.S.C. § 7543(a). The U.S. Environmental Protection Agency ("EPA"), however, issued "waivers" of Clean Air Act preemption purporting to allow California and other states to adopt and enforce their standards. *See id.* §§ 7543(b), 7507. The standards are commercially unfeasible and have already caused serious supply chain disruptions, threatening the automotive industry, workers, and the millions of ordinary Americans who depend on cars and trucks to get where they are going and to deliver the goods and services on which they depend.

**3-ER-444**

Congress and the President responded. Congress passed, and the President signed, three resolutions repealing the EPA waivers using the expedited procedures of the Congressional Review Act ("CRA"), 5 U.S.C. §§ 801–808. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2131 n.1 (2025). That should have been the end of the matter. But California and ten other states ("Plaintiffs") do not like this legislation. Having failed to persuade elected members of Congress, they ask this Court to repeal those laws by judicial decree, reinstate the waivers, and allow Plaintiffs to enforce the regulations. *See* Complaint (ECF No. 1). Plaintiffs' position is radical: they argue that bipartisan federal *legislation* cannot undo the *actions of an administrative agency*. While Plaintiffs exact argument is difficult to nail down, their two main theories appear to be that (1) Congress was somehow deprived of the authority to enact this legislation by prior allegedly unlawful acts of EPA and the President, including EPA's decision to submit the waivers to Congress as "rules" under the CRA; and (2) Congress misapplied its own internal procedures. These invitations to interfere with the legislative process are meritless and, more importantly, they lie far outside this Court's jurisdiction.

Movants are trade associations whose members are harmed by EPA's waivers and the California emissions programs they purport to allow, and who seek to intervene as Defendants to defend the resolutions invalidating those waivers. Movants easily satisfy the requirements for intervention by right: this motion is timely; Movants have multiple legally protectable interests in the validity of the resolutions that, as a practical matter, could be impaired by the disposition of the case; and no existing party adequately represents Movants' interests. Movants also easily satisfy the requirements for permissive intervention.[1]

### STATEMENT OF ISSUES

1.  Whether Movants may intervene by right under Rule 24(a)(2).

2.  Whether Movants should be permitted to intervene under Rule 24(b)(1)(B).

---

[1] Consistent with Rule 24(c), Movants have simultaneously filed a proposed motion to dismiss Plaintiffs' complaint, Ex. I, and a proposed answer, Ex. J.

## BACKGROUND

### I.   EPA Issues Waivers of Clean Air Act Preemption for Three California Programs

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions from the Nation's new motor vehicles, 42 U.S.C. § 7521(a), while Section 209(a) broadly preempts state law regulating new motor vehicle emissions, *id.* § 7543(a). The Act provides only one limited exception from federal preemption. Under Section 209(b), EPA "shall … waive application of" preemption to California emissions standards if certain statutory criteria are met. *Id.* § 7543(b). Once California has a waiver, other states may follow: under Section 177, other states "may adopt and enforce" emissions standards for new motor vehicles that are "identical to the California standards for which a waiver has been granted," with certain conditions. *Id.* § 7507(1). During the Biden administration, California sought and received EPA waivers for several state emissions programs, including three state programs relevant to the current litigation. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025).

*First*, **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026. By model year 2035, all cars and light trucks sold must be electric. Cal. Code Regs. tit. 13, § 1962.4.[2]

*Second*, **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles starting in model year 2024. Sales of internal-combustion vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab

///

---

[2] Up to 20% of the required electric vehicle sales may be plug-in hybrid electric vehicles. Cal. Code Regs. tit. 13, § 1962.4(e)(1)(C).

semis) with sales of electric trucks. *Id.* §§ 1963.1, 1963.2.[3]

*Third*, the **Omnibus Low NO$_x$ Program ("Omnibus Program")**, among other things, sets nitrogen oxides (NO$_x$) emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to sell electric vehicles and engines to comply. *See id.* § 1956.8(a)(2)(C), (D).[4] Eleven other states and the District of Columbia have adopted one or more of these California programs.[5]

## II.  Congress Repeals the EPA Waivers of Clean Air Act Preemption

EPA's waivers greenlighting California's programs spurred public outcry, focused, in part, on the potentially disastrous consequences for American consumers and the U.S. economy. Electric vehicles are far more expensive to manufacture (and so to purchase) than internal-combustion vehicles; their range is far shorter; and most of the country lacks sufficient infrastructure to charge them. As a result, many American consumers don't want to buy them. Indeed, automakers warned it would "take a miracle" for manufacturers to meet ACC II's light-duty vehicle standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[6] Trucking associations issued similarly ominous warnings about the ACT and Omnibus requirements, explaining that those standards were "causing equipment costs to skyrocket for trucking companies," "threatening to upend the supply chain for consumers," and so risked

///

///

---

[3] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion vehicles starting in model year 2036. *See* Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and is therefore preempted by the Clean Air Act. 42 U.S.C. § 7543(a).

[4] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program "are intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

[5] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

[6] All. for Auto. Innovation, *It's Gonna Take a Miracle: California And States With EV Sales Requirements* 3, 8 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

"enormous inflationary pressure on the economy."[7]

In response to the outcry, Congress and the President acted. After the Trump EPA transmitted the waivers to Congress, bipartisan majorities of the House and Senate passed resolutions of disapproval for the three waivers under the CRA, 5 U.S.C. §§ 801–808. On June 12, President Trump signed those resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025). As a result of the resolutions, the waivers are repealed: they "shall not take effect (or continue)" and "may not be reissued in substantially the same form … unless … specifically authorized by" a later-enacted law. 5 U.S.C. § 801(b)(2). Without a valid waiver in place, Plaintiffs now may not "adopt or attempt to enforce" any ACC II, ACT, or Omnibus Program standard. 42 U.S.C. § 7543(a).

Within hours of the President's signing, Plaintiffs filed this suit. Plaintiffs raise a grab bag of statutory and constitutional claims. They generally allege that defects in the process by which Congress considered and passed the resolutions, including EPA's decision to submit the waivers to Congress under the CRA, render the resolutions invalid. Complaint at 27–39, ¶¶ 114–188. Plaintiffs ultimately ask this Court, among other things, to declare the resolutions unlawful, to declare the waivers "valid and in effect," and to enjoin EPA "from interfering with Plaintiffs' enforcement" of the ACC II, ACT, and Omnibus Program standards. *Id.* at 39–40.

## III. Movants Have Substantial Interests in the Validity of the Resolutions.

Movants are associations whose members are among those harmed by EPA's waivers and by the California emissions standards those waivers allow. Movants thus have a substantial interest in defending the validity of the resolutions, which repeal those waivers and thereby subject California's standards to federal preemption.

Movant American Free Enterprise Chamber of Commerce ("AmFree") is a membership association that represents entrepreneurs and businesses across all sectors and all states. AmFree's members are vitally interested in maintaining free, fair, and open markets, and AmFree serves its

---

[7] Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

members by fighting against burdensome regulations and special-interest policies that threaten these markets and, consequently, threaten our nation's economic prosperity. *See* Ex. A, ¶ 4 (Collins Declaration).

AmFree's members are harmed by EPA's waivers, and by the California emissions standards allowed by those waivers, in various ways. *Id.* ¶¶ 10–18. Some AmFree members produce and sell ethanol, the second-largest component of automobile gasoline. ACC II, ACT, and the Omnibus Program mandate or incentivize the sale of electric vehicles, and so decrease the demand for gasoline, including for AmFree members' ethanol. *Id.* ¶¶ 15–17; Ex. B (Couser Declaration).

Other AmFree members operate, sell, or lease light-duty vehicles that are subject to ACC II, as well as heavy-duty trucks and vehicles that are subject to ACT and the Omnibus Program. In many cases, there are no suitable electric vehicles that meet the needs of these members or their customers, and so these members will continue to purchase internal-combustion versions. By artificially constraining the supply of internal-combustion vehicles, ACC II, ACT, and the Omnibus Program drive up the cost to purchase these vehicles, which AmFree's members cannot pass on entirely to their customers. Even if costs could be passed on, higher customer pricing would reduce the amount of business that these members' conduct. Ex. A, ¶¶ 11–13. Ex. C (DeMartini Declaration).

Moreover, even if there were electric vehicles that met members' needs, AmFree's members would incur substantial additional costs to operate, sell, or lease them. Electric vehicles are substantially more expensive to purchase than internal-combustion vehicles and have uncertain residual values, significantly increasing capital costs. The lack of a nationwide public charging network means that many members would need to install charging infrastructure at their facilities, which can cost more than $100,000 per charger, excluding costs to maintain those facilities. And members would need to overhaul their vehicle maintenance and repair operations to accommodate the unique needs and safety risks of electric vehicles, including training or hiring staff with specialized skills and retrofitting service areas to guard against the serious electrocution and fire risks posed by electric vehicles. All of these increase members' costs to provide their services or products, harming them economically. Ex. A, ¶ 14.

Members of Movants Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Corn Growers Associations") are similarly harmed by EPA's waivers and California's emissions standards. The Corn Growers Associations represent farmers throughout their states and the nation who grow and sell corn crops, including for ethanol production. Because ACC II, ACT, and the Omnibus program reduce demand for automobile gasoline and ethanol, they also reduce demand for corn, harming the Corn Growers Associations' members. And because ethanol is a primary use of U.S.-grown corn, lower ethanol production leads to lower corn prices, even harming those members who sell corn for other uses. *See* Ex. D (Weinzierl Declaration); Ex. E (Roe Declaration); Ex. F (Andrews Declaration); Ex. G (Schad Declaration); Ex. H (Howard Declaration); *see also Diamond Alt. Energy*, 145 S. Ct. at 2135 (holding that California program that "decrease[s] … purchases of gasoline and other liquid fuels … hurts the[] bottom line" of parties in the liquid fuel supply chain).

Because Movants' members are harmed by California's standards, they have long and actively opposed such state programs and fought to ensure those programs remain federally preempted. Some Corn Growers Associations challenged the Biden EPA's decision to reinstate a waiver for an earlier California electric vehicle mandate, Advanced Clean Cars I ("ACC I"), taking the case all the way to the Supreme Court. *See Diamond Alternative Energy*, 145 S. Ct. 2121. Some Corn Growers Associations explained in comments submitted to EPA that, for similar reasons, ACC II does not satisfy the statutory criteria for a waiver specified in Section 209(b), 42 U.S.C. § 7543(b), and EPA otherwise lacks authority to issue a waiver. *See* Ill. Corn Growers Ass'n et al., *Comment on Application for a Clean Air Act Waiver*, EPA-HQ-OAR-2023-0292-0185 (Feb. 27, 2024), https://perma.cc/K5KX-28KD. After EPA issued the ACC II and Omnibus waivers in January 2025, AmFree and other parties petitioned for review. *Am. Free Enter. Chamber of Com. v. EPA*, No. 25-106 (9th Cir.) (ACC II); *Am. Free Enter. Chamber of Com. v. EPA*, No. 25-89 (9th

///

**3-ER-450**

Cir.) (Omnibus).[8] Movants also supported the repeal of the waivers through the CRA.[9]

AmFree has also separately challenged a collusive agreement between the California Air Resources Board ("CARB") and the major heavy-duty truck and engine manufacturers and their trade association, in which the manufacturers agreed to comply with the ACT and Omnibus standards, even if California has no lawful authority to enforce them. AmFree argues that the agreement is a prohibited "attempt to enforce" preempted state emissions standards, in part because the resolutions repealed EPA's waivers. 42 U.S.C. § 7543(a); *see Am. Free Enter. Chamber of Com. v. Engine Mfrs. Ass'n.*, No. 3:24-cv-50504 (N.D. Ill.), ECF No. 103 ¶¶ 111–13 (challenging Clean Truck Partnership agreement).

The validity of the resolutions, which Plaintiffs challenge, is thus of crucial practical importance to Movants, as that validity (i) controls whether their members will face harm from Plaintiffs' enforcement of the ACC II, ACT, and Omnibus standards; and (ii) may bear on Movants' pending lawsuits challenging the ACC II and Omnibus waivers, and the agreement between CARB and the truck manufacturers.

### STANDARD FOR INTERVENTION

Under Rule 24(a)(2), a party may intervene by right if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Ninth Circuit applies a four-prong test to assess intervention by right: "(1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's

---

[8] After EPA issued the ACT waiver in April 2023, other parties (but not including Movants) petitioned for review of that waiver. *W. States Trucking Ass'n Inc. v. EPA*, No. 23-1143 and consolidated cases (D.C. Cir.).

[9] *See, e.g.*, Ill. Corn Growers Ass'n, *California EV Mandates, Clean Air Act, and a Congressional Review Act Vote* (May 20, 2025), https://perma.cc/85C8-DC47; AmFree, *AmFree Heralds Trump's EV Mandate Repeal, Vows to Fight California's Legal Challenge* (June 13, 2025), https://perma.cc/PZD3-JNVV.

ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (citation omitted). Courts are "required to accept as true the non-conclusory allegations made in support of an intervention motion" and they should be "guided primarily by practical considerations, not technical distinctions." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818–19 (9th Cir. 2001) (cleaned up).

Under Rule 24(b)(1)(B), a party "who … has a claim or defense that shares with the main action a common question of law or fact" may intervene with the Court's permission. Permissive intervention "requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992)). However, "the independent jurisdictional grounds requirement does not apply … in federal-question cases when the proposed intervenor is not raising new claims." *Id.* at 844. Even if these requirements are met, the Court may nonetheless deny the motion if permissive intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Generally, courts should "construe[] [Rule 24] broadly in favor of proposed intervenors," adopting a "liberal policy in favor of intervention [that] serves both efficient resolution of issues and broadened access to the courts" that "allow[s] parties with a *practical* interest in the outcome of a particular case to intervene." *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002) (citations omitted).

## ARGUMENT

This Court should grant intervention because Movants meet the requirements for intervention by right under Rule 24(a)(2) and for permissive intervention under Rule 24(b)(1)(B).

## I. Movants Are Entitled To Intervene Under Rule 24(a)(2)

Movants easily satisfy all four requirements to intervene as of right.

///

///

**3-ER-452**

## A. Intervention Is Timely

"In determining timeliness," courts consider "three factors—the stage of the proceedings, the prejudice to existing parties, and the length of and reason for the delay." *LULAC v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997). All three factors support timeliness here.

Movants have sought intervention at the earliest stage of the proceedings, "before any hearings or rulings on substantive matters," and well within the timeframe the Ninth Circuit has previously held is appropriate for intervention. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (allowing intervention four months after the complaint was filed and after plaintiff had moved for preliminary injunction); *see also City of Los Angeles*, 288 F.3d at 398 (timeliness easily satisfied where "motion was filed only approximately one and half months after the suit was filed"); *Citizens for Balanced Use*, 647 F.3d at 897 (motion timely when filed "less than three months after the complaint was filed and less than two weeks after [defendant] filed its answer"). The time for Defendants to respond to the complaint has not expired, Fed. R. Civ. P. 12(a)(3), and Defendants have not yet filed a responsive pleading. No substantive proceedings have taken place, and the initial Case Management Conference is still more than a month away. *See* ECF No. 8 (setting Conference for September 16, 2025). This posture favors intervention.

For similar reasons, intervention will not prejudice the parties. There is no "complex settlement" that could be "seriously disrupt[ed]," *United States ex rel. McGough v. Covington Technols. Co.*, 967 F.2d 1391, 1395 (9th Cir. 1992), and Plaintiffs will have an opportunity to consider and respond to any arguments that Movants raise. "This lack of prejudice weighs heavily in favor of timeliness." *Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 826 (9th Cir. 2021).

Finally, there has been no delay. Plaintiffs filed their suit just over seven weeks ago. Movants acted promptly to assess Plaintiffs' complaint, evaluate the need for intervention, and prepare the required motions and pleadings. The motion is timely.

## B. Movants Have a Protectable Interest That May Be Practically Impeded

The second and third prongs of the Ninth Circuit's test require that a party have "a significantly protectable interest" related to "the subject of the action" and that the "disposition of the action may as a practical matter impair or impede [the party's] ability to protect that

interest." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (en banc) (cleaned up). "Since these elements are often intertwined, it is proper to consider them together." *Sigwart v. U.S. Bank Nat. Ass'n*, 2014 WL 2451566, at *2 n.6 (D. Haw. May 30, 2014) (citing *Greene v. United States*, 996 F.2d 973 (9th Cir. 1993), which analyzed interest and impairment elements together). A party "has a significantly protectable interest" for purposes of intervention "if the interest is protected by law and there is a relationship between the legally protected interest and the plaintiff's claims." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). In other words, a party "has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation." *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)). Movants have multiple interests that may be practically impaired by this litigation and that justify intervention by right under Rule 24(a)(2).

*First*, Movants have a "significant protectable interest" in shielding their members from the harm that they would suffer were the resolutions invalidated and EPA's unlawful waivers given effect. *See Citizens for Balanced Use*, 647 F.3d at 897 (significant protectable interest in shielding members from decreased enjoyment of forest that would result from Forest Service order allowing motor vehicle use). As explained above, EPA's unlawful waivers, and the preempted California standards that the waivers allowed, harm Movants' members in multiple ways, including by predictably and substantially harming their economic interests. *See supra* Section III (pp. 5–8); *Alisal Water Corp.*, 370 F.3d at 919 ("a non-speculative, economic interest may be sufficient to support a right of intervention"). Movants' members have a legally protectable right not to suffer the effects of unlawful EPA actions. *See* 42 U.S.C. § 7607(b) (providing for judicial review of EPA actions). They also have a right not to be injured by preempted state standards. 42 U.S.C. § 7543(a); *cf. Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989). If Plaintiffs prevail and the Court grants the relief that they seek, EPA's unlawful waivers would be given full effect and Plaintiffs would be permitted to enforce their preempted standards, impairing Movants' ability to shield their members from the economic harm and operational difficulties that result from those standards. *See Diamond Alternative Energy*, 145 S. Ct. at 2135. That is sufficient for

**3-ER-454**

intervention under Rule 24(a)(2). *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818 (party "demonstrates a significantly protectable interest when the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests" (cleaned up)); *cf. Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189–90 (9th Cir. 1998) (permitting intervention by group whose members may be economically harmed by preemption suit).

*Second*, Movants are "entitled as a matter of right to intervene in an action challenging the legality of a measure [they] have supported." *Idaho Farm Bureau Fed'n.*, 58 F.3d at 1397. Here, Movants supported the resolutions and challenged EPA's waivers, which are the subject of Plaintiffs' suit. Some Corn Growers Associations "participated in the administrative process" leading to the ACC II waiver by submitting detailed comments explaining why that waiver is unlawful. *Id.* at 1397. AmFree "even filed a suit" to invalidate the ACC II and Omnibus waivers. *Id.* at 1398. The invalidation of the waivers, achieved by the resolutions, is "a cause which [both] organization[s] had championed." *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983). Movants thus indisputably have an "interest in the continued vitality" of the resolutions. *Idaho v. Freeman*, 625 F.2d 886, 887 (9th Cir. 1980). Given Movants' long-standing, active efforts to invalidate the waivers at the center of Plaintiffs' claims, this Court should have no "difficulty determining that the [Movants have] an interest in the subject of the suit." *Sagebrush Rebellion,* 713 F.2d at 527. And, when an organization seeks intervention to defend the legality of measures that it actively supported or opposed, there is "no question that disposition of [the] suit might, as a practical matter, impair the ability of the organization to protect its interest." *Id.*

*Third*, AmFree has a significantly protectable legal interest because the validity of the resolutions may bear on other pending lawsuits in which AmFree is a plaintiff or petitioner. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (holding that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause" and citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). AmFree has filed petitions in this Circuit challenging EPA's waivers for the ACC II and Omnibus Programs. The validity of the resolutions, which repealed those waivers, may be dispositive in those challenges or render further

litigation unnecessary. At the least, the resolutions are relevant to the enforceability of the challenged waivers, the central issue raised by AmFree's challenges. AmFree's suits, however, were held in abeyance as EPA reconsidered the waivers.[10] There is, therefore, a reasonable chance that the validity of those resolutions may be resolved through Plaintiffs' suit first, creating Ninth Circuit precedent that could impede AmFree's ability to successfully prosecute its case. *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) ("factual and legal determinations … when upheld by an appellate ruling will have a persuasive *stare decisis* effect in any parallel or subsequent litigation" and "is an important consideration in determining the extent to which an applicant's interest may be impaired."); *see also United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir. 1986) ("The prospect of stare decisis may … supply the requisite practical impairment warranting intervention as of right"), *vacated on other grounds* 480 U.S. 370 (1987).

Disposition of Plaintiffs' claims similarly may bear on AmFree's lawsuit in the District Court for the Northern District of Illinois challenging the agreement between CARB and truck manufacturers. That lawsuit alleges that the agreement's "attempt to enforce" ACT and Omnibus standards is prohibited by Clean Air Act Section 209(a), 42 U.S.C. § 7543(a), in part because "[a]ll of the regulations and related certification and compliance requirements enforced through the Agreement now lack a valid waiver" as a result of the resolutions. *Am. Free Enter. Chamber of Com.*, No. 3:24-cv-50504 (N.D. Ill.), ECF No. 103, at ¶ 113. The validity of the resolutions is thus of central importance. Although the Northern District of Illinois would not be bound by Ninth Circuit precedent, it would be bound by a Supreme Court decision in this case, which at this juncture cannot be foreclosed. Denying intervention here would thus leave AmFree with "no voice in the case" that makes a legal determination critical to its ongoing litigation, impairing AmFree's ability to successfully litigate. *Smith v. Pangilinan*, 651 F.2d 1320, 1325 (9th Cir. 1981).

### C. Federal Defendants May Not Adequately Represent Movants' Interests

Finally, the fourth prong of the Ninth Circuit's test "is satisfied if the [party] shows that

---

[10] *See Am. Free Enter. Chamber of Com.*, No. 25-106 (9th Cir.), ECF No. 25; *Am. Free Enter. Chamber of Com.*, No. 25-89 (9th Cir.), ECF No. 20.

representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972); *Citizens for Balanced Use*, 647 F.3d at 898 (same). In assessing adequacy of representation, courts consider "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). Where a private-sector party seeks to join government defendants, it is sufficient to show that the "interests of government and the private sector may diverge" during the course of litigation. *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823.

