Consolidated Appeal Nos. 25-8013, 26-88, 26-497, and 26-525

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

STATE OF CALIFORNIA, *et al.*,
*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA, *et al.*,
*Defendants*,

WESTERN STATES TRUCKING ASSOCIATION, INC. *et al.*,
*Proposed Defendant-Intervenors and Movant-Appellants*.

———————

**On Appeal from the U.S. District Court for the**
**Northern District of California**
No. 4:25-cv-04966-HSG

———————

**STATE OF CALIFORNIA ET AL.'S**
**SUPPLEMENTAL EXCERPTS OF RECORD (ONE VOLUME)**

———————

ROB BONTA
  *Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH SMITH
  *Senior Assistant Attorneys General*
MYUNG J. PARK
DAVID ZAFT
  *Supervising Deputy Attorneys General*

KATHERINE GAUMOND
CAITLAN MCLOON
M. ELAINE MECKENSTOCK
EMMANUELLE S. SOICHET
CECILIA D. SEGAL
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
  455 Golden Gate Ave., Ste. 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3545
  Fax: (415) 703-1107
  Email: cecilia.segal@doj.ca.gov
*Attorneys for State of California*

*Additional appellees and counsel listed on following pages*

March 27, 2026

**SER-001**

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM
Assistant Deputy Attorney General
Ralph L. Carr Judicial Center
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
carrie.noteboom@coag.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD
Senior Appellate Counsel
JON WHITNEY
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

/s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**JENNIFER DAVENPORT**
*Attorney General for the State of New Jersey*

*/s/ Lisa Morelli*
LISA MORELLI
Deputy Attorney General
Division of Law
25 Market Street, P.O. Box 093
Trenton, NJ 08625
(609) 376-2740
lisa.morelli@law.njoag.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

*/s/ William Grantham*
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
 (505) 717-3520
wgrantham@nmdoj.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**SER-003**

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

/s/ *Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

## INDEX

**Document**                                                                 **SER Location**

Excerpts from United States' Reply in Support of Motion to
Dismiss Amended Complaint
    Filed on Feb. 2, 2026, at D.Ct. Dkt. 227……..……………..………..7–9

Excerpts from Greg Dotson's Amicus Brief in Opposition to
United States' Motion to Dismiss
    Filed Jan. 29, 2026, at D.Ct. Dkt. 223…………………………………..10–12

Excerpts from Law Scholars' Amicus Brief in Opposition to
United States' Motion to Dismiss
    Filed Jan. 29, 2026, at D.Ct. Dkt. 222…………………………………..13–19

Excerpts from The Zero Emission Transportation Association's
Amicus Brief in Opposition to United States' Motion to Dismiss
    Filed Jan. 29, 2026, at D.Ct. Dkt. 218………………………….………20–23

Excerpts from Plaintiff States' Opposition to United States'
Motion to Dismiss
    Filed Jan. 9, 2026, at D.Ct. Dkt. 194…………………………………24–26

Excerpts from American Free Enterprise Chamber of Commerce
(AmFree) et al.'s Amicus Brief in Support of United States'
Motion to Dismiss
    Filed Dec. 12, 2025, at D.Ct. Dkt. 186-1……………….…………….27–29

Excerpts from The Alliance for Automotive Innovation
et al.'s Amicus Brief in Support of United States' Motion
to Dismiss
    Filed Dec. 12, 2025, at D.Ct. Dkt. 185-1……………….…………….30–34

Excerpts from Plaintiff States' Opposition to AmFree et al.'s
Motion for Leave to File Motion to Dismiss
    Filed Dec. 1, 2025, at D.Ct. Dkt. 181…………………………….…...35–40

Excerpts from The Truck Renting and Leasing Association
et al.'s Amicus Brief in Support of United States' Motion
to Dismiss
    Filed Nov. 24, 2025, at D.Ct. Dkt. 179-1……………………………….41–51

Excerpts from The Chamber of Commerce of the United States'
Amicus Brief in Support of United States' Motion to Dismiss
    Filed Nov. 24, 2025, at D.Ct. Dkt. 177-1……………………………….52–57

Plaintiff States' Opposition to Western States Trucking
Association (WSTA) et al.'s Motion to Intervene as Defendants
    Filed Sept. 29, 2025, at D.Ct. Dkt. 145………………………………58–78

WSTA et al.'s Motion to Intervene as Defendants
    Filed Sept. 15, 2025, at D.Ct. Dkt. 112……………………………...79–103

Letter from Zero Emission Transportation Association
(ZETA) Regarding Defendants' Revised Position on ZETA's
Motion to Intervene
    Filed July 29, 2025, at D.Ct. Dkt. 47……………………………………...104

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER (DC Bar #1028454)
*Deputy Assistant Attorney General*
JEFFREY HUGHES (NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
jeffrey.hughes@usdoj.gov

*Attorneys for Defendants*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division
JOSEPH E. BORSON
*Assistant Branch Director*
Federal Programs Branch
STEPHEN M. PEZZI (FL Bar #1041279)
*Senior Trial Counsel*
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 4:25-cv-04966-HSG<br><br>**REPLY IN SUPPORT OF UNITED STATES' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date: Feb. 19, 2026<br>Time: 2:00 p.m. PST<br>Judge: Hon. Haywood S. Gilliam, Jr.<br><br>ORAL ARGUMENT REQUESTED |

**SER-007**

omission *under*" the CRA. Opp. 7-8 (quoting 5 U.S.C. § 805) (emphasis added). Remarkably, they go so far as to assert that the CRA is "not implicated" by this case. *Id.* at 8. How so? On California's telling: (1) CRA procedures apply only to "a rule," 5 U.S.C. § 801(a)(1)(A), (2) EPA's waivers "are not rules," Opp. 8, and therefore (3) "none of the government conduct alleged in the complaint occurred 'under' the CRA," *id.* In other words, according to California, because the government violated the CRA, the CRA's preclusion provision does not apply.

That argument puts the cart before the horse and would effectively read 5 U.S.C. § 805 out of the U.S. Code. After all, *every* CRA plaintiff has some merits theory about how the CRA has been improperly invoked, or misinterpreted, or otherwise violated. The purpose of a jurisdiction-stripping provision is to prohibit judicial review of those very questions. California's argument is circular: it assumes the validity of its position on the merits as the basis for concluding that § 805 does not bar review of the merits. If the statute worked that way, all claims that a plaintiff asserts are meritorious would proceed—just as if the preclusion provision did not exist. This Court "should not lightly conclude that Congress enacted a self-defeating statute." *Pugin v. Garland*, 599 U.S. 600, 607 (2023). If California were correct, every case applying § 805 would have been analyzed very differently. Mot. 7-8 (citing cases).

**b.** This is not a question of first impression in the Ninth Circuit. The plaintiffs in *Bernhardt*, just like California here, claimed that the agency action at issue was "not eligible for disapproval" under the CRA because the agency failed to comply with certain statutory requirements of the CRA itself. 946 F.3d at 562-63; *see* Mot. 11. And those plaintiffs argued, just as California does here, that because the agency action at issue in that case was "not eligible for disapproval" under the CRA, "the Joint Resolution was not enacted 'under' the CRA" for purposes of § 805. *Id.* at 563. The Ninth Circuit explicitly rejected that argument, holding that enactment of a CRA resolution was "an action under the CRA" that was subject to the statute's jurisdiction-stripping provision. *Id.* at 564. Because it lacked jurisdiction, the Ninth Circuit thus never answered the question of whether (as those plaintiffs argued) the government violated the CRA in that case. This Court should reach the same result here, as the determination of whether EPA waivers are rules under the CRA is beyond the jurisdiction of this Court.

That is even more clear given the posture of this case: Congress itself conclusively determined that these waivers were properly subject to CRA procedures by voting (repeatedly) to use those procedures to disapprove the waivers. Mot. 5-6, 26. That procedural determination is exclusively the prerogative of Congress.[1] *See infra* at 5-6.

California's only response to *Bernhardt* is to (correctly) concede that "Section 805 bars 'claims that [the government] violated the CRA's statutory requirements,'" but then to (incorrectly) assert without explanation that "Plaintiffs press no such claim here." Opp. 7 (quoting *Bernhardt*, 946 F.3d at 564). Similarly, in a footnote, California tries to distinguish *Bernhardt* on the theory that the plaintiffs there claimed "that a joint resolution was ineffectual because it was not enacted in accordance with the statutory procedure in the CRA," and that, "[b]y contrast, Plaintiffs here claim that the Resolutions are ineffectual because their substance and the process used to pass them violated the Constitution." *Id.* at 7 n.6. But on its face, that distinction only works for California's constitutional claims—and thus seems to reflect forfeiture of all of California's statutory and ultra vires claims. In any event, whatever the explanation for California's shifting descriptions of its claims, the Court's task is now easier. Because California's only response to *Bernhardt*'s holding about the scope of § 805 is to point out that this case also involves constitutional claims, the Court should hold that all of California's statutory and ultra vires claims (Counts I, II, V, and VI) are precluded.[2]

---

[1] That is why (at least in their motion to dismiss in this case) Defendants do not argue the merits of whether "waivers are, in fact, rules, and thus subject to the CRA," Opp. 9—not because Plaintiffs are right about the definition of a "rule" versus an "order," but because the question is plainly beyond the jurisdiction of this Court under binding precedent, and because Congress has already decided that CRA procedures *do* apply here.

[2] Plaintiffs also extract without context (at 9) three words from *National TPS Alliance v. Noem*, 150 F.4th 1000, 1016 (9th Cir. 2025), but nothing in that case is inconsistent with the United States's argument here. That opinion interpreted the text of a materially different preclusion provision. *See id.* at 1016 (quoting 8 U.S.C. § 1254a). And the Ninth Circuit already interpreted *this* statute, in *Bernhardt*. So *Bernhardt* applies, not *National TPS Alliance*—that is, even ignoring the fact that the Supreme Court granted the government's stay motion in *National TPS Alliance*, 145 S. Ct. 2728 (2025) (Mem.), disagreeing with the Ninth Circuit's rejection of the same relief.

Jonathan Weissglass (CSB 185008)
Law Office of Jonathan Weissglass
1939 Harrison Street, Suite 150-B
Oakland, CA 94612
Telephone: 510-836-4200
E-mail: jonathan@weissglass.com

Attorney for *Amicus Curiae*
Greg Dotson

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No. 4:25-cv-04966-HSG |
| Plaintiffs, | **BRIEF OF *AMICUS CURIAE* GREG DOTSON IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants. | |

## II.    EPA Waivers And The CRA

### A.    Clean Air Act Waivers Historically Have Not Been Subject To The CRA

The Clean Air Act generally preempts states from adopting or enforcing emission standards for motor vehicles. 42 U.S.C. § 7543(a). The Clean Air Act also requires EPA to waive federal preemption over California vehicle emissions standards when certain factual predicates are satisfied. 42 U.S.C. § 7543(b). Since enactment of the Congressional Review Act in 1996, EPA has taken nearly 150 actions pursuant to this authority. *See* U.S. Environmental Protection Agency, Vehicle Emissions California Waivers and Authorizations, *available at* https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations. All available information indicates a consensus among Congress, EPA, and the GAO until 2025 that EPA's waivers of preemption were not considered to be "rules" subject to the CRA. Notices of these waivers of preemption were never before submitted to the GAO and the Congress by EPA pursuant to the CRA. *See* Congressional Research Service, California and the Clean Air Act (CAA) Waiver: Frequently Asked Questions, n.217, (May 9, 2025), *available at* https://www.congress.gov/crs_external_products/R/PDF/R48168/R48168.5.pdf.

For example, EPA granted a waiver of preemption in 2003 relating to California's Low Emission Vehicle program. Notice of Decision, Environmental Protection Agency, California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption, 68 Fed. Reg. 19811 (Apr. 22, 2003). In its notice, EPA states: "*As with past waiver decisions, this action is not a rule as defined by Executive Order 12866.*" *Id.* (emphasis added). The definition of a rule under Executive Order 12866 is similar to and likely more expansive than the definition of a rule under the CRA. *See* Executive Order No. 12866 (1993), § 2(d), *available at* https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf. The notice was not submitted to the GAO and Congress.

On March 14, 2022, EPA granted a waiver of preemption for California's Clean Car Program. Notice of Decision, Environmental Protection Agency, California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption, 87 Fed. Reg. 14332 (Mar. 14, 2022). A Senator requested

9

that the GAO determine whether the waiver of preemption is a "rule" for purposes of the CRA. GAO Decision B-334309, *Environmental Protection Agency—Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption*, at 1 (Nov. 30, 2023), *available at* https://www.gao.gov/assets/870/863746.pdf.

The GAO examined the issue and concluded that EPA's waivers do not fall under the CRA's definition of a rule. *Id.* at 4-7. The GAO explained that the waiver was an "order," not a "rule" under the APA because it "meets the statutory definition of an order, reflects the hallmarks of an order that courts identified, and is similar to the actions in our prior decisions that were orders." *Id.* at 5. The GAO found further support for this finding because the waiver was particular to California, based on consideration of particular facts, and had immediate effect in California. *Id.* at 5-6. The GAO concluded that even if the waiver was a rule, it is a rule of particular applicability because it "concerns a specific entity—California—and addresses a statutory waiver specific to California's Advanced Clean Car Program." *Id.* at 6. The CRA specifically excepts rules of particular applicability from review. 5 U.S.C. § 804(3)(A).

**B.**    **The Reaction To The Finding That The CRA Is Inapplicable To Waivers**

With CRA's inapplicability confirmed, opponents of California's emissions standards attempted to block the standards through the normal legislative process. On December 6, 2023, just one week after the GAO's determination was published, the House of Representatives passed the "Choice in Automobile Retail Sales Act of 2023," which would have prohibited EPA from finalizing its most recent emissions standards for cars and trucks, and, more importantly to the California waiver, amended the Clean Air Act to ensure that standards do not "result in limited availability of new motor vehicles based on the type of new motor vehicle engine in such new motor vehicles." H.R. 4468, 118th Congress (2023), *available at* https://www.congress.gov/bill/118th-congress/house-bill/4468/text.

The proposed amendment to the Clean Air Act would have prevented EPA from approving waivers of preemption for California's emissions standards. That is because California's waiver requests must be granted unless (among other considerations) the state standards are not consistent with the federal standards. 42 U.S.C. § 7543(b)(1)(C). Had the "Choice in Automobile Retail Sales

James P. Duffy (*pro hac vice pending*)
Peter Heisler (*pro hac vice pending*)
Daniel Alvarez *(pro hac vice pending*)
Center for Applied Environmental Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(802) 233-7967
jay.duffy@caelp.org

Theodore Lamm (Bar No. 319230)
Center for Law, Energy & the Environment
UC Berkeley School of Law
2680 Bancroft Way
Berkeley, CA 94720
(646) 823-4693
theodore.lamm@gmail.com

*Attorneys for Amici Curiae*
*Professors William Araiza, Nina Mendelson,*
*& Evan Zoldan.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants. | Case No. 4:25-cv-04966-HSG <br><br> **BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF STATES' OPPOSITION TO MOTION TO DISMISS** <br><br> Date: February 19, 2026 <br> Time: 2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge: Hon. Haywood S. Gilliam, Jr. |

rights of individual parties. *See, e.g.*, *id.* at 412–413 (opinion of Iredell, J., and Sitgreaves, D.J.). While it is "emphatically the province and duty of the [courts] to say what the law is," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)), executive-branch agencies unquestionably must apply law to facts in carrying out the law, *e.g.*, *Chadha*, 462 U.S. at 964 (Powell, J., concurring in the judgment), fulfilling a function similar to Article III adjudications. Legislative interference with either of the other branches' adjudications may raise "the very danger the Framers sought to avoid—the exercise of unchecked power." *Id.*[2] Therefore, Congress has no power to adjudicate or re-adjudicate a completed agency adjudication.[3]

## II. The California waiver is an adjudication—a license allowing California to implement its own air emissions standards.

Section 209(b)'s waiver process is not a rulemaking or broad policy-setting exercise; it is a paradigmatic adjudication. Congress designed the provision to require EPA to resolve a discrete,

---

[2] The President's approval of congressional adjudication cannot cure this constitutional defect. To be sure, the President may oversee principal officers who render binding legal positions in agency adjudications. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021). But that authority does not permit the President to collaborate with Congress to alter the outcome of completed agency adjudications governed by fixed statutory criteria that already embody Congress's policy choices and were enacted through proper presentment to a prior President—such as Section 209's waiver process. Allowing such coordinated outcome control would undermine statutory finality, evade judicial review, and distort the political accountability that the separation of powers is designed to preserve. *See id.* at 17–18; *Chadha*, 462 U.S. at 966 (Powell, J., concurring in the judgment); *see also Sierra Club v. Costle*, 657 F.2d 298, 406–07 (D.C. Cir. 1981) (recognizing the need for transparency (*i.e.*, docketing) where the President influences adjudicatory proceedings to promote due process and political accountability); Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration After Arthrex*, 75 Duke L.J. (forthcoming 2026) (manuscript at 86–87).

[3] Nor does the narrow administrative-law case distinguished in *Plaut* alter that conclusion. 514 U.S. at 232 (citing *Paramino Lumber Co. v. Marshall*, 309 U.S. 370 (1940)). The Court in *Paramino Lumber* specifically observed that the congressional act at issue did not "set aside a judgment . . . or direct the entry of an award;" instead, it reopened worker's compensation proceedings to allow presentation of new evidence "to remedy mistakes in administration." 309 U.S. at 376 & n.5, 378; *cf. Johannessen v. United States*, 225 U.S. 227, 241–42 (1912) (cited in *Paramino Lumber*, 309 U.S. at 381 n.25) (permitting review of a court proceeding granting a certificate of citizenship based on false evidence). Here, Congress has not merely reopened EPA's waiver adjudications to allow for presentation of supplemental or corrective evidence to the agency; rather, it has decided the matters itself. Nothing in the Court's cases suggests that Congress may reverse such adjudications—rather than changing the governing law for the future—consistent with the separation of powers.

BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN OPPOSITION TO MOTION TO DISMISS
Case No. 4:25-cv-04966-HSG                                         **SER-014**

record-based legal issue—whether California has satisfied fixed statutory criteria—through individualized factual determinations, not through the promulgation of generally applicable rules. As shown below, (a) the text and structure of Section 209(b) compel this conclusion because they confine EPA to narrow, case-specific findings; (b) the legislative history and EPA's consistent administrative practice confirm that Congress intended EPA to play an adjudicatory role; (c) courts have repeatedly characterized waiver decisions as adjudications subject to limited evidentiary review under statutory standards; and (d) the existence of Clean Air Act Section 177 does not transform EPA's adjudicatory determination into a legislative rulemaking simply because other states may later choose to adopt California's standards.

### a. The text of Section 209(b) shows Congress intended EPA's decisions under the provision to function as adjudications, not rulemakings.

The structure and text of Section 209(b) demonstrate that EPA's waiver decision is an adjudication requiring factual, record-based determinations under fixed statutory criteria. Section 209(b)(1) directs that "[t]he Administrator *shall . . .* waive application of this section . . . *if the State determines* that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards." 42 U.S.C. § 7543(b)(1) (emphasis added). EPA may deny a waiver only if it makes one of three narrow negative findings: (1) that California's protectiveness determination was arbitrary and capricious; (2) that California does not face "compelling and extraordinary conditions" necessitating its standards; or (3) that the standards are inconsistent with Section 202(a), which sets forth the factors governing federal standard-setting, including feasibility, safety, cost, and lead-time. *See id.* Each of these is a fact-bound, individualized determination—a hallmark of adjudication.

Had Congress intended a rulemaking, it would have used the language it employed elsewhere in the Clean Air Act: directing EPA to "promulgate," "prescribe," or "establish" *national* standards, accompanied by policy-oriented factors and procedures. *See, e.g.*, 42 U.S.C. §§ 7521(a), 7409. Congress also expressly required rulemaking elsewhere when authorizing waivers of preemption for other state programs. *See, e.g.*, 42 U.S.C. §§ 6297(d)(1)(A)–(B) (energy

10

efficiency waivers). Section 209(b) contains none of these indicia of rulemaking. *See Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotations omitted).

The nature of the required findings reinforces that EPA is acting as an adjudicator. Determining whether California's protectiveness finding is "arbitrary and capricious" requires EPA to evaluate the State's technical analysis, modeling, and justification—parallel to judicial review under the APA. Assessing whether California faces "compelling and extraordinary conditions" requires localized factual evaluation of California's air quality, climate, and pollution conditions. And determining consistency with Section 202(a) requires technical analysis of feasibility, lead time, and test procedure compatibility. *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 463 (D.C. Cir. 1998) (explaining that, in the waiver context, courts and EPA have repeatedly interpreted consistency with Section 202(a), 42 U.S.C. § 7521, to require only technological feasibility, meaning "sufficient lead time to permit manufacturers to develop and apply the necessary technology," and ensuring California's test procedures do not "impose inconsistent certification requirements"). None involves EPA's policy preferences.

Critically, Congress itself limited EPA's role under Section 209(b) to deciding whether the standards that California finds necessary to protect human health and the environment may take effect without disrupting EPA's overall statutory charge. EPA does not design, implement, or enforce the standards. In essence, EPA merely lifts federal preemption if statutory criteria are met. Its determination is a yes-or-no adjudication, not a policy-setting exercise.