That divergence is possible here. Although federal Defendants and Movants presently share a common interest in defending the validity of the resolutions, the federal government has a history of reversing its position in cases regarding EPA waivers. *See, e.g.*, *California v. Wheeler*, No. 19-1239 and consolidated cases (D.C. Cir.) (challenge to withdrawal of ACC I waiver); *see also Diamond Alt. Energy*, 145 S. Ct. at 2130–31 (explaining that the Bush EPA denied the ACC I waiver in 2008, the Obama EPA granted it in 2013, the Trump EPA rescinded it in 2019, and the Biden EPA reinstated it in 2022). Indeed, it is this persistent changing of positions that has ensured that no litigation challenging these waivers has ever reached the merits of the underlying statutory question whether they comply with the Clean Air Act. It is thus far from theoretical that federal Defendants could reverse position during the course of this litigation—for example, after a change in presidential administration—and decline to appeal (or dismiss an appeal of) an adverse decision. Intervention is thus necessary to ensure that Movants' interests are protected through the full course of the litigation.

Moreover, even now, Movants' and federal Defendants' interests are not entirely unified, which may give rise to divergent litigation choices. The federal Defendants' "obligation is to represent the interests of the American people," while Movants' "concern" is for businesses and corn farmers harmed by EPA's waivers and California's standards, a much narrower constituency. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). Although "[t]here may be

**3-ER-457**

some overlap" in their considerations, federal Defendants need not give Movants' concerns "the kind of primacy that [Movants] would give them." *Id.* For example, Movants' ultimate interest is ensuring that Plaintiffs may not enforce the ACC II, ACT, and Omnibus programs, whatever the grounds of decision. In contrast, the federal Defendants' strongest interest is likely to persuade the Court that the challenged actions are not justiciable, which would set a powerful precedent for future litigation by making similar government actions more difficult to challenge. These different objectives may cause Defendants to forego meritorious arguments that Movants would vigorously pursue, for example, arguing affirmatively that the waivers are "rules" properly subject to the CRA. Federal Defendants thus will not "undoubtedly make all [the] … arguments" that Movants are "capable and willing to make." *Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). And by making those arguments, Movants would "offer … necessary elements to the proceedings" that federal Defendants may "neglect." *Id.* (citation omitted).

Movants need not "anticipate specific differences in trial strategy." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 823. The possibility of a difference is all that Rule 24(a)(2) requires. *Trbovich*, 404 U.S. at 538 n. 10; *Sagebrush Rebellion*, 713 F.2d at 528 ("This court has consistently followed *Trbovich*"). Because the interests of Movants' members are "potentially more narrow and parochial than the interests of the public at large," Movants have met their minimal burden to "demonstrate[] that the representation of its interests by [federal Defendants] may … be[] inadequate." *Californians for Safe & Competitive Dump Truck Transp.*, 152 F.3d at 1190.

\* \* \*

Because Movants satisfy the requirements of Rule 24(a)(2), they are entitled to intervene as of right.

## II.  Alternatively, This Court Should Grant Permissive Intervention Under Rule 24(b)(1)(B)

Movants also easily satisfy the requirements for permissive intervention, which the Court should grant because intervention will not create undue delay or prejudice.

### A.  No Independent Jurisdictional Ground Is Required and Motion Is Timely

Because this is a federal-question case, *see* Complaint at 6, ¶ 29, and Movants are "not raising new claims," the requirement for "independent jurisdictional grounds … does not apply,"

**3-ER-458**

*Freedom from Religion Found.*, 644 F.3d at 844. Movants thus are "not required to make any further [jurisdictional] showing." *Id.* Moreover, this motion is timely for the reasons given in Section I.A above (p. 10). *LULAC*, 131 F.3d at 1308 ("In determining timeliness under Rule 24(b)(2), [a court] consider[s] precisely the same three factors … [it] consider[s] in determining timeliness under Rule 24(a)(2)").

### B.  Movants' Defense Shares Common Questions of Law and Fact

"Under Rule 24(b) the question … is whether the applicants to intervene assert a claim or defense in common with the main action." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110 (9th Cir. 2002) *abrogated on other grounds by Wilderness Soc'y*, 630 F.3d 1173. Movants easily satisfy this requirement.

Movants "intend to defend the [resolutions] against each of the claims raised in plaintiffs' complaint[]," and so their defenses indisputably "share common questions of law with the main action." *Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 968 (N.D. Cal. 2020). Movants' Proposed Motion to Dismiss argues that the Court lacks jurisdiction over Plaintiffs' claims and that Plaintiffs fail to state a constitutional claim, raising common questions of law regarding, among other things, the scope of the CRA's prohibition on judicial review, Plaintiffs' standing to challenge EPA's actions, the authority of this Court to second-guess congressional procedures, and the applicability of various constitutional doctrines to Plaintiffs' factual claims. *See* Ex. I, at 10–25 (Proposed Motion to Dismiss). Because Movants' "interest in this action arises from the same set of facts as Plaintiff[s'] claims," their defenses also "undisputed[ly]" share common questions of fact. *Nooksack Indian Tribe v. Zinke*, 321 F.R.D. 377, 383 (W.D. Wash. 2017).

### C.  Intervention Will Not Cause Undue Delay or Prejudice Existing Parties

Because Movants "satisf[y] the literal requirements of Rule 24(b)," it is "within the district court's discretion to decide whether to permit them to participate." *Kootenai Tribe of Idaho*, 313 F.3d at 1110. The Court should exercise its discretion to grant intervention here.

Movants' participation will not unduly delay litigation. Movants raise no new claims, have timely moved for intervention at a preliminary stage, and intend to coordinate with other

**3-ER-459**

Defendants to effectuate a just and efficient resolution to the case. Movants' participation also will not prejudice any existing party. Plaintiffs will have opportunity to fully respond to Movants' arguments. And courts regularly grant permissive intervention where, as here, a private party "asserts … a significant interest in defending [the] legality" of government action alongside government defendants. *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 2019 WL 5818061, at *2 (D. Mont. Nov. 7, 2019); *Am. Free Enter. Chamber of Com. v. EPA*, No. 1:25-cv-67, ECF No. 18 (W.D. Mich. Mar. 27, 2025).

Moreover, the "magnitude of this case"—challenging the validity of a duly-enacted federal law—favors intervention to ensure all relevant arguments are fully aired. *Kootenai Tribe of Idaho*, 313 F.3d at 1111. Movants have extensive experience and familiarity with the facts and law surrounding EPA's waivers and the CRA resolutions, and respectfully submit that this Court would benefit from Movants' participation.

## CONCLUSION

For these reasons, the Court should grant the motion to intervene of right by Movants American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association. In the alternative, this Court should grant Movants permissive intervention.

///

///

///

///

///

///

///

///

**3-ER-460**

Dated: August 4, 2025

Respectfully submitted,

*/s/ Eric Grant*

Michael Buschbacher
James R. Conde
James R. Wedeking
Laura B. Ruppalt
Boyden Gray PLLC

Eric Grant
John B. Thomas
Hicks Thomas LLP

Counsel for Proposed Intervenor-Defendants
American Free Enterprise Chamber of
Commerce, Illinois Corn Growers Association,
Indiana Corn Growers Association, Iowa Corn
Growers Association, Kansas Corn Growers
Association, Kentucky Corn Growers
Association, Michigan Corn Growers
Association, Missouri Corn Growers
Association, Nebraska Corn Growers
Association, Tennessee Corn Growers
Association, Texas Corn Producers, Wisconsin
Corn Growers Association, and National Corn
Growers Association.

## LIST OF EXHIBITS

A. Declaration of Gentry Collins

B. Declaration of Bill Couser

C. Declaration of Tim DeMartini

D. Declaration of Rodney M. Weinzierl

E. Declaration of Josh Roe

F. Declaration of Adam Andrews

G. Declaration of Bradley Schad

H. Declaration of Lane Howard

I. Proposed Motion to Dismiss

J. Proposed Answer

K. Proposed Order

# Ex. A

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**

        Plaintiffs,

        v.

**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN**, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:25-cv-04966-HSG

**DECLARATION OF GENTRY COLLINS IN SUPPORT OF AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE'S MOTION TO INTERVENE**

I, Gentry Collins, declare as follows:

1.    I make this declaration in support of American Free Enterprise Chamber of Commerce's ("AmFree's") Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I am the Chief Executive Officer of AmFree, a 501(c)(6) organization headquartered in Iowa.

3.    I am familiar with all aspects of AmFree's mission and work.

4.    AmFree is a membership association that represents hard-working entrepreneurs and businesses across all sectors and all states. AmFree's members are vitally interested in maintaining the free, fair, and open markets that have driven progress and enabled prosperity more effectively than all other economic systems combined. AmFree

Declaration of Gentry Collins in Support of AmFree's Motion to Intervene

**3-ER-464**<sup>Page 1</sup>

serves its members by fighting against burdensome regulations, counterproductive tax-policies, and special-interest deals that threaten these markets and our nation's economic future and harm free, open, and competitive markets. AmFree's members include companies that have a vital interest in ensuring that the duly-enacted resolutions challenged by California and other states in this suit are given full legal effect.

5. The challenged resolutions concern waivers granted by the U.S. Environmental Protection Agency ("EPA") to California for three state programs that govern emissions from new motor vehicles and engines. These programs are generally designed to increase the share of new electric vehicles sold, and so necessarily decrease the share of new internal-combustion vehicles sold.

6. California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035. As a result, all cars and light trucks sold in model years 2035 and beyond must be electric, which can include some plug-in electric hybrid vehicles. Cal. Code Regs. tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

7. California's Advanced Clean Trucks ("ACT") program aims "to accelerate the market for on-road zero-emission vehicles," i.e. electric vehicles, in the heavy-duty sector, that is, vehicles with a Gross Vehicle Weight Rating ("GVWR") greater than 8,500 lbs. Cal. Code Regs. tit. 13, § 1963(a), (b). Beginning with the 2024 model year, manufacturers must produce and sell an increasing number of electric heavy-duty vehicles (as a proportion of their sales) in California. *Id.* § 1963.1–1963.3. Manufacturers incur deficits based on their total heavy-duty vehicle sales, *id.* § 1963.1, and earn offsetting credits for each electric heavy-duty vehicle sold, *id.* § 1963.2. In lieu of generating credits by selling electric vehicles, a manufacturer can also meet its obligation (i.e., offset its deficit) by purchasing credits from a

competitor, *id.* § 1963.3. The share of electric heavy-duty vehicles that manufacturers must sell increases annually. *Id.* § 1963.1(b) tbl A-1. Beginning with the 2036 model year, manufacturers can no longer sell any heavy-duty internal-combustion engine vehicles. *Id.* § 2016; *see* CARB, *Resolution 24-5* at 8 (Nov. 6, 2024), https://perma.cc/QA6F-8GPL (amending ACT to adopt Cal. Code Regs. tit. 13, § 1963.6); CARB, *Appendix A-1 Proposed Regulation Order* at 16, https://perma.cc/5RDM-NPG3 (Dec. 23, 2024) (adopted § 1963.6 text incorporating § 2016). Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

8.    California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for new heavy-duty engines. The regulation set nitrogen-oxide emissions standards "90 percent below current levels on existing certification cycles" and introduced new, "lower [nitrogen-oxide] standards on new certification cycles" for diesel engines. CARB, *Heavy-Duty Low NO$_x$*, https://perma.cc/7SGB-5BUM (Dec. 23, 2024). The Omnibus program also increases the stringency of particulate-matter emissions standards, and imposes a host of complex new testing and warranty requirements. *See, e.g.*, Cal. Code Regs. tit. 13, §§ 1956.8, 2036. I understand that the Omnibus standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

9.    Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, EPA granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the ACC II, ACT, and Omnibus programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able

Declaration of Gentry Collins in Support of AmFree's Motion to Intervene

Page 3

to enforce the ACC II, ACT, and Omnibus regulations.

10.  AmFree members would be harmed by state enforcement of the ACC II, ACT, and Omnibus regulations in several ways.

11.  First, some AmFree members own and operate heavy-duty trucks that fall within ACT and Omnibus's scope. These members largely operate using diesel- or gasoline-powered internal-combustion trucks. Many have concluded that electric trucks are not a commercially feasible option for their business needs, citing electric trucks' higher up-front costs and more limited range (compared to internal-combustion trucks); their uncertain maintenance, repair, and operation costs; and the limited nationwide charging infrastructure. As a result, these members generally would prefer to purchase internal-combustion vehicles. It is a basic economic principle that reduced supply leads to increased prices for consumers. California's regulations require manufacturers to reduce supply of internal-combustion trucks, and so will predictably increase the price of those trucks for these AmFree members. These costs cannot realistically be passed entirely onto consumers, and so will harm these members' profits.

12.  Other AmFree members sell heavy-duty vehicles at retail. The reduced supply of internal-combustion vehicles that results from California's ACT and Omnibus regulations will similarly increase wholesale costs for these members. It will also limit the vehicle models that these members can offer for sale, decreasing consumer choice and likely reducing sales. Both increased wholesale prices and decreased retail sales harm these members' bottom line.

13.  Other AmFree members lease light, medium, and heavy-duty vehicles to consumers. The leases vary in duration, but can be as short as a few hours. These members' customers typically do not want to lease electric vehicles, in part due to the sparse charging infrastructure. Customers also generally do not want to lease electric heavy-duty vehicles because those vehicles do not meet customer needs for towing capacity or range. As a result, these members prefer to continue purchasing the internal-combustion vehicles their customers want. California's ACC II, ACT, and Omnibus regulations will increase the price of the vehicles these members' purchase.

14.    These AmFree members would incur significant additional costs even if they decided to purchase and operate electric vehicles. Because of the limited public charging infrastructure, they would have to install chargers at their facilities, which can cost more than one hundred thousand dollars per charger. Coordinating Research Council, Inc., *Assessing the Battery-Recharging and Hydrogen-Refueling Infrastructure Needs, Costs and Timelines Required to Support Regulatory Requirements for Light-, Medium-, and Heavy-Duty Zero-Emission Vehicles* (CRC Report No. SM-CR-9) 14, tbl. 2, https://perma.cc/2ZWE-BYV8 (June 26, 2025) (estimating 150 Watt DC fast charger cost of $142,200). They would also need to overhaul their maintenance and repair operations to adjust to the unique needs of electric vehicles, which will also be costly. All of these increased costs harm members' bottom lines, which is, in part, why they have largely concluded that switching to electric vehicles is not a feasible commercial option at this time.

15.    Other AmFree members are part of the automobile fuel supply chain and will also be harmed if ACC II, ACT, and Omnibus are enforced. For example, some AmFree members produce ethanol, a renewable fuel made from grain crops like corn and sorghum. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise gasoline's octane rating to a level suitable for use in most vehicles. U.S. DOE, *Ethanol Blends*, https://perma.cc/6D6X-G7KH (June 27, 2025).

16.    California's standards are designed to increase the share of electric vehicles on the road, and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons*

Declaration of Gentry Collins in Support of AmFree's Motion to Intervene

IX-34 (Oct. 22, 2019) ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state… ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

17.    California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol*, https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline."). This demand destruction harms the market for the ethanol produced by AmFree's members, resulting in economic harm.

18.    AmFree therefore has an interest, on behalf of its members, in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___July 15___, 2025.

_____
Gentry Collins

Declaration of Gentry Collins in Support of AmFree's Motion to Intervene

# Ex. B

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,

          Plaintiffs,

          v.

UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,

          Defendants.

No. 4:25-cv-04966-HSG

DECLARATION OF BILL COUSER IN SUPPORT OF AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE'S MOTION TO INTERVENE

I, Bill Couser, declare as follows:

1. I make this declaration in support of American Free Enterprise Chamber of Commerce's ("AmFree's") Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2. I am Vice Chairman and Secretary of the Board of Directors of Lincolnway Energy, LLC, a member of AmFree. Lincolnway Energy is located in Nevada, Iowa, where our ethanol plant processes corn into 50 million gallons of fuel-grade ethanol per year.

3. In my position as Vice Chairman and Secretary of the Board, I am familiar with all aspects of Lincolnway Energy's work and with the market for ethanol-containing fuels. I am also generally familiar with California's Advanced Clean Cars II ("ACC II"), Advanced Clean Trucks ("ACT"), and Heavy-Duty Engine and Vehicle Omnibus ("Omnibus")

Declaration of Bill Couser in Support of AmFree's Motion to Intervene

**3-ER-471**

Page 1

standards, which, if given legal effect, would govern sales of new motor vehicles in California and other states that have adopted them. I understand that the U.S. Environmental Protection Agency ("EPA") granted waivers of preemption under the Clean Air Act to allow California and other states to enforce these standards, that Congress passed and the President signed resolutions of disapproval that repeal those waivers, and that California and other states now challenge the validity of those resolutions.

4.    Ethanol is the second-largest component by volume of the fuel that powers the vast majority of the United States' passenger vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' net greenhouse gas emissions and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline, in part to raise its octane rating to a level suitable for use in most vehicles. In 2024, alone, the use of ethanol in vehicle fuel reduced greenhouse gas emissions by approximately 54.3 million metric tons, equivalent to removing about 12 million cars from the road. Renewable Fuels Association ("RFA"), *Ethanol and the Environment*, https://perma.cc/DXD8-Q3SM (July 3, 2025).

5.    In 2024 the ethanol industry directly supported more than 55,800 U.S. jobs, and indirectly supported or induced an additional 258,000 jobs. RFA, *Back to Our Roots: 2025 Ethanol Industry Outlook* 8, https://perma.cc/FZG5-GWYV (July 3, 2025). Just last year, the ethanol industry created $28.3 billion in household income and contributed approximately $53 billion to the nation's gross domestic product. *Id.*

6.    I understand that California's ACC II, ACT, and Omnibus programs are generally designed to increase the share of new electric vehicles sold, and so decrease the share of new internal-combustion vehicles sold. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. I understand that California acknowledges its standards will reduce gasoline demand. CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons*

Declaration of Bill Couser in Support of AmFree's Motion to Intervene

**3-ER-472**

Page 2

IX-34 (Oct. 22, 2019) ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state... ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

7.     California's programs will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol*, https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline."). This makes sense, since every electric car sold in place of a gasoline-fueled vehicle destroys demand for gasoline and ethanol across the lifetime of the vehicle.

8.     The demand destruction caused by California's programs would reduce the market for Lincolnway Energy's ethanol output and undermine the company's substantial economic investment in ethanol production.

9.     Lincolnway Energy therefore has a substantial interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states cannot enforce the ACC II, ACT, and Omnibus programs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 7/14, 2025.

_Bill Couser_
Bill Couser

# Ex. C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, STATE OF )
COLORADO, STATE OF DELAWARE, )
COMMONWEALTH OF )
MASSACHUSETTS, STATE OF NEW )
MEXICO, STATE OF NEW YORK, )    No. 4:25-cv-04966-HSG
STATE OF OREGON, STATE OF )
RHODE ISLAND, STATE OF )
VERMONT, and STATE OF )
WASHINGTON, )    DECLARATION OF TIM DEMARTINI
 )    IN SUPPORT OF AMERICAN FREE
  Plaintiffs, )    ENTERPRISE CHAMBER OF
 )    COMMERCE'S MOTION TO
  v. )    INTERVENE
 )
UNITED STATES OF AMERICA, U.S. )
ENVIRONMENTAL PROTECTION )
AGENCY, LEE ZELDIN, in his official )
capacity as Administrator of the U.S. )
Environmental Protection Agency, and )
DONALD J. TRUMP, in his official )
capacity as President of the United States, )
 )
  Defendants. )
_____ )

I, Tim DeMartini, declare as follows:

1.      I make this declaration in support of American Free Enterprise Chamber of Commerce's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.      I am the owner of DeMartini RV Sales ("DeMartini RV") and I am familiar with all aspects of the company's work and operations. DeMartini RV is a family owned and run sole proprietorship, with its main office in Grass Valley, California, that sells new and used recreational vehicles ("RVs"), primarily motorhomes, to customers from California and other states. DeMartini RV is a dues-paying member of the American Free Enterprise Chamber of Commerce.

3.      The RV industry directly generates more than $71 billion in annual economic

Declaration of Tim DeMartini in Support of AmFree's Motion to Intervene        **3-ER-475**Page 1

activity and supports more than 330,000 jobs nationwide. RV Industry Ass'n, *RVs Move America Economic Impact Study National Impact Data Table* (2022), available at https://www.rvia.org/rvs-move-america-economic-impact-study. In 2023, more than 313,000 RVs were sold wholesale in North America. Motorhomes comprised nearly 46,000 of those sales, or approximately 14.65%. RV Industry Ass'n, *December 2023 RV Wholesale Shipment Summary*, https://perma.cc/QAM8-Y3T2. In the United States, California accounts for 7.42% of wholesale RV shipments, second-most in the nation. RV Industry Ass'n, *2023 RV Industry Profile*, https://perma.cc/2RVY-SKW7. The RV industry directly contributes more than $4.7 billion to the California economy, supports over 23,000 jobs in the state, and generates more than $500 million in state tax revenue. RV Industry Ass'n, *RVs Move America Economic Impact Study California Impact Data Table* (2022), available at https://www.rvia.org/rvs-move-america-economic-impact-study.

4.      DeMartini RV has been selling RVs in California since 1986. In 2023, we sold more than 500 RVs, generating more than $75 million in sales revenue. Sales to California customers accounted for approximately two-thirds of the total, approximately $40 million to $50 million. These sales—and, indeed, the continued commercial viability of our 40-year-old business—are threatened by the Advanced Clean Trucks ("ACT") and Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") regulations, which California and other states seek to authority to enforce through this litigation.

5.      I understand that, generally, state regulations related to new vehicle emissions, like ACT and Omnibus, are prohibited by the federal Clean Air Act. 42 U.S.C. §7543(a). I also understand that the U.S. Environmental Protection Agency ("EPA") granted waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal these waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able to enforce the ACT and Omnibus regulations, and DeMartini RV will be harmed.

6.    To understand why, it helps to understand how the motorhome supply chain works. The supply chain includes many players. Motorhomes are built—from design through assembly—by RV manufacturers. RV manufacturers rely on various suppliers for motorhome components and parts, including for the RV chassis. The chassis serves as the foundation for the motorhome and includes the powertrain. To date, all commercially available motorhome powertrains incorporate internal-combustion engines. Most motorhomes—from large "Class Super C" models to smaller "Class C" models— incorporate diesel engines because they provide greater torque and towing capacity, have higher fuel efficiency, typically require less service, and tend to last longer and have higher resale value than models with gasoline engines. In the United States, only a few suppliers make RV chassis. These suppliers include Freightliner, a subsidiary of Daimler Trucks North America, LLC; Spartan (Shyft Group); Ram (Stellantis); and Ford. Some chassis suppliers incorporate engines made by these suppliers, or by engine manufacturer Cummins.