      **b.**    **Legislative history and EPA practice confirm that EPA's role under Section 209(b) is adjudicatory.**

Legislative history confirms that Congress intended a narrow, adjudicatory role for EPA. When first considering whether the Clean Air Act would preempt state air pollution laws in 1967, Congress faced two competing visions. The Dingell Amendment would have placed the federal government in control of California's program, granting the Administrator broad discretion to

11

decide whether California had met its burden to demonstrate that its more stringent standards were warranted by changing the operative verb controlling EPA's grant of a waiver from "shall" to "may." *See* H.R. Rep. No. 90-728, at 69 (1967). The Dingell Amendment would have changed EPA's adjudicatory role in the waiver process to that of a policymaker and California representatives fiercely opposed this, warning that the Amendment would force California to "come with hat in hand to Washington" to plead for permission. *See* 113 Cong. Rec. 30955 (1967) (statement of Rep. Edward R. Roybal). They emphasized that California would be "at the mercy" of a single federal official, 113 Cong. Rec. 30941–42 (1967) (statement of Rep. H. Allen Smith), and that national industry groups could use delay tactics to impede California's more stringent standards, 113 Cong. Rec. 30976 (1967) *(*statement of Rep. Charles H. Wilson). Representative Chester E. Holifield noted that, under the Dingell structure, California would need to litigate under the APA to vindicate its authority. *See* 113 Cong. Rec. 30951–52 (1967).

By contrast, the Murphy Amendment preserved California's primary regulatory role and confined the federal government to a narrow adjudicatory check—precisely the structure Congress adopted. The House overwhelmingly rejected the Dingell Amendment, replacing it with the Senate's Murphy language. *See* 113 Cong. Rec. 30989 (1967).

Early federal practice confirmed the adjudicatory structure. The first waiver determination in 1968 evaluated only whether California met statutory criteria based on the hearing record. *See* 33 Fed. Reg. 10160 (July 16, 1968). In 1971, EPA emphasized its limited role, shorn of any broad-based authority to make the policy judgments characteristic of legislation: "The issue of whether a proposed California requirement is . . . unwise . . . is not legally pertinent" because the statute permits denial only upon specific findings. 36 Fed. Reg. 17458 (Aug. 31, 1971).

When Congress revisited the waiver provision in 1977, it did not alter EPA's Section 209(b)'s adjudicatory nature. Rather, Congress *strengthened* deference to California: reaffirming EPA's "liberal construction" of the waiver and broadening California's authority. *See* H.R. Rep. No. 95-294, at 23, 301 (1977). Congress knew how EPA was administering the statute—and approved.

12

In the decades since, EPA has consistently interpreted its role as adjudicatory. *See, e.g.*, 88 Fed. Reg. 20688, 20692 (Apr. 6, 2023) (EPA may deny a waiver only upon specific factual findings based on the record; opponents of a waiver bear the burden to demonstrate that one of the criteria for denial has been met). EPA has granted more than fifty waivers and fully denied only one. *See* 74 Fed. Reg. 32744, 32745 (July 8, 2009). EPA's uniform, longstanding view is powerful evidence of Section 209(b)'s adjudicatory character.

### c.    Judicial decisions reinforce the conclusion that EPA's role under Section 209(b) is adjudicatory.

Courts have consistently described Section 209(b) waiver proceedings as tightly bounded, record-based adjudications. In *Motor & Equip. Mfrs Ass'n v. EPA*, 627 F.2d 1095, 1115, 1119, 1122 (D.C. Cir. 1979), the D.C. Circuit held that Section 209(b) "operates in a narrowly circumscribed proceeding," that EPA's authority is "modest in scope . . . with no 'broad and impressive' authority to modify California regulations," and that EPA's task is to "consider" and "assess" "material evidence" under the statutory criteria. Two decades later, the D.C. Circuit reaffirmed this understanding in *Nichols*, emphasizing that Congress "chose to permit California to blaze its own trail with a minimum of federal oversight" and held that EPA may not consider factors beyond those Congress specified. 142 F.3d at 463, 467. This unbroken judicial line confirms that EPA acts as an adjudicator—not a policymaker—when granting or denying waiver requests.

### d.    Section 177 does not transform EPA's Section 209(b) determinations into rulemakings.

Clean Air Act Section 177 does not transform EPA's Section 209(b) waiver determinations into rulemakings. Section 177 establishes a separate, downstream mechanism by which states may, if they independently choose, adopt California's emission standards *after* EPA has granted California a waiver. *See* 42 U.S.C. § 7507. That state-by-state adoption process occurs under each state's own authority, at a later point in time, and is neither considered nor controlled by EPA when it decides whether California has satisfied Section 209(b)'s statutory criteria. EPA's waiver

decision therefore concerns only a single, discrete question: whether California may implement its own standards free from federal preemption.

Arguments to the contrary are misplaced. *See* Defs.' Mot. to Dismiss at 24–25, Nov. 17, 2025, Dkt. No. 172 (claiming that because other provisions of the Clean Air Act allow other states to adopt California's regulations, the waivers affect a public policy issue of nationwide importance, and amount to more than a "particularized adjudication of rights"). Section 209(b) contains no reference to other states, and EPA has consistently rejected calls to consider the effects of potential Section 177 adoption when evaluating a waiver request. As EPA explained, "[i]t is not appropriate . . . to review California regulations . . . through the prism of adopted or potentially adopted regulations by section 177 states." 78 Fed. Reg. 2112, 2143 (Jan. 9, 2013).

The statutory history confirms the point. Section 177 was enacted a decade after Section 209(b). When Congress amended Section 209(b) in 1977, it did not incorporate any consideration of other states' potential adoption decisions. Instead, Congress strengthened deference to California. If Congress had intended the possibility of downstream-state adoption to alter the adjudicatory character of EPA's role under Section 209(b), it would have amended Section 209(b)'s text to require EPA to account for those later choices. It did not.

## III.    The Resolutions are impermissible legislative adjudication.

The congressional Resolutions are a quintessential legislative adjudication. Unlike valid exercises of legislative power, they do not amend any part of the Clean Air Act or regulations promulgated under the Act, alter statutory criteria under Section 209, or establish new EPA rules of general applicability for future conduct. Nor do they alter governing law to be applied in pending or future cases. *See Bank Markazi*, 578 U.S. at 231–32 (upholding congressional change in the governing law for a category of cases); *Robertson*, 503 U.S. at 437 (upholding a statute that "replaced the legal standard"). Instead, the Resolutions overturn the results of EPA's factor-and-fact-specific agency determination regarding the right of a single State—California—to determine how to best protect its air quality. *See* Pub. L. Nos. 119-15, 119-16, 119-17 (2025). Congress simply disagreed with and impermissibly overturned EPA's result without altering governing law,

14

Matthew J. Craig (SBN 350030)
mcraig@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (929) 294-2542
Facsimile: (212) 564-0883

Martin Totaro*
mtotaro@heckerfink.com
HECKER FINK LLP
1050 K Street, NW
Washington, D.C. 20001
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Attorneys for Amicus Curiae*
*Zero Emission Transportation Association*

*Admitted pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, | Case No.: 4:25-cv-04966-HSG |
| | **BRIEF OF THE ZERO EMISSION TRANSPORTATION ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS** |
| *Plaintiffs,* | |
| v. | |
| UNITED STATES OF AMERICA, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency, DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendants.* | |

President"); *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."). But "[t]he structure of the Constitution does not permit Congress to execute the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986); *see Dep't of Transp. v. Association of American Railroads*, 575 U.S. 43, 67-68 (2015) (Thomas, J., concurring) ("When the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, *only* the vested recipient of that power can perform it." (emphasis added)).

## B. The Purported Disapproval Resolutions Encroach on Executive Authority By Reversing Prior, Final Agency Waiver Determinations Under the Clean Air Act

### 1. *Individual Waiver Decisions Are Adjudicative*

Waiver decisions under the Clean Air Act are adjudications. Waiver decisions do not prescribe a rule of general applicability with "future effect," as do agency rules. 5 U.S.C. § 551(4); *id.* § 804(3). As the Government Accountability Office has explained, "a Clean Air Act preemption waiver . . . [is] instead an adjudicatory order." GAO, *B-337179: Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 2 (Mar. 6, 2025), https://www.gao.gov/assets/880/875948.pdf; *see id.* at 7 ("[A]n adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved."). A waiver is "particular to California's [emissions standards], as opposed to a broad unspecified group"; EPA's "process involve[s] consideration of particular facts, as opposed to general policy"; and a waiver decision "has immediate effect in that California is not preempted from enforcing its [emissions standard]." GAO, *B-334309: EPA— Applicability of the Congressional Review Act to Notice of Decision on Clean Air Act Waiver of Preemption* 5-6 (Nov. 30, 2023). Those are the hallmarks of an adjudication, not a rule.

That conclusion is compelled by the way in which the Clean Air Act operates. While generally preempting state regulation of emissions from new motor vehicles, 42 U.S.C. § 7543(a), Congress in the Clean Air Act required EPA to waive that preemption for California and allow California to promulgate its own state-law rules absent certain disqualifying conditions. The waiver provision mandates that EPA

- 7 -

"shall" waive federal preemption for California if the "State determines that the State standards will be, in the aggregate at least as protective of public health and welfare as applicable Federal standards." *Id.* § 7543(b)(1). Such a waiver must be granted unless EPA finds after a review of the facts one of three disqualifying conditions is met—that the State's determination on the protectiveness of the standards is arbitrary and capricious; that the State does not need standards "to meet compelling and extraordinary conditions"; or that the State's standards are technologically infeasible within the lead time provided or involve test procedures that are inconsistent with federal test procedures. *Id.* § 7543(b)(1)(A)-(C).

In contrast to a rulemaking, these provisions require EPA to conduct an adjudication that "resolve[s] disputes among specific individuals in specific cases"—whether a particular regulation by a specific party (California) satisfies the requirements for a waiver. *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). And EPA's decision here "ha[d] an immediate effect on specific individuals (those involved in the dispute)" by granting California permission to undertake a specific action (enforce particular motor-vehicle regulations). *Id.* As EPA previously explained while reiterating its position that waivers are adjudications rather than rules, those decisions are made pursuant to an "adjudicatory review" that is "based on evidence in the record" following a request by California to recognize the validity and enforceability of its already-adopted emissions regulations because California met the statutory standards for waiver. 88 Fed. Reg. at 20,692.

EPA's prior position is supported by a century of precedent. The distinction "between rulemaking and adjudication is illustrated by" the Supreme Court's "treatment of two related cases under the Due Process Clause of the Fourteenth Amendment." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244 (1973). In *Londoner v. Denver*, 210 U.S. 373 (1908), the Court held that the Denver city council acting as a tax board engaged in an adjudication when assessing a tax against a small group of landowners for the cost of paving a particular street. *Id.* at 386-88. But in *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441 (1915), the Court upheld a state agency's decision to increase the valuation of all taxable property in Denver without providing a hearing for those affected because that action was legislative, not adjudicative. "Central to the distinction was that the agency's action in *Bi-Metallic* was generally applicable to an open class of all Denver property owners while *Londoner* involved a

- 8 -

particularized order affecting particular owners in each case upon individual grounds." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (citation modified). As demonstrated by the contrasting results in *Londoner* and *Bi-Metallic*, an "adjudication" is not an exercise of legislative authority and results from fact-based determinations affecting "a small number of persons . . . in each case upon individual grounds." *Fla. E. Coast Ry.*, 410 U.S. at 244-45 (discussing *Londoner* and *Bi-Metallic*). A decision based on individual grounds to allow or not allow California to enforce its own emissions regulations after a review of the facts qualifies as an adjudication because it resolves an individual waiver application following review of the facts in the record.

### 2. *Upholding the Purported Disapproval Resolutions Would Distort Separation of Powers*

Because EPA's decisions are adjudicative, Congress has no authority to step in and reverse the agency's prior, fact-based, decision to grant California waivers. Since "the beginning of the Republic," agencies have "conduct[ed] adjudications," and "under our constitutional structure they *must be* exercises of . . . the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. Art. II, §1, cl. 1); *see Freytag v. Commissioner*, 501 U.S. 868, 909 (1991) (Scalia, J., concurring in part and concurring in the judgment) (agency adjudicators "exercise the executive power"). Even if Congress has authority to enact legislation "that govern[s] one or a very small number of specific subjects," *Bank Markazi*, 578 U.S. at 234, it cannot conduct or reverse individual adjudications. Just as "a statute that directs, in 'Smith v. Jones,' 'Smith wins,'" exceeds the legislative power because it "compel[s] . . . findings or results under old law," *Bank Markazi*, 578 U.S. at 231, so too does a statute erasing an already-final Executive Branch adjudication by infringing on the Executive Branch's core authority to execute the laws as to specific parties. "Congress possesses full legislative authority, but *the task of adjudication must be left to other tribunals*." *United States v. Brown*, 381 U.S. 437, 461 (1965) (emphasis added); *see 75 Acres, LLC v. Miami-Dade Cnty., Fla.*, 338 F.3d 1288, 1294 (11th Cir. 2003) (noting "the important distinction between legislative action and adjudicative action"); *cf. In re Aiken Cnty.*, 725 F.3d 255, 263 (D.C. Cir. 2013) (Congress can create new criminal offenses, but "Congress may not mandate that the President prosecute a certain kind of offense or offender").

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, STATE BAR NO. 349453
CAITLAN MCLOON, STATE BAR NO. 302798
CECILIA D. SEGAL, STATE BAR NO. 310935
EMMANUELLE S. SOICHET, STATE BAR NO. 290754
M. ELAINE MECKENSTOCK, STATE BAR NO. 268861
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN**, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP**, in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:       February 19, 2026<br>Time:       2:00 PM<br>Courtroom:  2 (4th Floor)<br>Judge:      The Honorable Haywood S. Gilliam, Jr.<br>Trial Date:  Not Set<br>Action Filed: June 12, 2025 |

Plaintiffs' Opposition to Defendants' Motion to Dismiss (4:25-cv-04966-HSG)

**SER-024**

Some of Defendants' *amici* try to argue that waivers are rules. Echoing a post hoc analysis from Russell Vought, Director of the White House Office of Management and Budget (which Defendants do not even mention), those *amici* collapse the distinction between EPA's waivers and California's regulations. ECF 177-1 at 9-13, 179-1 at 8-12, 185-1 at 7-10. California's regulations are not *federal* rules; they fail the definition of a CRA rule because the State is not "the Government of the United States." 5 U.S.C. § 551(1). The federal character of EPA's adjudication cannot be stapled onto *California's* rulemaking to produce a "federal rule."[9]

*Amici* otherwise rely on *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994), which categorized as a rule a discretionary determination by the Secretary of Housing and Urban Development (HUD) that the State of Washington's eviction procedures satisfied the elements of due process, as set forth in HUD regulations. In rejecting the United States' argument that HUD's determination was an adjudication, the court emphasized that "[n]othing in the statute requires HUD to make a due process determination in the first place." *Id.* at 449. As HUD did not have "to take any action at all," its decision to act was discretionary and could not be classified as mere adjudication. *Id.* HUD's action also "had no effect on the State"; the determination's "sole effect … was to deprive" public-housing tenants of their federal "right to an informal grievance hearing prior to eviction." *Id.* Additionally, that deprivation operated "only prospectively," and the affected tenants comprised a "broad category of individuals not yet identified." *Id.* at 448-49.

Waivers lack the features that rendered HUD's determination a rule in *Yesler Terrace*. EPA *must* act upon each waiver request. 42 U.S.C. § 7543(b)(1). EPA's action has direct effects on state laws; and downstream effects on a narrow, identifiable class of automakers that become

_____

crystalline statements in other legislation, A. Scalia & B. Garner, Reading Law 127 (2012). The CRA definitions thus prevail over the prefatory clauses of the Resolutions, which purport to be "[p]roviding congressional disapproval under chapter 8 of title 5, [U.S.] Code." 139 Stat. 65, 66, 67 (June 12, 2025). Prefatory clauses lack legal effect, 1 U.S.C. §§ 102-103, and cannot "expand the scope of the operative clause[s]," *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008). Nothing in the Resolutions' *operative* clauses broadens the CRA's definition of a "rule" (to cover waivers) or its definition of a "joint resolution" (to cover resolutions that disapprove non-rules).

[9] The Supreme Court's descriptive reference to the Resolutions in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025), does not establish otherwise. That case—briefed and argued before these Resolutions were enacted—involved a different waiver action (and no resolution). The issues raised here were thus "not at issue" there. *Id.* at 107. Whether the Resolutions are "action[s] under" the CRA, 5 U.S.C. § 805, is a question of first impression here.

10

subject to state standards. Plus, waiver grants do not announce a rule that is "subsequently applied" to California (or anyone else), *Yesler Terrace*, 37 F.3d at 448; rather, they have immediate retrospective (as well as prospective) effect: they waive preemption for actions California has already taken to adopt its standards, *see id.* § 7543(a), (b)(1), as well as for covered standards applicable to vehicles sold before EPA acted, *e.g.*, 90 Fed. Reg. 643, 644 (Jan. 6, 2025) (standards applicable in model years 2024 and later).

Waivers are not rules, no conduct occurred under the CRA, and Section 805 is inapplicable.

### B.    Plaintiffs' Constitutional Claims Do Not Raise Political Questions

Plaintiffs' constitutional claims also do not implicate the political questions doctrine—"a narrow exception to" the Judiciary's "responsibility to decide cases properly before it." *Newsom v. Trump*, 141 F.4th 1032, 1045 (9th Cir. 2025) (cleaned up). These claims "require[] an interpretation of the Constitution—a determination for which clearly there are judicially manageable standards." *Powell v. McCormack*, 395 U.S. 486, 549 (1969) (cleaned up).

Moreover, Plaintiffs' first separation-of-powers claim has nothing to do with legislative procedure. *Infra* Sec I.C.1. And Plaintiffs' second separation-of-powers and federalism claims do not depend on Congress's decision not to follow certain rules—e.g., the decision not "to hold a hearing on legislation applicable to the general public." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007). Rather, to the extent congressional procedure is implicated, Plaintiffs allege constitutional defects in the procedures Congress actually used. Such claims are justiciable because they ask whether "there is 'a reasonable relation between the mode or method of proceeding … and the result which is sought to be attained'" and whether the procedures "'ignore[d] constitutional restraints or violate[d] fundamental rights.'" *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (quoting *United States v. Ballin,* 144 U.S. 1, 5 (1892)); *see also Yellin v. United States*, 374 U.S. 109, 114 (1963) ("It has been long settled, of course, that rules of Congress and its committees are judicially cognizable."). Defendants' cases are in accord. *Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("[J]udicial intervention may be appropriate where rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures.");

Michael Buschbacher (*pro hac vice*)
James R. Conde (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Laura B. Ruppalt (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

John B. Thomas (Bar No. 269538)
Jessica Wahl (Bar No. 321887)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
jthomas@hicks-thomas.com

*Counsel for American Free Enterprise
Chamber of Commerce et al.*
(additional counsel and parties on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | No. 4:25-cv-04966-HSG <br><br> **BRIEF OF AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, STATE CORN GROWERS ASSOCIATIONS, NATIONAL CORN GROWERS ASSOCIATION, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, AND NATIONAL ASSOCIATION OF CONVENIENCE STORES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Date:         February 19, 2026 <br> Time:         2:00 p.m. <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:  Hon. Haywood S. Gilliam, Jr. |

Am. Free Enter. Chamber of Com. et al.'s Amicus Brief Supporting Motion to Dismiss, 4:25-cv-04966-HSG    Page i

**SER-027**

had all the participation they were due.

Moreover, it is not "extraordinary," or even unusual, for an Executive Branch agency to disagree with GAO about whether a particular agency action is a "rule" under the CRA. Am. Compl. at 39–40, ¶ 163. Agencies often disagree with GAO's conclusions.[16] What Plaintiffs allege is a "defect" is merely their disagreement with Congress's decision in this instance to side with the agency, which has a statutory role in the process, rather than with GAO, which does not.

But Congress isn't constitutionally required to defer to GAO, and Congress's decision to depart from GAO's conclusion here wasn't arbitrary. As OMB explained, there are strong reasons to conclude that the waivers are "rules" of "general applicability" for purposes of the CRA. *See* Ex. 1 at 3–6. The Ninth Circuit has described the relevant distinction between rules and adjudications:

> Two principal characteristics distinguish rulemaking from adjudication. First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals[.]… Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler*, 37 F.3d at 448 (citations omitted). The Ninth Circuit therefore held that a determination by the federal Department of Housing and Urban Development ("HUD") that the state of Washington's Public Housing Authority could substitute state eviction procedures for federal ones in federally funded housing projects was a "rule" under the APA. *Id.* at 448–49.

Like HUD's determination, EPA's waivers allowing Plaintiffs to substitute state emissions standards for federal ones have "all the hallmarks of a rule." *Id.* at 448. The waivers "had no immediate, concrete effect on anyone, but merely permitted" California and other states to enforce

---

(Senator Whitehouse speaking on the Senate Floor); *id.* at 17 (Senator Padilla speaking on the Senate Floor); *id.* at 18–19 (Senator Schiff speaking on the Senate Floor); *id.* at 23, 30–32 (Massachusetts Senator Markey speaking on the Senate Floor).

[16] *See, e.g.*, GAO, B-334540, *Securities and Exchange Commission—Applicability of Congressional Review Act to Staff Accounting Bulletin No. 121*, at 1 (Oct. 31, 2023) (SEC staff bulletin is a rule subject to the CRA, despite SEC's contrary conclusion); 170 Cong. Rec. S5883 (daily ed. Sept. 9, 2024) (EC-5696) (transmitting action to Congress even though "EPA disagrees with GAO[]" and "does not believe that the … action[] is a 'rule'" under the CRA).