7.    Although the chassis is essential to the motorhome, it is a small part of the overall product. Unlike automobiles, motorhomes are typically highly customized, with a variety of different lengths, floor plans, colors, accessories, and options available for any given vehicle. Each motorhome is built to the specification of the wholesale purchaser, usually an RV dealer. The RV dealer, in turn, orders motorhomes by anticipating customer needs or in some cases, by taking customers' special orders.

8.    A motorhome is a significant investment for a customer, since motorhome retail prices can range from $150,000 to over $1 million. Given the cost, it is generally imperative for customers to see motorhomes firsthand—in RV dealer showrooms—before making a final purchase decision. As a result, DeMartini RV (and other RV dealers) generally have numerous examples of different combinations of each model and brand on-site to show customers in person.

9.    Choosing the right combination of features for vehicles in our inventory is crucial to our success. Our inventory decisions are based on pricing, floor plans, and options available from the RV manufacturer. Typically, RV manufacturers unveil options for the

Declaration of Tim DeMartini in Support of AmFree's Motion to Intervene                Page 3

**3-ER-477**

upcoming model year during their new product showcases in the Spring, i.e., RV manufacturers will unveil products for the 2026 model year in Spring 2025. After the order is placed, the build and assembly process takes approximately three to four months, at which time the completed motorhomes are shipped to the dealer.

10. In 2021, California adopted the ACT and Omnibus regulations. *See* California Air Resources Board ("CARB"), *Advanced Clean Trucks*, https://perma.cc/XE3K-TQCQ (Dec. 20, 2024); CARB, *Heavy-Duty Engine and Vehicle Omnibus Regulation and Associated Amendments*, https://perma.cc/ZY33-YX4B (Dec. 20, 2024). California has since adopted amendments to both regulations. *See* CARB, *Amendments to the Advanced Clean Trucks Regulation and the Zero-Emissions Powertrain Certification Test Procedure*, https://perma.cc/YC93-8VXF (June 26, 2025); CARB, *Proposed Amendments to the Heavy-Duty Engine and Vehicle Omnibus Regulation*, https://perma.cc/4FKQ-GWKS (Dec. 23, 2024).

11. According to California, ACT aims "to accelerate the market for on-road zero-emissions vehicles," i.e. electric vehicles, in the heavy-duty sector, that is, vehicles with a Gross Vehicle Weight Rating ("GVWR") greater than 8,500 lbs. Cal. Code Regs. tit. 13, § 1963(a), (b). Beginning with the 2024 model year, manufacturers must produce and sell an increasing number of electric heavy-duty vehicles (as a proportion of their sales) in California. *Id.* § 1963.1–1963.3. Manufacturers incur deficits based on their total heavy-duty vehicle sales, *id.* § 1963.1, and earn offsetting credits for each electric heavy-duty vehicle sold, *id.* § 1963.2. In lieu of generating credits by selling electric vehicles, a manufacturer can also meet its obligation (i.e., offset its deficit) by purchasing credits from a competitor, *id.* § 1963.3. The share of electric heavy-duty vehicles that manufacturers must sell increases annually. *Id.* § 1963.1(b). Under the recent amendment, beginning with the 2036 model year, manufacturers can no longer sell any heavy-duty internal-combustion engine vehicles. *Id.* § 2016, *see* CARB, *Resolution 24-5* (Nov. 6, 2024), https://perma.cc/QA6F-8GPL (amending ACT to adopt Cal. Code Regs. tit. 13, § 1963.6); CARB, *Appendix A-1 Proposed Regulation Order*, https://perma.cc/5RDM-NPG3 (Dec. 23, 2024) (adopted § 1963.6 text incorporating § 2016). Ten other states have adopted California's ACT regulations. *See*

Declaration of Tim DeMartini in Support of AmFree's Motion to Intervene    Page 4

3-ER-478

CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

12.   Among other things, the Omnibus regulations set stringent nitrogen-oxide emissions standards for new heavy-duty engines. The regulations set nitrogen-oxide emissions standards "90 percent below current levels on existing certification cycles" and introduced new, "lower [nitrogen-oxide] standards on new certification cycles" for diesel engines. CARB, *Heavy-Duty Low NOx*, https://perma.cc/7SGB-5BUM (Dec. 23, 2024). The Omnibus regulations also increase the stringency of particulate-matter emissions standards, and impose a host of complex new testing and warranty requirements. *See, e.g.,* Cal. Code Regs. tit. 13, §§ 1956.8, 2036. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 24, 2025).

13.   Many motorhomes are heavy-duty vehicles. "Class Super C" RVs are built on a truck chassis and typically have GVWRs ranging from 19,500 lbs to 58,000 lbs. "Class A" RVs typically have GVWRs exceeding 13,000 lbs., and can exceed 30,000 lbs. "Class C" RVs typically range from 10,000 to 12,000 lbs. "Class B" RVs are the smallest, generally between 6,000 to 8,000 lbs. As a result, most Class A, Class C, and Class Super C RVs are heavy-duty vehicles subject to the ACT and Omnibus regulations. Under CARB's regulations, RV chassis suppliers are the parties responsible for complying with the ACT and Omnibus requirements.

14.   To meet the requirements of the ACT and Omnibus regulations, it is my understanding that suppliers will need to increase the share of electric powertrains sold in California, to reduce the share of internal-combustion engines—including those in RV chassis—sold in California, and to stop selling internal-combustion engines—including those in RV chassis—altogether in California starting in 2036.

15.   There are presently no electric powertrain options for RV chassis. The ACT and Omnibus regulations reduce sales of heavy-duty engines in California and thus will constrain the supply of RV chassis—and so motorhomes—limiting DeMartini RV's

Declaration of Tim DeMartini in Support of AmFree's Motion to Intervene

inventory and decreasing DeMartini RV's retail sales. Basic economic principles also dictate that reducing the supply of engines for RV chassis will predictably increase prices for motorhome wholesalers. Both decreased retail sales and increased wholesale prices will harm DeMartini RV's bottom line.

16.     Indeed, the ACT and Omnibus regulations have already had effects, which are rippling through the RV supply chain. In December 2024, DeMartini RV was notified by a major RV manufacturer that—based on limited ACT credits and Omnibus engine allocations—its RV chassis supplier will only provide *five* of a popular Class A RV chassis for the entire state of California in the first two quarters of 2025, with no commitment for any deliveries in the third and fourth quarters. DeMartini RV, alone, typically sells around *thirty* motorhomes from this particular RV manufacturer, based on this Class A chassis, to California residents each year. Five chassis is not even enough to demonstrate floorplans, models, and colors to promote the product to customers. The chassis supplier also indicated it will apply a surcharge of $9,000 per RV chassis to the RV manufacturer sold for the California market, and require immediate, non-cancellable orders. This means that the fee to DeMartini RV, the retailer, will be a *minimum* of $9,000. In the past, the RV manufacturer has charged retailers more than the chassis supplier surcharge. Unwilling to assume the risk that California retailers may not order motorhomes built on this chassis, the RV manufacturer has told DeMartini RV it will not procure the chassis unless we guarantee to purchase the finished motorhome products that will be built on them months from now— before we have seen the RV manufacturer's new product showcase (including costs and available configurations) or assessed customer demand. The constrained supply of this RV chassis places DeMartini RV in a bind: assume one-hundred-percent of the risk by guaranteeing purchase of motorhomes now—without knowing ultimate costs, available configurations, or customer sentiment—or risk having no models available during all of 2025.

17.     The RV manufacturer has also informed DeMartini RV that its supplier currently does not plan to provide *any* of a second popular RV chassis—used for "Super C"

Declaration of Tim DeMartini in Support of AmFree's Motion to Intervene                    Page 6

**3-ER-480**

Class motorhomes—for sale in California in 2025. In recent years, DeMartini RV has been one of the top sellers of a model line that relies heavily on this Super C RV chassis. The unavailability of this RV chassis for California sales means that DeMartini RV can no longer offer these popular Super C Class motorhomes to its mostly California buyers and will miss out on significant sales revenue. This is an example of only one of the RV manufacturers that DeMartini RV sells in the retail marketplace. The others are informing us of very similar supply constraints and issues, as well.

18.    The shortages and price hikes will only increase if the ACT and Omnibus requirements ramp up in future years, as the regulations require. If they continue apace, selling new motorhomes may no longer be profitable in California. Indeed, there is a significant risk that RV chassis suppliers would abandon the California market entirely, since it represents only a small part of their overall business. DeMartini RV's only option to remain commercially-viable—although not nearly as profitable—likely would be to sell only used, older motorhomes, many of which would be purchased from out-of-state. The ACT and Omnibus regulations thus could have the unfortunate effect of *increasing* carbon dioxide emissions by encouraging the sale of older, less efficient motorhomes instead of new, clean-burning motorhomes.

19.    DeMartini RV therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACT and Omnibus regulations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 27, 2025.

*[signature]*

Tim DeMartini

# Ex. D

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>Defendants. | No. 4:25-cv-04966-HSG<br><br>DECLARATION OF RODNEY WEINZIERL IN SUPPORT OF ILLINOIS CORN GROWERS ASSOCIATION'S MOTION TO INTERVENE |

I, Rodney Weinzierl, declare as follows:

1.      I make this declaration in support of Illinois Corn Growers Association's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.      I am the Executive Director of the Illinois Corn Growers Association, a nonprofit trade association based in Illinois with a membership of over 3,500 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

3.      I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

4.      Illinois is the nation's second leading corn producer, with a total production of

Declaration of R. Weinzierl in Support of Illinois Corn Growers Association's Motion to Intervene      Page 1

**3-ER-483**

more than 2 billion bushels of corn. A primary use of this corn is as a feedstock for ethanol production. Nationwide, about 40% of U.S. corn crops are used for ethanol and related products. Steven Ramsey, et al., *Global Demand for Fuel Ethanol Through 2030*, USDA Economic Research Service, https://perma.cc/N75B-PPNW (June 27, 2025).

5. The ethanol industry supports more than 300,000 jobs in 24 states. Ethanol contributes more than $53 billion to the national GDP and profitably processed approximately 5.5 billion bushels of corn in 2024.

6. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 131 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (June 24, 2025), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

7. California has adopted several emissions programs for motor vehicles that aim to reduce gasoline consumption (and the greenhouse gas emissions generated by combusting that gasoline) by mandating sales of electric vehicles.

8. California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035, which means all cars and light trucks sold must be electric, with some exceptions for plug-in electric hybrid vehicles. Cal. Code Regs. tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

Declaration of R. Weinzierl in Support of Illinois Corn Growers Association's Motion to Intervene    Page 2

**3-ER-484**

9. California's Advanced Clean Trucks ("ACT") program requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. Cal. Code Regs. tit 13, §§ 1963.1, 1963.2. Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

10. California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines. Cal. Code Regs. tit. 13, § 1956.8. I understand that the standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

11. Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, the U.S. Environmental Protection Agency ("EPA") granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able to enforce ACC II, ACT, and the Omnibus program, and the Association and its members will be harmed.

12. California's standards aim to increase the share of electric vehicles on the road,

Declaration of R. Weinzierl in Support of Illinois Corn Growers Association's Motion to Intervene     Page 3

**3-ER-485**

and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. *See* CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons* IX-34 ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state... ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

13.  California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol,* https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline.").

14.  This demand destruction harms members of the Illinois Corn Growers Association by decreasing demand for the corn they grow and the price they can obtain for their crops. Because ethanol is a primary market for U.S. corn crops, lower ethanol production leads to lower corn prices. Nicole Condon, et al., *Impacts of ethanol policy on corn prices: A review and meta-analysis of recent evidence,* 51 Food Policy 63, 71 (2015) ("increasing corn ethanol production" by one billion gallons "would increase corn prices by three to four percent" while decreasing by one billion gallons "would result in a three to four percent drop in corn prices, since scenarios examining ethanol increases and decrease have roughly symmetrical effects on corn prices").

15.  These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

//

//

Declaration of R. Weinzierl in Support of Illinois Corn Growers Association's Motion to Intervene   Page 4

**3-ER-486**

16.    The Illinois Corn Growers Association therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _July, 11_, 2025.

Rodney M. Weinzierl

# Ex. E

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,**

       Plaintiffs,

       v.

**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN**, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 4:25-cv-04966-HSG

**DECLARATION OF JOSH ROE IN SUPPORT OF KANSAS CORN GROWERS ASSOCIATION'S MOTION TO INTERVENE**

I, Josh Roe, declare as follows:

1.     I make this declaration in support of Kansas Corn Growers Association's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.     I am the Chief Executive Officer of the Kansas Corn Growers Association, a nonprofit trade association based in Kansas with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

3.     I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

4.     Kansas is one of the nation's leading corn producing states, with a total

production of nearly 750 million bushels of corn. A primary use of this corn is as a feedstock for ethanol production. Nationwide, about 40% of U.S. corn crops are used for ethanol and related products. Steven Ramsey, et al., *Global Demand for Fuel Ethanol Through 2030*, USDA Economic Research Service, https://perma.cc/N75B-PPNW (June 27, 2025).

5.    The ethanol industry supports more than 300,000 jobs in 24 states. Ethanol contributes more than $53 billion to the national GDP and profitably processed approximately 5.5 billion bushels of corn in 2024.

6.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 131 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (June 24, 2025), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

7.    California has adopted several emissions programs for motor vehicles that aim to reduce gasoline consumption (and the greenhouse gas emissions generated by combusting that gasoline) by mandating sales of electric vehicles.

8.    California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035, which means all cars and light trucks sold must be electric, with some exceptions for plug-in electric hybrid vehicles. Cal. Code Regs. tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

Declaration of Josh Roe in Support of Kansas Corn Growers Association's Motion to Intervene-Page 2

9. California's Advanced Clean Trucks ("ACT") program requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. Cal. Code Regs. tit 13, §§ 1963.1, 1963.2. Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

10. California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines. Cal. Code Regs. tit. 13, § 1956.8. I understand that the standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

11. Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, the U.S. Environmental Protection Agency ("EPA") granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able to enforce ACC II, ACT, and the Omnibus program, and the Association and its members will be harmed.

12. California's standards aim to increase the share of electric vehicles on the road,

and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. *See* CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons* IX-34 ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state... ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

13.   California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol,* https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline.").

14.   This demand destruction harms members of the Kansas Corn Growers Association by decreasing demand for the corn they grow and the price they can obtain for their crops. Because ethanol is a primary market for U.S. corn crops, lower ethanol production leads to lower corn prices. Nicole Condon, et al., *Impacts of ethanol policy on corn prices: A review and meta-analysis of recent evidence,* 51 Food Policy 63, 71 (2015) ("increasing corn ethanol production" by one billion gallons "would increase corn prices by three to four percent" while decreasing by one billion gallons "would result in a three to four percent drop in corn prices, since scenarios examining ethanol increases and decrease have roughly symmetrical effects on corn prices").

15.   These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

//

//

Declaration of Josh Roe in Support of Kansas Corn Growers Association's Motion to Intervene Page 4

16.    The Kansas Corn Growers Association therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____July 11_____, 2025.

_____
Josh Roe

# Ex. F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, STATE OF ) 
COLORADO, STATE OF DELAWARE, )
COMMONWEALTH OF )
MASSACHUSETTS, STATE OF NEW )
JERSEY, STATE OF NEW MEXICO, )    No. 4:25-cv-04966-HSG
STATE OF NEW YORK, STATE OF )
OREGON, STATE OF RHODE ISLAND, )
STATE OF VERMONT, and STATE OF )
WASHINGTON, )                     DECLARATION OF ADAM
        )                         ANDREWS IN SUPPORT OF
Plaintiffs, )                     KENTUCKY CORN GROWERS
        )                         ASSOCIATION'S MOTION TO
v. )                              INTERVENE
        )
UNITED STATES OF AMERICA, U.S. )
ENVIRONMENTAL PROTECTION )
AGENCY, LEE ZELDIN, in his official )
capacity as Administrator of the U.S. )
Environmental Protection Agency, and )
DONALD J. TRUMP, in his official )
capacity as President of the United States, )
        )
Defendants. )
_____ )

I, Adam Andrews, declare as follows:

1.    I make this declaration in support of Kentucky Corn Growers Association's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I am the Programs Director of the Kentucky Corn Growers Association, a nonprofit trade association based in Kentucky that represents the interests of more than 6,000 corn farmers throughout the Commonwealth. We operate to promote the general commercial, legislative, and other common interests of our members.

3.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

4.    Corn is one of Kentucky's highest grossing agricultural crops. Kentucky corn

Declaration of A. Andrews in Support of Kentucky Corn Growers Association's Motion to Intervene    Page 1

**3-ER-495**

farmers produced more than 227 million bushels of corn in 2024. A primary use of U.S-grown corn is as a feedstock for ethanol production. Nationwide, about 40% of U.S. corn crops are used for ethanol and related products. Steven Ramsey, et al., *Global Demand for Fuel Ethanol Through 2030*, USDA Economic Research Service, https://perma.cc/N75B-PPNW (June 27, 2025).

5. The ethanol industry supports more than 300,000 jobs in 24 states. Ethanol contributes more than $53 billion to the national GDP and profitably processed approximately 5.5 billion bushels of corn in 2024.

6. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 131 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (June 24, 2025), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

7. California has adopted several emissions programs for motor vehicles that aim to reduce gasoline consumption (and the greenhouse gas emissions generated by combusting that gasoline) by mandating sales of electric vehicles.

8. California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035, which means all cars and light trucks sold must be electric, with some exceptions for plug-in electric hybrid vehicles. Cal. Code Regs. tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle*

*Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

9.    California's Advanced Clean Trucks ("ACT") program requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. Cal. Code Regs. tit 13, §§ 1963.1, 1963.2. Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

10.    California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines. Cal. Code Regs. tit. 13, § 1956.8. I understand that the standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

11.    Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, the U.S. Environmental Protection Agency ("EPA") granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able to enforce ACC II, ACT, and the Omnibus program, and the Association and its members will be harmed.

Declaration of A. Andrews in Support of Kentucky Corn Growers Association's Motion to Intervene    Page 3

**3-ER-497**

12. California's standards aim to increase the share of electric vehicles on the road, and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. *See* CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons* IX-34 ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state... ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

13. California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol*, https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline.").

14. This demand destruction harms members of the Kentucky Corn Growers Association by decreasing demand for the corn they grow and the price they can obtain for their crops. Because ethanol is a primary market for U.S. corn crops, lower ethanol production leads to lower corn prices. Nicole Condon, et al., *Impacts of ethanol policy on corn prices: A review and meta-analysis of recent evidence*, 51 Food Policy 63, 71 (2015) ("increasing corn ethanol production" by one billion gallons "would increase corn prices by three to four percent" while decreasing by one billion gallons "would result in a three to four percent drop in corn prices, since scenarios examining ethanol increases and decrease have roughly symmetrical effects on corn prices").

15. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

//

Declaration of A. Andrews in Support of Kentucky Corn Growers Association's Motion to Intervene   Page 4

**3-ER-498**

16.    The Kentucky Corn Growers Association therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 11, 2025.

_____
Adam Andrews

# Ex. G

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,

       Plaintiffs,

       v.

UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,

       Defendants.

No. 4:25-cv-04966-HSG

DECLARATION OF BRADLEY SCHAD IN SUPPORT OF MISSOURI CORN GROWERS ASSOCIATION'S MOTION TO INTERVENE

I, Bradley Schad, declare as follows:

1.    I make this declaration in support of Missouri Corn Growers Association's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I am the Chief Executive Officer of the Missouri Corn Growers Association, a nonprofit trade association based in Missouri with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

3.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

4.    Missouri is one of the nation's leading corn producing states, with a total

production of more than 600 million bushels of corn. A primary use of this corn is as a feedstock for ethanol production. Nationwide, about 40% of U.S. corn crops are used for ethanol and related products. Steven Ramsey, et al., *Global Demand for Fuel Ethanol Through 2030*, USDA Economic Research Service, https://perma.cc/N75B-PPNW (June 27, 2025).

5. The ethanol industry supports more than 300,000 jobs in 24 states. Ethanol contributes more than $53 billion to the national GDP and profitably processed approximately 5.5 billion bushels of corn in 2024.

6. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 131 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (June 24, 2025), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

7. California has adopted several emissions programs for motor vehicles that aim to reduce gasoline consumption (and the greenhouse gas emissions generated by combusting that gasoline) by mandating sales of electric vehicles.

8. California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035, which means all cars and light trucks sold must be electric, with some exceptions for plug-in electric hybrid vehicles. Cal. Code Regs. tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

9. California's Advanced Clean Trucks ("ACT") program requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. Cal. Code Regs. tit 13, §§ 1963.1, 1963.2. Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

10. California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines. Cal. Code Regs. tit. 13, § 1956.8. I understand that the standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

11. Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, the U.S. Environmental Protection Agency ("EPA") granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal, they may be able to enforce ACC II, ACT, and the Omnibus program, and the Association and its members will be harmed.

12. California's standards aim to increase the share of electric vehicles on the road,

and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. *See* CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons* IX-34 ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state… ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

13. California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol*, https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline.").

14. This demand destruction harms members of the Missouri Corn Growers Association by decreasing demand for the corn they grow and the price they can obtain for their crops. Because ethanol is a primary market for U.S. corn crops, lower ethanol production leads to lower corn prices. Nicole Condon, et al., *Impacts of ethanol policy on corn prices: A review and meta-analysis of recent evidence*, 51 Food Policy 63, 71 (2015) ("increasing corn ethanol production" by one billion gallons "would increase corn prices by three to four percent" while decreasing by one billion gallons "would result in a three to four percent drop in corn prices, since scenarios examining ethanol increases and decrease have roughly symmetrical effects on corn prices").

15. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

//

//

Declaration of B. Schad in Support of Missouri Corn Growers Association's Motion to Intervene    Page 4

**3-ER-504**

16.    The Missouri Corn Growers Association therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __7/9__, 2025.

_Bradley Schad_
Bradley Schad

# Ex. H

3-ER-506

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | No. 4:25-cv-04966-HSG<br><br>**DECLARATION OF LANE HOWARD IN SUPPORT OF NATIONAL CORN GROWERS ASSOCIATION'S MOTION TO INTERVENE** |

I, Lane Howard, declare as follows:

1.    I make this declaration in support of National Corn Growers Association's Motion to Intervene, to which this declaration is attached. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I am the Biofuels Director of the National Corn Growers Association, a nonprofit trade association headquartered in Missouri that represents the interests of more than 36,000 dues-paying corn farmers in 48 states and the interests of more than 300,000 farmers in their states. We operate to promote the general commercial, legislative, and other common interests of corn farmers across the nation.