Am. Free Enter. Chamber of Com. et al.'s Amicus Brief Supporting Motion to Dismiss, 4:25-cv-04966-HSG Page 24

SER-028

state emissions standards "in the future." *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C), requiring lead time for California standards); *id.* § 7507(2) (other states must "adopt such standards at least two years before commencement of [the applicable] model year"). EPA waivers therefore have "prospective" rather than "immediate" effect. *Yesler*, 37 F.3d at 448. The waivers also "affected the rights of a broad category of individuals not yet identified": manufacturers who, in the future, may sell new motor vehicles in those states. *Id.*

As with HUD's determination, it doesn't matter "that the manner in which [EPA] made its decision[s] shares certain features with adjudications." *See id.* at 449. "The form of the proceeding is not dispositive; what counts is its effect." *Id.* And the effect of a waiver is that of a rule that implements "a unique alternative nationwide compliance pathway" governing conduct of manufacturers nationwide. Ex. 1 at 5; 42 U.S.C. § 7543(b)(3) ("compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). EPA's waiver decisions "plainly involved more than applying a rule of decision to particular facts," including weighing policy-laden considerations like the standards' technological feasibility and cost appropriateness. *Yesler*, 37 F.3d at 449; 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C)). The waivers also are "generally," not "particularly," applicable. Once EPA issues a waiver, other states may adopt California's standards. 42 U.S.C. § 7507. A waiver therefore imposes obligations on manufacturers nationwide, which is why—until the Biden EPA's midnight January 2025 waivers—EPA regularly concluded that waivers are "nationally applicable" or of "nationwide scope [and] effect." 88 Fed. Reg. at 20,725 (ACT waiver). EPA and Congress were thus correct to treat the waivers as "rules" under the CRA, despite GAO's contrary conclusion.

At bottom, Plaintiffs disagree with the Senate's decision to curtail California's special treatment under the Clean Air Act without applying filibuster rules. Am. Compl. at 41, ¶ 167 (describing the Resolutions as an "end-run"). But Congress's ability to choose the procedures that it applies to any particular legislation isn't a "defect" of the legislative process, but a feature of the constitutional design. The Senate isn't limited to using procedures to which "[a]ll of the States consented." *Contra id.* at 40, ¶ 166. "Each House," alone, "determine[s] the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. That is all that the Senate did here when deciding to treat the

Am. Free Enter. Chamber of Com. et al.'s Amicus Brief Supporting Motion to Dismiss, 4:25-cv-04966-HSG Page 25

**SER-029**

Raymond B. Ludwiszewski (*pro hac vice*)
Rachel Levick (*pro hac vice*)
GIBSON, DUNN & CRUTCHER
1700 M Street, NW
Washington, DC 20036
Tel.: 202-955-8500
Fax: 202-467-0539
rludwiszewski@gibsondunn.com
rlevick@gibsondunn.com

Sean Howell, Bar No. 315967
GIBSON, DUNN & CRUTCHER
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
Tel.: 415-393-8355
Fax: 415-801-7364
showell@gibsondunn.com

*Attorneys for Amicus Curiae,*
*The Alliance for Automotive Innovation and*
*The National Automobile Dealers Association*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No.   4:25-cv-04966-HSG |
| Plaintiffs, | **BRIEF OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION AND THE NATIONAL AUTOMOBILE DEALERS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF DISMISSAL** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | Administrative Procedure Act Case |
| | Action Filed: June 12, 2025 |
| | Trial Date: none |
| | Hearing Date: February 12, 2026 |
| | Judge:  Honorable Haywood S. Gilliam |

of identical Federal and State standards, separately administered, would be difficult for the industry to meet since different administration could easily lead to different answers to identical questions.").

Congress gave EPA the authority to "waive" this preemptive effect for California under certain conditions. 42 U.S.C. § 7543(b)(1). If EPA determines that those conditions are met, EPA shall permit California to adopt and enforce vehicle emissions standards. EPA has considerable discretion in determining whether those conditions have been met. *See, e.g.*, *id.* § 7543(b)(1)(A)–(B) ("No such waiver shall be granted if [EPA] finds that the determination of [California]" that the standards are at least as protective as the applicable Federal standards "is arbitrary and capricious" or if EPA finds that California "does not need such State standards to meet compelling and extraordinary conditions").

*Second*, starting from this mischaracterization of the statute, Plaintiffs analogize an EPA waiver to an adjudication, asserting that an EPA action to grant a waiver is akin to "a court judgment finding no preemption." Am. Compl. ¶ 152. Plaintiffs argue that "Congress lacks constitutional power to declare, in the first instance or on review, the rights of an individual party under a preexisting federal statute." *Id.* ¶¶ 153–154. And because declaring the rights of an individual under a preexisting statute is the duty of the other branches, Plaintiffs insist that Congress overstepped its authority in declaring the waivers void under the CRA. But as explained below, *infra* Part III, EPA waiver actions are rules, not adjudications, and they are precisely the kind of policy judgment properly evaluated by Congress under the CRA (or, with respect to the waiver grant itself, delegated by Congress to the EPA).

### III. Plaintiffs Fail to State a Claim Under Their Statutory or Constitutional Theories Because EPA Waiver Actions Are Rules, Not Orders.

Even if the Court had subject-matter jurisdiction to consider these statutory or constitutional claims—and it does not—each of Plaintiffs' claims fails on the merits based on a common flaw. According to Plaintiffs, "orders" are excluded from review under the CRA, and here, Congress incorrectly concluded that EPA's waiver actions are "rules" instead of "orders" for purposes of CRA review. But the waiver actions are best classified as "rules" that are reviewable under the CRA.

The CRA adopts the broad definition of "rule" from the APA. *See* 5 U.S.C. § 804(3). The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). The CRA

7

Gibson, Dunn & Crutcher LLP

does include adjudicatory orders in the scope of a "rule," and it explicitly excludes three other types of actions from the definition, including "rule[s] of particular applicability," "rule[s] relating to agency management or personnel," and rules related to an agency practice or procedures that "do[] not substantially affect the rights or obligations of non-agency parties." *Id*. § 804(3). By contrast, an "order" under the APA is "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." *Id.* § 551(6).

Courts have stated that rules of general applicability are those which impact many individuals or stakeholders, are prospective in nature, and are designed to prescribe a policy in enforcing a statute.[2] *See, e.g.*, *United States v. Fla. E. Coast Ry. Co.,* 410 U.S. 224, 246 (1973); *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (holding that a "determination that Washington's eviction procedures meet regulatory due process standards" is a rule, not an order, because it had "no immediate, concrete effect on anyone" and "affected the rights of a broad category of individuals not yet identified"). "[O]nly rules have legal consequences 'for the future.'" Truck Renting & Gas Assn's Br. as Amicus Curiae, ECF No. 179-1, at 5 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988) (Scalia, J., concurring)).

When EPA grants a Clean Air Act preemption waiver, the effect of that waiver action is that California can adopt and enforce its own state emissions regulations, which in turn can be adopted by states across the country. EPA's waiver actions therefore have all the characteristics of a rule—they impact many individuals or stakeholders, are prospective in nature, and are designed to prescribe a policy in enforcing (or here, declining to enforce the preemptive effect of) a statute. *Yesler*, 37 F.3d at 448.

---

[2] Rules of particular applicability are rules addressed to specific, identified entities. *American Broad. Co., Inc. v. FCC*, 682 F.2d 25, 31–32 (2d. Cir. 1982) (explaining that a rule is one of "particular applicability" if it is "addressed to and served upon named persons"). In *American Broadcasting*, the Second Circuit relied on the APA's legislative history to explain that a rule of particular applicability is a rule that is served upon a named person *rather than being published in the Federal Register*. *Id.* In other words, rules of particular applicability were added to the APA definition of "rule" to avoid filling the Federal Register with masses of particularized rule making, such as rate setting, that do not "directly affect[] pre-existing legal rights or obligations." *Id.* (quoting *Appalachian Power Co. v. Train*, 566 F.2d 451, 455 (4th Cir. 1977) (internal quotations omitted)).

Gibson, Dunn & Crutcher LLP

BRIEF OF AUTO INNOVATORS AND NADA AS AMICUS CURIAE IN SUPPORT OF DISMISSAL
Case No. 4:25-cv-04966-HSG                    **SER-032**

It is indisputable that California's state emissions standards impact numerous individuals and stakeholders, including manufacturers, dealers, and customers. California's Advanced Clean Cars II standards, for example, are designed on their face for widespread adoption—not just by California, but also by multiple states pursuant to Section 177 of the Clean Air Act ("Section 177 states"). The regulations include provisions for pooling zero-emission vehicles sales across the states that adopt the ZEV regulations. Cal. Code Regs., tit. 13, § 1962.4(g)(1)(D). California and the other Section 177 states are expected to account for approximately *forty percent* of new light-duty vehicle registrations. *See, e.g.*, "Section 177 States Regulation Dashboard," *available at* https://ww2.arb.ca.gov/our-work/programs/advanced-clean-cars-program/states-have-adopted-californias-vehicle-regulations (last visited December 11, 2025); *cf.* 87 Fed. Reg. 14,332, 14,379 (Mar. 14, 2022) (explaining that Advanced Clean Cars I would "affect manufacturers nationwide" in part because of the sixteen Section 177 States who adopted the regulations). As a result, EPA's action to grant the waiver for Advanced Clean Cars II—if reinstated—will have a nationwide impact.

In addition, EPA's waivers are prospective in nature because they "ha[ve] a definitive effect on individuals only after the rule subsequently is applied." *Yesler*, 37 F.3d at 448. In *Yesler*, the Ninth Circuit concluded that an agency determination "ha[d] all the hallmarks of a rule," in part because it "had no immediate, concrete effect on anyone," and instead merely permitted the state agency to take action in the future. *Id.* Likewise, EPA's actions to allow California to adopt and enforce various emissions standards are felt by manufacturers, dealers, and customers in the future—the waiver decisions do not "bind parties by *retroactively* applying law to their past actions." Truck Renting & Gas Assn's Br. as Amicus Curiae, at 8 (quoting *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added)). The Clean Air Act also requires that California provide sufficient "lead time" for compliance with its standards and that the Section 177 States provide "two years" of lead time before the commencement of the model year for which the standards apply. *See* 42 U.S.C. §§ 7507, 7521(a). This underscores the forward-looking nature of EPA's waiver actions.

Further, emissions standards are plainly viewed by CARB as a prescription of agency policy, and the EPA waiver actions allow California to adopt and enforce these policies. For example, former CARB chair Liane Randolph stated that the Advanced Clean Cars II represented "a historic moment

9

Gibson, Dunn &
Crutcher LLP

for California, for [its] partner states, and for the world as [it] set forth this path towards a zero-emission future." *See* CARB Meeting Transcript 9 (Aug. 25, 2022), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2023-0292-0044. Recently, CARB has indicated its intent to retroactively enforce Advanced Clean Cars II by a Notice of Emergency Rulemaking if a court holds the CRA Resolutions invalid. Manufacturers Advisory Correspondence ECCD-2025-08, CARB (Aug. 25, 2025); Notice of Emergency Rulemaking at 6, CARB (Sept. 15, 2025). And in response to the CRA Resolutions, Governor Newsom signed an Executive Order touting that "California's policies and standards have spurred global innovation in zero-emission vehicles and technologies." Executive Order N-27-25 (June 12, 2025), https://www.gov.ca.gov/wp-content/uploads/2025/06/CRA-Response-EO-N-27-25_-ATTESTED.pdf. The view that the waiver actions are mere adjudications and not rules is thus wholly inconsistent with the importance attached to the standards by California itself.

Importantly, EPA only has the authority to grant waivers to CARB for standards that EPA would be able to implement as emissions regulations itself, further suggesting the waiver actions are equivalent to EPA rules. Section 202(a) of the Clean Air Act describes EPA's authority when promulgating emissions standards applicable to new motor vehicles. 42 U.S.C. § 7521(a)(1). This provision is incorporated by reference into the waiver requirements of Section 209(b). *Id.* § 7543(b)(1). As a result, EPA shall only grant a waiver for California's "standards and accompanying enforcement procedures" if those standards and procedures are "consistent with" the limits on authority that would apply if EPA were to promulgate the same rules itself.

If EPA attempted a separate action with the same contours and magnitude of California's Advanced Clean Cars II regulation, it would undoubtedly be considered a rule. EPA's action waiving federal preemption of a state agency rule having the same effect should not evade CRA review as an adjudication.

## IV.    Plaintiffs Fail to State a Constitutional Claim Upon Which Relief Can Be Granted

Plaintiffs do not adequately allege constitutional violations, and their constitutional claims should likewise be dismissed. As correctly argued by the United States, Defendants did not violate separation-of-powers principles. *See* Mot. to Dismiss at 21–28. Plaintiffs allege that a waiver

10

Gibson, Dunn & Crutcher LLP

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN MCLOON, State Bar No. 302798
CECILIA D. SEGAL, State Bar No. 310935
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0299
  Fax:  (510) 622-2270
  E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | Case No. 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO PROPOSED INTERVENOR-DEFENDANTS AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE ET AL.'S MOTION FOR LEAVE TO FILE MOTION TO DISMISS**<br><br>Date:      January 8, 2026<br>Time:      2:00 p.m.<br>Judge:    Hon. Haywood S. Gilliam, Jr.<br><br>Action filed: June 12, 2025 |

Court deny all five motions and permit the proposed intervenor-defendants to instead present their views on the case in amicus briefs. In the alternative, Plaintiffs asked the Court to exercise its discretion to impose reasonable case management conditions to mitigate the risk of prejudice and ensure the case proceeds efficiently. *E.g.*, *id.* at 12-13.

On September 19, 2025, the United States moved to dismiss Plaintiffs' complaint. ECF No. 118. Several groups moved for leave to file amicus briefs in support of the United States' motion. ECF Nos. 120, 138, 139, 141. Plaintiffs later amended their complaint as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), which had the effect of mooting the United States' motion to dismiss and the motions for leave to file amicus briefs. ECF No. 157; *see also* ECF Nos. 151, 153-156.

On October 23, 2025, the Court granted the parties' stipulated briefing schedule for the United States' motion to dismiss the amended complaint. ECF No. 162. Pursuant to that schedule, the United States filed its motion on November 17, 2025; Plaintiffs' opposition is due December 23, 2025; the United States' reply is due January 19, 2026; and the hearing is calendared for January 29, 2026. *Id.* at 1-2. The schedule also provides deadlines for amici briefs in support of the United States' motion and Plaintiffs' opposition, with both parties consenting to the filing of such briefs. *Id.* To date, four groups of amici have filed motions and proposed briefs in support of the United States. ECF Nos. 176, 177, 178, 179.

With its motion to intervene pending, AmFree now seeks leave to file its own motion to dismiss, appended to its motion for leave. Mot. 2:2-11 & Ex. A. Briefing on AmFree's motion for leave will be complete on December 8, 2025, and the hearing is set for January 8, 2026. Mot. 2:2; ECF No. 171. Two sets of other proposed defendant-intervenors filed similar motions. ECF Nos. 173, 174.

**ARGUMENT**

The Court should deny AmFree's motion for leave. AmFree asserts that it seeks "to preserve [its] ability to participate in this case without disrupting the Court's schedule." Mot. 3:17-18. But the motion for leave does nothing to demonstrate a right to such participation at all, much less at the motion to dismiss stage. To the contrary, AmFree's proposed motion to dismiss

2

only underscores that AmFree's intervention should be denied because its interests are adequately represented and because its participation will cause prejudicial delay. Indeed, permitting AmFree to file a motion to dismiss now *would* disrupt the existing schedule approved by the Court, contrary to AmFree's contention. That schedule does not contemplate motions to dismiss filed after November 17, and Plaintiffs would require more time and more pages to respond to any later-filed, additional motions. Finally, even if AmFree's intervention were granted, its motion for leave should be denied because any motion(s) to dismiss filed by intervenors should be subject to case management conditions, as laid out in Plaintiffs' oppositions to the motions to intervene— conditions that could very well preclude the filing of AmFree's motion to dismiss as currently proposed.

1. To begin, Plaintiffs opposed AmFree's motion to intervene, ECF No. 84, and thus maintain that AmFree should not be permitted to file a motion to dismiss at all. AmFree's proposed motion to dismiss confirms the point. For example, Plaintiffs contended that AmFree's interests are adequately represented by the United States and that the possibility of divergent litigation choices is insufficient to overcome the presumption of adequacy that attaches where, as here, "the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment." *Id.* at 6:17-7:12 (quoting *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011)). As is now evident even from the table of contents of each motion, the United States is robustly defending the federal actions at issue and is more than capable of making the arguments AmFree advances. *Compare* ECF No. 172 at i-ii, *with* ECF No. 170-1 at ii. *See also Drakes Bay Oyster Co. v. Salazar*, No. 12-cv-6134, 2013 WL 451813, at *9 & n.6 (N.D. Cal. Feb. 4, 2013) (cited at Mot. 3:18-19) (relying on movant-intervenors' proposed opposition brief to assess their motion to intervene and finding the brief "very closely tracks" and "duplicat[es]" defendants' arguments, weighing against intervention). To the extent the United States' motion does not contain every single argument that AmFree's motion does, that difference by itself cannot defeat the presumption of adequate representation. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1087-88 (9th Cir. 2003) (presumption not rebutted where state defendants would "make all arguments necessary to defend" proposed intervenors' interests and

"no conflict[s]" would prevent such a defense); *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 955 (9th Cir. 2009) ("[T]he use of different arguments as a matter of litigation judgment is not inadequate representation *per se*." (quoting *Daggett v. Comm'n on Gov't Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999))). If AmFree believed the federal government's motion to dismiss required supplementation, it could have opted to present its views in an amicus brief, as Plaintiffs previously argued it could. ECF No. 84 at 8. Indeed, the parties consented to and incorporated deadlines for such briefs into their scheduling stipulation, granted by the Court more than three weeks before AmFree filed the present motion. ECF No. 162 at 1-2.

Plaintiffs also opposed AmFree's motion to intervene given the duplication and delay AmFree's and other proposed defendant-intervenors' participation could introduce. ECF No. 84 at 8:7-27. That, too, is borne out by the recently filed motions. AmFree and the other two sets of proposed intervenor-defendants' proposed motions to dismiss contain arguments that substantially overlap not just with the United States' brief, but with each other. *Compare, e.g.*, ECF No. 172 at 14-16 (arguing Plaintiffs lack standing for their statutory claims against EPA); ECF No. 170-1 at 13-15 (same); ECF No. 173-1 at 14-15 (same); ECF No. 174-1 at 13-15 (same); *compare also, e.g.*, ECF No. 170-1 at 23-24 (arguing that the preemption waivers are rules, not adjudications); ECF No. 173-1 at 17-18 (same); ECF No. 174-1 at 17-19 (same). Far from eliminating prejudice to Plaintiffs, this overlap requires Plaintiffs to sift through, at minimum, four sets of arguments and endeavor to account for and respond to any differences across each. For example, while the United States and AmFree both argue that Plaintiffs fail to state a Tenth Amendment claim, they rely on different authorities to do so. *Compare* ECF No. 172 at 28-30, *with* ECF No. 170-1 at 21-25. AmFree's attempt to file a motion to dismiss also demonstrates that the participation of proposed intervenor-defendants will delay forward progress of this litigation because, as described below, it will disrupt the orderly schedule agreed to by the parties and adopted by the Court.

2. In fact, if AmFree's proposed motion to dismiss were treated as filed (as AmFree requests), it would necessarily alter—and thereby disrupt—the existing negotiated and court-approved schedule. *Contra* Mot. 3:18. That schedule provides Plaintiffs with approximately five

4

weeks (including holidays) to prepare and file a response to the United States' motion and four weeks to consider amici briefs in support; it does not contemplate additional motions to dismiss filed after November 17. ECF No. 162. If AmFree's motion to dismiss were filed now, Plaintiffs would require additional time—and pages—to file a response. *See Drakes Bay Oyster Co.*, 2013 WL 451813, at *9 n.6 (cited at Mot. 3:18-19) (granting plaintiffs leave to file a response to movant-intervenors' earlier filed opposition brief); *Wash. Cattlemen's Ass'n v. EPA*, No. 19-cv-569, 2019 WL 3206052, at *2 (W.D. Wash. July 16, 2019) (cited at Mot. 3:21-22) (granting plaintiff "additional time to fully respond" to movant-intervenors' proposed opposition brief). That would prejudice Plaintiffs by delaying resolution of the motion to dismiss stage of this litigation.[1]

All of this confirms Plaintiffs' point that allowing AmFree (and potentially four other groups of intervenor-defendants) to participate in this case will inevitably cause prejudicial delay, counseling against these groups' intervention. But even if the Court disagrees and decides to grant AmFree's motion to intervene, it need not permit participation in the motion to dismiss stage. Rather, it should limit participation to whatever proceedings follow resolution of the United States' already filed motion to dismiss. *See Kivalina Relocation Plan. Comm. v. Teck Cominco Alaska Inc.*, 81 F. App'x 640, 641 (9th Cir. Nov. 17, 2003) (mem.) (limiting intervention as of right to remedial phase of the litigation); *Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 741 (9th Cir. 2011) (describing district court's discretion to limit permissive intervention "to particular issues").