3.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members and

**3-ER-507**

contributors.

4.      Corn farming is one of the largest sectors in American agriculture. In 2024, corn farmers in the United States grew 14.9 billion bushels of corn for grain valued at $64.7 billion. A primary use of U.S-grown corn is as a feedstock for ethanol production. Nationwide, about 40% of U.S. corn crops are used for ethanol and related products. Steven Ramsey, et al., *Global Demand for Fuel Ethanol Through 2030*, USDA Economic Research Service, https://perma.cc/N75B-PPNW (June 27, 2025).

5.      The ethanol industry supports more than 300,000 jobs in 24 states. Ethanol contributes more than $53 billion to the national GDP and profitably processed approximately 5.5 billion bushels of corn in 2024.

6.      Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—a measure of a fuel's resistance to "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2022, alone, the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 131 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (June 24, 2025), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

7.      California has adopted several emissions programs for motor vehicles that aim to reduce gasoline consumption (and the greenhouse gas emissions generated by combusting that gasoline) by mandating sales of electric vehicles.

8.      California's Advanced Clean Cars II ("ACC II") program requires manufacturers to sell an annually increasing percentage share of electric cars and light trucks (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet in model year 2026 and increase to 100% by model year 2035, which means all cars and light trucks sold must be electric, with some exceptions for plug-in electric hybrid vehicles. Cal. Code Regs.

tit. 13, § 1962.4. Eleven other states have adopted California's ACC II standards. *See* California Air Resources Board ("CARB"), *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

9. California's Advanced Clean Trucks ("ACT") program requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing percentage share of internal-combustion vehicles) starting in model year 2024. Sales of internal-combustion engine vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually, and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. Cal. Code Regs. tit 13, §§ 1963.1, 1963.2. Ten other states have adopted California's ACT standards. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

10. California's Heavy-Duty Engine and Vehicle Omnibus ("Omnibus") program, among other things, sets stringent nitrogen-oxide emissions standards for model year 2024 and later medium- and heavy-duty vehicles and engines. Cal. Code Regs. tit. 13, § 1956.8. I understand that the standards are so low that, in practice, manufacturers must sell some electric vehicles and engines to comply. Nine other states have adopted California's Omnibus regulations. *See* CARB, *States That Have Adopted California's Vehicle Regulations*, https://perma.cc/AG5L-GZFN (June 26, 2025).

11. Generally, state regulations related to new vehicle emissions are prohibited by the federal Clean Air Act. 42 U.S.C. § 7543(a). However, the U.S. Environmental Protection Agency ("EPA") granted California waivers of Clean Air Act preemption, which would have allowed California and other states to enforce the programs. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025); *see* 42 U.S.C. §§ 7507, 7543(b). On June 12, 2025, President Trump signed resolutions of disapproval that repeal those waivers. If California and other states succeed in their lawsuit challenging that repeal,

**3-ER-509**

they may be able to enforce ACC II, ACT, and the Omnibus program, and the Association and its members will be harmed.

12. California's standards aim to increase the share of electric vehicles on the road, and so decrease the share of gasoline-powered vehicles. Basic economic principles and common-sense dictate that the standards will therefore decrease demand for automobile gasoline. Indeed, California acknowledges its standards will reduce gasoline demand. *See* CARB, *ACC II Initial Statement of Reasons* 169 (discussing the "decrease in gasoline sales" from ACC II), https://perma.cc/S8C5-HL4Y (June 27, 2025); CARB, *ACT Initial Statement of Reasons* IX-34 ("Displacing gasoline and diesel with electricity and hydrogen [as required by ACT] will decrease the total amount of gasoline and diesel dispensed in the state… ."), https://perma.cc/M6ZJ-UPNF (June 27, 2025); *id.* at IX-40 (ACT is predicted to cause "a relatively large decrease in demand for gasoline and diesel").

13. California's standards will therefore also drive down demand for ethanol, since U.S. production of fuel ethanol tracks demand for automobile fuels. *See* U.S. Energy Information Administration, *Biofuels explained: Ethanol*, https://perma.cc/5L4C-GWG4 (June 27, 2025). ("Fuel ethanol production fell in 2020, mainly because lower overall gasoline demand reduced the demand for ethanol blending into motor gasoline.").

14. This demand destruction harms corn farmer members of the National Corn Growers Association by decreasing demand for the corn they grow and the price they can obtain for their crops. Because ethanol is a primary market for U.S. corn crops, lower ethanol production leads to lower corn prices. Nicole Condon, et al., *Impacts of ethanol policy on corn prices: A review and meta-analysis of recent evidence*, 51 Food Policy 63, 71 (2015) ("increasing corn ethanol production" by one billion gallons "would increase corn prices by three to four percent" while decreasing by one billion gallons "would result in a three to four percent drop in corn prices, since scenarios examining ethanol increases and decrease have roughly symmetrical effects on corn prices").

15. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its

members.

16.     The National Corn Growers Association therefore has an interest in ensuring that the resolutions repealing the waivers are given full legal effect so that California and other states are prohibited from enforcing the ACC II, ACT, and Omnibus standards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on   July 16, 2025.                     _____
                                                 Lane Howard

3-ER-511

# Ex. I

Michael Buschbacher*
James R. Conde*
James R. Wedeking*
Laura B. Ruppalt*
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
*Pro hac vice applications forthcoming

Eric Grant (Bar No. 151064)
John B. Thomas (Bar No. 269538)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 447-4900
grant@hicks-thomas.com

Counsel for Proposed Intervenor-Defendants
(complete list on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **INTERVENOR-DEFENDANTS' MOTION TO DISMISS [Fed. R. Civ. P. 12(b)(1), (6)]** <br><br><br><br><br><br><br><br><br><br><br><br><br><br> Date: _____ \_\_, 2025 <br> Time: 2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

NOTICE OF MOTION.....................................................................................................1

MOTION TO DISMISS.....................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

STATEMENT OF ISSUES ..............................................................................................2

BACKGROUND ..............................................................................................................2

I.      The Clean Air Act Broadly Preempts State Regulation of Motor
        Vehicle Emissions..............................................................................................2

II.     EPA Issues Waivers of Clean Air Act Preemption For Three
        California Programs ...........................................................................................3

III.    Congress Repeals the EPA Waivers of Clean Air Act Preemption.....................4

IV.     Procedural History ...........................................................................................10

ARGUMENT ..................................................................................................................10

I.      The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims.......................11

        A.      The Congressional Review Act Prohibits Judicial Review.....................11

        B.      Plaintiffs Lack Standing for their Statutory Claims ..............................12

        C.      This Court Lacks Jurisdiction Under the APA ......................................14

II.     This Court Lacks Jurisdiction Over Plaintiffs' Constitutional Claims .............16

        A.      This Court May Not Review Challenges to House and Senate
                Procedures .........................................................................................16

        B.      This Court May Not Review Plaintiffs' Claims Against the
                President..............................................................................................18

III.    Plaintiffs Fail to State Constitutional Claims .................................................19

        A.      Plaintiffs Fail to State an Article II Claim............................................19

        B.      Plaintiffs Fail to State a Separations-of-Powers Claim .........................21

        C.      Plaintiffs Fail to State Tenth Amendment or Federalism Claim ...........24

        D.      Plaintiffs Lack a Cause of Action for Their Constitutional Claims.......25

IV.     The Complaint Should Be Dismissed *With* Prejudice....................................25

CONCLUSION ...............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ................................................................................... 25

*Baker v. Carr*,
    369 U.S. 186 (1962) ........................................................................ 17, 18, 19

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................... 15

*California v. Texas*,
    593 U.S. 659 (2021) ................................................................................... 14

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
    529 F. Supp. 2d 1151 (E.D. Cal. 2007) ...................................................... 21

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
    598 F.3d 1115 (9th Cir. 2010) .................................................................... 10

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
    482 F.3d 1157 (9th 2007) ....................................................................... 16, 18

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) ...................................................................... 17

*County of San Diego v. Nielsen*,
    465 F. Supp. 3d 1073 (S.D. Cal. 2020) ...................................................... 15

*Ctr. for Biological Diversity v. Bernhardt*,
    946 F.3d 553 (9th Cir. 2019) ...................................... 2, 5, 11, 12, 17, 23, 24

*Dalton v. Specter*,
    511 U.S. 462 (1994) .............................................................................. 15, 19

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d. 992 (9th Cir. 2010) ...................................................................... 8

*DeVillier v. Texas*,
    601 U.S. 285 (2024) ................................................................................... 25

*Diamond Alt. Energy, LLC v. EPA*,
    145 S. Ct. 2121 (2025) ............................................................................. 1, 5

*Dorsey v. United States*,
    567 U.S. 260 (2012) ................................................................................... 25

*Foster v. USDA*,
    68 F.4th 372 (8th Cir. 2023) ...................................................................... 11

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .......................................................................................................15, 25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ...............................................................................................................18

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) ......................................................................................21

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018) ..............................................................................................14

*Idaho Watersheds Project v. Hahn*,
  307 F.3d 815 (9th Cir. 2002) ................................................................................................15

*INS v. Chadha*,
  462 U.S. 919 (1983) ...............................................................................................................14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ...............................................................................................................17

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
  971 F.3d 1222 (10th Cir. 2020) ...........................................................................................11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ...............................................................................................................10

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ................................................................................................10

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ..............................................................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................................14

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ..............................................................................................10

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) .................................................................................................................18

*Mistretta v. United States*,
  488 U.S. 361 (1989) ...............................................................................................................22

*Montanans for Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) .............................................................................................11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*,
  627 F.2d 1095 (D.C. Cir. 1979) .............................................................................................3

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..................................................................................................... 10, 13, 14

*Newsom v. Trump*,
  2025 WL 1712930 (9th Cir. June 19, 2025) ............................................................. 16

*NRC v. Texas*,
  145 S. Ct. 1762 (2025) ............................................................................................ 16

*Patchak v. Zinke*,
  583 U.S. 244 (2018) ................................................................................................ 23

*Polich v. Burlington Northern, Inc.*,
  942 F.2d 1467 (9th Cir. 1991) ................................................................................ 25

*Robertson v. Seattle Audubon Soc'y*,
  503 U.S. 429 (1992) ................................................................................................ 23

*Smith v. Los Angeles Unified Sch. Dist.*,
  830 F.3d 843 (9th Cir. 2016) .................................................................................... 8

*Steel Co. v. Citizens for Better Env't*,
  523 U.S. 83 (1998) .................................................................................................. 14

*Trump v. CASA, Inc.*,
  2025 WL 1773631 (U.S. June 27, 2025) ................................................................ 18

*Trump v. United States*,
  603 U.S. 593 (2024) ................................................................................................ 19

*United States v. Ballin*,
  144 U.S. 1 (1892) ............................................................................... 14, 16, 17, 23

*United States v. Fla. E. Coast Ry. Co.*,
  410 U.S. 224 (1973) ................................................................................................ 12

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................................................... 14, 18, 19

*Utah v. Strieff*,
  579 U.S. 232 (2016) ................................................................................................ 14

*Wash. All. of Tech. Workers v. United States*,
  892 F.3d 332 (D.C. Cir. 2018) ................................................................................ 11

*Yesler Terrace Cmty. Council v. Cisneros*,
  37 F.3d 442 (9th Cir. 1994) .............................................................................. 20, 21

## Constitution

U.S. Const. art. I, § 1 ..................................................................................... 13

U.S. Const. art. I, § 5, cl. 2 ..................................................................... 2, 17, 24

U.S. Const. art. I, § 7, cl. 2–3 ................................................................... 13, 19

U.S. Const. art. II, § 3 ................................................................................. 18

## Statutes

5 U.S.C. § 551(4) ........................................................................................ 6

5 U.S.C. § 551(6) ........................................................................................ 6

5 U.S.C. § 551(8) ........................................................................................ 6

5 U.S.C. § 701(a)(1) ..................................................................................... 15

5 U.S.C. § 704 .......................................................................................... 14

5 U.S.C. §§ 801–808 .................................................................................... 5

5 U.S.C. § 801 .......................................................................................... 19

5 U.S.C. § 801(a)(1)(A) ............................................................................. 6, 12

5 U.S.C. § 801(a)(1)(A)(ii) ............................................................................ 12

5 U.S.C. § 801(a)(3)(B) ................................................................................ 12

5 U.S.C. § 801(b) ........................................................................................ 5

5 U.S.C. § 801(b)(1) .................................................................................... 12

5 U.S.C. § 802 .......................................................................................... 12

5 U.S.C. § 802(a) ........................................................................................ 6

5 U.S.C. § 802(d) ........................................................................................ 5

5 U.S.C. § 804(3) ................................................................................. 6, 12, 19

5 U.S.C. § 805 ................................................................................ 2, 11, 12, 23

42 U.S.C. § 7507 ..................................................................................... 3, 21

42 U.S.C. § 7507(2) .................................................................................... 20

42 U.S.C. § 7521(a) .................................................................................. 3, 25

42 U.S.C. § 7521(a)(2) ............................................................................ 20, 21

3-ER-518

42 U.S.C. § 7543(a) ................................................................................................... 3, 4, 13, 25

42 U.S.C. § 7543(b) ........................................................................................................ 3, 25

42 U.S.C. § 7543(b)(1)(C) .............................................................................................. 20, 21

42 U.S.C. § 7543(b)(3) ........................................................................................................ 21

Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996) ................................................ 5

Pub. L. No. 119-15, 139 Stat. 65 (2025) ............................................................................ 8

Pub. L. No. 119-16, 139 Stat. 66 (2025) ............................................................................ 8

Pub. L. No. 119-17, 139 Stat. 67 (2025) ............................................................................ 8

## Congressional Sources

170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) ................................................................. 7

171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) ................................................................. 7

171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) ................................................................. 7

171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) ................................................................ 7

171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) ............................................................... 7

S. Doc. No. 118-6 (Sept. 26, 2023) ................................................................................... 13

*Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1,
    2025), https://perma.cc/46A6-JNK3 ............................................................................ 8

*Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025),
    https://perma.cc/B4X7-YA4U ..................................................................................... 8

## Regulations

88 Fed. Reg. 20,688 (Apr. 6, 2023) ............................................................................... 4, 21

90 Fed. Reg. 642 (Jan. 6, 2025) ........................................................................................ 4

90 Fed. Reg. 643 (Jan. 6, 2025) ........................................................................................ 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(C) ....................................................................... 4

Cal. Code. Regs. tit. 13, § 1956.8(a)(2)(D) ....................................................................... 4

Cal. Code Regs. tit. 13, § 1962.4 ...................................................................................... 3

Cal. Code Regs. tit. 13, § 1963.1 ...................................................................................... 4

Cal. Code Regs. tit. 13, § 1963.2 ..................................................................................4

Cal. Code Regs. tit. 13, § 1963.6(a) .............................................................................4

Cal. Code Regs. tit. 13, § 2016 ....................................................................................4


**Court Rules**

Fed. R. Civ. P. Rule 12(b)(1)............................................................................... 1, 10, 11

Fed. R. Civ. P. Rule 12(b)(6) ..................................................................1, 10, 11, 15, 19

Fed. R. Evid. 201(b) ...................................................................................................8

Fed. R. Evid. 902(1) ...................................................................................................8

N. Dist. Cal. Civil Local R. 7-2 ...................................................................................1


**Other Authorities**

Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014) ............................................6

All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* (Dec. 11, 2024), https://perma.cc/97Y3-Q869 ...........................5

CARB, *Omnibus Program Initial Statement of Reasons* (June 23, 2020), https://perma.cc/32CP-SSV8......................................................................................4

CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN..................................................................4

GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* (May 29, 2014) ............................................................................................. 7, 23

GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018) ..............................................7

George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/ 2F4U-F5PN ............................................................................................................ 13

Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C....................................................................................3

Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW......................................................................5

Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* (updated Nov. 12, 2021) ......................................................................................................................6

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on _____ ___, 2025 at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (4th Floor) of the above-named Court (Hon. Haywood S. Gilliam, Jr. presiding), located at 1301 Clay Street, Oakland, California 94612, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association ("Intervenor-Defendants") will, and hereby do, move to dismiss Plaintiffs' complaint in its entirety and with prejudice, as described below.

## MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Civil Local Rule 7-2, Intervenor-Defendants respectfully move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. This Motion is supported by the following Memorandum of Points and Authorities, the attached document that is properly the subject of judicial notice, and any argument that may be presented to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Congress passed a legislative repeal of waivers of Clean Air Act preemption issued by the Environmental Protection Agency ("EPA") for three California programs designed to ban or limit the sale of new internal-combustion vehicles. The President signed those repeals into law. As the Supreme Court recently noted, this "legislation … block[s] [these] California regulations." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2131 n.1 (2025). California and the ten states that joined this complaint ("Plaintiffs") do not like this legislation. Having failed to persuade Congress, they ask this Court to repeal those laws by judicial decree.

To call this a reach is an understatement. Plaintiffs' complaint alleges a wide variety of legal theories, but at bottom Plaintiffs appear to argue that this legislation is void because the Senate allowed the votes to proceed with the approval of a simple majority of Senators, rather than the

**3-ER-521**

three-fifths that Senate filibuster rules sometimes require. But the filibuster is not part of the Constitution, there is no private right to enforce it, and there is nothing more exclusively within the Legislative Branch's authority than "determin[ing] the Rules of its Proceedings." U.S. Const. art. 1, § 5, cl. 2. Allowing courts to second guess those determinations would make federal judges arbiters of those parliamentary procedures—a separation-of-powers nightmare. This is why the Congressional Review Act ("CRA")—the law that codifies the procedures Congress followed here—provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. As the Ninth Circuit has held, this forecloses judicial review of statutory challenges like those Plaintiffs mount here. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 560–64 (9th Cir. 2019). This Court also lacks jurisdiction over Plaintiffs' claims for multiple other reasons: Plaintiffs lack standing to challenge EPA's actions, review is unavailable under the APA, and this Court lacks authority to review the political questions raised by Plaintiffs' constitutional claims. And, in any event, Plaintiffs' constitutional challenges fail to state a cognizable claim or even a viable cause of action. This Court should dismiss.

## STATEMENT OF ISSUES

1.  Whether the Congressional Review Act bars judicial review of Plaintiffs' claims.

2.  Whether Plaintiffs lack standing for their statutory claims because their alleged injuries result from Acts of Congress, not from EPA's actions, and relief directed towards those actions would not repeal or otherwise render invalid the Acts of Congress at issue.

3.  Whether this Court lacks jurisdiction under the APA because the challenged EPA actions are not "final agency action."

4.  Whether Plaintiffs' challenges to congressional procedures raise a non-justiciable political question.

5.  Whether Plaintiffs' claims against the President raise a non-justiciable political question.

6.  Whether Plaintiffs' constitutional claims fail to state a legally cognizable claim.

## BACKGROUND

### I.   The Clean Air Act Broadly Preempts State Regulation of Motor Vehicle Emissions

Section 202(a) of the Clean Air Act authorizes EPA to comprehensively regulate emissions

**3-ER-522**

from the Nation's new motor vehicles. 42 U.S.C. § 7521(a). The Clean Air Act also broadly preempts state law regulating new motor vehicle emissions. Section 209(a) provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." *Id.* § 7543(a). Preemption prevents "an anarchic patchwork of federal and state regulatory programs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

The Clean Air Act allows for one limited exception from federal preemption. Section 209(b) provides that EPA "shall … waive application of [preemption] to" California—and only to California—if certain statutory criteria are met. 42 U.S.C. § 7543(b). Once California has a waiver, other states may follow. Under Section 177, "[n]otwithstanding" Section 209(a), other states "may adopt and enforce" emissions standards for new motor vehicles that are "identical to the California standards for which a waiver has been granted," provided that "California and such State adopt such standards at least two years before commencement of [the applicable] model year." *Id.* § 7507.

## II. EPA Issues Waivers of Clean Air Act Preemption For Three California Programs

In 2020, in a misguided effort to address "the climate change crisis," California decided to ban new internal-combustion vehicles and to require "zero-emission" vehicles (i.e., battery-electric or fuel-cell-electric vehicles). *See* Office of Gov. Gavin Newsom, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/VK64-G93C. California adopted several regulatory programs under this policy, three of which are relevant to this suit.

*First,* **Advanced Clean Cars II ("ACC II")** requires light-duty automakers to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2026. The required electric vehicle sales start at 35% of the fleet; by model year 2035, all cars and light trucks sold must be electric. Up to 20% of the required sales may be plug-in hybrid electric vehicles. *See* Cal. Code Regs. tit. 13, § 1962.4.

*Second,* **Advanced Clean Trucks ("ACT")** requires manufacturers of medium- and heavy-duty trucks to sell an annually increasing percentage share of electric vehicles (and so an annually decreasing share of internal-combustion vehicles) starting in model year 2024. Sales of internal-

**3-ER-523**

combustion vehicles must be offset with "credits" generated by sales of electric trucks. The required offset increases annually and varies by vehicle class. By 2035, ACT requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semis) with sales of electric trucks. *See id.* §§ 1963.1, 1963.2.[1]

*Third*, the **Omnibus Low NO$_x$ ("Omnibus") Program**, among other things, sets emissions standards for nitrogen oxides ("NO$_x$") for model year 2024 and later medium- and heavy-duty vehicles and engines so low that, in practice, manufacturers are incentivized to sell some electric vehicles and engines to comply. *See id.* § 1956.8(a)(2)(C), (D).[2]

As California recognized, these programs "relat[e] to the control of emissions from new motor vehicles" and are preempted by Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Thus, California submitted waiver requests. The Biden EPA issued a waiver for ACT in April 2023, 88 Fed. Reg. 20,688 (Apr. 6, 2023),[3] and waivers for ACC II and the Omnibus Program in January 2025, just weeks before President Biden left office. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). Eleven other states and the District of Columbia have adopted one or more of the programs.[4]

## III. Congress Repeals the EPA Waivers of Clean Air Act Preemption

Many members of Congress were dismayed by EPA's midnight waivers, which greenlighted a ban on sales of new internal-combustion engine cars and light trucks in about 30% of the U.S.