3. Finally, even if AmFree were ultimately granted intervention and permitted to file *a* motion to dismiss, it is premature to grant it permission to file *this* motion to dismiss. Plaintiffs' opposition to AmFree's motion to intervene requested that reasonable limitations be placed on AmFree's participation, should it become a party to the case. For example, Plaintiffs requested that all private movant-intervenors be required to jointly brief and argue all dispositive motions,

---

[1] The alternative AmFree appears to suggest—i.e., requiring Plaintiffs to preemptively respond on the existing schedule to AmFree's proposed motion to dismiss, without knowing whether AmFree will even be a party to the case—would unquestionably and seriously prejudice Plaintiffs.

and that the combined total page limit for their brief be limited to two-thirds the page limit allowed to the United States. *See* ECF No. 84 at 9:6-20; ECF No. 145 at 12:21-13:14. The proposed motions to dismiss filed by AmFree and other proposed intervenor-defendants confirms that these requested limitations are both reasonable and appropriate. The United States' motion is 30 pages long. ECF No. 172. Rather than be limited to a single brief of 20 pages, AmFree and the other proposed intervenor-defendants have filed three separate briefs totaling nearly 75 pages. ECF Nos. 170-1, 173-1, 174-1. In the event the Court grants AmFree's intervention but also imposes one or more of Plaintiffs' requested conditions, that could materially alter the length and scope of any motion to dismiss AmFree may join.

## CONCLUSION

For the foregoing reasons, AmFree's motion for leave to file a motion to dismiss should be denied (as should its motion to intervene). If the Court is nonetheless inclined to grant AmFree intervention, Plaintiffs respectfully request that the Court structure AmFree's participation to minimize disruptions to the case and conserve the Court's and parties' resources, such as by limiting intervention to later stages of the litigation or requiring all private intervenor-defendants to submit a consolidated motion to dismiss limited to 20 pages (and providing Plaintiffs a full opportunity to respond).

Dated:  December 1, 2025                                 Respectfully submitted,

                                                        ROB BONTA
                                                        Attorney General of California
                                                        MYUNG J. PARK
                                                        Supervising Deputy Attorney General


                                                        */s/ Cecilia D. Segal*
                                                        CECILIA D. SEGAL
                                                        Deputy Attorney General
                                                        *Attorneys for Plaintiff State of California*

6

**SER-040**

David L. Rosenthal (CA Bar #314344)
    david@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Of Counsel*
Thomas R. McCarthy
    tom@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Counsel for AMICI CURIAE*
THE TRUCK RENTING AND LEASING ASSOCIATION,
NATIONAL PROPANE GAS ASSOCIATION,
WESTERN PROPANE GAS ASSOCATION, AND
PROPANE GAS ASSOCIATION OF NEW ENGLAND

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES OF AMERICA, U.S. EN-VIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>   *Defendants*. | CASE NO. 4:25-cv-04966-HSG<br><br>**AMICI CURIAE BRIEF OF THE TRUCK RENTING AND LEASING ASSOCIATION, NATIONAL PROPANE GAS ASSOCIATION, WESTERN PROPANE GAS ASSOCIATION, AND PROPANE GAS ASSOCIATION OF NEW ENGLAND**<br><br>Judge: Hon. Haywood S. Gilliam, Jr. |

**SER-041**

model year 2035 must be electric. *Id.* California would also set emissions standards for medium- and heavy-duty trucks so low that, in practice, they require manufactures to sell an increasing percentage of electric vehicles to comply with the standard. *Id.* The combined effect of California's rules will effectively regulate the internal-combustion engine out of existence in the production of new vehicles.

After Congress passed three joint resolutions of disapproval of California's EPA waivers under the CRA, the President signed each into law on June 12, 2025. *Id.* at 6. And for good reason, due to the unsettling effects of California's actions if permitted to go into place. *See infra* 12-15. Several States challenge the resolutions, alleging in part that the EPA waivers are not "rules" subject to the CRA, but are instead "adjudicatory orders" that escape congressional review. *E.g.*, First Am. Compl. ("FAC," Doc. 157), ¶¶123, 132-40, 143-44, 151, 157, 166. Along with the reasons the United States gives in its brief, MTD.6-30, the proper characterization of the EPA waivers as rules disposes of the States' claims based on an alleged CRA violation.

## I.    The EPA waivers are rules subject to the CRA, rather than orders.

The EPA actions approving Clean Air Act preemption waivers are "rules," rather than "adjudicatory orders." This matters because rules are subject to disapproval under the CRA, whereas orders are not. 5 U.S.C. §801.

The CRA expressly adopts the Administrative Procedure Act's definition of "rule" with limited exceptions that do not apply here. *See* 5 U.S.C. §804(3) ("The term 'rule' has the meaning given such term in section 551 [of the Administrative Procedure Act]."). For the purpose of CRA review, then, the term "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future" of various standards. 5 U.S.C. §551(4). Importantly, the Supreme Court has observed that rule "is defined broadly." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (citing 5 U.S.C. §551(4)).

Courts also look to the APA definition of "order" to inform whether an action is better classified as an order under the CRA. *See, e.g.*, Valeria Brannon & Maeve Carey, Cong. Rsch. Serv., R45248, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* 9-12 (Oct. 22, 2024) (collecting authorities); *see also, e.g.*, *United States v. Reece*, 956 F. Supp. 2d 736, 745 (W.D. La. 2013) (examining the APA's definition of "order" to determine that, under the CRA, "rules and orders are two different things"). The APA (and thus the CRA) term "order" means "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. §551(6). An adjudicatory order is retrospective in nature and binds specific individuals in specific cases. *E.g.*, *United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245 (1973) (recognizing a "distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other"). The "central distinction" between rulemaking and adjudicatory orders is that only rules have legal consequences "for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216-17 (1988) (Scalia, J., concurring).

### A.  Congress alone provides the authoritative interpretation of the CRA.

As a threshold issue, the CRA gives Congress the authoritative power to consider agency actions submitted to it for review. 5 U.S.C. §805 ("No determination, finding, action, or omission under this chapter shall be subject to judicial review."); *see also* MTD.6-11.

The CRA makes clear that Congress must interpret the CRA for at least two reasons. *See* Letter from Russell Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General, Government Accountability Office, at 2 (June 18, 2025), perma.cc/JDA6-DY76. *First*, the CRA treats joint resolutions of disapproval similar to federal statutes by requiring that they satisfy bicameralism and presentment. U.S. Const. art. I, §7; *INS v. Chadha*, 462 U.S. 919, 951-59 (1983). Upon completing this process, a joint resolution of disapproval is binding on the agency, just as a statute binds agency authority. So, the EPA has no choice but to treat California's since-revoked waivers as invalid because Congress in fact invalidated them.

CRA]," but nevertheless submitted the action for CRA review "out of an abundance of caution." EC5696, 170 Cong. Rec. 139 (Sept. 9, 2024). Each submission placed the determination of whether the action was in fact a rule, and thus whether the CRA applied, into Congress's hands alone. The same exact event occurred here when the EPA submitted the waivers to Congress—it sent the determination of whether the waivers were rules to Congress, making Congress's determination binding and immune from judicial review.

**B. The EPA waivers have all the hallmarks of rules of general applicability subject to the CRA.**

Even if the Court decides to review Congress's CRA action here, the EPA waivers have all the key features of "rules" of general applicability with prospective effect. The Ninth Circuit has identified three "hallmarks of a rule": an agency determination that (1) "has no immediate, concrete effect on anyone," (2) permits a state to act a certain way "in the future," and (3) affects "the rights of a broad category of individuals not yet identified." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994).

*First*, the EPA waivers do not have an immediate effect but are prospective in nature. The Clean Air Act requires that California give automakers sufficient "lead time" to comply with any State-specific emissions standard. 42 U.S.C. §7521(a). The Act also requires that other States that adopt California's alternate standard provide "two years" of lead time before the regulation goes into effect. 42 U.S.C. §7507. Courts have agreed that forward-looking obligations are indicative of rules, while "adjudications immediately bind parties by *retroactively* applying law to their past actions." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017) (emphasis added); *see also Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013) (explaining that "an adjudication must have retroactive effect, or else it would be considered a rulemaking"). Lead time is, of course, inherently forward-looking.

On this score, the Ninth Circuit's reasoning in *Yesler* is instructive. There, the Ninth Circuit considered the government's determination that the State of Washington's public housing authority could substitute its own eviction procedures for federally required ones. *Id.* That action was in fact a rule—not an order—because it "has no immediate, concrete effect on anyone, but

8

**SER-044**

merely permitted [a Washington agency] to evict tenants in the future without providing them with informal grievance hearings." *Id.* at 448. Just as in *Yesler*, the sub-delegation of regulatory authority from an agency to a state accomplished through the EPA waivers is indicative of a rule. To be sure, the EPA initially labeled the waivers as "decision[s]." *Id.* at 449. But how an agency labels an action is irrelevant. *Yesler* went even further to say whether "the manner in which [an agency] made its decision shares certain features with adjudications" is "not dispositive." *Id.* Instead, "what counts is its effect." *Id.* The EPA waivers lack the features of an order—and cannot be recharacterized by a mere label—because the waivers have "legal consequences for yet-to-be-identified individuals only prospectively." *Id.* These are "the effects of a rule, not of an adjudication." *Id.*

The logic of the Clean Air Act cases confirms that the *Yesler* analysis applies to this EPA waiver question. *See supra* 8. The EPA waivers in dispute have "no immediate, concrete effect on anyone, but merely permit[]" California and other Plaintiff-States to enforce California's standards "in the future." *Yesler*, 37 F.3d at 448. In other words, they have only a "prospective" effect with future applicability. *See id.* The EPA waivers here are prospective in nature because they greenlit California programs set to go into effect well after the State enacted them. For instance, California adopted the Advanced Clean Trucks program in March 2021 and received the EPA waiver from the Biden Administration in April 2023. 88 Fed. Reg. 20,688 (Apr. 6, 2023). But the standards Advanced Clean Trucks imposed were not set to take effect until 2024, ratcheting up through 2035. So, at the time the EPA issued the enabling waiver for Advanced Clean Trucks, the program had no immediate effects but instead imposed future production standards. *See supra* 3-4. The same is true for Advanced Clean Cars II—enacted in August 2022, approved for an EPA waiver in January 2025, with effects that were not set to begin until 2026 and ratcheting up through 2035. 90 Fed. Reg. 642 (Jan. 6, 2025). California's "Omnibus" Low NOx program also sets emissions standards into the future. 90 Fed. Reg. 643 (Jan. 6, 2025). The future effects of rules that California enacted years before standards go into effect, if the EPA waivers were to stand, confirm the rules' future orientation.

*Second*, the waivers have nationwide consequence. In permitting California to receive a preemption waiver, the Clean Air Act also permits every other State to adopt California's emissions standards. *See* FAC ¶4 (citing 42 U.S.C. §7507). This means that a waiver for California really grants a waiver to all 50 states to adopt California's emissions standards that are more stringent than federal standards. *See* 42 U.S.C. §7507. As Texas explained, the EPA waivers effectively "allow California—and California alone—to dictate motor vehicle emissions standards" nationwide. Doc. 86, at 14. In practice, the EPA waivers granted to California "effectively nationalize its emission standards" because automakers must hit California electric vehicle target in order to sell vehicles within the State under California's rules. *Id.* at 15. Sales benchmarks aside, automakers cannot practically produce two sets of vehicles for sale in the country that meet different emissions standards. *See id.* In essence, California's more stringent standards override federal standards and impose a new regime across the United States. And California makes clear that is its regulatory goal. The California Air Resource Board, responsible for implementing California's rules, boasts that its regulatory scheme not only "sends truck manufacturers a clear signal regarding the end of combustion truck sales in California," but also forces "manufacturers [to] respond creatively when regulators inside and outside of California send strong, unified, regulatory signals." Letter from Richard Corey, Executive Director, CARB, to Liane Randolph, CARB Chair, and Board Members, at 5-6 (Jan. 10, 2022), perma.cc/AG2Z-8L42; *see also* Press Release, *California and Major Automakers reach Groundbreaking Framework Agreement on Clean Emission Standards*, CARB (July 25, 2019) perma.cc/2PP8-63RJ (expressing the regulator's intent in promulgating emissions rules to promote "an alternative path forward for clean vehicle standards nationwide").

Indeed, the ten States who join California in this lawsuit, among others, "have adopted these California standards as their own." FAC ¶4. Contrary to the States' claim then, the EPA's waiver decisions do not "concern a specific entity—California," but rather affect the whole country. *See id.* ¶85. Waivers that permit emissions standards that differ from federal law to predominate in many states are not particular to any one party and again evidence the effect of a

**SER-046**

rule rather than an order. As in *Yesler*, the waivers "affect[] a broad category of individuals not yet identified," including manufacturers that will sell their new vehicles and engines in California or in States that have already adopted, or may in the future adopt, California's standards. *See* 37 F.3d at 448.

District courts have agreed that Clean Air Act waiver decisions implicating the Act's preemption provision are properly classified as rules. "[O]nce EPA issues a waiver for a California emissions standard," it has "the same stature as a federal regulation." *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 343 (D. Vt. 2007); *see also Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d U51, 1174 (E.D. Cal. 2007) ("The court can discern no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation."). If an EPA waiver makes California's standards a generally applicable rule that applies with the force of federal law, then the waivers here are rules of general applicability too.

*Third*, an EPA waiver does not simply govern conduct in California and the other Plaintiff-States who've chosen to adopt California's standards. The effect is broader still because the waivers govern the conduct of automotive manufacturers and gas-related industries nationwide. The Clean Air Act dictates that compliance with California's differing standards "shall be treated as compliance with applicable Federal standards." 42 U.S.C. §7543(b)(3). An EPA waiver thus creates an alternative path to compliance with federal law for automotive manufacturers that ignores the EPA's otherwise governing federal standards. Again, the waivers affect a broad category of market participants far beyond any one state's borders.

But for the CRA joint resolution, then, the EPA waivers would set "general policy," rather than considerations "of particular facts" that would be indicative of an order. *See* Doc. 157-1, at 6. The Clean Air Act requires the EPA, in granting waivers, to address whether a California regulation that provides the basis for a waiver is consistent with the EPA's primary authority to regulate motor vehicles. *See* 42 U.S.C. §7543(b)(l)(C). This assessment requires the EPA to

consider the same policy questions raised by setting federal emissions standards and make policy judgments rather than address "particular facts." *See* 42 U.S.C. §7521. Because they set general policy—along with other, identified reasons—the EPA waivers are rules, not orders, subject to CRA review.

## II.    The EPA waivers will have tremendous, harmful effects in the marketplace if Congress's decision is nullified by this action.

The EPA waivers and underlying California regulations would impose massive, unwarranted costs on the marketplace. Amici and their members are particularly concerned with the problem of transporting hazardous materials, including propane gas, on an electric vehicle. But for the CRA joint resolutions, California's regulations would require just that, as they would effectively ban the internal-combustion engine for new vehicles. The burden that the fleet turnover would place on an industry fueled by internal-combustion engines poses grave concerns. So too does the lack of sufficient charging infrastructure for electric engines to support industrial vehicles.

To begin with, battery placement on the class of electric vehicles that could transport propane gas poses a significant safety hazard. In the current class, batteries are located between the frames of a truck behind the cab to the rear axle. This means that the battery sits below propane containers in transit, such that a battery fire could lead to container failure. And the requirement that industry be limited to electric vehicles for transport operations will only increase dangerous fires by placing a potential ignition point filled with propane gas directly above a battery. These battery fires pose significant complications to firefighting crews and communities alike. *See, e.g.*, Jonathan Lloyd, *'Unprecedented' Number of Lithium Ion Batteries Complicates LA Wildfires Cleanup*, NBC LA (Jan. 29, 2025), bit.ly/46aGfOz. California's regulations have no answer for industry's concern and instead put the public at risk.

Separately, forcing industry to switch its fleets to all-electric vehicles dramatically reduces range and strains charging infrastructure. But that is exactly what will happen if California's regulations go into full effect and force automakers to curtail productions of internal-combustion engine vehicles. The sheer size of batteries for this class of vehicle allows for a range of less than

12

TRUCK RENTING AND PROPANE ASSOCIATIONS' AMICI BRIEF
CASE NO. 4:25-cv-04966-HSG

**SER-048**

200 miles. The additional weight risks creating more frequent incidents of rollovers and fires. Even assuming smooth operation, each stop and common comforts for drivers, such as air conditioning, further reduce range. And charging times for electric vehicles far exceed existing fueling needs in both time and frequency. Frequent charging, in turn, creates more wear-and-tear on batteries and hinders productivity, assuming adequate charging stations are even available. But, of course, the charging infrastructure is nowhere near available. The cost to build and install charging stations to meet hazard location requirements is both cost-prohibitive and unfeasible with current energy demand. *See, e.g.*, Brad Plumer, *Electric Cars Are Coming, and Fast. Is the Nation's Grid Up to It?*, N.Y. Times (Aug. 3, 2021), bit.ly/46p2PSn (recognizing that increased electric vehicle charging "would put a major strain on the grid").

To further illuminate these concerns, take TRALA's membership. TRALA members include nearly 500 truck leasing and rental firms, employ about 60,000 people, and maintain over 33,000 locations across the United States. TRALA members utilize massive fleets, totaling around 900,000 light-, medium-, and heavy-duty trucks (ranging from Class 2 to Class 8). Americans rely on these trucks for everything from moving across town to hauling goods across the country. In fact, one in every four trucks on the road today is a rented or leased truck. TRALA members and the services they provide thus represent true mobility for the American public.

To serve the public, TRALA members rely overwhelmingly on internal-combustion engine vehicles. Fleet plans are years in the making and require meticulous consideration. A decision that allows California regulations to upend the marketplace will alter operations for need-based travel across the country and impose astronomical costs to replace hundreds of thousands of trucks as fleets age. When TRALA members would ordinarily update fleets over time and replace aging internal-combustion engine vehicles with new, more efficient vehicles of the same kind, California's rules that restrict (and eventually eliminate) the production of those vehicles derail fleet plans. This will force TRALA members to run older, less efficient equipment for longer that is counterproductive for business and the environment alike.

SER-049

To maintain their fleets, TRALA members purchase over 30% of all new over-the-road trucks each year. If California and others are permitted to enforce a standard more stringent than that set at the federal level, the automakers that produce those trucks will make fewer internal-combustion trucks for TRALA members and others to buy. Those fewer trucks available will command a higher price and harm members' ability to provide cost-conscious Americans with affordable mobility solutions.

Electric trucks don't meet the duty-cycle needs of TRALA members either. A typical truck for in-town service is rented multiple times a day, which requires quick turnaround times that cannot accommodate the extended recharging required by typical electric vehicles. The time that a vehicle is not productive increases the cost to the consumer. And the cost of installing electric charging facilities at truck rental locations is cost prohibitive. TRALA members have estimated that it would cost billions of dollars to add electric vehicle charging capabilities to their respective locations. The predictable result is a reduction in TRALA members' national footprint—which means customers will have to travel further to obtain the services they need, increasing moving times and costs—and increased prices. Prices to consumers only go up when accounting for the increased burden on maintenance and repair operations imposed by an aging or electric fleet.

The artificial decrease of available internal-combustion engine trucks is not only bad for business, but also bad for American consumers. If California's rules go into effect, American consumers will be left with the choice of renting internal-combustion engine trucks at artificially high rates or renting expensive electric trucks that are not up to the task of handling their hauling and moving needs. The limited range of electric trucks—often less than 200 miles—is further reduced under moving conditions (e.g., towing a vehicle or with weight for large loads). This limits the utility of electric trucks that cannot complete a typical one-way move trailering a car to the satisfaction of consumers, an everyday request from TRALA's consumer rental companies' customers. And that again assumes that adequate charging stations are available to power an electric fleet. Very few routes are populated with enough suitably located chargers to support electric truck transit, while charging times slow movement across the country.

**SER-050**

To that end, the national infrastructure to indulge California's standards does not exist and will not exist for decades, if ever. And even if the charging infrastructure were to exist, the strain that frequent charging places on energy demand is too great to bear. In particular, the country lacks sufficient high-voltage transmission lines to transport the requisite electricity to charging stations as more electric vehicles hit the streets. Katie Brigham, *Why the electric vehicle boom could put a major strain on the U.S. power grid*, NBC News (July 1, 2023). And grid upgrades do not come cheap. A California Public Utilities Commission study forecasted that California alone must spend $50 billion by 2035 in distribution grid upgrades to meet the electric vehicle targets set by the State's rules. *Electrification Impacts Study Part 1*, Cal. Pub. Utils. Comm'n (May 9, 2023), perma.cc/265G-K3D2.

Finally, NPGA, TRALA, WPGA, and PGANE members have long been proponents of environmentally sustainable practices. The propane industry, for instance, has promoted propane Autogas vehicles, a low-emission alternative to diesel, and renewable propane, whose carbon intensity score is a fraction of conventional fuels. As with the truck renting/leasing industry, the propane industry also frequently turns over vehicles to introduce higher efficiency, low-emission engines. Across industries, equipment sharing reduces greenhouse gas emissions and reduces the national inventory of total large capacity vehicles. California's regulations would stifle this progress and impose negative environmental effects.

Until electric vehicles can safely and cost-effectively meet the needs of consumers, industry cannot provide them. That day is not yet here. California's regulations hasten to bring about a world that does not yet exist. The resurrection of California's unrealistic standards that the CRA joint resolutions nullified would be bad for business, bad for consumers, and bad for the environment.

## **CONCLUSION**

The truck renting/leasing and propane associations respectfully offer this analysis in support of Defendants' motion to dismiss Plaintiffs' complaint.

**SER-051**

ANDREW KIM (CA SBN 288925)
*andrewkim@goodwinlaw.com*
WILLIAM M. JAY (*pro hac vice*)
*wjay@goodwinlaw.com*
**GOODWIN PROCTER** LLP
1900 N Street, NW
Washington, DC  20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

KATAHDIN RENDINO (CA SBN 351915)
*KRendino@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, California 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

Attorneys for Amicus Curiae

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, and STATE of WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> Defendants. | Case No. 4:25-cv-04966-HSG <br><br> **BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF MOTION TO DISMISS** <br><br> Date:     January 29, 2026 <br> Time:     2:00 p.m. PST <br> Courtroom: 2, 4th Floor Oakland Courthouse <br> Judge:    Hon. Haywood S. Gilliam, Jr. |

Plaintiffs have sued EPA, the President, and the Administrator as if this were a garden-variety challenge to administrative action. But Plaintiffs are seeking to invalidate *legislation*, not an agency action—indeed, they do not dispute that as long as the Resolutions remain on the books, the President "has the constitutional obligation to execute [them]." *Ctr. for Biological Diversity*, 946 F.3d at 562. And the executive officials did not *cause* the passage of the Resolutions through Congress.