---

[1] In 2025, California amended ACT to ban sales of medium- and heavy-duty internal-combustion vehicles starting in model year 2036. Cal. Code Regs. tit. 13, §§ 1963.6(a), 2016. That amendment has not been considered by EPA, and so it remains preempted by Section 209 of the Clean Air Act, 42 U.S.C. § 7543(a).

[2] *See* CARB, *Omnibus Program Initial Statement of Reasons*, at I-36 (June 23, 2020), https://perma.cc/32CP-SSV8 (aspects of the Program are "intended to provide incentives for manufacturers to make more heavy-duty [zero-emission vehicles]").

[3] The April 2023 waiver also waived preemption for three other California programs: the Zero-Emission Airport Shuttle, Zero-Emission Power Train Certification, and Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance programs. 88 Fed. Reg. at 20,688.

[4] *See* CARB, *States That Have Adopted California's Vehicle Regulations* (last updated Apr. 2025), https://perma.cc/AG5L-GZFN.

market by 2035.[5] That ban could be catastrophic for the U.S. economy. Electric vehicles are far more expensive to manufacture (and so to purchase) than internal-combustion vehicles; their range is far shorter; and most of the country lacks sufficient infrastructure to charge them. Automakers warned that it would "take a miracle" for manufacturers to meet ACC II's standards, and that the program "will depress economic activity, increase costs and limit vehicle choice."[6] California's truck regulations could be even more devastating. The limited range and payload of electric trucks would increase the cost of transporting everyday goods and raise prices, while the limited availability of compliant heavy-duty engine technology was already threatening supply disruptions.[7] Rather than await a recission by the Trump EPA, which would invariably be challenged in court and could be reversed by a future EPA, Congress opted for legislation to fully and finally settle the undeniable "major question" of whether EPA can mandate electrification.

Specifically, Congress used the Congressional Review Act. Enacted in 1996, the CRA provides a set of expedited legislative procedures by which Congress may review, and ultimately disapprove, rules issued by federal agencies. Pub. L. No. 104-121, § 251, 110 Stat. 847, 868–74 (1996), *codified at* 5 U.S.C. §§ 801–808. If Congress passes, and the President signs, a "joint resolution" of disapproval, then the rule "shall not take effect (or continue)," and the rule "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after the date of the joint resolution." 5 U.S.C. § 801(b). The joint resolution is federal law, enacted in accordance with the constitutional requirements of bicameralism and presentment. *Ctr. for Biological Diversity*, 946 F.3d at 562 & n.6 (citing U.S. Const. art. I, §§ 1, 7 (bicameralism); *id.* art. I, § 7, cl. 2 (presentment)); *accord Diamond Alt. Energy*, 145 S. Ct. at 2131 n.1. One feature of the CRA is that joint resolutions are put on a legislative fast track that is exempt from the Senate's ordinary filibuster rule and that limits the motions that Senators may raise. 5 U.S.C. § 802(d). Although

[5]All. for Auto. Innovation, *It's Gonna Take a Miracle: California and States With EV Sales Requirements* 2 (Dec. 11, 2024), https://perma.cc/97Y3-Q869.

[6] *Id.* at 3, 8.

[7] *See* Letter from Am. Trucking Ass'ns to House and Senate Republican Leaders (Apr. 1, 2025), https://perma.cc/6KRW-9TZW.

3-ER-525

Congress chose to codify an exception to the filibuster in the CRA, no law—let alone the Constitution—*compels* the Senate follow a filibuster rule for *any* legislation, whether or not the CRA applies. *See generally* Akhil Reed Amar, *Lex Majoris Partis: How the Senate Can End the Filibuster on Any Day by Simple Majority Rule*, 63 Duke L.J. 1483 (2014).

CRA procedures are typically triggered by an agency's transmission of a rule to Congress. The CRA requires federal agencies to "submit to each House of the Congress and to the Comptroller General" each rule it promulgates, along with a report that includes "a concise general statement relating to the rule." 5 U.S.C. § 801(a)(1)(A). Once the rule is received, Congress generally has 60 days to introduce a joint resolution. *Id.* § 802(a).

But federal agencies need not submit every agency action because not every agency action is a "rule." The CRA defines that term by reference to the Administrative Procedure Act ("APA"), *id.* § 804(3), which, in turn, defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," *id.* § 551(4). A "rule" is distinguished from an "order," which the APA separately defines as the "final disposition … of an agency in a matter other than rule making but including licensing," *id.* § 551(6), where a "license" is defined as "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission," *id.* § 551(8). Finally, the CRA restricts its application to exclude "any rule of particular applicability," like ratemaking proceedings, and rules related to internal agency organization or management. *Id.* § 804(3).

Sometimes, an agency fails to submit a rule to Congress. In those circumstances, Congress has established an informal, ad-hoc process by which any member of Congress may ask the Government Accountability Office ("GAO") for an opinion on whether the agency action is a "rule" under the CRA. If GAO concludes the action is a "rule," Congress has by parliamentary convention typically deferred to that determination and treated publication of GAO's opinion in the *Congressional Record* as constructive submission that starts the CRA's 60-day clock.[8] GAO's

---

[8] *See* Maeve P. Carey & Christopher M. Davis, Cong. Rsch. Serv., R43992, *The Congressional Review Act (CRA): Frequently Asked Questions* 12–13 (updated Nov. 12, 2021).

informal role, however, is entirely by convention. The CRA gives GAO no authority to determine whether an agency action is a "rule," and GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to *Congress* to decide whether CRA would apply." GAO, B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (May 29, 2014) (emphasis added) ("GAO Letter B-32552").

Moreover, the ad-hoc practice of consulting GAO applies *only when an agency has not submitted a rule* to Congress. GAO has explained that when an agency submits a rule—even if the agency "believes [the action] is exempt from the CRA" and submits it merely "out of an abundance of caution"—GAO will "take no position on whether the [submitted action] is a rule" because "an opinion by GAO would not further the purposes of [the] CRA by protecting Congress's CRA review and oversight authorities." GAO, B-330376, *Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38*, at 3 (Nov. 30, 2018). In GAO's words, an agency's submission "obviates the need for a GAO opinion." *Id.* Agencies under presidents of both parties, including President Biden, have thus submitted dozens of actions to Congress "out of an abundance of caution." *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696).

Initially, EPA did not submit the ACT, ACC II, and Omnibus Program waivers to Congress. Under President Trump, EPA reversed course and transmitted the waivers to Congress after EPA concluded that the waivers were rules subject to the CRA.[9]

Several Senators nonetheless sought an opinion from GAO on whether the submitted waivers were "rules" under the CRA. Complaint, Ex. B (ECF No. 1-2) at 1 n.2. Breaking with past practice, GAO provided a substantive response in just a few days. GAO acknowledged the circumstances were "not one in which [it] normally issue[s] a legal decision." *Id.* at 1. But GAO went on to offer "[o]bservations" "to assist Congress as it considers how to treat these Notices of Decision and the application of CRA procedures." *Id.* at 1, 9. Invoking its prior analysis of a different EPA action

---

[9] *See* 171 Cong. Rec. S1311 (daily ed. Feb. 24, 2025) (EC-439, EC-440, EC-441); 171 Cong. Rec. H875 (daily ed. Feb. 26, 2025) (EC-484, EC-485, EC-486); 171 Cong. Rec. H1035 (daily ed. Mar. 6, 2025) (EC-518, EC-519, EC-520); 171 Cong. Rec. S1871 (daily ed. Mar. 26, 2025) (EC-660, EC-661, EC-662).

(the withdrawal of a waiver rescission), GAO concluded that the waivers were "not … rule[s] for purposes of [the] CRA because [they are] order[s] under [the] APA." *Id.* at 9.

Congress considered these arguments and ultimately disagreed with GAO's analysis and rejected its unprecedented attempt to insert itself into the process. In early April 2025, resolutions of disapproval for all three waivers were introduced in the House (the "Resolutions"). By May 1, the House had passed all three Resolutions with bipartisan majorities, including 35 Democratic House members who voted to repeal ACC II, *Roll Call 114 | Bill Number: H.J. Res. 88*, U.S. House of Representatives (May 1, 2025), https://perma.cc/46A6-JNK3. Following CRA procedures, the Senate moved to consider the three Resolutions by majority—not supermajority—vote. On May 22, the Senate voted to adopt all three. The Senate's disapproval of the ACC II waiver was also bipartisan, with Democrat Senator Elissa Slotkin from Michigan voting with Senate Republicans. *Roll Call Vote Summary on H.J. Res. 88*, U.S. Senate (May 22, 2025), https://perma.cc/B4X7-YA4U. On June 12, President Trump signed the Resolutions into law. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

Congress had good reason to agree with EPA's determination that the waivers are "rules" under the CRA, and to doubt GAO's "observations." Although not required to provide an explanation, the Executive Branch set forth its concerns with GAO's analysis in a June 18, 2025, letter from the Director of the Office of Management and Budget ("OMB") to GAO Comptroller General. *See* Ex. 1 (reproducing letter).[10] OMB is home to the Office of Information and Regulatory Affairs ("OIRA"), which is the "Executive Branch's central authority for reviewing federal

---

[10] The existence and contents of this letter are properly subject to judicial notice under Federal Rule of Evidence 201(b)(2) as facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The letter is an official government document publicly available through a government website. *See* https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf (last visited July 9, 2025). And the letter is self-authenticating under Rule 902(1), because it is on official OMB letterhead, bears OMB's seal, and contains OMB Director Russell Vought's signature. Courts "routinely take judicial notice of letters published by the government," like this one. *Smith v. Los Angeles Unified Sch. Dist.,* 830 F.3d 843, 851 n.10 (9th Cir. 2016); *see also Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998–99 (9th Cir. 2010) ("It is appropriate to take judicial notice of … information … made publicly available by government entities" where the authenticity of the information is not subject to reasonable dispute.).

regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a 'major rule' within the meaning of the [CRA]," which includes "pars[ing] whether an action is a 'rule' at all." *Id.* at 1–2.

OMB explained that GAO failed to consider relevant case law, including a decision from the Ninth Circuit holding that an analogous "sub-delegation of regulatory authority to a State … is characteristic of a 'rule,' not an 'order,'" *id.* at 4–5 (citing *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994)), and two federal district court decisions that had examined the Clean Air Act's waiver provisions and whose logic confirmed "that California waiver decisions are better classed as rules rather than as orders," *id.* at 4 (citing *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007), and *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007)). GAO also "overlook[ed] the most significant part of the entire statutory scheme": Section 177 of the Clean Air Act, which "allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing" and which makes waivers "nationally applicable," not "particular to California." *Id.* at 5 (cleaned up).

OMB also criticized GAO for failing to consider that a waiver "directly governs the conduct of motor-vehicle manufacturers *nationwide*," because "certification and conformance to California's alternative standards … creates a unique alternative nationwide compliance pathway … that displaces EPA's otherwise applicable federal standards." *Id.* (citing 42 U.S.C. § 7543(b)(3)). Therefore, like a rule, a waiver "creat[es] a new interstate regulator that can replace federal standards … across numerous States." *Id.* at 5–6. OMB also found puzzling GAO's conclusion that the waiver has "'immediate effect,'" because the Clean Air Act requires that waived California standards "give motor vehicle manufacturers [years of] 'lead time'" and "at least 'two years' of lead time for other States adopting" California's standards. *Id.* at 6.

Finally, OMB disagreed with GAO's assertion that a waiver merely "involve[s] considerations 'of particular facts, as opposed to general policy.'" *Id.* OMB observed that in issuing a waiver, EPA "considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place," including whether California's

**3-ER-529**

programs "give the industry sufficient lead time to transition to 100% electric vehicles," whether "the industry's compliance costs with that lead time [are] 'appropriate,'" and whether "the standards [are] 'technologically feasible.'" *Id.*

Although OMB agreed with EPA that the waivers are "rules" subject to the CRA, it recognized that the ultimate decision fell elsewhere: "Congress … is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes. … *That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic.*" *Id.* at 7.

## IV. Procedural History

Within hours of the President's signing the Resolutions, Plaintiffs filed this suit. Complaint, ECF No. 1 (June 12, 2025). Plaintiffs allege statutory and constitutional violations by EPA and its Administrator, non-party Congress, and the President. Plaintiffs ask this Court, among other things, to vacate EPA's actions, invalidate the Resolutions, and reinstate the waivers. *Id.* at 39–40. Just over seven weeks later, Intervenor-Defendants moved to intervene.

## ARGUMENT

A court must dismiss a claim under Rule 12(b)(1) when it lacks jurisdiction over the subject matter of a claim. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts … possess only that power authorized by Constitution and statute."). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence," *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010), including standing, which "plaintiffs must demonstrate … for each claim that they press … and for each form of relief that they seek," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). A court must dismiss a claim under Rule 12(b)(6) "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). At the motion-to-dismiss stage, "factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (cleaned up) (Rule 12(b)(6)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (Rule 12(b)(1) facial challenge). "Conclusory allegations of law," however, "are insufficient to defeat a motion to dismiss." *Lee*, 250 F.3d at 679. Plaintiffs' complaint should be dismissed under

**3-ER-530**

Rules 12(b)(1) and 12(b)(6).

## I. The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claims

### A. The Congressional Review Act Prohibits Judicial Review

Congress has expressly withheld subject matter jurisdiction over Plaintiffs' claims in this suit. Section 805 of the CRA is expansive: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. "On its face, this language bars judicial review of *all* challenges to actions under the CRA, including constitutional challenges." *Ctr. for Biological Diversity*, 946 F.3d at 561 (emphasis added). Plaintiffs' suit is no more—and no less—than a challenge to the political branches' use of the CRA to enact Resolutions repealing EPA's waivers. Indeed, the only remedy that will redress Plaintiffs' alleged injury is invalidation of those Resolutions. *See infra* Section I.B (pp. 12–14). Judicial review of the suit, in its entirety, is therefore barred by Section 805.

Despite the provision's clear text, the Ninth Circuit has held that courts may consider constitutional claims related to actions taken under the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 561. Even under that precedent, however, Plaintiffs' statutory claims (Counts I–III), which are based entirely on alleged determinations, actions, or omissions "under" the CRA, are beyond this Court's review. 5 U.S.C. § 805; *Ctr. for Biological Diversity*, 946 F.3d at 563–64.

"'Under this chapter' refers to duties the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020). Section 805 does not distinguish among actors, and thus includes actions or omissions "by agencies, the Comptroller General, the President, and Congress." *Id.* at 1236; *see also Foster v. USDA*, 68 F.4th 372, 379 (8th Cir. 2023) (Section 805 bars review of agency action or omission), *vacated on other grounds*, 144 S. Ct 2707 (2024) (mem.); *Wash. All. of Tech. Workers v. United States*, 892 F.3d 332, 346 (D.C. Cir. 2018) (same); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.) (same).

All of the actions that Plaintiffs challenge were taken "under" the CRA and so fall squarely within Section 805's prohibition. The CRA requires federal agencies to "submit to each House of

**3-ER-531**

the Congress and to the Comptroller General a report" for each "rule," which includes "a concise general statement relating to the rule."5 U.S.C. § 801(a)(1)(A). That submission necessarily requires agencies to determine what actions are "rules" under the CRA. *See id.* § 804(3). The CRA then provides procedures for consideration of joint resolutions disapproving of rules, *id.* § 802, which necessarily requires that Congress determine a resolution is eligible for those procedures. The CRA provides that a joint resolution adopted by Congress and signed by the President has the effect that the "rule shall not take effect (or continue)," *id.* § 801(b)(1), and it specifies when the rule takes effect if the President vetoes the resolution, *id.* § 801(a)(3)(B).

EPA's characterization of waivers as "rules"; EPA's submission of the waivers to Congress; EPA's alleged failure to explain its reasoning in the "concise general statement relating to the rule," *id.* § 801(a)(1)(A)(ii); Congress's decision to consider the Resolutions under the CRA's expedited procedures; Congress's adoption of the Resolutions; and the President's signing of the Resolutions are therefore actions "under" the CRA and excluded from judicial review. *Id.* § 805. Indeed, despite their attempt to make this case about *EPA's* actions, *see infra* Section I.B (pp. 12–14), Plaintiffs at bottom challenge "*Congress's* enactment of the Joint Resolution[s]," over which this court "lack[s] jurisdiction." *Ctr. for Biological Diversity*, 946 F.3d at 563 (emphasis added).

Congress withheld review of actions under the CRA for good reason. Allowing courts to second-guess Congress's determination of what qualifies as a "rule" or other aspects of the CRA process would enable the judicial branch to override Congress's establishment of its own procedures, raising serious separation-of-powers concerns. *See infra* Section III.A (pp. 19–21). It would also add significant uncertainty: "the line dividing" a rule from an order is "not always … a bright one." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Allowing judicial review would turn what is intended to be an expedited process for curtailing agency overreach into a protracted legal battle, leaving the status of a duly enacted law in limbo for months or years as litigation plays out. Congress not only acted well within its authority by withholding judicial review for suits like this one, *Ctr. for Biological Diversity*, 946 F.3d at 563, it also acted wisely.

### B.  Plaintiffs Lack Standing for their Statutory Claims

Plaintiffs also lack standing for their statutory claims. Essentially, those claims allege that

EPA's characterization of the waivers as "rules" and subsequent submission of the waivers to Congress was unlawful and thus somehow tainted the Resolutions passed by Congress and signed by the President. Complaint at 27–31, ¶¶ 116–120, 126–132, 139. Plaintiffs, however, lack standing to bring these claims because their alleged injury (i) is not traceable to EPA's actions and (ii) will not be redressed by a favorable ruling or relief directed to EPA's actions. To establish standing, Plaintiffs "must show that [they] ha[ve] suffered … [1] an injury that is … [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Murthy*, 603 U.S. at 57 (internal quotation marks omitted). Plaintiffs allege they are injured because they are "prevent[ed] … from enforcing laws they have chosen to adopt within their jurisdictions." Complaint at 2, ¶ 5.

That injury does not result from the challenged EPA actions, but rather from Congress, which is not a party to this case, exercising its Article I authority to enact legislation nullifying EPA's prior Clean Air Act waivers. *See* U.S. Const. art. I, § 1. The CRA Resolutions were "adopt[ed]" by Congress and "signed" by President. Complaint at 2, ¶ 5. These legislative acts, not any action by EPA, repealed the Clean Air Act waivers at issue and triggered the preemption provisions of Section 209(a) of the Clean Air Act. *See* 42 U.S.C. § 7543(a) ("No State … shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines….").

This "exercise [of] independent judgment" by Congress and the President severs any causal chain to EPA. *Murthy*, 603 U.S. at 60. Congress was not obligated to accept EPA's characterization of the waivers or to pass Resolutions of disapproval once the waivers were submitted. Most rules that agencies submit under the CRA never make it to the floor of either House.[11] And Congress has the prerogative to act under the CRA even when an agency doesn't submit an action. *See supra* Section III (pp. 4–10). Nor was the President required to sign the Resolutions into law; he exercised independent judgment in concluding the CRA was an appropriate means to repeal the waivers. *See* Ex. 1; *see also* S. Doc. No. 118-6 (Sept. 26, 2023) (President Biden's veto of S.J. Res. 9, which

---

[11] George Washington Univ. Regul. Stud. Ctr., *Number of CRA Bills by Stage in the Legislative Process, 1996–2024* (updated Jan. 15, 2025), https://perma.cc/2F4U-F5PN.

disapproved a final rule listing the lesser prairie chicken under the Endangered Species Act pursuant to the CRA). These "unfettered choices made by independent actors" extinguish any link between the challenged EPA actions and Plaintiffs' alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Plaintiffs' alleged injury also will not be redressed "by a favorable ruling" on EPA's actions, *Murthy*, 603 U.S. at 57, because a declaration or order related to *EPA's actions* would not render the *Resolutions* unenforceable. The Resolutions were enacted "in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President," *INS v. Chadha*, 462 U.S. 919, 958 (1983); *see also* U.S. Const. art. I, § 7, cls. 2–3; *United States v. Ballin*, 144 U.S. 1, 6 (1892) (under the "federal constitution," "the act of a majority of the quorum is the act of the body"). Therefore, the Resolutions are and will remain a legitimate exercise of the federal legislative power, regardless of any alleged deficiency in EPA's non-binding characterization and submission. *See Chadha*, 462 U.S. at 951. Simply put: there is no "fruit of the poisonous tree" doctrine for legislation. *Cf. Utah v. Strieff*, 579 U.S. 232, 237 (2016). Nor would the persuasive effect of the Court's opinion provide redress: "Whatever a court may say in an opinion does no more to compel [Congress and the President] to change how they exercise their [lawmaking power] than an order vacating" EPA's actions. *United States v. Texas*, 599 U.S. 670, 691 (2023) (Gorsuch, J., concurring in the judgment). Nor may Plaintiffs seek "damages" or prospective relief against EPA to remedy an alleged past violation; and Plaintiffs do not "claim that they might enjoin Congress." *California v. Texas*, 593 U.S. 659, 673 (2021); *see also Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 108–09 (1998) (failure to submit mandatory reports in the past did not authorize a prospective injunction). A decision of the court related to EPA's actions "would amount to 'an advisory opinion without the possibility of any judicial relief.'" *California v. Texas*, 593 U.S. at 673. No action of this Court regarding EPA's actions could remedy Plaintiffs' alleged injury.

### C.  This Court Lacks Jurisdiction Under the APA

For similar reasons, the challenged EPA actions are not "final agency action," 5 U.S.C. § 704, and so this Court lacks jurisdiction over Plaintiffs' APA claim. *Havasupai Tribe v. Provencio*, 906

**3-ER-534**

F.3d 1155, 1161 (9th Cir. 2018) ("Final agency action is a jurisdictional requirement imposed by 5 U.S.C. § 704" (cleaned up)); *see also* Complaint at 28–30, ¶¶ 122–135 (Count II).[12]

An agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). EPA's actions do not satisfy *Bennett*'s second criterion. EPA's characterization of the waivers as "rules" and subsequent submission to Congress created no right, imposed no obligation, and had no "direct consequences" for Plaintiffs. *Dalton v. Specter*, 511 U.S. 462, 469 (1994). Even after submission, the waivers remained effective unless and until Congress passed (and the President signed) resolutions of disapproval. Like other agency actions the Supreme Court has held are not final, EPA's characterization and submission of the waivers were, at most, "recommendations [that] were in no way binding on the President [and Congress], who had absolute discretion to accept or reject them." *Bennett*, 520 U.S. at 178; *see also Dalton*, 511 U.S. at 469 (Secretary of Defense's base closure recommendations were not final because the "action that will directly affect the military bases is taken by the President, when he submits his certification of approval to Congress" (cleaned up)); *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (Secretary of Commerce's report of census results was not final because it "serves more like a tentative recommendation" to the President, who ultimately submits a count to Congress). [13]

Plaintiffs also cannot evade the APA jurisdictional bar by claiming that EPA's actions were "ultra vires." Complaint at 27–28, ¶¶ 114–21 (Count I). As the Supreme Court recently made clear, the ultra vires exception to the APA "is a narrow one": it "applies only when an agency has

---

[12] Elsewhere, the Ninth Circuit has opined that "the fact that an agency decision is not final under the APA is not a defect in subject matter jurisdiction." *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 830 (9th Cir. 2002). Under that approach, lack of finality is assessed under Rule 12(b)(6). *County of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1086 (S.D. Cal. 2020). Either way, Plaintiffs' APA claim must be dismissed.