Litigants cannot block Congress from disapproving a rule by preventing the transmission of the rule to Congress—including by asking a court to invalidate the transmission. The transmission is not even a prerequisite to the passage of a resolution under the CRA. To the contrary, it is well established that because the CRA is an exercise of Congress's own rulemaking power, Congress itself can make its own determination about when its procedures are triggered. Thus, for example, when the Consumer Financial Protection Bureau refused to send a "guidance" bulletin to Congress under the CRA, Congress determined that it was a "rule" and passed a resolution disapproving it. *See* Pub. L. No. 115-172, 132 Stat. 1290 (2018) (concluding "that the Bulletin is a rule under the Congressional Review Act"); *see generally* Brannon & Carey, *supra*, at 25–26 & nn.233–38. As a result, Plaintiffs cannot obtain any form of redress by attacking the transmission of the Waivers to Congress. And even if they could, it would not be *retroactive* redress that would serve to invalidate legislation Congress has already passed. Plaintiffs have no standing to sue the Executive Branch on this theory.

Plaintiffs' quarrel is with Congress—and they cannot hide that fact by suing a different defendant. *See Common Cause*, 748 F.3d at 1283.

* * * * *

For the foregoing reasons, this suit is nonjusticiable.

## II. THE SENATE CORRECTLY CONCLUDED THAT THE AGENCY ACTIONS AT ISSUE IN THIS CASE ARE RULES UNDER THE CONGRESSIONAL REVIEW ACT.

All of Plaintiffs' claims hinge on whether Congress (and especially the Senate) properly concluded that the EPA Waivers at issue in this case were "rules" under the CRA. Even Plaintiffs' repackaged constitutional claims (*i.e.*, separation of powers and Tenth Amendment) are just the statutory claims in disguise, as at bottom, they are arguments that the Waivers should not have been

9

able to pass through Congress using the CRA's streamlined legislative procedures. For the reasons already stated, those arguments are not justiciable. But if the Court reaches the merits of the CRA argument, it should hold that Congress correctly treated the Waivers as rules within the meaning of the CRA. These agency actions are excellent examples of the type of nationally significant decision that Congress chose to designate for review under the CRA.

The CRA largely adopts the Administrative Procedure Act ("APA") definition of a rule. *See* 5 U.S.C. §§ 551(4), 804(3). Under the CRA and APA, a "rule" is "an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4) (APA definition); *see id.* § 804(3) (excluding, from the definition of "rule" under the CRA, rules of "particular applicability"; rules relating to "agency management or personnel"; and "rule[s] of agency organization, procedure, or practice that do[] not substantially affect the rights or obligations of non-agency parties"). "The statutory definition of an agency 'rule' is 'broad.'" *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1107 (9th Cir. 2025) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015)). "The definition of 'rule' includes 'nearly every statement an agency may make.' *Id.* (quoting *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980)). Rules are "prospective[] and ha[ve] a definitive effect on individuals only after the rule subsequently is applied." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "The form of the proceeding is not dispositive; what counts is its effect." *Id.* at 449.

Here, EPA's Waivers allowed California, and any other states that chose to adopt California's standards pursuant to 42 U.S.C. § 7507, to adopt more stringent emissions policies than promulgated by EPA. Like the regulations that were recently at issue in the Supreme Court's decision on standing in *Diamond Alternative Energy*, the California regulations that were the subject of the Waivers "requir[ed] automakers [and truck manufacturers] to alter their fleets of new vehicles," "caus[ing] a decrease in purchases of gasoline and other liquid fuels for" such vehicles. 145 S. Ct. at 2135. But those state regulations would have no force without EPA's action—they would be displaced by federal law. Thus, by operation of law, the Waivers functionally transformed California law into federal regulation—a compliance pathway that satisfies federal law in lieu of the

10

federal standards that would otherwise apply.  Letter from Russell T. Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General, U.S. Government Accountability Office (June 18, 2025), at 5 (explaining why each of the Waivers "directly governs the conduct of motor-vehicle manufacturers *nationwide*" by creating this "unique alternative nationwide compliance pathway").[8]  In sum, EPA's Waivers had a direct, prospective impact on the interests of a broad category of regulated entities, not just in California, but across the nation.  "These are the effects of a rule[.]"  *Yesler Terrace*, 37 F.3d 449 (finding that a federal agency's decision allowing Washington state's eviction procedures to be used, as an alternative to the federal grievance procedure that would otherwise be required, was a "rule" because of its prospective effect on "a broad category of people" and the consequent "legal consequences" for those people).  They are likewise effects of general, not particular, applicability:  they fall not just on particular "named persons," but on every manufacturer nationwide subject to the relevant CAA rules.  *See Attorney General's Manual on the Administrative Procedure Act* 13 (1947).  Even if the Waivers affected only California, the prospective regulation of the Nation's largest market remains one of "general" applicability:  in the overlapping, interstate market for automobiles in the United States, deviation by a state as large as California leads to nationwide impacts on manufacturers' compliance obligations (and their costs of compliance), necessarily affecting their core business decisions about which products to manufacture and sell for the U.S. market.  And it is not just California whose direct coercive power is at stake:  a waiver for California allows *other* states to adopt regulations "identical" to California's under 42 U.S.C. § 7507, further augmenting the Waivers' impact and significance.  *See generally* Am. Compl. ¶¶ 15–24 (reciting that most of the Plaintiff States, including New York, New Jersey, and Washington, had adopted all three of the California measures that the Waivers authorized).

The GAO itself has previously concluded that a revocation of a preemption waiver was a rule. Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, FRL010000-45 (Sep. 27, 2019) (describing EPA's decision to

---

[8] Available at https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf.

11

withdraw California waiver as a "Final Rule" under CAA).[9] Likewise, other courts have found EPA waivers to constitute federal regulations. As one example, the court in *Central Valley Chrysler-Jeep, Inc. v. Goldstene* determined that there was "no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation." 529 F. Supp. 2d 1151, 1173 (E.D. Cal. 2007), *as corrected* (Mar. 26, 2008). Similarly, in *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, the court determined that it was "beyond serious dispute . . . that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation. . . . . Congress . . . could not have intended that an EPA-approved emissions reduction regulation did not have the force of a federal regulation." 508 F. Supp. 2d 295, 347 (D. Vt. 2007). As Plaintiffs admit, "the text of the CRA is exclusively concerned with federal rules promulgated by federal agencies." Am. Compl. ¶ 58 (citing 5 U.S.C. § 801(a)(1)(B)).

In sum, the Waivers would allow the law of an entire state (plus other states that follow it) to escape preemption and to simultaneously disrupt and augment what would otherwise be a nationally uniform legal and regulatory framework. This is exactly the type of "general applicability" and "prospective effect" that fit the broad definition of a rule. Indeed, the Waivers here have *outsize* nationwide impacts because of their effects on the national markets for vehicles, technology, and energy. As the Chamber has explained:

> [The Resolutions] would severely restrict consumer choice and impose substantial costs on businesses, not only in California but also in other states that have adopted California's regulatory programs. By mandating adoption of technologies not yet commercially viable at scale, and on a recklessly accelerated timeline, these rules risk significant increases to transportation costs and could hinder the movement of people and goods nationwide. Additionally, factors such as insufficient vehicle charging infrastructure, which are beyond the control of manufacturers, further deter market adoption of electric vehicles and exacerbate compliance challenges.

Letter from Neil Bradley, Executive Vice President, U.S. Chamber of Commerce, to Members of

---

[9] Available at https://www.gao.gov/fedrules/196015.

12

the U.S. Senate (May 13, 2025).[10]

The crucial public policy choice made by each of the Waivers—whether to create an exception to federal preemption for a key component of the U.S. transportation sector, and to allow California and other states to reshape key aspects of the nationwide economy—is exactly the type of decision, with sweeping impacts, that Congress reasonably concluded should be subject to the CRA's streamlined review procedures. The CRA ensures that the people's representatives can expeditiously review such a consequential agency decision. As explained above, Congress's compliance with the CRA is not justiciable in this Court; to hold otherwise would be to trigger serious separation of powers concerns. But if that question *were* justiciable, the answer is that Congress complied with the CRA in accepting the Waivers for review as "rules" under that statute.

### CONCLUSION

The Court should grant the federal Defendants' motion to dismiss the First Amended Complaint (Dkt. 172).

---

[10] Available at https://www.uschamber.com/assets/documents/250513_Hill_CRA-EPA-Preemption Waivers_Senate-FINAL.pdf.

SER-057

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
KATHERINE GAUMOND, State Bar No. 349453
CAITLAN McLOON, State Bar No. 302798
CECILIA D. SEGAL, State Bar No. 310935
EMMANUELLE S. SOICHET, State Bar No. 290754
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-0550
Telephone: (510) 879-0299
Fax: (510) 622-2270
E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Plaintiff State of California*
(additional counsel on signature pages)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT,** and **STATE OF WASHINGTON,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN,** in his official capacity as Administrator of the U.S. Environmental Protection Agency, and **DONALD J. TRUMP,** in his official capacity as President of the United States,<br><br>Defendants. | 4:25-cv-04966-HSG<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE BY WESTERN STATES TRUCKING ASSOCIATION, INC. AND CONSTRUCTION INDUSTRY AIR QUALITY COALITION, INC.**<br><br>(Administrative Procedure Act, 5 U.S.C. § 701 et seq.; 5 U.S.C. § 801 et seq.)<br><br>**Date**:  October 23, 2025<br>**Time**:  2:00 PM<br>**Judge**:  Hon. Haywood S. Gilliam, Jr,<br>**Action Filed**: June 12, 2025 |

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-058**

**TABLE OF CONTENTS**

**Page**

Statement of Issues to Be Decided ........................................................................... 1

Introduction .............................................................................................................. 1

Background ............................................................................................................... 2

Legal Standard ......................................................................................................... 3

Argument .................................................................................................................. 4

    I.    WSTA and CIAQC Do Not Meet the Standard for Intervention as of Right ........ 4

        A.    WSTA and CIAQC lack a protectable interest that could be impeded by disposition of this case ............................................. 4

        B.    WSTA's and CIAQC's interests are adequately represented by Federal Defendants ....................................................................... 6

    II.    WSTA And CIAQC Do Not Meet The Standard for Permissive Intervention ....................................................................................... 9

    III.    If the Court Grants Intervention, It Should Exercise Its Discretion to Impose Reasonable Case Management Conditions ................................ 12

Conclusion ............................................................................................................. 13

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Akina v. Hawaii*
   835 F.3d 1003 (9th Cir. 2016) ................................................................................ 9

*Apple Inc. v. Iancu*
   No. 5:20-cv-06128-EJD, 2021 WL 411157 (N.D. Cal. Feb. 5, 2021) ................................... 10

*Arakaki v. Cayetano*
   324 F.3d 1078 (9th Cir. 2003) ................................................................................ 7

*Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*
   54 F.4th 1078 (9th Cir. 2022) ................................................................................ 5

*California ex rel. Lockyer v. United States*
   450 F.3d 436 (9th Cir. 2006) ............................................................................. 7, 8

*California v. BLM*
   No. 18-cv-000521-HSG, 2018 WL 3439453 (N.D. Cal. July 17, 2018) ................................. 8

*California v. Health & Human Servs.*
   No. 17-cv-05738-HSG, 2017 WL 6731640 (N.D. Cal. Dec. 29, 2017) ................................. 12

*Conservation Law Foundation v. Mosbacher*
   966 F.2d 39 (1st Cir. 1992) ................................................................................. 8

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*
   No. 21-cv-00344-JSW, 2021 WL 4552144 (N.D. Cal. May 3, 2021) ................................... 12

*E. Bay Sanctuary Covenant v. Biden*
   102 F.4th 996 (9th Cir. 2024) ............................................................................. 3, 4

*Freedom from Religion Found., Inc. v. Geithner*
   644 F.3d 836 (9th Cir. 2011) ............................................................................. 3, 7

*H.R. Ewell, Inc. et al. v. EPA*
   No. 25-1475 (9th Cir. filed Mar. 7, 2025) ................................................................. 6

*In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*
   No. 22-cv-05173-TLT, 2023 WL 4536883 (N.D. Cal. July 13, 2023) ................................. 11

*Kalbers v. U.S. Dep't of Justice*
   22 F.4th 816 (9th Cir. 2021) ............................................................................... 11

*Mi Pueblo San Jose, Inc. v. City of Oakland*
   No. 06-cv-4094, 2007 WL 578987, at *1 (N.D. Cal. Feb. 21, 2007) ................................... 4

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-060**

**TABLE OF AUTHORITIES**
(continued)

Page

*Montgomery v. Rumsfeld*
  572 F.2d 250 (9th Cir. 1978)...................................................................................... 11

*N. Arapaho Tribe v. LaCounte*
  No. 16-cv-11, 2016 WL 8710178 (D. Mont. Apr. 4, 2016)........................................ 5

*Or. Nat. Res. Council v. Allen*
  No. CV 03-888-PA, 2003 WL 27386127 (D. Or. Nov. 4, 2003)................................ 8

*S. Cal. Edison Co. v. Lynch*
  307 F.3d 794 (9th Cir. 2002)................................................................................. 3, 9

*Stringfellow v. Concerned Neighbors in Action*
  480 U.S. 370 (1987)............................................................................................ 11, 12

*Sw. Ctr. for Biological Diversity v. Berg*
  268 F.3d 810 (9th Cir. 2001)...................................................................................... 4

*U.S. ex rel. Richards v. De Leon Guerrero*
  4 F.3d 749 (9th Cir. 1993)........................................................................................ 12

*United States v. Alisal Water Corp.*
  370 F.3d 915 (9th Cir. 2004)...................................................................................... 9

*United States v. City of Los Angeles*
  288 F.3d 391 (9th Cir. 2002)............................................................................... 3, 6, 9

*W. States Trucking Ass'n, Inc. v. EPA*
  No. 23-1143 (D.C. Cir.) ............................................................................................. 6

*Wellington Hills Park, LLC v. Assurance Co. of Am.*
  No. 10-cv-01916, 2011 WL 1344249 (W.D. Wash. Apr. 7, 2011).......................... 4, 6

**STATUTES**

28 U.S.C.
  § 530D(a)(1)(B)(ii).................................................................................................... 8

42 U.S.C.
  § 7507........................................................................................................................ 2
  § 7543(b) ................................................................................................................ 2, 4
  § 7607(b) ................................................................................................................... 5

iii

**TABLE OF AUTHORITIES**
(continued)

Page

COURT RULES

Federal Rules of Civil Procedure
    Rule 24(a)............................................................................................. 3, 4, 11, 12
    Rule 24(b) ............................................................................................. 3, 9, 11, 12

OTHER AUTHORITIES

California Code of Regulations, Title 13
    § 1956.8(a)(2)....................................................................................................... 10
    § 1962.4(b) ............................................................................................................ 10

FEDERAL REGULATIONS

74 Fed. Reg. 32,744 (July 8, 2009) ................................................................................ 7

88 Fed. Reg. 20,688 (Apr. 6, 2023) ............................................................................... 2

90 Fed. Reg. 642 (Jan. 6, 2025) ..................................................................................... 2

90 Fed. Reg. 643 (Jan. 6, 2025) ..................................................................................... 2

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Court deny the motion filed by Western States Trucking Association, Inc. (WSTA) and Construction Industry Air Quality Coalition, Inc. (CIAQC) to intervene either as of right or permissively in the above-captioned matter? If the Court grants the motion, should it nonetheless place reasonable conditions on WSTA's and CIAQC's participation and on this litigation to ensure Plaintiffs are not prejudiced and the case proceeds efficiently?

**INTRODUCTION**

To date, 21 entities have filed five separate motions to intervene defensively in this case. All claim that they have a significantly protectable interest in the litigation that will not adequately be represented by Federal Defendants. All are mistaken.

WSTA and CIAQC, the latest movants to file, cannot overcome the flaws identified by Plaintiffs in the previous movants' papers. Their asserted protectable interest lies in the lawfulness of the U.S. Environmental Protection Agency's (EPA) decision to grant California's requests for Clean Air Act preemption waivers that authorize enforcement of state vehicle emissions standards known as the Omnibus and Advanced Clean Trucks regulations. But that interest is simply not relevant to this suit. That interest is also better protected via petitions for review under the Clean Air Act challenging the waivers themselves—as WSTA and CIAQC well know, having filed two such petitions. WSTA and CIAQC thus cannot show that their interest would be impaired by the Court's resolution of Plaintiffs' claims here. Nor can they rebut the presumption that the federal government will adequately represent their interest. Intervention as of right is not warranted.

Furthermore, and again as with prior movants, WSTA's and CIAQC's intervention threatens to expand the scope of the litigation to encompass extraneous issues and facts, prejudicing Plaintiffs. That they could become the 20th and 21st parties on Federal Defendants' side of the case adds to the risk of prejudice from undue duplication and delay, and underscores that such intervention is neither practical nor equitable. The Court should deny WSTA and CIAQC permissive intervention and instead allow them to air their views in an amicus brief.

1

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-063**

Alternatively, if the Court is inclined to grant intervention, Plaintiffs respectfully request that the Court exercise its discretion to place reasonable limitations on WSTA's and CIAQC's participation, along with certain procedural conditions on all parties to ensure the case proceeds efficiently.

**BACKGROUND**

Earlier this year, Congress took the unprecedented and unlawful step of targeting, with resolutions of "rule" disapproval (Resolutions), three Clean Air Act orders that waived preemption of certain emissions standards set by California for new motor vehicles sold in the State. Compl. ¶¶ 5-7, ECF 1. California has been setting such standards for more than half a century. *Id.* ¶ 33. Since 1967, when Congress generally preempted States from setting new motor vehicle standards, California has done so pursuant to the preemption waivers that EPA must grant, subject to certain limited conditions. *See* 42 U.S.C. § 7543(b)(1).

Each of the three waivers targeted by the Resolutions permits California to enforce specific amendments to its regulatory program, adopted to reduce harmful pollution and protect public health and welfare. These waivers similarly allow other States to adopt and enforce California's regulations as their own. *Id.* § 7507. The first waiver, published in April 2023 (88 Fed. Reg. 20,688 (Apr. 6, 2023)), authorizes the Advanced Clean Trucks (ACT) regulation, which requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles in California beginning with model year 2024. Compl. ¶ 44. The second and third waivers, published in early January 2025, authorize the Advanced Clean Cars II (ACCII) and Omnibus regulations, respectively. 90 Fed. Reg. 642 (Jan. 6, 2025); 90 Fed. Reg. 643 (Jan. 6, 2025). ACCII gradually strengthens California's longstanding emission standards for light-duty vehicles (passenger cars and light trucks), including the State's zero-emission-vehicle sales requirements and the exhaust emission standards for criteria pollutants, requiring reductions in smog-forming oxides of nitrogen (NOx) and particulate matter. Compl. ¶ 43. The Omnibus regulation likewise strengthens longstanding state emission standards, requiring substantial reductions in NOx exhaust emissions from new medium- and heavy-duty vehicles. *Id.* ¶ 45. All three of these regulations are crucial parts of California's comprehensive plan to improve the air Californians

2

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-064**

breathe and meet state and federal air quality standards. *Id.* ¶ 46 (noting tens of millions of Californians are affected by some of the worst air quality in the Nation).

The unlawful targeting of these waivers began months (or, in the case of ACT, years) after the waivers were granted. EPA reversed the view it had consistently held for decades—shared by the Government Accountability Office—and suddenly declared, without any explanation, that waivers were "rules" within the meaning of the Congressional Review Act (CRA). *Id.* ¶¶ 65, 68-70, 73-77; *see also* Mot. 14:8-10 (referring to "EPA's change in position"). Relying on EPA's misinterpretation, Congress enacted the Resolutions that purport to invalidate the three waivers. Compl. ¶¶ 94, 103, 108. The President signed the Resolutions on June 12, 2025. *Id.* ¶ 113. Plaintiff States sued the United States the same day. Plaintiffs seek, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles and, correspondingly, to have the three waivers declared valid and in effect. *Id.* ¶¶ 153-178 & Prayer for Relief.

## LEGAL STANDARD

To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), a movant must show that: (1) the motion is timely; (2) the movant has a "significantly protectable interest" in the subject of the action; (3) disposition of the action may, as a practical matter, impair or impede the movant's ability to protect that interest; and (4) the movant's interest is inadequately represented by the existing parties. *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024). "Failure to satisfy any one of the requirements is fatal to the application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011).

To intervene permissively under Federal Rule of Civil Procedure 24(b)(1), a movant must show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the movant's claim or defense shares a common question of law or fact with the main action. *United States v. City of Los Angeles*, 288 F.3d 391, 403 (9th Cir. 2002). Even if a movant satisfies those "threshold requirements," a court "has discretion to deny permissive intervention," *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002), particularly if intervention would "unduly delay or prejudice" the existing parties, Fed. R. Civ. P. 24(b)(3).