[13] Section 805's prohibition of judicial review, *see supra* Section I.A. (pp. 11–12), also makes APA review unavailable. 5 U.S.C. § 701(a)(1) (APA review does not apply "to the extent that … [other] statutes preclude judicial review."); *see* Complaint at 29–30, ¶¶ 122–132 (challenging the same actions barred from review by 5 U.S.C. § 805).

taken action entirely in excess of its delegated powers and contrary to a specific prohibition in statute," not merely when "an agency has arguably reached a conclusion which does not comport with the law." *NRC v. Texas*, 145 S. Ct. 1762, 1776 (2025) (cleaned up). Plaintiffs' ultra vires claim does not come close to passing that high bar, as it does nothing more than "dress up a typical statutory-authority argument as an ultra vires claim." *Id.*

## II. This Court Lacks Jurisdiction Over Plaintiffs' Constitutional Claims

This Court also lacks authority to review Plaintiffs' constitutional claims because they raise non-justiciable political questions.[14]

### A. This Court May Not Review Challenges to House and Senate Procedures

Plaintiffs allege various constitutional defects in Congress's enactment of the Resolutions. *See, e.g.*, Complaint at 34–35, 37–38, ¶¶ 155–158, 161–163, 172–176 (Counts V and VI). These claims amount to a non-justiciable challenge to House and Senate procedures.

"The constitution empowers each house to determine its rules of proceedings." *Ballin*, 144 U.S. at 5. That power is "absolute and beyond the challenge of any other body or tribunal," subject only to very narrow limitations: Congress may not "by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the … rule and the result which is sought to be attained." *Id.* "Neither … the advantages or disadvantages, the wisdom or folly, of … a rule [of Congress] present any matters for judicial consideration." *Id.* "In short, the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th 2007).

Plaintiffs' claims asserting constitutional defects in the process of enacting the Resolutions are "question[s] of legislative procedural rules" that this Court lacks authority to review. *Id.* Plaintiffs allege that Congress improperly (i) ignored the non-binding advice of GAO and the Senate Parliamentarian, Complaint at 31, 37 ¶¶ 140, 172, 175; (ii) accepted EPA's characterization of the

---

[14] Although the "political question doctrine … has traditionally been limited to constitutional cases," *Newsom v. Trump*, 2025 WL 1712930, at *5 (9th Cir. June 19, 2025) (per curiam), it applies with equal force to Plaintiffs' statutory claims to the extent those claims challenge Congress's establishment and application of CRA procedures, which are decisions committed to each House of Congress by the Constitution. U.S. Const. art. I, § 5, cl. 2.

**3-ER-536**

waivers, *id.* at 34–35, ¶¶ 158–163; (iii) raised Points of Orders in the Senate, *id.* at 24–25, ¶¶ 101–105; (v) applied the CRA's procedures to the Resolutions, *id.* at 31–32, 37–38, ¶¶ 141, 173, 175–176, and (iv) limited Plaintiffs' participation in Congress's lawmaking process, *id.* at 37–38, ¶¶ 173, 175. In essence, Plaintiffs complain that the Senate chose to adopt the Resolutions without applying filibuster rules or seeking Plaintiffs' advice. But selecting the procedural rules to apply to pending legislation is a matter squarely committed to each House's discretion by the Constitution. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings."). And so determining whether to apply the CRA's "accelerated procedure is 'an exercise of the rulemaking power of the Senate and House of Representatives, respectively.'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)). The Constitution provides no right to particular congressional procedures or participation, and allowing the Senate to vote on the Resolutions without a prior supermajority procedural vote or testimony from Plaintiffs violates no "constitutional restraints or … fundamental rights." *Ballin*, 144 U.S. at 5; *see also infra* Section III (pp. 19–25). Moreover, use of expedited procedures and limited debate is "reasonabl[y] relat[ed]" to Congress's desire to expeditiously address what it viewed as EPA's error in issuing the waivers. *Ballin*, 144 U.S. at 5.

In modern parlance, whether Congress may consider the Resolutions using CRA procedures and without consulting Plaintiffs is a "political question" that "revolve[s] around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962). The "presence of a political question deprives a court of subject matter jurisdiction." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

The role of establishing and applying procedural rules is "textually … commit[ted]" by the Constitution to each House of Congress. *Baker*, 369 U.S. at 217. A court cannot "independent[ly] resol[ve]" Plaintiffs' claims "without expressing lack of the respect due" Congress in executing its lawmaking function or "without an initial policy determination"—like whether Congress should credit GAO's non-binding observations over competing recommendations—"of a kind

clearly for nonjudicial discretion." *Id.* Nor does it matter if Congress departed from its previous practice in passing the Resolutions (although it did not). As the Ninth Circuit has recognized, "the asserted failure of Congress to comply with its own procedural rules" in adopting the Resolutions "is a non-justiciable political question beyond [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72.

### B. This Court May Not Review Plaintiffs' Claims Against the President

Likewise, this Court may not review Plaintiffs' claims against the President. Plaintiffs appear to challenge the President's agreement that EPA's waivers are "rules" and his decision to sign the Resolutions into law. Complaint at 28, 32–33, 37–38, ¶¶ 117, 146–149, 172–176. But challenges to these actions, taken in furtherance of the President's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, raise a non-justiciable political question.

"[T]he duty of the President in the exercise of the power to see that the laws are faithfully executed … is purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). Under Article II, the President "possesses authority to decide" how that duty is best accomplished, including by deciding what Acts of Congress he chooses to sign into law. *United States v. Texas*, 599 U.S. at 678–79. Consistent with "general principles" of separation of powers, "judicial interference with th[at] exercise of Executive discretion" is "forbid[den]." *Johnson*, 71 U.S. at 499. Indeed, an "attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized … as 'an absurd and excessive extravagance.'" *Id.* Simply stated: "federal courts do not exercise general oversight of the Executive Branch." *Trump v. CASA, Inc.*, 2025 WL 1773631, at *15 (U.S. June 27, 2025).

Plaintiffs' claim that the President "neither exercised care nor even attempted to faithfully execute the Nation's laws," Complaint at 33, ¶ 149, would require this Court to engage in the sort of "judicial interference" with the President's core authorities that separation-of-powers principles "forbid." *Johnson*, 71 U.S. at 499. Under the Constitution, "it is [the *President's*] responsibility to take care that the laws be faithfully executed" and to decide which bills to approve, not a *court's*. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010). This Court

**3-ER-538**

has no constitutional role in assessing whether the President sufficiently "exercised care" or adequately "attempted to faithfully execute the Nation's laws" pursuant to his Article II authority. *Cf. Trump v. United States*, 603 U.S. 593, 607 (2024) ("courts have no power to control the President's discretion when he acts pursuant to the powers invested exclusively in him by the Constitution" (cleaned up)). Indeed, a court could not undertake the inquiry "without expressing lack of the respect due" the President in execution of his Article II authorities. *Baker*, 369 U.S. at 217. Nor could this Court feasibly resolve Plaintiffs' claims, as "courts generally lack meaningful standards for assessing" the sufficiency of the President's efforts. *United States v. Texas*, 599 U.S. at 679. This is especially true when, as here, a lawsuit challenges the President's decision to sign proposed legislation—a unique power that the president holds under Article I, not Article II, of the Constitution. *See* U.S. Const. art. I. § 7, cl. 2–3. A President's decision to sign legislation is as unreviewable as a Congressman's decision to vote for it. Plaintiffs' claims against the President are therefore beyond this court's authority to address.

## III. Plaintiffs Fail to State Constitutional Claims

Plaintiffs' constitutional claims should also be dismissed because they are meritless and so fail to state a cognizable claim. Fed. R. Civ. P. 12(b)(6).

### A. Plaintiffs Fail to State an Article II Claim

Plaintiffs allege that the President, EPA Administrator, and EPA "neither exercised care nor even attempted to faithfully execute the Nation's laws" by concluding that the waivers were "rules of general applicability subject to the CRA." Complaint at 32–33, ¶¶ 146–149 (Count IV).

These allegations do not raise a constitutional issue. Rather, they raise a garden-variety statutory claim: that the Executive Branch incorrectly interpreted the meaning of "rule" under the CRA to encompass EPA's waivers and so exceeded its statutory authority. *See* 5 U.S.C. §§ 801, 804(3). But an alleged error in statutory interpretation does not constitute an Article II "take care" violation. "The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Dalton*, 511 U.S. at 474. Plaintiffs cannot slap a constitutional label on statutory claims to evade the CRA's jurisdiction bar.

In any event, the Executive Branch did not err in its interpretation. As OMB explained, EPA, its Administrator, and the President were correct to conclude that the waivers are "rules" of "general applicability" for purposes of the CRA, despite GAO's contrary (and far less carefully reasoned) conclusion. *See* Ex. 1 at 3–6. The Ninth Circuit has explained:

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals[.]… Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler*, 37 F.3d at 448 (citations omitted). Applying this framework, the Ninth Circuit held that a determination by the federal Department of Housing and Urban Development ("HUD") that the state of Washington's Public Housing Authority could apply state (rather than federal) eviction procedures in federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

Like HUD's determination allowing Washington to substitute state procedures for federal ones, EPA's waivers allowing Plaintiffs to substitute state emissions standards for federal ones have "all the hallmarks of a rule." *Id.* at 448. First, the waivers "had no immediate, concrete effect on anyone, but merely permitted" California and other states to enforce state emissions standards "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable to California standards through § 7543(b)(1)(C), requiring California's standards to give manufacturers adequate lead time "to permit the development and application of the requisite technology"); *id.* § 7507(2) (copycat states must "adopt such standards at least two years before commencement of [the applicable] model year"). EPA waivers therefore have "prospective," rather than "immediate," effect. *Yesler*, 37 F.3d at 448. Second, the waivers "affected the rights of a broad category of individuals not yet identified": manufacturers who, in the future, may sell new motor vehicles in those states. *Id.*

It does not matter "that the manner in which [EPA] made its decision[s] [may] share[] certain features with adjudications," namely, that EPA "compare[s] the [criteria] … set out in [statute] with" California's standards. *Id.* at 449. "The form of the proceeding is not dispositive; what

counts is its effect." *Id.* And the effect of a waiver is that of a rule that implements "a unique alternative nationwide compliance pathway" governing conduct of manufacturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) (providing that "compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). Intervenor-Defendants are aware of no other "adjudication" that has such sweeping, prospective effect on such a broad range of individuals.

In any event, describing EPA's process for considering a waiver request as merely an "adjudication" is "incomplete." *Yesler*, 37 F.3d at 449. EPA's "decision plainly involved more than applying a rule of decision to particular facts," since EPA weighs policy-laden considerations, including the technological feasibility and cost appropriateness of the state standards. *Id.*; 42 U.S.C. § 7521(a)(2) (applicable to California standards through § 7543(b)(1)(C)).

The waivers also are "generally," not "particularly," applicable rules. Once EPA issues a waiver, *any* other state may adopt California's standards without any additional factual showing or hearing. *Id.* § 7507. A waiver therefore imposes obligations on manufacturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA regularly concluded that waivers are "nationally applicable" and of "nationwide scope [and] effect." 88 Fed. Reg. at 20,725 (ACT waiver). Two federal district courts have agreed, opining that EPA waivers give effect to standards that are equivalent to federal regulations. *Green Mountain Chrysler*, 508 F. Supp. 2d at 347 ("It seems beyond serious dispute therefore that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation."); *Cent. Valley Chrysler-Jeep*, 529 F. Supp. 2d at 1173 ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

Because the waivers are reasonably characterized as "rules" under the CRA, Plaintiffs' Article II claim is meritless and fails to state a cognizable claim.

### B. Plaintiffs Fail to State a Separations-of-Powers Claim

Plaintiffs also fail to state a claim that Congress has violated separation of powers principles, either by delegating legislative power to the executive branch, Complaint at 34–35, ¶¶ 157–162, or

by exercising judicial power, *id.* at 35–36, ¶¶ 163–66 (Count V).

*First*, Plaintiffs claim that Congress "improperly delegated its constitutional authority 'to determine the Rules of its Proceedings' to the Executive Branch." *Id.* at 34, ¶ 158 (cleaned up). But Plaintiffs' account explains that both Houses applied their own judgment and rules of procedure in considering the Resolutions under the CRA. Members of the House "introduced the Resolutions" about "a month" after GAO issued its analysis, well aware of the dispute over the waivers' characterization, *id.* at 20, 22, ¶¶ 85, 93, and "voted to adopt all three Resolutions" by majority vote, consistent with House rules, *id.* at 23, ¶ 95. Members of the Senate were also familiar with GAO's opinion, as well as with other views. *Id.* at 20–21, ¶¶ 86, 89–90. Faced with competing interpretations, a majority of the Senate agreed that rules submitted by executive branch agencies consistent with "Section 802 of the Congressional Review Act" should be eligible for consideration under the CRA's expedited procedures. *Id.* at 24–25, ¶ 103 (the "Point of Order"). The Senate then went on, by majority vote, to adopt the Resolutions. *Id.* at 27, ¶ 111. Throughout the legislative process, Congress—not the Executive Branch—determined how to apply each House's rules and procedures.

Congress's considered decision to credit EPA's characterization of the waivers is no more a "delegation" than a decision to abide by GAO's opinion would be. The Constitution does not forbid Congress from consulting the Executive Branch in determining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches.").

*Second*, Plaintiffs' claim that "Congress's decision to allow the Executive Branch to be the sole arbiter of what the definition of 'rule' means under the APA and CRA … unconstitutionally intruded on the judiciary's Article III power." Complaint at 35, ¶ 163. But Congress has *not* made the executive branch "the sole arbiter." Each House of Congress, itself, decided to consider the waivers "rules" under the CRA. *Id.* at 22–24, ¶¶ 93–100. Even the "Point of Order" that Plaintiffs assail does not indicate that the Senate will agree with the Executive Branch in all circumstances, since it does not bind Senators' votes and says nothing about what happens when a federal agency

**3-ER-542**

does *not* submit an action to Congress. The Senate can, as it did here, decide for itself whether the CRA applies, and it may well agree with GAO. And in the future, the Senate can always change the Point of Order anyway. *Ballin*, 144 U.S. at 5 (each House has "a continuous power" to make its own rules); GAO Letter B-32552, *supra*, at 9 ("CRA's expedited procedure for congressional review of agency rules was enacted as an exercise of the authority of the Senate and House of Representatives to set their own rules, with full recognition of the right of either House to change the rules.").

Nor did Congress's procedures intrude on the judicial power, because courts *have no power* to determine whether an agency action is a rule under the CRA. 5 U.S.C. § 805. "Congress generally does not infringe the judicial power when it strips jurisdiction because, with limited exceptions, a congressional grant of jurisdiction is a *prerequisite* to the exercise of judicial power." *Patchak v. Zinke*, 583 U.S. 244, 254 (2018) (plurality opinion). Congress's actions in the context of the CRA also have no effect on courts' authority to determine whether agency actions are "rules" in suits brought under the APA in non-CRA contexts. *Contra* Complaint at 35, ¶ 163.

Third, Plaintiffs claim that the Resolutions, themselves, invade the judicial power because they "direct the court how pre-existing law applies to particular circumstances" yet "fail[] to supply any new legal standard." *Id.* at 35–36, ¶¶ 164, 166 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17, 231 (2016)). But that completely misunderstands the Resolutions, and the CRA, itself. The Resolutions do effectuate a new legal standard: namely, that the three waivers are now unlawful and that there can be no judicial review of that decision. "When Congress enacts legislation that directs an agency to issue a particular rule, 'Congress has amended the law.'" *Ctr. for Biological Diversity*, 946 F.3d at 562. The same is true when Congress overrides an agency rule with new legislation. The Resolutions "compelled changes in law, not findings or results under old law." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992). The Resolutions are therefore "enforceable as a change to substantive law, even though [they] did not state that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 562. And "because the [Resolutions] changed the substantive law, [they do] 'not violate the constitutional separation of powers' even though [they may] … 'chang[e] the law

applicable'" to "'pending litigation.'" *Id.* (*quoting All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)).

### C.  Plaintiffs Fail to State Tenth Amendment or Federalism Claim

Finally, Plaintiffs also fail to state a claim under the Tenth Amendment or federalism principles. Complaint at 36–38, ¶¶ 171–176 (Count VI).

Plaintiffs appear to claim that by using expedited procedures to adopt Resolutions that had the effect of limiting Plaintiffs' enforcement of state emissions standards, Congress violated Plaintiffs' Tenth Amendment rights and structural principles of federalism. *Id.* at 37–38, ¶¶ 172–76. In essence, Plaintiffs claim a Tenth Amendment right to the Senate filibuster when it comes to any curtailment of California's special treatment under the Clean Air Act.

But there is no constitutional right to the filibuster under the Tenth Amendment or any other provision of the Constitution. The Constitution provides that "*Each House* may determine the Rules of its Proceedings," including if, when, and how to apply the filibuster. U.S. Const. art. I, § 5, cl. 2 (emphasis added); *see also supra* Section II.A (pp. 16–18). Nor do states have a constitutional right to dictate congressional procedures for legislation in which they have particular interest. There is no "federalism" exception to each House's authority to determine its internal rules that would allow Plaintiffs to demand "debate," "testimony" by state officials, or other preferred forms of "participat[ion]." *See* Complaint at 37, ¶¶ 173, 175.

Nor do the Resolutions, themselves, impermissibly tread on constitutionally protected state interests. The Resolutions do not "negate *state rules*" as such. *Contra id.* at 2, ¶ 7. They invalidate *federal agency actions*: EPA's waivers. Even so, if Congress may affirmatively carve out a special exception for federal Clean Air Act preemption for California, then it surely can put limits on that exception when it believes California has gone too far.

The Resolutions certainly do modify the waiver provision of the Clean Air Act, including by forbidding EPA from imposing substantially similar waivers in the future. *See Ctr. for Biological Diversity*, 946 F.3d at 562. But that poses no problem because Plaintiffs have no *constitutional right* to enforce their own motor vehicle emissions programs. (Nor do Plaintiffs appear to claim one, as they have not challenged Congress's authority to regulate motor vehicle emissions and preempt

state programs. 42 U.S.C. §§ 7521(a), 7543(a)). Nor does California have a right to the precise, limited exception to Clean Air Act preemption that an earlier Congress provided. *See id.* § 7543(b). "[S]tatutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified. And Congress remains free to express any such intention either expressly or by implication as it chooses." *Dorsey v. United States*, 567 U.S. 260, 274 (2012) (citation omitted).

### D.  Plaintiffs Lack a Cause of Action for Their Constitutional Claims

Finally, Plaintiffs' constitutional claims fail for a more fundamental reason: they lack a cause of action. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, see, *e.g.*, 42 U.S.C. § 1983." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted). No constitutional provision, doctrine, or statute cited by Plaintiffs provides a right to sue to challenge the sufficiency of presidential action or the internal procedures of Congress. *See Franklin*, 505 U.S. at 796; *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–26 (2015). Nor can Plaintiffs successfully invoke the "inherent equitable power" of federal courts. Complaint at 38, ¶ 180 (Count VII). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and the CRA's jurisdiction stripping provision announces Congress's "'intent to foreclose' [the] equitable relief" that Plaintiffs seek. *Armstrong*, 575 U.S. at 327–28; *see supra* Section I.A (pp. 11–12).

## IV. The Complaint Should Be Dismissed *With* Prejudice

Because Plaintiffs cannot cure the defects by amendment, the Complaint should be dismissed with prejudice. *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (dismissal with prejudice is appropriate where "the complaint could not be saved by any amendment").

## CONCLUSION

For the foregoing reasons, Plaintiffs' entire complaint should be dismissed with prejudice for lack of subject matter jurisdiction and failure to state any cognizable claim.

Dated: _____ ___, 2025         Respectfully submitted,

_____

Michael Buschbacher
James R. Conde
James R. Wedeking
Laura B. Ruppalt
Boyden Gray PLLC

Eric Grant
John B. Thomas
Hicks Thomas LLP

Counsel for Intervenor-Defendants
American Free Enterprise Chamber of
Commerce, Illinois Corn Growers Association,
Indiana Corn Growers Association, Iowa Corn
Growers Association, Kansas Corn Growers
Association, Kentucky Corn Growers
Association, Michigan Corn Growers
Association, Missouri Corn Growers
Association, Nebraska Corn Growers
Association, Tennessee Corn Growers
Association, Texas Corn Producers, Wisconsin
Corn Growers Association, and National Corn
Growers Association

**3-ER-546**

# Ex. 1



EXECUTIVE OFFICE OF THE PRESIDENT

OFFICE OF MANAGEMENT AND BUDGET

WASHINGTON, D.C. 20503

THE DIRECTOR

June 18, 2025

Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

Re:     Post-CRA Resolutions Response to GAO's March 6, 2025
        "Observations Regarding the Environmental Protection Agency's
        Submission of Notices of Decision on Clean Air Act Preemption
        Waivers as Rules Under the Congressional Review Act"

Dear Mr. Comptroller General:

Late last month, the Senate voted in favor of three joint House resolutions (which by then had passed the House)[1] invalidating three waivers of preemption granted by EPA to California.[2] The analysis below buttresses Congress's legal conclusions *both* to substantively override those waivers *and* to deem the waivers to be rules subject to the Congressional Review Act ("CRA") in the first place.