3

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-065**

Though courts construe Rule 24 broadly in favor of intervention, the movant bears the burden of establishing that the Rule's requirements are met. *See E. Bay Sanctuary Covenant*, 102 F.4th at 1001 & n.2. Conclusory allegations will not suffice. *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

## ARGUMENT

**I.  WSTA AND CIAQC DO NOT MEET THE STANDARD FOR INTERVENTION AS OF RIGHT**

### A.  WSTA and CIAQC lack a protectable interest that could be impeded by disposition of this case

As in the four sets of defensive intervention motions filed before this one, WSTA's and CIAQC's asserted interest lies in the legality of certain EPA waiver decisions, not the legality of the Resolutions. That interest is neither sufficiently related to Plaintiffs' claims nor impaired by the disposition of this case.

*Mi Pueblo San Jose, Inc. v. City of Oakland* is instructive. There, Mi Pueblo sought to open a new grocery store in Oakland and obtained the necessary building permits. No. 06-cv-4094, 2007 WL 578987, at *1 (N.D. Cal. Feb. 21, 2007). The City later revoked the permits. *Id.* Mi Pueblo challenged the revocation as violating the Constitution and relevant statutes. *Id.* An association of local businesses moved to intervene, arguing that Mi Pueblo needed to obtain a conditional use permit for the store to operate. *Id.* at *2. The court denied intervention, finding that the association lacked a protectable interest because "[w]hether a conditional use permit is required for the . . . store is not related to Mi Pueblo's constitutional claims against the City." *Id.* at *6. So too here. Whether EPA's waiver decisions satisfied the specific criteria set out in the Clean Air Act's waiver provision, 42 U.S.C. § 7543(b), is "not related" to Plaintiffs' constitutional and statutory claims against the Resolutions. *Id.*; *see also Wellington Hills Park, LLC v. Assurance Co. of Am.*, No. 10-cv-01916, 2011 WL 1344249, at *3 (W.D. Wash. Apr. 7, 2011) (proposed intervenor's interest not sufficiently related to plaintiff's breach of contract claim because it involved the interpretation of an entirely different document than the contested contract).

4

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-066**

WSTA and CIAQC—well "aware" that Plaintiffs made this argument in opposing other motions to intervene (*see* Mot. 16:20-21)—attempt to frame their interest as "whether the ACT rule is valid" and peg that interest to Plaintiffs' prayer for relief. Mot. 9:25-26, 10:26-11:1. That gambit fails. Plaintiffs' "goal in this suit" (Mot. 10:26) is to invalidate the Resolutions for, *inter alia*, violating separation of powers principles in several respects along with the Tenth Amendment and structural principles of federalism. *See, e.g.*, Compl. ¶ 9 ("The Federal Government ran roughshod over federalism and separation of powers principles in applying the [Congressional Review Act] to these three preemption waiver decisions."); *id.* ¶ 12 ("With every step, the workings of the National Government failed to follow the law and likewise failed to honor the special restraints on federal power over the States." (cleaned up)). Plaintiffs' request to have the three waivers declared valid simply follows from a ruling invalidating the Resolutions under one or more of Plaintiffs' legal theories and would not predispose pending challenges to the waiver decisions under a separate statute. *See id.* ¶ 183 ("Because the Resolutions are unlawful, unconstitutional and void, the preemption waivers granted for" ACCII, ACT, and Omnibus "are valid and in effect."). WSTA's and CIAQC's stated interest in that *outcome* as to two of the three waivers (Mot. 3:6-8, 9:24-26, 11:20-21) should not be "confused" with "a legally protectable interest in the subject of the action." *N. Arapaho Tribe v. LaCounte*, No. 16-cv-11, 2016 WL 8710178, at *2 (D. Mont. Apr. 4, 2016). WSTA's and CIAQC's failure to demonstrate a "relationship between [their] legally protected interest and the claims at issue" is fatal to their intervention as of right. *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1088 (9th Cir. 2022) (cleaned up); *id.* at 1087-88 & n.8 (clarifying Ninth Circuit interpretation of interest test).

WSTA and CIAQC likewise strain to explain how their alleged interest would be impeded by this suit. They implicitly concede that a petition for review under the Clean Air Act's judicial review provision, 42 U.S.C. § 7607(b), is an appropriate mechanism for challenging EPA's waiver decisions, citing their own lawsuit against the waiver for ACT pending in the D.C. Circuit.

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-067**

*See* Mot. 11:12-15.[1] But any argument that this case would impair that separate litigation falls flat. First, EPA has *not* moved to dismiss the D.C. Circuit petition for review, *supra* n.1, and so "this case" has *not* "already affected" how WSTA and CIAQC "are litigating" it. Mot. 11:15-19; *see also W. States Trucking Ass'n, Inc. v. EPA*, No. 23-1143 (D.C. Cir.) (no substantive filings since case placed in abeyance on December 21, 2023). Second, that WSTA and CIAQC might choose to "continue prosecuting" their cases—in either the D.C. or Ninth Circuit, or both, *supra* n.1—following the disposition of this suit (Mot. 11:20-21) undermines, rather than supports, their position. *See Wellington Hills Park*, 2011 WL 1344249, at * 3 (no impairment where movant-intervenor could assert its rights in state court proceedings); *accord City of Los Angeles*, 288 F.3d at 402. Finally, WSTA and CIAQC profess an unspecified interest in whether the waiver for ACT (and presumably Omnibus) is a "'rule' under the Administrative Procedure Act," claiming that a decision on that question could open "avenues" for challenging those or future waivers. Mot. 12:1-7. Notably, WSTA and CIAQC identify no such avenues. Indeed, they fail to explain how a decision that certain waivers are "rules" makes any difference to them at all. Their argument is a transparent attempt to connect their actual interest in certain waiver decisions with this litigation; the conclusory nature of the argument only highlights the absence of any such connection.

**B.     WSTA's and CIAQC's interests are adequately represented by Federal Defendants**

WSTA and CIAQC acknowledge the presumption of adequate representation that arises where, as here, movant-intervenors and an existing party "share an ultimate objective." Mot. 12:22-24. They attempt to overcome that presumption by arguing that their interests diverge from those of the federal government in three respects. *Id.* at 13:3-7. None is persuasive.

---

[1] WSTA's and CIAQC's garbled description of the case's procedural posture bears correcting. EPA has not sought to dismiss that case. Rather, EPA moved to dismiss WSTA's and CIAQC's petition for review of the waiver for *Omnibus* in the *Ninth* Circuit, *H.R. Ewell, Inc. et al. v. EPA*, No. 25-1475 (9th Cir. filed Mar. 7, 2025)—a suit they neglect to mention. In response, WSTA and CIAQC explained that they may seek to continue litigating their petition for review should another court deem the Resolutions invalid. *See* Petrs.' Resp. to Mot. to Dismiss at 12-13, *H.R. Ewell*, No. 25-1475, Dkt. 30.1; *id.* at 13 n.5 ("[I]t might be more appropriate to hold this case in abeyance pending resolution of California's lawsuit."). They later appeared to change position, asserting that they oppose abeyance and support EPA's motion to dismiss. *See* Petrs.' Resp. to State Intervenors' Cross-Mot. for Abeyance & Resp. to EPA's Mot. to Dismiss at 2, 8-9, *H.R. Ewell*, No. 25-1475, Dkt. 37.1.

6

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-068**

WSTA and CIAQC first suggest that Federal Defendants may focus on justiciability arguments, to the exclusion of others. *Id.* at 13:8-23. But the presumption of adequacy is "nowhere more applicable than in a case where the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment." *Freedom from Religion Found.*, 644 F.3d at 841. Rebutting that presumption requires a "very compelling showing." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 443-44 (9th Cir. 2006). Here, WSTA and CIAQC offer no evidence that the federal government's defense of the Resolutions will be anything less than rigorous. Indeed, their contention regarding the focus of the federal government's attention is belied by the government's motion to dismiss, which is not limited to arguments on justiciability. *See, e.g.*, United States' Mot. to Dismiss 15:20-17:11, 20:3-25:24, ECF 118. And while WSTA and CIAQC assert that they will focus on arguments going beyond justiciability, one of the arguments they identify relates to the reviewability of the Senate's rules—which the federal government also makes. *Id.* at 13:8-15:19. Any "differences in litigation strategy" WSTA and CIAQC purport to have with the federal government are thus illusory and, in any event, insufficient to rebut the presumption of adequacy. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086-88 (9th Cir. 2003); *see also Freedom from Religious Found.*, 644 F.3d at 841-42 (presumption not rebutted where proposed intervenor merely speculated that interests might diverge, presenting no evidence that federal defendants would take an inconsistent position or abandon key arguments).[2]

WSTA and CIAQC next reference the federal government's history of changing course on two earlier waivers—out of more than 75—and of changing course on the question of whether waivers constitute rules—for the first time in decades. Mot. 14:3-16; Compl. ¶ 41.[3] As noted, *supra* at 6:10-16, WSTA and CIAQC have not identified any actual interest in whether waivers are "rules." But, regardless, changing course on an administrative action is not the same as

___

[2] WSTA and CIAQC assert that they—for institutional reasons—will refrain from making certain arguments Federal Defendants are likely to raise. Mot. 13:8-11 & n.3. That has it exactly backwards. The adequacy of representation inquiry looks to whether the *existing party* will make the *proposed intervenors'* arguments—not the other way around. *See Arakaki*, 324 F.3d at 1086.

[3] WSTA and CIAQC incorrectly assert that "the Bush EPA denied the ACC I waiver in 2008" and "the Obama EPA granted it in 2013." Mot. 14:6-7. The 2008 denial involved a different waiver request that was granted in 2009. 74 Fed. Reg. 32,744 (July 8, 2009).

7

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-069**

changing course on a statute. Most relevant here, should the U.S. Department of Justice later wish to refrain from defending the constitutionality of the Resolutions at issue, it would have to submit a report to Congress divulging and explaining that decision pursuant to 28 U.S.C. § 530D(a)(1)(B)(ii), at which point WSTA and CIAQC may renew their motion to intervene, *see Or. Nat. Res. Council v. Allen*, No. CV 03-888-PA, 2003 WL 27386127, at *3 (D. Or. Nov. 4, 2003). WSTA's and CIAQC's reliance on a limited history of EPA action is again insufficient to rebut the presumption of adequacy.

Finally, WSTA and CIAQC rely on the fact that Federal Defendants are not regulated parties. But neither are WSTA and CIAQC. Their members are not regulated by the Resolutions that are the subject of this suit. They are also not regulated by the California standards with which they disagree. As WSTA and CIAQC concede, those regulations apply to *manufacturers* of vehicles and engines (Mot. 4:18-5:10), while WSTA's and CIACQ's members "use"—but do not manufacture—"medium- and heavy-duty vehicles" (*id.* at 6:25-26). In any event, their cited authorities finding inadequate representation where regulated parties sought to intervene alongside the federal government are inapposite because the circumstances underlying those findings are absent here. *See Lockyer*, 450 F.3d at 445 (cited at Mot. 14:20) (presumption of adequacy overcome where movants provided "direct evidence that the United States will take a position that actually compromises (and potentially eviscerates)" their legal position); *California v. BLM*, No. 18-cv-000521-HSG, 2018 WL 3439453, at *8 (N.D. Cal. July 17, 2018) (cited at Mot. 14:22-23) (plaintiffs did not oppose movants' "substantive rationales for intervention"). Indeed, in *Conservation Law Foundation v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) (cited at Mot. 15:5-8), the Secretary of Commerce decided not to file an answer to the complaint and instead accepted a consent decree providing for "virtually all the relief sought," demonstrating that the Secretary was "less than wholeheartedly dedicated to opposing the [plaintiff's] aims." Of course, here, Federal Defendants have already moved to dismiss Plaintiffs' Complaint. WSTA and CIAQC also rely on the fact that they are adverse to EPA in their petition for review of the ACT waiver. Mot. 13:23-14:2. They cite no authority for the proposition that "an adverse party from another case" could not adequately represent an intervenor's interests in the case in

8

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-070**

question. *Id.* In both cases, the Federal Government is defending its own actions; it just so happens that WSTA and CIAQC have different views of the actions in question. That does not, by itself, suggest inadequate representation.

More broadly, WSTA and CIAQC seem to argue that, because their members are affected by California's vehicle emissions standards, their intervention should be granted. *E.g.*, Mot. 10:13, 15:4-5. Taken to its logical conclusion, their argument opens the door to intervention by countless others, "creat[ing] a slippery slope where anyone" with such an undifferentiated stake in the litigation "could bootstrap that stake into an interest in the litigation itself." *United States v. Alisal Water Corp.*, 370 F.3d 915, 920 n.3 (9th Cir. 2004). Intervention as of right "involves an accommodation between two potentially conflicting goals: to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending." *Akina v. Hawaii*, 835 F.3d 1003, 1012 (9th Cir. 2016) (quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969)). WSTA and CIAQC imply that their intervention promotes judicial economy because, absent this suit, they need not continue litigating a separate case. *See* Mot. 11:21-22. But, even taken at face value, that establishes only that WSTA and CIAQC would have preferred Plaintiffs not file this suit. That preference is insufficient to support intervention. Moreover, judicial economy is only served where *related* claims are litigated together. *See Akina*, 835 F.3d at 1012. That is not the case here. *Supra* at 5:1-22. And courts have denied intervention as of right where the movant was able to protect its interests by filing another lawsuit, even though doing so would generate additional litigation. *See Akina*, 835 F.3d at 1012; *City of Los Angeles*, 288 F.3d at 402.

## II. WSTA AND CIAQC DO NOT MEET THE STANDARD FOR PERMISSIVE INTERVENTION

WSTA and CIAQC proclaim that "[c]ourts favor intervention when practical and equitable considerations support it." Mot. 7:26. But those considerations weigh *against* intervention here. *See* Fed. R. Civ. P. 24(b)(3); *S. Cal. Edison Co.*, 307 F.3d at 803 (court has discretion to deny permissive intervention even where Rule 24(b)'s threshold elements are met).

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-071**

As with every movant-intervenor-defendant to date, WSTA's and CIAQC's interests plainly concern the lawfulness of EPA's waivers—specifically, EPA's waivers for ACT and Omnibus. While those interests are more properly vindicated through existing lawsuits under the Clean Air Act, and are irrelevant to Plaintiffs' claims, WSTA and CIAQC may nonetheless attempt to inject them into this suit. For example, WSTA and CIAQC repeatedly (and erroneously) refer to California's "electric vehicle mandates," while implicitly conceding that their petition for review of the ACT waiver will air that grievance. *See, e.g.*, Mot. 2:21-22, 2:27-28; *see also, e.g.*, Mot. 7:3-16 (describing purported drawbacks of electric vehicles).[4] Defending against such "collateral issues" risks prejudicing Plaintiffs, *Apple Inc. v. Iancu*, No. 5:20-cv-06128-EJD, 2021 WL 411157, at *5 (N.D. Cal. Feb. 5, 2021); at minimum, it risks wasting judicial and party resources on unnecessary disputes about the case's scope.

WSTA's and CIAQC's participation as intervenor-defendants further risks prejudicing Plaintiffs by introducing (and compounding) duplication and delay. Indeed, that risk is already apparent. Plaintiffs have now filed five separate responses to five serial motions to intervene defensively. And though the hearing date on these motions has been consolidated, the Court must likewise review all five sets of papers. Additional groups may yet seek to intervene defensively. Each group of movant-intervenor-defendants to date has also indicated an intent to file a motion to dismiss. Mot. 13:16-17; ECF 49 at 2 n.1; ECF 61 at 2 n.2; ECF 86 at 5:4; ECF 92 at 1:12. If all pending motions to intervene are granted, and all intervenors are allowed to file full-length motions to dismiss, that could amount to 150 pages of briefing on Defendants' side of the case, before replies are even factored in.[5] None of the movants on Defendants' side has demonstrated an interest worth subjecting the Court or Plaintiffs to such voluminous briefing. Nor can Plaintiffs reasonably be expected to respond to such voluminous briefing without additional time and

---

[4] None of these California regulations is an "electric vehicle mandate." Some of the provisions of ACCII and ACT require the sale of *zero-emission* vehicles, but those vehicles need not be *electric* vehicles. *E.g.*, Cal. Code Regs., tit. 13, § 1962.4(b). And the Omnibus regulation simply requires certain vehicles with tailpipe emissions—*e.g.*, not electric vehicles—to emit less. *See id.* § 1956.8(a)(2)(C), (a)(2)(D).

[5] That also does not account for amicus briefs that may be filed in support of those motions to dismiss. Indeed, three motions seeking leave to file such amicus briefs have already been filed to date. ECF 120, 138, 139.

10

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-072**

pages. Plaintiffs should not be burdened with having to seek that relief from the Court; and the Court should not be burdened by having to resolve disputes between Defendants over who should jointly brief with whom, under what page limits. Similar challenges and issues will arise in all motion practice and merits briefing throughout the case—and that assumes each group that moved to intervene will continue to file jointly, which is far from guaranteed. Critically, there is no countervailing efficiency gained by WSTA's and CIAQC's participation; they seek to intervene as defendants, not plaintiffs, and do not contend that there is a "separate action that [they] may bring" that could instead be "part of this action," promoting judicial economy. *In re Wells Fargo & Co. Hiring Pracs. Derivative Litig.*, No. 22-cv-05173-TLT, 2023 WL 4536883, at *4 (N.D. Cal. July 13, 2023).[6]

If granted intervention, WSTA and CIAQC would not be "another party in the case," Mot. 16:11 (quoting *Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 825 (9th Cir. 2021)); they could very well be the 20th and 21st on the side of Federal Defendants. *Contra Kalbers*, 22 F.4th at 825 ("three parties are more than two").[7] That result is neither equitable nor practical. To prevent this already complex case from becoming unmanageable, this Court should exercise its discretion and decline to permit Movants' intervention. *See Montgomery v. Rumsfeld*, 572 F.2d 250, 255 (9th Cir. 1978) ("The district judge acted well within his discretion when he decided that 13 additional plaintiffs would unnecessarily delay and complicate the case."); *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987) ("[I]n a complex case . . . a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference."). At most, WSTA and CIAQC

---

[6] As to the Zero Emission Transportation Association's unopposed motion to intervene as a plaintiff-intervenor, *see* ECF 43, that association is in a materially different position than the movant-defendant-intervenors. For example, Zero Emission Transportation Association's participation will increase rather than impede judicial efficiency because it could bring a separate lawsuit on legal issues in common with those presented by Plaintiffs' suit. We respectfully request that the Court consider acting on that unopposed motion, which, if granted, would allow the October 23 hearing to focus solely on the multiple contested motions by the movant-defendant-intervenors.

[7] Notably, the *Kalbers* line of cases stands for the proposition that future delay associated with adding another party to the case should not bear on the question of whether the motion to intervene was timely in the first instance, as Rule 24(a)(2) requires. Those cases do not hold that delay caused by adding more parties is irrelevant to the question of prejudice under Rule 24(b).

11

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-073**

should instead be permitted to present their views in an amicus brief, as numerous other groups are now seeking to do. *See supra* n.5; *see also United States ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 756 (9th Cir. 1993) (affirming district court decision to deny permissive intervention but allow movant to participate as amicus curiae).

### III.    IF THE COURT GRANTS INTERVENTION, IT SHOULD EXERCISE ITS DISCRETION TO IMPOSE REASONABLE CASE MANAGEMENT CONDITIONS

If the Court nonetheless intends to grant WSTA's and CIAQC's intervention, and in light of the concerns identified above, Plaintiffs respectfully request that the Court impose reasonable limitations on their participation. Such conditions are authorized under Federal Rule of Civil Procedure 24(a) and 24(b), are routinely applied, and will help promote judicial efficiency. *See Stringfellow*, 480 U.S. at 382-83 & n.2 (Brennan, J., concurring in part and concurring in the judgment) (confirming district courts have discretion to limit intervention as of right and even more discretion to limit permissive intervention (citing Advisory Committee Notes, Fed. R. Civ. P. 24)); *Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-cv-00344-JSW, 2021 WL 4552144, at *3 (N.D. Cal. May 3, 2021) (barring defendant-intervenors from initiating discovery and directing parties to meet and confer on case schedule allowing for efficient adjudication of anticipated motion to dismiss and motions for summary judgment); *California v. Health & Human Servs.*, No. 17-cv-05738-HSG, 2017 WL 6731640, at *9 (N.D. Cal. Dec. 29, 2017) (limiting issues in the case to those raised by the original parties).

In particular, Plaintiffs request the following conditions:

(1) WSTA and CIAQC shall not initiate discovery;

(2) WSTA's and CIAQC's arguments and defenses shall be limited to those claims and issues raised in any operative complaints;[8]

(3) if two or more sets of private movant-intervenor-defendants are granted intervention, they shall be required to jointly brief and argue all dispositive motions; and

---

[8] WSTA and CIAQC preemptively respond to this condition, asserting that they "do not intend to bring any counterclaims or crossclaims." Mot. 17:12-13. If that is so, then the condition should not prejudice them.

12

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-074**

(4) all such private intervenor-defendants shall otherwise file papers and appear before the Court in the same groups that moved to intervene together. For example, WSTA and CIAQC, if granted intervention, would be required to appear jointly on all non-dispositive motions and at all status conferences.[9]

In addition, Plaintiffs respectfully request that the Court impose the following procedural conditions on all parties, including all intervenors:

(1) the parties must meet and confer at least two weeks before the filing of any dispositive motion and submit a joint proposed briefing schedule to the Court at least one week before the motion's filing; and

(2) the combined total page limit of any intervenor briefs on any dispositive motion must be limited to two-thirds of the page limit allowed to the original parties that the intervenor is supporting. In other words, defendant-intervenors would, collectively, be limited to two-thirds the pages available to Federal Defendants, and plaintiff-intervenors would, collectively, be limited to two-thirds the pages available to Plaintiff States.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motion to intervene. In the alternative, Plaintiffs respectfully request that the Court impose the case management conditions described above to avoid prejudice to Plaintiffs.