More specifically, this letter provides the Office of Management and Budget's ("OMB's") response to a March 6, 2025 Government Accountability Office ("GAO") letter concerning application of the CRA to these three waivers. In preparing this letter, I have consulted with the Office of Information and Regulatory Affairs ("OIRA"), which has a statutorily assigned role in the CRA process and reports to me as part of OMB.

OMB strongly disagrees with GAO's analysis (styled as a set of "Observations") for numerous reasons falling into two basic categories—GAO's lack of authority in this area *and* GAO's flawed administrative law analysis of how to classify when an agency action is deemed a rule versus an adjudication. I turn first to the four reasons why GAO exceeded its authority:

---

[1] *See* H.J. Resolutions 87, 88, and 89, *available at* https://www.congress.gov/bill/119th-congress/house-joint-resolution/87; https://www.congress.gov/bill/119th-congress/house-joint-resolution/88; and https://www.congress.gov/bill/119th-congress/house-joint-resolution/89 (last visited June 17, 2025).
[2] *See* 90 Fed. Reg. 643 (Jan. 6, 2025); 90 Fed. Reg. 642 (Jan. 6, 2025); 68 Fed. Reg. 20,688 (Apr. 6, 2023).

## I.  GAO'S LACK OF POWER IN THIS AREA

***First, GAO has no legal role whatsoever*** in deciding whether an action the Executive Branch submits to Congress for consideration under the Congressional Review Act ("CRA") is a "rule" or an "adjudication." That role is assigned instead to the Administrator of OIRA (see below for additional details) and ultimately Congress.

***Second, GAO also has no expertise in this area***, whereas OIRA routinely reviews federal actions to determine their character, consistency with law, and whether they meet the basic tests of rationality, such as producing net benefits or net costs, and at what level. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see also* Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). When performing zone-of-interests analysis, for instance, the Supreme Court considers agency expertise to be a relevant prudential factor.[3] Just so here. As a prudential matter, GAO's non-expert Observations were properly not be credited by Congress and should not be in the future because GAO lacks expertise in this area, being an agency with a different assigned role.

***Third***, GAO has reached the opposite conclusion in the past. Indeed, as Comptroller, you ***conceded*** both the lack of a GAO role here and that GAO's Observations took an unprecedented legal position when being questioned recently by Representatives Valadao (CA) and Moore (WV).[4]

***Fourth, and worst of all, GAO's "Observations" functionally attempt to interfere with the democratic process.*** Members of Congress should decide for themselves whether to apply the CRA to a particular action of the Executive Branch, not GAO. If Congress had wanted GAO to have a gatekeeping role over application of the CRA, Congress would have said so in clear terms. The silence in the statute on this point is telling. And Congress's enactment of the joint resolutions of disapproval represents an express rejection of GAO's actions.

\* \* \* \* \*

OIRA is the Executive Branch's central authority for reviewing federal regulations and thus has considerable expertise in reviewing federal agency action. OIRA has statutory responsibility for determining whether an agency action is a "major rule" within the meaning of the Congressional Review Act ("CRA" or "the Act"). *See* 5 U.S.C. § 804(2). Part of that role is to parse whether an action is a "rule" at all. Given this statutory role and based as well on OIRA's experience, I explain in detail below OMB's affirmative determination that the waivers are "rules" subject to the CRA.

As GAO notes, in granting those waivers, the prior Administration summarily asserted that the actions at issue are not subject to the Act. But following the change in Administration, EPA's new Administrator reassessed the agency's evaluation and

---

[3] *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 226–27 (2012) (considering Department of Interior regulations when resolving a zone-of-interests dispute); *Federal Defenders of N.Y. v. Federal Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (same as to federal BOP regulations). Zone-of-interests analysis constitutes a prudential jurisdictional analysis. *See Bennett v. Spear*, 520 U.S. 154, 162 (1994). We argue by analogy here that GAO lacks the congressional equivalent of jurisdiction over the CRA question at issue.

[4] *See* Hearing Before the House Committee on Appropriations, Subcommittee on the Legislative Branch, 119th Congress (Apr. 7, 2025), *available at* http://appropriations.house.gov/schedule/hearings/budget-hearing-government-accountability-office-congressional-budget-office-and (last visited June 17, 2025).

Page **2** of 7

**3-ER-549**

concluded that the waivers are best characterized as rules of general applicability within the meaning of the Act.[5]

Like Congress, OMB agrees with EPA Administrator Zeldin that the waivers are rules of general applicability subject to the CRA. And regardless, even if the question were close (which it is not), it was prudent for the EPA Administrator to submit the waivers to Congress out of an abundance of caution and out of deference to Congress's role in our constitutional Republic. This common agency practice obviates any advisory role for GAO.[6] Indeed, EPA has previously sent a prior action revoking a Clean Air Act preemption provision to Congress and that action remains listed on GAO's own website as a "final rule."[7]

OMB therefore believes that no additional information was necessary for Congress to discharge its legislative role, or for GAO to discharge its *ad hoc* advisory role. As GAO through a prior general counsel once testified before the Senate, the Act does not give GAO power "to decide what a rule is."[8] As GAO further explained in its March 6, 2025 letter concerning these waivers, *see* B-337179, GAO does not even "normally issue a legal decision" when an agency submits an action for review. *Id.* at 1. Indeed, OMB is unaware of GAO ever doing so before now. *See also supra* n.4.

As GAO notes in its letter to congressional requesters, "GAO does not issue formal decisions on actions that agencies have submitted to Congress as rules under the CRA because that submission generally obviates the need for a GAO decision on the matter." *Id.* at 1 n.3.[9] Hence, that should have marked the conclusion of GAO's involvement.

In its March informal letter to congressional requesters, however, GAO nevertheless departed from its longstanding practice and opined (albeit informally) that the submitted waivers were not rules of general applicability, citing a prior GAO opinion about a different waiver and claiming that the same legal analysis would apply to these three submitted waivers. *See* B-337179 at 7. GAO also claims that EPA has not explained

---

[5] "The Biden Administration failed to send rules on California's waivers to Congress, ***preventing Members of Congress from deciding on extremely consequential actions that have massive impacts and costs across the entire United States.*** The Trump EPA is transparently correcting this wrong and rightly following the rule of law," said Administrator Zeldin.

EPA, Press Release, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* (Feb. 14, 2025), *available at* https://www.epa.gov/newsreleases/trump-epa-transmit-california-waivers-congress-accordance-statutory-reporting (last visited June 17, 2025) (emphasis added). GAO's footnote 15 in its Observations simply reflects the prior Administration's attempt to sidestep CRA review of California waiver decisions, relying on Biden-era EPA *Federal Register* notice from 2023 and a so-called "midnight" rule issued on January 6, 2025—precisely the kind of rule that the CRA was especially designed to place under Congress's watchful eye.

The position we take here is also consistent with that of the Small Business Administration's Office of Advocacy. *See* Advocacy Submits Comments on EPA Waiver Request for California Locomotive Regulation (Apr. 23, 2024), *available at* https://advocacy.sba.gov/2024/04/23/advocacy-submits-comments-on-epa-waiver-request-for-california-locomotive-regulation/ (last visited June 17, 2025) ("The Clean Air Act allows other states to implement California's standards once they are finalized. Advocacy is concerned that the ability of other states to potentially implement the In-Use Locomotive Rule ***turns a state regulation into a de facto national regulation.*** Advocacy is concerned that California's proposed rule will disproportionately harm small locomotives [and] small businesses nationwide who rely on the country's rail system.") (emphasis added).

[6] *See, e.g.,* EC-5696, 170 Cong. Rec. S5883 (Sept. 9, 2024) (EPA "does not believe that the enclosed actions is [*sic*] a 'rule' within the meaning of 5 U.S.C. 804(3). Nevertheless, out of an abundance of caution, EPA is voluntarily submitting the action 'to each House of the Congress and the Comptroller General,' for their review under 5 U.S.C. 801(a).").

[7] *See* Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, FRL-10000-45,* https://www.gao.gov/fedrules/196015 (adopting EPA's description of a 2019 waiver decision as a "final rule.").

[8] *Tongass Land Management: Joint Hearings Before the S. Comm. On Energy and Nat. Res. and H. Comm. On Res.,* 105th Cong. 20 (1977).

[9] *See also Internal Revenue Service: Applicability of the Congressional Review Act to Revenue Procedure 2018-38,* B-330376 (Nov. 30, 2018).

3-ER-550

why it disagrees with GAO. This letter provides the Executive Branch's response to GAO.

## II. GAO'S FLAWED ADMINISTRATIVE LAW ANALYSIS

In OMB's view, GAO's opinion overlooks and misrepresents important aspects of how preemption waivers under the Clean Air Act work under Section 209(b) of that statute as a matter of administrative law.

GAO's foundational claim is that a waiver of preemption is an "order" (by which it appears to mean something like a "license" particular to California, though GAO does not actually reach that conclusion) and thus is not a "rule" of general applicability. In the alternative, GAO claims that, if the waiver is a rule, it is one of particular applicability. OMB disagrees with both of these claims for five reasons.

*First*, GAO's conclusion that the waivers are "orders" is inconsistent with judicial decisions interpreting the Administrative Procedure Act, which forms the basis for the CRA's definition of a "rule."[10] Courts have been clear that sub-delegation of regulatory authority to a State—like that accomplished through the waivers—is characteristic of a "rule," not an "order." The seminal case here is *Yesler Terrace Community Council v. Cisneros*, which involved HUD's determination that Washington State's public housing authority could substitute its own eviction procedures for federally required ones. 37 F.3d 442 (9th Cir. 1994). The Ninth Circuit rejected HUD's argument that this was an "order," concluding that HUD's action "has all the hallmarks of a rule. HUD's determination has no immediate, concrete effect on anyone, but merely permitted [the Washington Public Housing Authority] to evict tenants in the future without providing them with informal grievance hearings. At the same time, the determination affected the rights of a broad category of individuals not yet identified." *Id.* at 448.

Moreover, two separate district courts were called on to carefully analyze the Clean Air Act mobile source program including its preemption provision. And the analysis of each parallel OMB's conclusion that California waiver decisions are better classed as rules rather than as orders. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007) ("[O]nce EPA issues a waiver for a California emissions standard" it has "the same stature as a federal regulation."); *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation.").

The *Yesler* analysis, as confirmed by the Clean Air Act-specific logic of the *Green Mountain* and *Central Valley* district courts, applies here. The waivers at issue have "no immediate, concrete effect on anyone, but merely permit[]" California (and other States) to enforce different standards "in the future." *Id.* The waivers similarly "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *Id.*

---

[10] *See* 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]" with certain exceptions).

**3-ER-551**

*Yesler* also shows why it is irrelevant that EPA styled its waivers as "decision[s]" and initially summarily disclaimed application of the CRA. As the Ninth Circuit explained, "that the manner in which [an agency] made its decision shares certain features with adjudications" is not determinative. *Id.* at 449. "The form of the proceeding is not dispositive, what counts is its *effect.*" *Id.* (emphasis added). The waivers, like the HUD determination in *Yesler*, have "legal consequences for yet-to-be-identified individuals only prospectively," *i.e.*, "the effects of a rule, not of an adjudication." *Id.*

GAO curiously cites *Yesler* on page 7 of its analysis, yet seems oblivious to the fact that *Yesler*, as applied here, leads to the opposite outcome than the one which GAO advocates. GAO does not even say anything about why waivers are distinguishable from the delegation of eviction authority at issue in *Yesler*.

*Second*, unlike an ordinary license, a waiver of Section 209(a) Clean Air Act preemption does more than grant California alone an exemption from a prohibition under the Clean Air Act. Under Section 177 of the Clean Air Act, 42 U.S.C. § 7507, a waiver allows every other State in the country to adopt an identical rule without any additional factual showing or contested hearing. As EPA explained in the Advanced Clean Trucks waiver, "[t]his final action will not only affect manufacturers of new heavy-duty vehicles and engines sold in California, but also manufacturers that sell their new heavy-duty vehicles and engines in those states that have already adopted or may choose to adopt California's regulations"—consequently, "this final action is *nationally applicable.*"[11]

Currently, 18 States have adopted at least one of California's electric-vehicle standards under Section 177. GAO's claim that a waiver is "particular to California" thus overlooks the most significant part of the entire statutory scheme. GAO's analysis, however, does not address this provision in any form.

Nor did GAO address Section 177's prohibition on creating a "third vehicle" that could lawfully be sold in the United States. Of course, the point of the "third vehicle" prohibition confirms that there are two and only two nationally applicable automobile emissions regimes that can govern in the United States: (1) EPA's federal car standards, unmistakably issued exclusively in the form of regulations; and (2) California's standards, because those standards can "travel" under Section 177 to govern in non-California States without a separate waiver.[12] It makes no sense to imagine that federal-car States are governed via regulations but California-car States are governed by adjudication. And any such argument particularly withers once one realizes that what EPA grants preemption waivers of is California regulations, not California adjudications.

*Third*, a waiver of Section 209(a) Clean Air Act preemption does not simply govern the primary conduct of California and all other Section 177 States. Instead, such a waiver also directly governs the conduct of motor-vehicle manufacturers *nationwide*. Under Section 209(b)(3) of the Clean Air Act, certification and conformance to California's alternative standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. § 7543(b)(3). Thus, a waiver creates a unique alternative nationwide compliance pathway for motor-vehicle manufacturers that displaces EPA's otherwise applicable federal standards. Again, OMB is not aware of any "adjudicatory order" creating a new interstate regulator that can replace federal standards and govern

---

[11] *See, e.g.*, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023) (emphasis added).
[12] As noted above, EPA does not conduct a separate adjudication applicable to Section 177 State borrowing decisions.

**3-ER-552**

compliance for an entire manufacturing industry across numerous States. Yet GAO's analysis is also mum about this provision.

*Fourth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption are orders because they have "immediate effect" on California, not prospective effect. It is unclear what GAO means by "immediate effect," but Section 202(a) of the Clean Air Act, 42 U.S.C. § 7521(a), which applies to EPA directly and to waiver decisions as well through Section 209(b)(1)(C), 42 U.S.C. § 7543(b)(1)(C), requires that the waived California rules give motor vehicle manufacturers adequate "lead time," which is typically measured in years, not months. And Section 177(2) also requires at least "two years" of lead time for other States adopting these alternative standards. OMB is aware of no adjudicatory order that requires multiple years of lead time.

True adjudications are inherently retrospective in nature—that is, they describe and establish at that moment in time the law as it always has been, not the law as it is being established prospectively and only for the first time. *See, e.g., Harper v. Virginia Dep't of Tax'n,* 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). By contrast, California emissions regulations apply only prospectively, and only after the lapse of the appropriate amount of lead time. Moreover, EPA waivers are inherently prospective. Otherwise, Section 177 States would have no stability—if they could adopt the California-car standards "immediately" after California promulgated the relevant regulations, then a denied EPA waiver would automatically upset the national market for new automobiles and engines.

As the D.C. Circuit has explained, moreover, even in the agency context specifically, forward-looking obligations are a characteristic of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club In'tl. v. Zinke,* 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius,* 718 F.3d 914, 922 (D.C. Cir. 2013) ("an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking. Again, however, GAO's analysis does not discuss the Clean Air Act's lead time provisions.

*Fifth*, GAO asserts that waivers of Section 209(a) Clean Air Act preemption involve considerations "of particular facts, as opposed to general policy." Not so. In granting waivers, EPA must address the consistency of the regulations with Section 202(a), EPA's primary regulatory authority for motor vehicles. *See* 42 U.S.C. § 7543(b)(1)(C). In so doing, EPA considers the same policy-laden questions implicated in setting *by regulation* the prospective federal emission standards for motor vehicles in the first place. These questions require making predictive policy judgments, not addressing "particular facts." For example, do the California regulations give the industry sufficient lead time to transition to 100% electric vehicles? Are the industry's compliance costs with that lead time "appropriate"? Are the standards "technologically feasible"? 42 U.S.C. § 7521(a)(2). OMB is unaware of any adjudicatory order that requires addressing similarly forward-looking and policy-laden questions about any entire industry's ability to comply. As with the other points made above, however, GAO's analysis is completely silent on the lead-time and technological feasibility aspects of the statutory regime.

Page **6** of 7

**3-ER-553**

\* \* \* \* \*

Because GAO does not address any of these five points, and appears to misunderstand how these Clean Air Act waivers operate, OMB, as the Executive Branch's expert agency for regulatory matters generally, is unpersuaded by GAO's opinion and letter and instead believes that the waivers were and are best characterized as rules of general applicability. But regardless, even if a close call, the EPA Administrator's decision to submit the waivers to promote greater accountability to Congress was reasonable. That practice promotes the kind of agency accountability to Congress that the CRA—and GAO—was created to enhance, not diminish.

It is Congress that is optimally positioned to *decide for itself* when to put rules submitted to it to CRA votes, as it did in considering the three passed House Joint Resolutions 87 through 89. *That is the path that best affords Congress its constitutional role of ensuring representative democracy in our Republic.* In enacting the resolutions of disapproval, Congress emphatically rejected GAO's inappropriate attempt to interfere with Congress's powers under the Constitution and CRA. EPA is thus now barred from issuing any waiver of preemption California seeks that is substantially similar to the three overridden waivers.[13]

Sincerely,

Russell T. Vought
Director

---

[13] *See* 5 U.S.C. 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.").

3-ER-554

# Ex. J

Michael Buschbacher*
James R. Conde*
James R. Wedeking*
Laura B. Ruppalt*
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
*Pro hac vice applications forthcoming

Eric Grant (Bar No. 151064)
John B. Thomas (Bar No. 269538)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 447-4900
grant@hicks-thomas.com

Counsel for Proposed Intervenor-Defendants
(complete list on signature page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **INTERVENOR-DEFENDANTS' ANSWER** <br><br><br><br><br><br><br><br><br><br><br><br><br><br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:    Hon. Haywood S. Gilliam, Jr. |

Intervenor-Defendants' Answer (4:25-cv-04966-HSG)

**3-ER-556** Page 1

Intervenor-Defendants American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Indiana Corn Growers Association, Iowa Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, Tennessee Corn Growers Association, Texas Corn Producers, Wisconsin Corn Growers Association, and National Corn Growers Association hereby answer the Complaint, ECF No. 1 (June 12, 2025), filed by Plaintiffs the States of California, Colorado, Delaware, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and the Commonwealth of Massachusetts.

### RESPONSES TO THE NUMBERED PARAGRAPHS IN THE COMPLAINT

Intervenor-Defendants deny all allegations in the Complaint, including the relief sought, except as specifically admitted in this Answer. To the extent that the Complaint refers to or quotes from external documents, statutes, or other sources, Intervenor-Defendants may refer to such materials for their accurate and complete contents in response; however, Intervenor-Defendants' responses are not intended to be, and should not be construed to be, an admission that the cited materials are (a) correctly cited or quoted by Plaintiffs; (b) relevant to this, or any other, action; or (c) admissible in this, or any other, action. Intervenor-Defendants respond to the separately numbered paragraphs and prayer for relief in the Complaint as follows:

### INTRODUCTION*

1. This paragraph contains legal conclusions and characterizations of statutory provisions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization of the statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

2. Intervenor-Defendants deny the allegations in Paragraph 2.

_____

* For ease of reference, Intervenor-Defendants refer to Plaintiffs' headings and titles, but to the extent that those headings and titles could be construed to contain factual allegations, such allegations are denied.

3.   Intervenor-Defendants admit the first sentence of Paragraph 3, which alleges that the Clean Air Act waiver provision was enacted in 1967 and that EPA has granted more than seventy-five preemption waivers for California's new motor vehicle emissions regulations. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

4.   Intervenor-Defendants admit the first sentence of Paragraph 4 to the extent that it alleges that between April 2023 and January 2025, EPA granted California's requests for Clean Air Act waivers of preemption for the Advanced Clean Trucks ("ACT"), Advanced Clean Cars II ("ACC II"), and Omnibus Low $NO_x$ ("Omnibus") regulations. Intervenor-Defendants admit the second sentence of Paragraph 4 to the extent that it alleges that other States, including the remaining Plaintiffs, purport to have adopted some or all of these standards pursuant to Section 177 of the Clean Air Act. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

5.   Intervenor-Defendants admit the first two sentences of Paragraph 5, which allege that the Senate and House passed three joint resolutions, H.J. Res. 87, 88, 89, 119th Congress (2025), disapproving the ACT, ACC II, and Omnibus waivers, and that the President signed them. Intervenor-Defendants also admit Plaintiffs filed this lawsuit. The remainder of the paragraph contains arguments and legal conclusions that do not require a response. To the extent that a response is required, Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

6.   This paragraph contains legal conclusions and characterizations of statutory provisions, which require no response. To the extent a response is required, Intervenor-Defendants deny any characterization of the statutory provisions, which speak for themselves, and respectfully refer the Court to those provisions for a complete and accurate statement of their contents.

7.   Intervenor-Defendants deny the allegations in Paragraph 7.

8.   This paragraph contains argument and legal conclusions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any factual allegations contained in this paragraph.

9.   This paragraph contains argument and legal conclusions, which require no response. To

the extent that a response is required, Intervenor-Defendants deny any factual allegations contained in this paragraph.

10. Intervenor-Defendants deny the allegations in Paragraph 10.

11. Intervenor-Defendants deny the allegations in Paragraph 11.

12. This paragraph contains argument and legal conclusions, which require no response. To the extent that a response is required, Intervenor-Defendants deny the allegations.