---

[9] That American Free Enterprise Chamber of Commerce et al. and American Fuel & Petrochemical Manufacturers et al. filed a joint reply on their separate motions to intervene, ECF 88, illustrates that further consolidation may be both appropriate and achievable.

13

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-075**

Dated:  September 29, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
455 Golden Gate Ave., Ste. 11000
San Francisco, CA 94102
Telephone:  (415) 510-3545
Fax:  (510) 622-2270
E-mail: Cecilia.Segal@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

*/s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6285
carrie.noteboom@coag.gov

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**ANDREA JOY CAMPBELL**
*Attorney General for the Commonwealth of Massachusetts*

*/s/ Seth Schofield*
SETH SCHOFIELD *
Senior Appellate Counsel
JON WHITNEY*
Special Assistant Attorney General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, 18th Flr.
Boston, Mass. 02108
(617) 727-2200
seth.schofield@mass.gov
jon.whitney@mass.gov

14

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-076**

**MATTHEW J. PLATKIN**
*Attorney General for the State of New Jersey*

*/s/ Lisa J. Morelli*
LISA J. MORELLI
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
(609) 376-2740
Lisa.Morelli@law.njoag.gov

**RAÚL TORREZ**
*Attorney General for the State of New Mexico*

*/s/ William Grantham*
WILLIAM GRANTHAM*
Assistant Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 717-3520
wgrantham@nmdoj.gov

**LETITIA JAMES**
*Attorney General for the State of New York*

*/s/ Ashley M. Gregor*
ASHLEY M. GREGOR*
Assistant Attorney General
Environmental Protection Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8454
ashley.gregor@ag.ny.gov

**DAN RAYFIELD**
*Attorney General for the State of Oregon*

*/s/ Paul Garrahan*
PAUL GARRAHAN*
Sr. Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.oregon.gov

**PETER F. NERONHA**
*Attorney General for the State of Rhode Island*

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Chief, Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

/s/ *Hannah Yindra*
HANNAH YINDRA*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

**NICHOLAS W. BROWN**
*Attorney General for the State of Washington*

*/s/ Alexandria Doolittle*
ALEXANDRIA K. DOOLITTLE*
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504-0117
(360) 586-6769
Alex.Doolittle@atg.wa.gov

15

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

**SER-077**

*Admitted pro hac vice

Pursuant to Local Rule 5-1(i), I attest that all signatories to this document concurred in its filing.


/s/ Cecilia D. Segal
Cecilia D. Segal
Counsel for Plaintiff State of California


OK2025401237
92035894

Plaintiffs' Opposition to Mot. to Intervene by Western States Trucking Association, Inc. et al. (4:25-cv-04966-HSG)

SER-078

Robert Henneke* (TX 24046058)
Theodore Hadzi-Antich (CA 264663)
Eric Heigis (CA 343828)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:   (512) 472-2700
Email:       tha@texaspolicy.com

*Attorneys for Proposed Intervenor-Defendants*
*Western States Trucking Association, Inc. and*
*Construction Industry Air Quality Coalition, Inc.*

\*Motion for admission *pro hac vice* forthcoming

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | No.  4:25-cv-04966-HSG |
| *Plaintiffs,* | |
| v. | **MOTION TO INTERVENE AS DEFENDANTS BY WESTERN STATES TRUCKING ASSOCIATION AND CONSTRUCTION INDUSTRY AIR QUALITY COALITION** |
| UNITED STATES OF AMERICA, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendants.* | Date:     November 20, 2025<br>Time:     2:00 p.m.<br>Courtroom: 2, 4th Floor, Oakland Courthouse<br>Judge:     Hon. Haywood S. Gilliam, Jr. |

i

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................ iii

Motion to Intervene ............................................................................................ 1

Memorandum of Points and Authorities ............................................................ 1

Statement of Issues ............................................................................................ 3

Background ......................................................................................................... 3

     I.     The Clean Air Act and Federal Preemption of Emission Standards ...... 3

     II.    California Imposes an Electric Vehicle Mandate for Cars and Trucks .. 4

     III.   EPA Issues CAA Section 209 Waivers for California's Electric Vehicle Mandate ........................................................................................ 5

     IV.   Congress Repeals EPA's Waivers .......................................................... 6

     V.    The ACT Rule and Omnibus Program Will Harm WSTA and CIAQC ................................................................................................... 6

Standard to Intervene ......................................................................................... 7

Argument ............................................................................................................ 8

I.    Movants Are Entitled To Intervene as of Right Because They Are the End-Users Affected by the Regulations at Issue .................................... 8

    A.   The motion is timely because it was filed early in the case prior to any substantive proceedings ........................................................ 9

    B.   Movants have a significantly protectable interest in whether the ACT Rule is valid, and this case's outcome may impair Movants' ability to protect that interest ................................................ 9

    C.   The existing parties will not adequately protect Movants' interests in the case ............................................................................ 12

II.   Movants Should Be Granted Permission To Intervene Because There Are Common Questions of Law and Fact Between Movants' Defense and the Main Action ................................................................................ 15

III.  Movants Are Amenable To Certain Limits That Plaintiffs Have Suggested For Other Proposed Intervenor-Defendants ....................... 16

Conclusion ........................................................................................................ 18

Certificate of Service ........................................................................................ 19

Certificate of Compliance ................................................................................. 19

List of Exhibits ................................................................................................. 20

ii

# TABLE OF AUTHORITIES

*Cases:*                                                                                      *Page(s):*

*Arakaki v. Cayetano,*
    324 F.3d 1078 (9th Cir. 2003) ............................................................... 12

*California v. BLM,*
    No. 18-cv-00521-HSG, 2018 U.S. Dist. LEXIS 119379,
    (N.D. Cal. July 17, 2018) ...................................................................... 14

*California v. EPA,*
    940 F.3d 1342 (D.C. Cir. 2019).............................................................. 3

*California ex rel. Lockyer,*
    450 F.3d 436 (9th Cir. 2006) ................................................................ 14

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
    647 F.3d 893 (9th Cir. 2011) ........................................ 7, 8, 10, 11, 12

*Conservation L. Found. of New England, Inc. v. Mosbacher,*
    966 F.2d 39 (1st Cir. 1992) ................................................................... 15

*Diamond Alt. Energy, LLC v. EPA,*
    145 S. Ct. 2121 (2025) ........................................................................... 14

*Donnelly v. Glickman,*
    159 F.3d 405 (9th Cir. 1998) ............................................................... 10

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ............................................................................... 14

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011) ............................................................ 8, 15

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ................................................................. 9

*Kalbers v. United States DOJ,*
    22 F.4th 816 (9th Cir. 2021) ................................................................ 16

*Levin Richmond Terminal Corp. v. City of Richmond,*
    482 F. Supp. 3d 944 (N.D. Cal. 2020) ............................................... 15

*Nooksack Indian Tribe v. Zinke,*
    321 F.R.D. 377 (W.D. Wash. 2017) .................................................... 16

*Nw. Forest Res. Council v. Glickman,*
    82 F.3d 825 (9th Cir. 1996) ............................................................. 9, 10

*Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC,*
    339 F.3d 1146 (9th Cir. 2003) ............................................................. 13

**SER-081**

*Sims v. Fla., Dep't of Highway Safety & Motor Vehicles,*
　　862 F.2d 1449 (11th Cir. 1989) ................................................................... 3

*Smith v. L.A. Unified Sch. Dist.,*
　　830 F.3d 843 (9th Cir. 2016) ..................................................................... 16

*Sw. Ctr. for Biological Diversity v. Berg,*
　　268 F.3d 810 (9th Cir. 2001) ................................................................. 8, 12

*Trbovich v. United Mine Workers of Am.,*
　　404 U.S. 528 (1972) .................................................................................. 13

*United States v. Alisal Water Corp.,*
　　370 F.3d 915 (9th Cir. 2004) ..................................................................... 10

*United States v. City of Los Angeles,*
　　288 F.3d 391 (9th Cir. 2002) ................................................................. 8, 10

*United States v. Oregon,*
　　913 F.2d 576 (9th Cir. 1990) ....................................................................... 9

*W. Watersheds Project v. Haaland,*
　　22 F.4th 828 (9th Cir. 2022) ..................................................................... 7, 8

**Statutes, Regulations and Rules:**

42 U.S.C.
　　§ 7543(a) ............................................................................................. 2, 3, 6
　　§ 7543(b) ...................................................................................................... 2
　　§ 7543(b)(1) ............................................................................................... 3, 4
　　§ 7543(b)(1)(A)-(C) ........................................................................................ 4
　　§ 7507(1) ....................................................................................................... 4

Pub. L. No. 119-15, 139 Stat. 65 (2025) ...................................................... 2, 6

Pub. L. No. 119-16, 139 Stat. 66 (2025) ...................................................... 2, 6

Pub. L. No. 119-17, 139 Stat. 67 (2025) ...................................................... 2, 6

Cal. Code Regs. tit. 13,
　　§ 1962.4 ......................................................................................................... 1
　　§ 1962.4(c)(1)(B) ............................................................................................ 4
　　§§ 1962.4(b); 1963(a) ............................................................................... 2, 5, 6
　　§ 2016(c) .................................................................................................... 2, 5

40 C.F.R. Part 86 .................................................................................................. 3

88 Fed. Reg. 20,688 (Apr. 6, 2023) ..................................................................... 5

90 Fed. Reg. 642 (Jan. 6, 2025) .......................................................................... 5

90 Fed. Reg. 643 (Jan. 6, 2025) .......................................................................... 5

Federal Rule of Civil Procedure 24 .............................................................. 1, 7, 8, 15

*Constitutional Provisions:*

H.R.J. Res. 87, 119th Cong. (2025) ......................................................................... 6

H.R.J. Res. 88, 119th Cong. (2025) ......................................................................... 6

H.R.J. Res. 89, 119th Cong. (2025) ......................................................................... 6

*Other Authorities:*

Cal. Air Res. Bd., States That Have Adopted California's Vehicle
   Regulations, https://tinyurl.com/3ws67cd9 (last updated Apr. 2025) ........... 5, 6

Cal. Air. Res. Bd., Updated Costs and Benefits Analysis for the Proposed
   Advanced Clean Trucks Regulation 14
   (Apr. 28, 2020), https://tinyurl.com/3ws67cd9 ................................................. 10

Cal. Exec. Order No. N-79-20 at 2, *available at* https://tinyurl.com/5hyj3js5 ............. 4

Maeve P. Carey & Christopher M. Davis, Cong. Research Serv., R43992,
   The Congressional Review Act (CRA): Frequently Asked Questions
   (Aug. 29, 2024), https://www.congress.gov/crs-products/R43992 ................... 13

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 20, 2025, at 2:00 p.m. PST, or as soon thereafter as this matter may be heard[1] in the United States District Court for the Northern District of California, 1301 Clay Street, Courtroom 2 (4th Floor), Oakland, CA 94612, Proposed Intervenors Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc. will appear and present their motion to intervene in this case pursuant to Federal Rule of Civil Procedure 24.

## MOTION TO INTERVENE

Pursuant to Federal Rule of Civil Procedure 24 ("Rule 24") and Civil Local Rule 7-2, Western States Trucking Association, Inc. ("WSTA") and Construction Industry Air Quality Coalition, Inc. ("CIAQC") (collectively "Movants") respectfully move to intervene, by right or by permission, as Defendants in this civil action. Movants are entitled to intervene under Rule 24(a)(2). Alternatively, this Court should grant permissive intervention under Rule 24(b)(1)(B). This Motion is supported by the following Memorandum of Points and Authorities, its supporting declarations and exhibits, all pleadings and papers filed in this action, and such other written and oral argument or evidence as may be presented at or before the time the Motion is taken under submission.

## MEMORANDUM OF POINTS AND AUTHORITIES

The State of California adopted an electric vehicle mandate for both passenger cars and heavy-duty vehicles. By model year 2035, all cars and light trucks sold in the state must be electric. Cal. Code Regs. tit. 13, § 1962.4. By model year 2036, all medium- and heavy-duty vehicles sold in California (with some emergency vehicles

---

[1] Movants are aware that this Court has set a hearing on other parties' motions to intervene on October 23, 2025. Dkt. No. 87. Movants are prepared to present this motion on that date and respectfully request hearing this motion at that time. Consolidating the hearings will avoid undue delay and will likely be more convenient for the Plaintiffs and the Court.

1

WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

excepted) must be electric. *Id.* § 2016(c). The express purpose of this mandate is to reduce vehicle emissions. *Id.* §§ 1962.4(b); 1963(a).

The federal Clean Air Act ("CAA") prohibits states from regulating emissions from new motor vehicles. 42 U.S.C. § 7543(a). However, Congress provided a special carveout for California. CAA section 209 allows the Environmental Protection Agency ("EPA") to issue a waiver that allows California to adopt emissions standards that are stricter than federal standards. *Id.* § 7543(b). EPA issued waivers for California's car and heavy-duty electric vehicle mandates in 2025 and 2023, respectively. EPA also issued a waiver that allowed California to implement low nitrogen oxides ($NO_x$) emissions standards for heavy-duty trucks that further incentivizes electric vehicles.

In response, both houses of Congress passed legislation to repeal each of the three waivers. The president signed them into law. *See* Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025). Each of those laws states the EPA's waiver "shall have no force or effect." Without a waiver, the CAA prevents California from enforcing emissions standards that effectively mandate electric vehicles. 42 U.S.C. § 7543(a).

Now California and 10 other states have brought the present lawsuit seeking to invalidate those laws. Plaintiffs seek judicial declarations that the laws are invalid and that therefore the car and heavy-duty electric vehicle mandates are valid and in effect. *See* Pls.' Compl., Dkt. No. 1 at 40.

Movants will suffer severe economic harms if California's electric vehicle mandates take effect. For example, the mandates increase the purchase price for all heavy-duty vehicles sold in the state and reduce the availability of reliable diesel-powered heavy-duty vehicles. Movants' members operate these regulated vehicles in California in the ordinary course of their businesses, and California's electrification mandates would directly increase Movants' costs and decrease their profits.

Accordingly, Movants petitioned for review of EPA's grant of California's waiver application for the electric vehicle mandates. *See Western States Trucking Ass'n et al.*

2

WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

*v. U.S. Envtl. Prot. Agency*, No. 23-1143 (D.C. Cir.), and Movants' case in the D.C. Circuit remains pending. But for the filing of the instant case by the Plaintiffs, the laws repealing EPA's waiver grant would not have been put in question and Movants would have been inclined to voluntarily dismiss the pending action in the D.C. Circuit. Now Movants will not agree to dismiss that case until the instant case is finally resolved. The outcome in this case—especially on whether a CAA section 209 waiver is a rule—will affect how Movants will litigate (or voluntarily dismiss, as the case may be) their pending case in the D.C. Circuit. For this reason, and for all the reasons stated below in more detail, Movants satisfy the requirements to intervene as of right and for permissive intervention.

## STATEMENT OF ISSUES

1. Whether Movants WSTA and CIAQC are entitled to intervene as of right under Fed. R. Civ. P. 24(a)(2).

2. Whether Movants WSTA and CIAQC should be permitted to intervene under Fed. R. Civ. P. 24(b).

## BACKGROUND

**I.    The Clean Air Act and Federal Preemption of Emissions Standards**

In 1967 Congress amended the CAA to prohibit states from adopting or enforcing "any standard relating to the control of emissions from new motor vehicles." CAA § 209, 42 U.S.C. § 7543(a). "The express language in section 7543(a) indicates Congress's intent to exclusively regulate the control of new motor vehicle emissions prior to their initial sale." *Sims v. Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1455 (11th Cir. 1989). Pursuant to the CAA, the EPA has promulgated national standards for motor vehicle emissions. *See generally* 40 C.F.R. Part 86.

At the same time it enacted the preemption provision, Congress also gave EPA the authority to waive preemption for a state that had its own vehicle emissions standards in 1966. 42 U.S.C. § 7543(b)(1). California is the only state eligible for this waiver. *California v. EPA*, 940 F.3d 1342, 1345 (D.C. Cir. 2019). To be eligible for such

3

a waiver, California must show that its proposed standards are "at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(b)(1). EPA cannot issue a waiver if it finds the standards are arbitrary and capricious, do not address "compelling and extraordinary conditions" within California, or are not consistent with section 202 of the CAA. *Id.* § 7543(b)(1)(A)–(C). If EPA approves the waiver, California can enforce those emissions standards. The CAA allows other states to adopt these standards so long as "such standards are identical to the California standards for which a waiver has been granted." *Id.* § 7507(1). Because it is expensive and inefficient for auto manufacturers to produce two versions of every vehicle—i.e., one that is California compliant and one that meets EPA's federal standards—California's emissions standards become de facto national standards.

## II.     California Imposes an Electric Vehicle Mandate for Cars and Trucks

In September 2020, California Governor Gavin Newsom announced a goal to ban gas-powered cars and trucks by 2035. *See* Cal. Exec. Order No. N-79-20 at 2, *available at* https://tinyurl.com/5hyj3js5. The state legislature never voted on this mandate. Instead, the California Air Resources Board ("CARB") promulgated a series of regulations in 2022 to implement this electric vehicle mandate:

- **Advanced Clean Cars II ("ACC II")** requires light-duty car manufacturers sell an increasing percentage share of electric vehicles between model year 2026 and model year 2035. In model year 2026, 35% of vehicles sold in California must be a "zero-emission vehicle." Cal. Code Regs. tit. 13, § 1962.4(c)(1)(B). By model year 2035, that percentage increases to 100%. *Id.* The ACC II Rule thus prohibits selling gasoline powered cars beginning in 2035.

- **Advanced Clean Trucks ("ACT")** requires medium- and heavy-duty truck manufacturers to sell an increasing percentage of electric vehicles between model year 2024 and model year 2035. *Id.* § 1963.1. Sales of internal-combustion vehicles must be offset with "credits" generated by sales of electric trucks. *Id.* The required offset increases annually and varies by vehicle class.

4

WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

**SER-087**

In model year 2035, the ACT Rule requires manufacturers to offset at least 55% of their Class 2b-3 sales (heavy-duty pickups), 75% of their Class 4-8 sales (from box trucks to semis), and 40% of their Class 7-8 (day and sleeper cab semi-trucks) with zero emission vehicles. *Id.* After model year 2035 the ACT Rule prohibits selling non-electric heavy-duty vehicles in California. *Id.* § 2016(c).

- **Omnibus Low NO$_x$ Program ("Omnibus Program")** sets nitrogen oxides (NO$_x$) emissions standards for model year 2024 and later medium- and heavy-duty vehicles. These standards are set at levels that further incentivize manufacturers to sell electric vehicles and phase out internal combustion engines. *See id.* § 1956.8(a)(2)(C), (D).

The express purpose of these three rules is to reduce new vehicle emissions. *Id.* §§ 1962.4(b); 1963(a). That means California had to seek a CAA section 209 waiver from EPA for each rule.

## III.    EPA Issues CAA Section 209 Waivers for California's Electric Vehicle Mandate

EPA issued waivers for each of the three CARB rules. EPA first issued a waiver for the ACT Rule in 2023. *California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision*, 88 Fed. Reg. 20,688 (Apr. 6, 2023). EPA then issued a waiver for the ACC II Rule in 2025. *California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision*, 90 Fed. Reg. 642 (Jan. 6, 2025). EPA issued a waiver for the Omnibus Program the same day. *California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low NOX Regulation; Waiver of Preemption; Notice of Decision*, 90 Fed. Reg. 643 (Jan. 6, 2025). These waivers allowed California, eleven other states, and the District of Columbia to implement these regulations. *See* Cal. Air Res. Bd., States That

5

WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

**SER-088**

Have Adopted California's Vehicle Regulations, https://tinyurl.com/3ws67cd9 (last updated Apr. 2025).

## IV.   Congress Repeals EPA's Waivers

Following EPA's waiver approvals in 2025, Congress took action to repeal the waivers. In April, three U.S. Representatives introduced joint resolutions to repeal the ACT Rule, ACC II Rule, and Omnibus Program. H.R.J. Res. 87, 119th Cong. (2025); H.R.J. Res. 88, 119th Cong. (2025); H.R.J. Res. 89, 119th Cong. (2025). The legislative text of each resolution named the EPA waiver, included its Federal Register citation, and stated the waiver "shall have no force or effect." *Id.* Each piece of legislation passed the House and Senate without amendment in April and May 2025. *See* 139 Stat. 65–67 (2025) (explaining legislative history). President Trump signed them into law on June 12. *See* Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025). Following that action, federal law unequivocally states that the ACT, ACC II, and Omnibus Program waivers "shall have no force or effect."

As stated above, the express purpose of the ACT Rule, ACC II Rule, and Omnibus Program is to reduce new vehicle emissions. Cal. Code Regs. tit. 13, §§ 1962.4(b); 1963(a). Without a valid waiver in effect, California cannot "attempt to enforce" these standards. 42 U.S.C. § 7543(a).

## V.   The ACT Rule and Omnibus Program Will Harm WSTA and CIAQC

In this lawsuit, Plaintiffs claim the "preemption waivers are valid and in effect" and seek a judicial declaration that the laws repealing the waivers are "unconstitutional, unlawful, void, and of no effect." *See* Pls.' Compl., Dkt. No. 1 at 40. If the ACT Rule and Omnibus Program go into effect, they will inflict serious harm on Movants' members. Movants are trade organizations whose members in California use medium- and heavy-duty trucks as part of the ordinary course of their business. *See* Brown Decl. ¶ 11; Aboudi Decl. ¶ 6; Lewis Decl. ¶ 7. These rules limit the

availability of vehicles needed for WSTA and CIAQC members to profitably conduct their businesses.