13. Intervenor-Defendants deny the allegations in Paragraph 13.

**PARTIES**

14. Intervenor-Defendants admit the allegations in Paragraph 14.

15. Intervenor-Defendants admit the allegations in Paragraph 15.

16. Intervenor-Defendants admit the allegations in Paragraph 16.

17. Intervenor-Defendants admit the allegations in Paragraph 17.

18. Intervenor-Defendants admit the allegations in Paragraph 18.

19. Intervenor-Defendants admit the allegations in Paragraph 19.

20. Intervenor-Defendants admit the allegations in Paragraph 20.

21. Intervenor-Defendants admit the allegations in Paragraph 21.

22. Intervenor-Defendants admit the allegations in Paragraph 22.

23. Intervenor-Defendants admit the allegations in Paragraph 23.

24. Intervenor-Defendants admit the allegations in Paragraph 24.

25. Intervenor-Defendants admit the allegations in Paragraph 25.

26. Intervenor-Defendants admit the allegations in Paragraph 26.

27. Intervenor-Defendants admit the allegations in Paragraph 27.

28. Intervenor-Defendants admit the allegations in Paragraph 28.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

29. This paragraph contains legal conclusions, which require no response.

30. This paragraph contains legal conclusions, which require no response.

31. This paragraph contains legal conclusions, which require no response.

32. This paragraph contains legal conclusions, which require no response.

**FACTUAL BACKGROUND**

33. Intervenor-Defendants admit only so much of Paragraph 33 that alleges that California began mandating motor vehicle emission standards before Congress did so. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

34. Intervenor-Defendants admit only so much of Paragraph 34 that alleges that California has requested and received from EPA waivers of Clean Air preemption of California motor vehicle emissions standards under 42 U.S.C. § 7543(b)(1). Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

35. Intervenor-Defendants admit that the Senate and House proposed different text for what would later become 42 U.S.C. § 7543(b). Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

36. Intervenor-Defendants admit only so much of Paragraph 36 that alleges that members of Congress made the statements that appear there in quotation marks. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

37. Intervenor-Defendants admit that 42 U.S.C. § 7543(b)(1) uses the word "shall" and that the provisions were codified as specified in Footnote 4. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

38. Intervenor-Defendants deny the allegations in Paragraph 38.

39. This paragraph characterizes House reports and statutory provisions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the reports and provisions, which speak for themselves. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

40. This paragraph characterizes statutory text, which requires no response. To the extent that a response is required, the Intervenor-Defendants deny any characterization and refer the Court to the statute, which speaks for itself. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

41. Intervenor-Defendants admit that EPA has granted California numerous waivers of Clean Air Act preemption, that those waivers have been granted under both Democratic and Republican

Intervenor-Defendants' Answer (4:25-cv-04966-HSG)

presidential administrations, and that EPA's issuance of those waivers is subject to judicial review under 42 U.S.C. § 7607(b)(1). Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

42. Intervenor-Defendants deny that an "electric or hydrogen vehicle" is a "zero-emission vehicle," as alleged in Footnote 6. Intervenor-Defendants admit that EPA granted waivers of Clean Air Act preemption as indicated in the Federal Register citations, and that California has adopted increasingly stringent emissions requirements for passenger cars and light trucks over time.

43. This paragraph characterizes California ACC II regulations, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the regulations, which speak for themselves.

44. This paragraph characterizes California ACT regulations, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the regulations, which speak for themselves. Intervenor-Defendants admit that the California Air Resources Board ("CARB") issued the statement in quotation marks. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

45. This paragraph characterizes California Omnibus regulations, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the regulations, which speak for themselves.

46. Intervenor-Defendants deny the allegations in Paragraph 46.

47. Intervenor-Defendants deny the allegations in Paragraph 47.

48. This paragraph characterizes a Senate report, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the report, which speaks for itself. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

49. This paragraph characterizes a House report, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the report, which speaks for itself. Intervenor-Defendants admit that Congress did not impose a moratorium on all new federal regulations in 1995. Intervenor-Defendants deny any additional

factual allegations contained in this paragraph.

50. Intervenor-Defendants admit the allegations in Paragraph 50, which describe the 1996 enactment of the bill that included the Congressional Review Act ("CRA").

51. This paragraph characterizes statutory text, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the text, which speaks for itself.

52. This paragraph characterizes statutory text, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the text, which speaks for itself.

53. This paragraph characterizes statutory text, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the text, which speaks for itself.

54. Intervenor-Defendants admit only so much of Paragraph 54 that alleges that Congress has established an ad-hoc, informal process involving the Government Accountability Office ("GAO"), for instance, where an agency fails to submit an action that one or more members of Congress believe is a "rule" subject to the CRA. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

55. This paragraph characterizes statutory text, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the text, which speaks for itself. To the extent that Plaintiffs' characterization contains additional factual allegations, Intervenor-Defendants deny them.

56. Intervenor-Defendants admit the allegations in Paragraph 56.

57. Intervenor-Defendants deny the allegations in the first sentence of Paragraph 57. The remainder of the paragraph characterizes statutory text, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the statutory text, which speaks for itself.

58. This paragraph contains argument and legal conclusions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any factual allegations the

paragraph contains.

59. This paragraph contains argument and legal conclusions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any factual allegations the paragraph contains.

60. This paragraph contains argument and legal conclusions, which require no response. Intervenor-Defendants, however, deny that the agency actions disapproved by the joint resolutions passed by the Senate on May 22, 2025 are "outside the [CRA's] intended and explicit scope."

61. Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 61.

62. Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 related to what Congress has considered using the CRA to disapprove. Intervenor-Defendants deny that waivers of Clean Air Act preemption are "similar" to "a radio spectrum license, mining permit, or oil lease."

63. This paragraph characterizes statutory text and contains argument and legal conclusions, which requires no response. To the extent that a response is required, Intervenor-Defendants refer the Court to the statutory text, which speaks for itself.

64. This paragraph contains legal conclusions, which require no response. To the extent that a response is required, Intervenor-Defendants deny any factual allegations the paragraph contains.

65. This paragraph characterizes statements by EPA published in the Federal Register, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Federal Register publications, which speak for themselves. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

66. This paragraph characterizes a GAO decision letter, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the letter, which speaks for itself. To the extent that Plaintiffs' characterization contains additional factual allegations, Intervenor-Defendants deny them.

67. Intervenor-Defendants admit that the members of Congress specified made the statements indicated in quotation marks. Intervenor-Defendants deny any additional factual allegations

contained in this paragraph.

68. This paragraph contains argument and legal conclusions, which require no response. To the extent a response is required, Intervenor-Defendants admit that EPA provided opportunity for public hearing and comment on the waiver requests. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

69. This paragraph characterizes statements by EPA published in the Federal Register, which require no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Federal Register publications, which speak for themselves.

70. Intervenor-Defendants admit that EPA did not submit the waivers of Clean Air Act preemption for Advanced Clean Cars II ("ACC II"), Advanced Clean Trucks ("ACT"), and the Omnibus regulations to Congress at the same time that they were published in the Federal Register. Intervenor-Defendants admit, based on their knowledge and belief, that any member could have asked GAO for an opinion on whether the waivers were subject to the CRA after the waivers were published in the Federal Register time, and that no member of Congress did so.

71. Intervenor-Defendants admit the second sentence of Paragraph 71, which alleges that President Trump signed a day-one Executive Order indicating certain "state emissions waivers" should be ended. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

72. This paragraph characterizes an Executive Order, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Executive Order, which speaks for itself. To the extent that Plaintiffs' characterization of that order contains additional factual allegations, Intervenor-Defendants deny them.

73. Intervenor-Defendants admit that President Trump and EPA Administrator Zeldin made the announcement in the first sentence of Paragraph 73. Intervenor-Defendants deny that this announcement "changed course." Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

74. This paragraph characterizes EPA Zeldin's announcement, which requires no response.

To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the announcement, which speaks for itself.

75. This paragraph characterizes EPA Zeldin's announcement, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the announcement, which speaks for itself.

76. This paragraph characterizes an X (formerly, Twitter) post, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the post, which speaks for itself. To the extent that Paragraph 76 contains additional factual allegations, Intervenor-Defendants deny them.

77. Intervenor-Defendants admit that EPA submitted the waivers to Congress in February 2025. Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 77.

78. This paragraph characterizes actions recounted in a letter written by GAO, which Plaintiffs attached to their Complaint as Exhibit B, and so requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to Exhibit B, which speaks for itself.

79. Intervenor-Defendants admit that the letter that Plaintiffs attached as Exhibit B states that three Senators requested a legal opinion from GAO on whether the waivers were rules under the CRA.

80. This paragraph characterizes actions recounted in a letter written by GAO, which Plaintiffs attached to their Complaint as Exhibit B, and so requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to Exhibit B, which speaks for itself.

81. Intervenor-Defendants admit that Senator Capito made the statement quoted in the Times of San Diego in this paragraph. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

82. Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82.

83. This paragraph characterizes a letter written by GAO, which Plaintiffs attached to their Complaint as Exhibit B, and so requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to Exhibit B, which speaks for itself. To the extent that Plaintiffs' characterization of the letter contains additional factual allegations, Intervenor-Defendants deny them.

84. This paragraph characterizes a letter written by GAO, which Plaintiffs attached to their Complaint as Exhibit B, and so requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to Exhibit B, which speaks for itself. To the extent that Plaintiffs' characterization of the letter contains additional factual allegations, Intervenor-Defendants deny them.

85. Intervenor-Defendants admit that the House of Representatives introduced H.J. Res. 87, 88, and 89 "[a]bout a month" after the date of the letter that Plaintiffs attached to their Complaint as Exhibit B. Intervenor-Defendants deny any additional factual allegations in Paragraph 85.

86. This paragraph characterizes a newsletter published by a media outlet, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization of the newsletter or additional factual allegations contained in the paragraph and refer the Court to the newsletter, which speaks for itself.

87. Intervenor-Defendants deny the allegations in Paragraph 87.

88. This paragraph characterizes a publicly available journal article, and so requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization of that article and refer the Court to the article, which speaks for itself.

89. Intervenor-Defendants admit that the Senate parliamentarian was presented with the question whether the waivers were subject to the CRA. The remainder of this paragraph consists of legal conclusions, which require no response. To the extent that any further response is required, Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

90. Intervenor-Defendants admit that the cited source reported an opinion by the Senate parliamentarian on April 4, 2025. Intervenor-Defendants lack sufficient knowledge or information to form an opinion as to the truth of the remaining allegations in Paragraph 90.

91. The first sentence of Paragraph 91 contains a legal conclusion, which requires no response. To the extent that the first sentence of Paragraph 91 contains factual allegations, Intervenor-Defendants deny them. The second sentence of Paragraph 92 characterizes a publicly available article, which requires no response. To the extent that a response is required, Intervenor-Defendants deny that characterization and any additional factual allegations contained in this paragraph.

92. This paragraph characterizes publicly available articles, which require no response. To the extent that a response is required, Intervenor-Defendants deny Plaintiffs' characterization and any additional factual allegations contained in this paragraph, and refer the Court to the articles, which speak for themselves.

93. Intervenor-Defendants admit that House members introduced resolutions under the CRA for three EPA waivers. Intervenor-Defendants deny all other factual allegations in this paragraph.

94. Intervenor-Defendants deny the allegations in Paragraph 94.

95. Intervenor-Defendants admit that the House voted to adopt three resolutions of disapproval related to EPA waivers of Clean Air Act preemption for California emissions standards.

96. Intervenor-Defendants deny the allegations in Paragraph 96.

97. This paragraph characterizes a publicly available document, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the document, which speaks for itself.

98. Intervenor-Defendants admit that the Senate proceeded with votes on resolutions of disapproval under the CRA regarding EPA's waivers. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

99. Intervenor-Defendants admit that the cited article contains the phrases set out in quotation marks. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

100. Intervenor-Defendants admit that in the quoted statement, if accurate, Senate Majority Leader Thune did not explain how the Senate would proceed with the resolutions of disapproval regarding EPA's waivers. To the extent that this paragraph contains additional factual allegations,

Intervenor-Defendants deny them.

101.    Intervenor-Defendants admit that Majority Leader Thune introduced the indicated point of order and that the Senate voted to agree to that point of order. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

102.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

103.    The first and fourth sentences of Paragraph 103 state argument and legal conclusions, which requires no response. To the extent that these sentences contain factual allegations, Intervenor-Defendants deny them. Intervenor-Defendants admit the factual allegations in the second and third sentences of this paragraph, which explain the point of order and its effect.

104.    This paragraph characterizes a statement by Senator Whitehouse reported in the Congressional Record, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Congressional Record, which speaks for itself. Intervenor-Defendants deny any remaining factual allegations this paragraph.

105.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

106.    This paragraph characterizes a statement by Senator Capito reported in the Congressional Record, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Congressional Record, which speaks for itself. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

107.    This paragraph characterizes statements by Senators Barrasso and Capito reported in the Congressional Record, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Congressional Record, which speaks for itself. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

108.    This paragraph characterizes statements by lawmakers reported in the Congressional

Record, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Congressional Record, which speaks for itself. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

109.    Intervenor-Defendants deny the allegations in Paragraph 109.

110.    This paragraph characterizes statements by lawmakers reported in the Congressional Record, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Congressional Record, which speaks for itself. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

111.    Intervenor-Defendants admit that the Senate voted to adopt the resolutions of disapproval in May 2025.

112.    Intervenor-Defendants admit that EPA issued a press release that included the statements in quotation marks. Intervenor-Defendants deny any remaining factual allegations contained in this paragraph.

113.    Intervenor-Defendants admit the allegations in Paragraph 113.

**CLAIMS FOR RELIEF**

**COUNT I**
*Ultra Vires* **– Conduct in Excess of Statutory Authority**
**(Against All Defendants)**

114.    Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

115.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

116.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

117.    Intervenor-Defendants deny the allegations in Paragraph 117.

118.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

119.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

120.    Intervenor-Defendants deny the allegations in Paragraph 120.

121.    Intervenor-Defendants deny the allegations in Paragraph 121.

## COUNT II
### Violation of the Administrative Procedure Act
### (Against the United States, EPA, and Its Administrator)

122.    Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

123.    Intervenor-Defendants admit the allegations in Paragraph 123.

124.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

125.    This paragraph characterizes statutory text, which requires no response. To the extent a response is required, Intervenor-Defendants deny any characterization and refer the Court to the text, which speaks for itself.

126.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

127.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

128.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

129.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

130.    Intervenor-Defendants deny the allegations in Paragraph 130.

131.    Intervenor-Defendants deny the allegations in Paragraph 131.

132.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

133.    Intervenor-Defendants deny the allegations in Paragraph 133.

134.    Intervenor-Defendants deny the allegations in Paragraph 134.

135. Intervenor-Defendants deny the allegations in Paragraph 135.

## COUNT III
### Violation of the Congressional Review Act
### (Against All Defendants)

136. Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

137. This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

138. Intervenor-Defendants admit that EPA did not submit the waivers to Congress at the time it issued them, and that no member of Congress sought GAO's opinion whether the waivers were "rules" immediately following EPA's issuance of the waivers. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

139. Intervenor-Defendants deny the allegations in Paragraph 139.

140. Intervenor-Defendants admit that GAO concluded that the waivers are not "rules" under the CRA. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

141. This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

142. Intervenor-Defendants deny the allegations in Paragraph 142.

143. Intervenor-Defendants deny the allegations in Paragraph 143.

## COUNT IV
### Violation of the Take Care Clause
### (Against President Trump, EPA, and Its Administrator)

144. Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

145. This paragraph characterizes a provision of the United States Constitution, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and refer the Court to the Constitution, which speaks for itself.

146. Intervenor-Defendants deny the allegations in Paragraph 146.

147. The second sentence of this paragraph characterizes a publicly available document,

Intervenor-Defendants' Answer (4:25-cv-04966-HSG)                                    Page 16

which requires no response. To the extent a response is required, Intervenor-Defendants deny any characterization and refer the Court to the document, which speaks for itself. Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in the third sentence of Paragraph 147. Intervenor-Defendants deny any additional factual allegations contained in this paragraph.

148.    Intervenor-Defendants deny the allegations in Paragraph 148.

149.    Intervenor-Defendants deny the allegations in Paragraph 149.

150.    Intervenor-Defendants deny the allegations in Paragraph 150.

151.    Intervenor-Defendants deny the allegations in Paragraph 151.

152.    Intervenor-Defendants deny the allegations in Paragraph 152.

**COUNT V**
**Violation of Separation of Powers**
**(Against All Defendants)**

153.    Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

154.    This paragraph contains argument and legal conclusions, which require no response. The paragraph also characterizes provisions of the Constitution, which requires no response. To the extent that a response is required, Intervenor-Defendants deny any characterization and any factual allegations, and refer the Court to the Constitution, which speaks for itself.

155.    This paragraph contains argument and legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

156.    Intervenor-Defendants deny the allegations in Paragraph 156.

157.    Intervenor-Defendants deny the allegations in Paragraph 157.

158.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

159.    This paragraph contains argument and  legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

160.    This paragraph contains argument, which requires no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

161.    This paragraph contains argument and legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

162.    This paragraph contains argument and legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

163.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

164.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

165.    Intervenor-Defendants admit that the waivers "were the subject of pending litigation at the time the Resolutions were introduced and voted on." The remainder of this paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any additional factual allegations, Intervenor-Defendants deny them.

166.    This paragraph contains legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

167.    This paragraph contains argument and legal conclusions, which require no response. To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

168.    Intervenor-Defendants deny the allegations in Paragraph 168.

169.    Intervenor-Defendants deny the allegations in Paragraph 169.

## COUNT VI
### Violation of the Tenth Amendment and Structural Principles of Federalism
### (Against All Defendants)

170.    Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

171.    This paragraph contains argument and legal conclusions, which require no response.

Intervenor-Defendants' Answer (4:25-cv-04966-HSG)                                    Page 18

**3-ER-573**

To the extent that this paragraph contains any factual allegations, Intervenor-Defendants deny them.

172.    Intervenor-Defendants deny the allegations in Paragraph 172.

173.    Intervenor-Defendants deny the allegations in Paragraph 173.

174.    Intervenor-Defendants deny the allegations in Paragraph 174.

175.    This paragraph contains argument and legal conclusions, which require no response. To the extent that the remainder of this paragraph contains any factual allegations, Intervenor-Defendants deny them.

176.    This paragraph contains argument and legal conclusions, which require no response. To the extent that the remainder of this paragraph contains any factual allegations, Intervenor-Defendants deny them.

177.    Intervenor-Defendants deny the allegations in Paragraph 177.

178.    Intervenor-Defendants deny the allegations in Paragraph 178.

## COUNT VII
### Nonstatutory Review: Violations of Federal Law by Federal Officials
### (Against All Defendants)

179.    Intervenor-Defendants incorporate by reference each of their responses to the preceding paragraphs as if fully set forth herein.

180.    This paragraph contains legal conclusions, which require no response. To the extent that the remainder of the paragraph contains factual allegations, Intervenor-Defendants deny them.

181.    Intervenor-Defendants admit that, following the enactment of the resolutions of disapproval, ACC II, ACT, and the Omnibus regulations are "preempted" by the Clean Air Act and so "unenforceable."

182.    Intervenor-Defendants deny the allegations in Paragraph 182.

183.    Intervenor-Defendants deny the allegations in Paragraph 183.

184.    Intervenor-Defendants deny the allegations in Paragraph 184.

185.    Intervenor-Defendants deny the allegations in Paragraph 185.

186.    Intervenor-Defendants deny the allegations in Paragraph 186.

187.  Intervenor-Defendants deny the allegations in Paragraph 187.

188.  Intervenor-Defendants deny the allegations in Paragraph 188.

## PRAYER FOR RELIEF

The remainder of the Complaint contains Plaintiffs' prayer for relief, which requires no response. To the extent that a response is deemed required, Intervenor-Defendants deny that Plaintiffs are entitled to the relief that they seek or to any other relief in this action.

## DEFENSES

1.  **Rule 12(b)(1): Lack of Subject Matter Jurisdiction:** This court lacks subject matter jurisdiction over this case because Congress, in the Congressional Review Act, has expressly withheld jurisdiction over Plaintiffs' claims in this suit. *See* 5 U.S.C. § 805.

2.  **Rule 12(b)(1): Lack of Article III Standing:** Plaintiffs lack Article III standing to bring their statutory claims because their alleged injury—their inability to enforce their preempted regulations—is neither fairly traceable to the challenged EPA actions, nor redressable by a favorable ruling related to those actions.

3.  **Rule 12(b)(1): Lack of Subject Matter Jurisdiction:** This court lacks subject matter jurisdiction over Plaintiffs' Administrative Procedure Act claim because the challenged EPA actions are not "final agency action." 5 U.S.C. § 704.

4.  **Rule 12(b)(1): Lack of Subject Matter Jurisdiction:** This court lacks subject matter jurisdiction over Plaintiffs' constitutional claims because they raise non-justiciable political questions.

5.  **Rule 12(b)(6): Failure to State a Claim on Which Relief Can Be Granted:** This court should dismiss Plaintiffs' constitutional and nonstatutory review claims because they are not legally cognizable claims.

///

///

///

///

///

Dated: _____ ___, 2025        Respectfully submitted,

_____

Michael Buschbacher
James R. Conde
James R. Wedeking
Laura B. Ruppalt
Boyden Gray PLLC

Eric Grant
John B. Thomas
Hicks Thomas LLP

Counsel for Intervenor-Defendants
American Free Enterprise Chamber of
Commerce, Illinois Corn Growers Association,
Indiana Corn Growers Association, Iowa Corn
Growers Association, Kansas Corn Growers
Association, Kentucky Corn Growers
Association, Michigan Corn Growers
Association, Missouri Corn Growers
Association, Nebraska Corn Growers
Association, Tennessee Corn Growers
Association, Texas Corn Producers, Wisconsin
Corn Growers Association, and National Corn
Growers Association

February 25, 2026

Respectfully Submitted,

/s/ *Rachel Levick*

Raymond B. Ludwiszewski
Rachel Levick
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
Tel.: (202) 955-8500
Fax: (202) 467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

Sean Howell
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
  Suite 2600
San Francisco, CA 94111
Tel.: (415) 393-8355
Fax: (415) 801-7364
showell@gibsondunn.com

*Counsel for The Alliance for*
*Automotive Innovation and*
*The National Automobile Dealers*
*Association*

/s/ *Michael Buschbacher*

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
  Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620
mbuschbacher@boydengray.com
jconde@boydengray.com
lruppalt@boydengray.com

*Counsel for American Free*
*Enterprise Chamber of Commerce,*
*Illinois Corn Growers Association,*
*Indiana Corn Growers Association,*
*Iowa Corn Growers Association,*
*Kansas Corn Growers Association,*
*Kentucky Corn Growers Association,*
*Michigan Corn Growers Association,*
*Missouri Corn Growers Association,*
*Nebraska Corn Growers Association,*
*Tennessee Corn Growers Associa-*
*tion, Texas Corn Producers,*
*Wisconsin Corn Growers Associa-*
*tion, and National Corn Growers*
*Association*

**3-ER-577**

*/s/ Katherine C. Yarger*
Katherine C. Yarger
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
Email: katie@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

Steven P. Lehotsky
Michael B. Schon
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue NW
 Suite 700
Washington, DC 20001
steve@lkcfirm.com
mike@lkcfirm.com
Tel.: (512) 693-8350
Fax: (512) 727-4755

*Counsel for American Fuel &
Petrochemical Manufacturers,
American Petroleum Institute, and
the National Association of
Convenience Stores*