The ACT Rule's electric vehicle sales requirement imposes increased market scarcity of reliable and cost-effective diesel-powered heavy-duty vehicles, parts, and supplies necessary to maintaining a profitable fleet. *See* Brown Decl. ¶ 14; Aboudi Decl. ¶ 8; Lewis Decl. ¶ 12. The electric trucks the ACT Rule mandates cost $300,000 more per truck as compared to diesel-powered trucks. Aboudi Decl. ¶ 14. Additionally, as fewer diesel-powered heavy-duty vehicles remain on the road thanks to the knock-on effects of the ACT Rule, the cost of diesel fuel will increase and the prevalence of diesel refueling stations will decrease. *See* Brown Decl. ¶ 15; Aboudi Decl. ¶ 10; Lewis Decl. ¶ 13. If WSTA and CIAQC's members wish to continue operating, these regulations will eventually force them to purchase unreliable electric vehicles that often break down or catch fire. There is no nationwide or even statewide charging infrastructure yet available for such vehicles. Their employees will lose valuable time and be made to risk their lives due to these regulations. *See* Brown Decl. ¶ 16; Aboudi Decl. ¶ 11; Lewis Decl. ¶ 14.

## STANDARD TO INTERVENE

Rule 24 allows a party to intervene as of right in subsection (a) and by permission in subsection (b). Fed. R. Civ. P. 24. The Ninth Circuit uses a four-prong test to analyze intervention as of right under Rule 24(a): (1) whether the applicant has a significantly protectable interest in the subject of the action; (2) whether the action's outcome may, as a practical matter, impair the applicant's ability to protect that interest; (3) whether the motion is timely; and (4) whether the existing parties may not adequately represent the applicant's interest. *See W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022). These factors are not applied rigidly. Courts favor intervention when practical and equitable considerations support it, and the Ninth Circuit has instructed that the rule should be "broadly interpreted in favor of intervention." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893,

897 (9th Cir. 2011). Furthermore, "a district court is required to accept as true the non-conclusory allegations made in support of an intervention motion." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001).

Rule 24(b) allows permissive intervention where the applicant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). To obtain permissive intervention, a party must show: (1) an independent basis for jurisdiction; (2) that the motion is timely; and (3) that its claim or defense shares a legal or factual question with the main action. *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011). But "the independent jurisdictional grounds requirement does not apply . . . in federal-question cases when the proposed intervenor is not raising new claims." *Id*. at 844. The court must also assess whether intervention would "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The Ninth Circuit has explained that courts should construe Rule 24 "broadly in favor of proposed intervenors" to allow "parties with a *practical* interest in the outcome of a particular case to intervene." *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002) (emphasis in original).

## ARGUMENT

This Court should grant this motion because Movants are entitled to intervene as of right under Rule 24(a)(2) and because Movants meet the standard for permissive intervention under Rule 24(b)(1)(B).

**I.     Movants Are Entitled To Intervene as of Right Because They Are the End-Users Affected by the Regulations at Issue.**

Movants satisfy Rule 24(a)(2)'s requirements to intervene as of right. This motion is timely, the Movants have a significantly protectable interest in the subject of this case, this case's outcome will impair Movants' ability to protect that interest, and the existing parties may not adequately represent Movants' interest. *See W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022).

### A.    The motion is timely because it was filed early in the case prior to any substantive proceedings.

"Timeliness is the threshold requirement for intervention." *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990). The Ninth Circuit uses three factors to assess timeliness: "the stage of the proceeding, prejudice to other parties, and the reason for and length of the delay." *Id.* All three factors favor granting the motion.

Movants are seeking to intervene at the very early stages of this case. Movants filed this motion "before any hearings or rulings on substantive matters." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995). Plaintiffs have not filed a preliminary injunction or other substantive motion, and Defendants have not filed an answer or motion to dismiss. The initial case management conference has not yet occurred, and Defendants have until September 19 to respond to the complaint. *See* Dkt. Nos. 8, 81. If "the motion was filed before the district court had made any substantive rulings" there is little risk of prejudice to either party. *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996).

The Ninth Circuit does not use a strict deadline for timeliness when a case is still in its early stages. Even so, this motion was filed well within the timeframe the Ninth Circuit has used for other motions to intervene. *See e.g., Idaho Farm Bureau Fed'n*, 58 F.3d at 1397 (allowing intervention when motion was filed four months after complaint).

Movants are seeking to intervene shortly after this case was filed and before the parties have filed any substantive motions. Movants have not delayed seeking to intervene, and intervening at this early stage in the proceedings will not prejudice the parties. Thus this motion is timely.

### B.    Movants have a significantly protectable interest in whether the ACT Rule is valid, and this case's outcome may impair Movants' ability to protect that interest.

This lawsuit seeks to revive California's ACT Rule. Movants have a significant interest in ensuring the ACT Rule remains repealed.

To establish a significant interest, the movant must show "that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). "The relationship requirement is met 'if the resolution of the plaintiff's claims actually will affect the applicant.'" *United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (quoting *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998)). This test is a "practical, threshold inquiry, and no specific legal or equitable interest need be established." *Citizens for Balanced Use*, 647 F.3d at 897 (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996)) (cleaned up). An economic interest is a significant interest if it is "concrete and related to the underlying subject matter of the action." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004)

Movants are the end-users of the trucks the ACT Rule regulates. At the time it adopted the ACT Rule, CARB estimated as part of its cost-benefit analysis that the rule would impose $9.1 billion in costs on vehicle manufacturers through 2040. *See* Cal. Air. Res. Bd., Updated Costs and Benefits Analysis for the Proposed Advanced Clean Trucks Regulation 14 (Apr. 28, 2020), https://tinyurl.com/3ws67cd9 [hereafter "CARB ACT Rule Cost-Benefit Analysis"]. Vehicle manufacturers will naturally pass on those costs to customers. CARB admitted as much when it noted "ZEVs have higher upfront capital costs for the vehicle and infrastructure investments." *Id.* at 12. As an example, Oakland Port Services, Inc. (a member of WSTA) estimates the ACT Rule will increase its purchase price for new trucks by $300,000. Aboudi Decl. ¶ 14. CARB's cost-benefit analysis and the Aboudi Declaration provide sufficient evidence that this economic impact is concrete.

This economic impact is also directly "related to the underlying subject matter of the action." *Alisal Water Corp.*, 370 F.3d at 919. Plaintiffs have one goal in this suit: revive the ACT Rule, ACC II Rule, and Omnibus Program. *See* Pls.' Compl., Dkt. No. 1 at 40 (prayer for relief requesting the Court "[d]eclare that the three preemption

10

waivers at issue are valid and in effect"). Receiving that relief will impose costs on the end-users of the trucks the ACT Rule regulates. Thus the Movants have an economic interest that satisfies the significant interest test.

Once a court finds Movants have a significant protectable interest, there is often "little difficulty concluding that the disposition of the case may, as a practical matter, affect it." *Citizens for Balanced Use*, 647 F.3d at 898 (cleaned up). All that is required is that the Movants "be substantially affected in a practical sense by the determination made in an action." *Id.* If this Court holds that the ACT Rule Waiver is valid and in effect, Movants will be "substantially affected" by the economic consequences of more costly trucks. *See* Brown Decl. ¶ 14; Aboudi Decl. ¶¶ 8, 14; Lewis Decl. ¶ 12.

The Movants also have a significant interest in this case based on how it can affect the Movants' ACT Rule litigation. Movants are petitioners in *Western States Trucking Ass'n et al. v. U.S. Envtl. Prot. Agency*, Case No. 23-1143 (D.C. Cir.)—a petition for review challenging the ACT Rule. Following Congress's repeal of the ACT Rule waiver, EPA sought to voluntarily dismiss that case.[2] Movants were initially inclined to agree to voluntary dismissal. But Movants ultimately declined consent to voluntary dismissal when Plaintiffs filed the instant case. Thus, this case has already affected how Movants are litigating the separate lawsuit pending in the D.C. Circuit. And a favorable outcome for Plaintiffs will require Movants to continue prosecuting that case once the abeyance has been lifted. But for this lawsuit, Movants could avoid the time and costs associated with litigating its case in the D.C. Circuit.

---

[2]    *Western States Trucking Ass'n v. U.S. Envtl. Prot. Agency* is presently held in abeyance pending the outcome of *Texas v. EPA*, No. 22-1031 (D.C. Cir.), even though the two cases are challenging different rules. *See Western States Trucking Ass'n v. U.S. Envtl. Prot. Agency*, No. 23-1143, Doc. No. 2032808 (D.C. Cir. Dec. 21, 2023). The D.C. Circuit recently placed *Texas v. EPA* in abeyance after EPA indicated it was reconsidering the rule being challenged in that case. *Texas v. EPA*, No. 22-1031, Doc. No. 1208758920 (D.C. Cir. filed July 18, 2025).

Furthermore, this case will likely decide whether the ACT Rule Waiver was a "rule" under the Administrative Procedure Act. After all, each of Plaintiffs' counts relies on the argument that the waivers are not properly considered rules. *See* Pls.' Compl., Dkt. No. 1 ¶¶ 116, 118, 126, 128–32, 137–40, 146–48, 157, 172. Treating such waivers as rules rather than orders or other administrative actions provides avenues that otherwise would not be available for Movants to challenge the ACT Rule and future waivers. The federal government may seek to defend this lawsuit on narrow grounds that may not fully support Movants' position that CAA section 209 waivers should always be treated as rules under the Administrative Procedure Act. This is especially troublesome given the fact that the Federal Defendants in this case are also defendants in the ACT Rule challenge pending in the D.C. Circuit, where Movants are plaintiffs rather than defendants. No court has explicitly decided whether a CAA section 209 waiver is a rule. Movants have a strong interest in the outcome of this argument, and a favorable outcome for Plaintiffs could, as a practical matter, impair that interest. Thus Movants have a significantly protectable interest in the subject of this case, and its outcome could impair Movants' ability to protect its interest.

### C. The existing parties will not adequately protect Movants' interests in the case.

The Defendants will not adequately represent Movants' interest in this case. "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)). Although there is a presumption of adequate representation when the Movant and parties share an ultimate objective, "it is sufficient for Applicants to show that, because of the difference in interests, it is likely that Defendants will not advance the same arguments as Applicants." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 824 (9th Cir. 2001). Private parties need not prove an actual conflict with the government; it is sufficient that the

government's representation "'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

Movants' interests diverge from Defendants in three ways. *First*, Defendants are likely to argue for dismissal on narrow grounds. *Second*, the federal government has a history of changing positions on CAA section 209 waivers. *Third*, Movants have economic interests and interests as regulated parties that the government Defendants do not represent.

Defendants are likely to focus their argument on justiciability.[3] Movants frequently challenge the federal government's actions, especially climate regulations. Deciding this case on justiciability grounds alone could make it more difficult for Movants to bring cases against the federal government in the future. Instead, Movants will primarily focus their arguments on the fact that EPA's waivers are rules under the APA, meaning Congress acted properly under the Congressional Review Act ("CRA"). Movants will also argue that—notwithstanding the CRA—the Constitution empowers Congress to revoke an agency's authority, and that there is no private right of action to enforce the Senate's rules. As explained in its proposed Motion to Dismiss (attached as Exhibit D), the CRA is a procedural mechanism that allows Congress to invalidate an agency rule using expedited procedures. It expedites consideration by limiting debate on a qualifying resolution of disapproval in the Senate to ten hours. *See generally* Maeve P. Carey & Christopher M. Davis, Cong. Research Serv., R43992, The Congressional Review Act (CRA): Frequently Asked Questions (Aug. 29, 2024), https://www.congress.gov/crs-product/R43992.

It should also be noted that Movants are suing many of the same federal defendants in *Western States Trucking Ass'n et al. v. U.S. Envtl. Prot. Agency*. Movants

---

[3] Movants will also argue for dismissal based on justiciability, but only so that they do not forfeit this alternative ground for dismissal. Movants also recognize that a "federal court's jurisdiction is a threshold question." *Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am.*, LLC, 339 F.3d 1146, 1148 (9th Cir. 2003).

13

WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

should not have to rely on an adverse party from another case to represent its interests here.

The federal government has a history of changing positions in cases involving CAA section 209 waivers. *See, e.g.*, *California v. Wheeler*, No. 19-1239 and consolidated cases (D.C. Cir.) (challenge to withdrawal of ACC I waiver); *see also Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2130–31 (2025) (explaining that the Bush EPA denied the ACC I waiver in 2008, the Obama EPA granted it in 2013, the Trump EPA rescinded it in 2019, and the Biden EPA reinstated it in 2022). Additionally, EPA's change in position on whether these three waivers are rules arguably sparked the instant lawsuit. It is far from speculative that Defendants could change positions again, as is their right. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). If that happens, Defendants may seek to settle this case or choose not to appeal an adverse ruling. Movants' participation in this case will ensure their interests are protected against the federal government's changing positions.

Finally, Defendants do not represent Movants' significant economic interests in this case. The Ninth Circuit has recognized government defendants represent the public interest at large, which may differ from an industry group's parochial interests. *California ex rel. Lockyer*, 450 F.3d 436, 445 (9th Cir. 2006). This Court has also allowed intervention in part because an industry association's direct economic interest differs from a federal government defendant's interest in the case. *California v. BLM*, No. 18-cv-00521-HSG, 2018 U.S. Dist. LEXIS 119379, at *24 (N.D. Cal. July 17, 2018) (noting the proposed intervenors "have a 'direct economic stake' in this controversy"). Here, while both Defendants and Movants are interested in defending Congress's action, the economic stakes are much higher for Movants. If Movants lose this case, it will cost them dearly. *See* Brown Decl. ¶ 14; Aboudi Decl. ¶¶ 8, 14; Lewis Decl. ¶ 12. Even Plaintiff California agrees that the increased costs associated with the relevant

14

emissions standards could run into the billions. CARB ACT Rule Cost-Benefit Analysis, *supra*, at 12, 14. If Defendants lose, they will not suffer economic loss. This divergent interest also supports intervention.

In a similar way, the federal government, as a regulator, does not have the same interests as a regulated party. *See Conservation L. Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) (explaining that the Secretary of Commerce could not adequately represent groups who are presently subject to the Secretary's regulations). Movants' members are subject to regulations from both Plaintiff State of California and Defendant EPA. Like in *Mosbacher*, Movants cannot rely on one of its regulators (i.e. EPA, whom it is currently suing in another case over one of the waivers at issue here) to represent its interests in the instant case. For these reasons, Movants have satisfied their "minimal" burden of showing inadequate representation.

Because Movants satisfy Rule 24(a)(2)'s requirements, they are entitled to intervene as of right.

## II.   Movants Should Be Granted Permission To Intervene Because There Are Common Questions of Law and Fact Between Movants' Defense and the Main Action.

Movants also satisfy Rule 24(b)'s requirements for permissive intervention. Movants need not show an independent basis for jurisdiction, since this is a federal question case and Movants will not raise any new claims. *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011). For the reasons stated above, this motion is timely. Thus the Court need only consider whether there is a common question of law and fact with the main action and whether intervention will cause undue delay or prejudice. *See id.* at 843; Fed. R. Civ. P. 24(b)(2)(B), (b)(3).

Movants seek to defend Public Laws 119-15, 119-16, and 119-17 against each of the Plaintiffs' claims. Thus they share a common question of law and fact with the main action. *See Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 968 (N.D. Cal. 2020) ("Proposed intervenors intend to defend the Ordinance

against each of the claims raised in plaintiffs' complaints, and thus, their defenses share common questions of law with the main action."). Movants' interest in this case "arises from the same set of facts as Plaintiff[s'] claims." *Nooksack Indian Tribe v. Zinke*, 321 F.R.D. 377, 383 (W.D. Wash. 2017). Movants do not need additional discovery and do not seek to inject extraneous claims into this case. They seek to defend the same claims that Plaintiffs have brought against the Defendants. Thus the Movants' defenses "undisputed[ly]" share common questions of fact. *Id.*

Allowing permissive intervention will not cause undue delay or prejudice. Movants need no additional time to fully participate in this case. Plaintiffs cannot argue that Movants' mere request to intervene is prejudicial. "[T]he fact that including another party in the case might make resolution more difficult does not constitute prejudice." *Kalbers v. United States DOJ*, 22 F.4th 816, 825 (9th Cir. 2021) (quoting *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 857 (9th Cir. 2016)) (cleaned up). As explained below, Movants will work with other intervenors to avoid duplicative briefing and will work with all parties on reasonable case-management orders to ensure Movants' participation does not cause any undue delay.

Because Movants satisfy Rule 24(b)'s requirements for permissive intervention, the Court should grant permission to intervene as defendants.

### III. Movants Are Amenable To Certain Limits That Plaintiffs Have Suggested For Other Proposed Intervenor-Defendants.

Movants are aware that Plaintiffs have proposed case management conditions in its opposition to other proposed intervenor-defendants' motions. Dkt. No. 84 at 10. To expedite resolution of these issues, Movants will address those proposed conditions here.

Plaintiffs have proposed the following conditions: (1) intervenors may not initiate discovery; (2) intervenors are limited to those claims and issues raised in Plaintiffs' complaint; (3) intervenors must jointly brief and argue all dispositive motions; (4) all parties must meet and confer two weeks prior to filing a dispositive

motion and must submit a joint proposed briefing schedule one week before the motion is filed; and (5) a combined total page limit for intervenors' briefs set at two-thirds the limit of the brief for the party they are supporting.

*First*, like Proposed Intervenor-Defendants American Free Enterprise Chamber of Commerce and American Fuel & Petrochemical Manufacturers, Movants believe discovery is unnecessary for all parties because this case involves only pure questions of law. *See* Dkt. No. 88 at 20. Movants would consent to a mutual waiver of discovery in this case. However, like the other Proposed Intervenor-Defendants, Movants would oppose limiting intervenors' discovery rights without also limiting Plaintiffs' discovery.

*Second*, as to limiting claims and defenses, Movants seek to defend Public Laws 119-15, 119-16, and 119-17 against each of the Plaintiffs' claims. Movants do not intend to bring any counterclaims or crossclaims.

*Third*, Movants are willing to work with other Proposed Intervenor-Defendants on consolidated briefing to avoid duplication. However, Movants would request that any orders on consolidated briefing take place once all Intervenor-Defendants (and any Intervenor-Plaintiffs) are known so that they can properly align their interests on briefs and motions.

*Fourth*, for these same reasons, the notice and briefing schedule conditions are premature and should be revisited once all Intervenor-Defendants (and any Intervenor-Plaintiffs) are known.

*Fifth*, Movants would tend to oppose Plaintiffs' proposed page limits. A major reason for Movants' request to intervene is to ensure its interests, which no other party represents, receive full and fair consideration. Movants have already explained the reasons why Defendants do not adequately represent their interests. Until all of the intervenors are known, Movants would be reticent to agree to allow other Intervenor-Defendants to represent their interests on an abbreviated brief. If the

Court is inclined to impose page limits, Movants request it revisit this matter after it has decided all motions to intervene.

## CONCLUSION

Movants have demonstrated they meet the requirements for intervention as of right and permissive intervention. This motion is timely, Movants have a significant protectable interest in the validity of California's electric vehicle mandates that is not adequately represented by Defendants, and Movants' defense shares common questions of law and fact with this case. For these reasons, the Court should grant WSTA and CIAQC's motion to intervene as defendants.

Dated: September 15, 2025            Respectfully submitted,

/s/ Theodore Hadzi-Antich
Robert Henneke* (TX 24046058)
Theodore Hadzi-Antich (CA 264663)
Eric Heigis (CA 343828)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Email:        tha@texaspolicy.com

*Attorneys for Proposed Intervenor-Defendants Western States Trucking Association, Inc., and Construction Industry Air Quality Coalition, Inc.*

*Motion for admission pro hac vice forthcoming

18
WSTA and CIAQC's Motion to Intervene (4:25-cv-04966-HSG)

**SER-101**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, I served WSTA's and CIAQC's Motion to Intervene by filing with the Clerk of the Court for the Northern District of California by using the CM/ECF system, causing electronic service upon all counsel of record.

*/s/Theodore Hadzi-Antich*
Theodore Hadzi-Antich

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the form requirements of Local Rule 7-2(b) because it does not exceed 25 pages in length.

*/s/Theodore Hadzi-Antich*
Theodore Hadzi-Antich

## LIST OF EXHIBTS

A.    Declaration of Lee Brown

B.    Declaration of William Aboudi

C.    Declaration of Michael Lewis

D.    Proposed Motion to Dismiss

E.    Proposed Answer

F.    Proposed Order

**SER-103**

## Hecker Fink LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.HECKERFINK.COM

DIRECT DIAL      646.741.5693
DIRECT EMAIL     mtotaro@heckerfink.com

July 29, 2025

**BY CM/ECF**

The Honorable Haywood S. Gilliam, Jr.
United States District Court
Northern District of California
Oakland Courthouse, Courtroom 2 – 4th Floor
1301 Clay Street, Oakland, CA 94612

> Re:   *California v. United States, No. 4:25-cv-04966-HSG (N.D. Cal.)—*
> *Defendants' revised position on ZETA's intervention motion*

Dear Judge Gilliam:

On July 25, 2025, Zero Emission Transportation Association (ZETA) filed a motion to intervene, along with a proposed complaint, in the above-captioned lawsuit. *See* Doc. 43. The motion stated that "Plaintiffs do not oppose this motion," but "Defendants oppose this motion." *Id.* at 2 n.2. Today, Defendants informed ZETA that they are withdrawing their opposition to ZETA's motion to intervene and take no position on the motion. Accordingly, ZETA's motion is now unopposed.

Respectfully submitted,

/s/ *Martin Totaro*
Martin Totaro

**SER-104**